No. 24-1104

---

### United States Court of Appeals
### for the Federal Circuit

_____

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY,

*Petitioners,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

_____

**MOTION FOR STAY PENDING JUDICIAL REVIEW**

_____

Brian R. Stimson
Sara M. Lord
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

November 1, 2023

## I.    INTRODUCTION AND RELIEF SOUGHT

Pursuant to Federal Rules of Appellate Procedure 18 and 27-32, and Federal Circuit Rules 18 and 27-32, Petitioners Metropolitan Area EMS Authority, a.k.a. MedStar Mobile Healthcare (MedStar), Altoona Logan Township Mobile Medical Emergency Department Authority (AMED), Valley Ambulance Authority (VAA), and Quaker Valley Ambulance Authority (QVAA) file this motion for a stay pending judicial review of the U.S. Department of Veterans Affairs' (VA) final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023).  The final rule, which becomes effective on February 16, 2024, will drastically reduce the rates paid by VA on claims for hundreds of thousands of non-contract ambulance transports every year. VA currently pays 100% of the actual charges for these claims; the final rule will slash payments to the "lesser of" the actual charges or the Medicare Fee Schedule (MFS) amount.  The MFS amount is invariably less than not only the actual charges, but also the cost of providing the transport.  The payment of the MFS amount will irreparably harm MedStar and AMED by forcing them to downsize their operations through layoffs.  It will also irreparably harm VAA and QVAA by starving them of funds they need to deliver services in their capacities as § 501(c)(3) charitable organizations.

This Court should prevent the irreparable harm because the final rule violates 38 U.S.C. § 502 and the Administrative Procedure Act (APA) provisions codified at

1

5 U.S.C. §§ 706(2)(A) and (C).  The final rule is not in accordance with law, and in excess of statutory authority, because it is overbroad to the point of rendering one of VA's statutory authorities, 38 U.S.C. § 1728, meaningless.  The final rule is also irreconcilable with the very statute it purports to implement: 38 U.S.C. § 111.  These legal errors are substantial and demand a stay.

What is more, Petitioners are likely to succeed in showing that the final rule violates 38 U.S.C. § 502, and 5 U.S.C. §§ 611(a)(2) and 706(a)(2)(A), because it is arbitrary and capricious.  One glaring example of arbitrary and capricious reasoning is VA's certification under the Regulatory Flexibility Act (RFA) that the final rule "will not have a significant economic impact on a substantial number of small entities."  VA based that certification on economic projections from 2020 that are undercut by VA's own data on its payments of actual charges in 2022.  The data shows that the projections in 2020 understated the final rule's economic impact *by a factor of five*.  Yet VA still made the certification and finalized the rule without conducting a regulatory flexibility analysis.  It is manifestly irrational for an agency to finalize a rule *that is gutted by the agency's own data*.

The balance of the equities here strongly favors a stay.  VA set the status quo. Neither the public nor veterans have an interest in the implementation of an unlawful rule.  To the contrary, a stay will maintain veterans' current level of access to

ambulance services.  This Court should accordingly stay the final rule pending the completion of judicial review.[1]

## II.    THE LEGAL AND FACTUAL GROUNDS FOR THIS MOTION

### A.    THE STATUTORY AND REGULATORY FRAMEWORK

Congress has expressly defined and limited the authority of the Secretary for Veterans Affairs to set payments for non-contract ambulance transports. In 38 U.S.C. §§ 1728(a)-(b), Congress directed the Secretary to "reimburse veterans … for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111 of this title)," or, "in lieu of reimbursing such veteran, [to] make payment of the reasonable value of emergency treatment directly" to the provider.  Section 1728 aligns with 30 U.S.C. § 111(a), which authorizes the Secretary to pay "the actual necessary expense of travel . . . of any person to or from a Department facility or other place."  Within § 111, however, Congress carved out a limited exception "[i]n the case of transportation of a person to or from a Department facility by ambulance." 38 U.S.C. § 111(b)(3)(C). Congress gave the Secretary discretion, only in such a case, to pay "the lesser of the actual charge for the transportation or the [MFS amount] unless the Secretary has entered into a contract for that transportation … ." *Id.*

---

[1] Petitioners sought the Secretary's position on this motion at 8:55 a.m. on November 1, 2013.  They have not yet received a response.

3

The current regulation implementing § 111 states that VA pays the "actual cost" for *all* non-contract ambulance transports. 38 C.F.R. § 70.30(a)(4).

The Secretary has not previously invoked the limited discretionary authority, granted in § 111(b)(3)(C), to pay the lesser of the actual charge or the MFS amount for non-contract ambulance transports to or from Department facilities.

### B.    THE INTERPRETIVE AND FINAL RULES

On May 2, 2022, VA issued an interpretive rule in the form of guidance explaining its authorities on non-contract ambulance transports.  VA, *Fact Sheet: VHA Office of Integrated Care – Ambulance Transportation*, available at: https://www.va.gov/COMMUNITYCARE/docs/pubfiles/factsheets/FactSheet_20-44.pdf# (May 2, 2022).[2]  VA explained that it pays for Authorized Transports under 38 C.F.R. § 17.4020(c) (which implements the Veterans Community Care Program, authorized at 38 U.S.C. § 1703), and for certain Unauthorized Emergency Transport under 38 USC § 1728, at "[g]enerally billed charges." *Id*.

The May 2022 interpretive rule makes no mention of paying for non-contract emergent ambulance transports pursuant to 38 U.S.C. § 111(b)(3)(C).

In the final rule, however, VA has not only adopted the "lesser of" methodology to pay for non-contract ambulance transports *to or from Department*

---

[2] VA documents are subject to judicial notice.  *See Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1151, n.1 (Fed. Cir. 2021).

*facilities* but has extended it to cover *all* non-contract ambulance transports.  The final rule states: "VA will pay the lesser of the actual charge for ambulance transportation or the [MFS amount]," unless VA has a contract with the provider, "in which case the terms of the contract will govern VA payments." 88 Fed. Reg. at 10,036.  This language is so broad that it reaches all ambulance transports that VA currently pays under 38 U.S.C. §§ 1703 and 1728.  Most of those transports are emergent ones that are to and from places besides Department facilities, such as roadsides accident scenes, personal residences, and private hospitals.

The final rule thus overrides the requirement in 38 U.S.C. § 1728 to pay either the "customary and usual charges" to the veteran, or the "reasonable value of emergency treatment" to the provider.  It also exceeds the limited authority to set lower rates for non-contract ambulance transports to or from Department facilities that Congress granted to the Secretary in 38 U.S.C. § 111(b)(3)(3).

### C.    THE FLAWED REASONING BEHIND THE FINAL RULE

In the final rule, multiple commenters expressed concerns about the effects that payment of the MFS amount will have on their operations.  One commenter noted that the MFS amount was less than 50 percent of its operating costs, and that payment of the MFS amount would hinder its ability to serve rural areas, cause a loss of several million dollars for the company, and impact the rest of emergency air medical services throughout the United States.  88 Fed. Reg. at 10,033.  Another

commenter urged VA to work with the U.S. Department of Health and Human Services (HHS) to bring the MFS amount closer to the actual cost of providing the service. *Id*. at 10,034. Numerous commenters noted that the Centers for Medicare & Medicaid Services (CMS), an operating division of HHS, is collecting ambulance cost data, and urged VA to delay and revisit the rulemaking once CMS has finished the collection and determined a fair rate. *Id*. at 10,034 – 10,035.

VA brushed these concerns aside. It responded that, since Congress gave VA discretion in 38 U.S.C. § 111(b)(3)(C) to elect to pay the "lesser of" the actual charge or the MFS amount for non-contract ambulance transports to or from Department facilities, the decision to apply the "lesser of" methodology to *all* non-contract ambulance transports was authorized. *Id*. at 10,033. It also told commenters that it would address rural access issues through contracting. *Id*. at 10,034.

VA further justified the final rule by certifying under the RFA that the final rule "will not have a significant economic impact on a substantial number of small entities … ." 88 Fed. Reg. at 10,036. VA based its certification on its cursory Regulatory Impact Analysis (RIA), which projected that charges for non-contract ambulance transports would total $1,458,899,847 from 2021 through 2025; that total payments under the final rule would be $1,259,322,348; and, thus, that the final rule would yield savings of $199,577,499 over five years. *Rates that VA Pays for Special Modes of Transportation*, available at: https://www.regulations.gov/document/VA-

2020-VHA-0022-0002 (posted Nov. 4, 2020).

VA's own data for 2022, produced in response to a Freedom of Information Act request, shows that the RIA was far off the mark. In fact, *in fiscal year 2022 alone,* VA actually paid $1,653,725,407 in actual charges for non-contract ambulance transports. VA, *Initial Agency Decision on FOIA Request #23-09227-F,* p. 5 (Aug. 18, 2023) (attached as Exhibit 1). Thus, VA's outdated RIA *underestimated* the final rule's impact by *a factor of five*.

### D.     THE VA PROVIDER CONTRACTING INITIATIVES

VA has tried unsuccessfully to backstop the final rule through shifting contracting initiatives rolled out over three industry days.

During the first industry day on May 25, 2023, VA announced that each of the 172 VA Medical Centers (VAMCs) nationwide would solicit contracts for ambulance transports for its entire catchment area. VA, *V225—Veteran's Health Administration (VHA) Ambulance Industry Day May 25, 2023*, SAM.GOV, May 25, 2023, at 7, https://sam.gov/opp/b2330d309b45469fa81782d128e7ed4c/view. VA assured providers that it had sufficient resources to contract with all willing providers by February 16, 2024. VA, *Amendment to Special Notice re: Ambulance Industry Day May 25, 2023*, SAM.GOV, May 25, 2023, at Question 3 and Answer 3, https://sam.gov/opp/b2330d309b45469fa81782d128e7ed4c/view.

VA held its second industry day on July 20, 2023. It announced that VAMC contracts with ambulance providers would apply "to all VA-initiated ambulance trips," but not to ambulance transports initiated through the 9-1-1 system, which "would be paid at the Medicare rate" under the final rule. VA, *V225—2nd Ambulance Industry Day July 20, 2023 Sessions 1 and 2*, SAM.GOV, July 20, 2023, at 7, https://sam.gov/opp/559aa333057a46a6914e85b09afc7294/view; Declaration of Brian Stimson, ¶ 11, Tab 7 at MEDSTAR_000128. (attached as Exhibit 2). With that change implemented, VA was confident it would have "contracts at every [VAMC]" by February 16, 2024. *Id.*, ¶ 11, Tab 7 at MEDSTAR_000115.

VA muddled the landscape even further during its third industry day on August 30, 2023. VA disclosed that 78% of all VA dollars paid for ambulance services are for transports initiated through the 9-1-1 system, and that it conducted no independent analysis of the reasonableness or sufficiency of the Medicare rate that it planned to pay for all such transports. *Id.*, ¶ 11, Tab 7 at MEDSTAR_000307. VA reasoned that the Medicare rate is not a VA rate, even when VA applies it to 78% of VA spending on ambulance transports. *Id.,* ¶ 11, Tab 7 at MEDSTAR_000308.

The ambulance providers in attendance expressed serious concerns about the final rule and VA's contracting strategy. *Id.,* ¶ 11, Tab 7 at MEDSTAR_000330. VA assured providers that it was making progress on including provisions in

contracts for VA-initiated transports that would enable VA to pay the contract rate for 9-1-1-initiated transports.  *Id.*, ¶ 11, Tab 7 at MEDSTAR_000336.    VA emphasized that it was "expecting to insert that into our strategy for the solicitations over the next few days," and was "very close to a solution."  *Id.*, ¶ 11, Tab 7 at MEDSTAR_000285.  But one VA official commented that "the idea of taking [the solution] to every provider is [] gonna be a challenge for sure."  *Id.*, ¶ 11, Tab 7 at MEDSTAR_000283.  He acknowledged that "I don't know if [VA] will be able to get to that … ."  *Id.*

As it turns out, that official was prescient.  VA has yet to make good on its assurances or show that it can and will do so by February 16, 2024.  VA has finalized only 33 contracts for VA-initiated ground transports since publishing the final rule on February 16, 2023.  Second Declaration of Gary Watters, ¶ 10 (attached as Exhibit 3).  Only 10 pre-solicitation or solicitation notices for such transports are pending.  *Id.*  Thus, more than 120 of 172 VAMCs have yet to issue pre-solicitation or solicitation notices for such transports.  None of the contracts or notices reach ground ambulance transports initiated through the 9-1-1 system.  *Id.*, ¶ 11.

## E.    THE ADMINISTRATIVE STAY MOTION

On September 27, 2023, MedStar submitted a motion for an administrative stay of the final rule to VA.  Ex. 2, ¶ 4, Tab 1.  MedStar renewed its motion on October 13, 2023.  *Id.*, ¶ 5, Tab 2.  VA acknowledged receipt.  *Id.*, ¶ 6, Tab 3.

Petitioners then renewed the motion again on October 26, 2023. *Id*., ¶ 7, Tab 4. VA acknowledged receipt. *Id.,* ¶ 8, Tab 5. VA then responded via letter that it plans to treat the motion as a request for rulemaking. *Id*., ¶ 14, Tab 10. But the motion was not a request for rulemaking, and even if it was, VA likely lacks sufficient time to complete notice-and-comment rulemaking by February 16, 2024.[3]

With the final rule's effective date fast approaching, it is impracticable for Petitioners to continue to wait for VA to rule upon their motion.

### E.    THE HARM TO PETITIONERS

The final rule will harm all Petitioners, beginning with MedStar. MedStar serves 14 cities in Tarrant, Parker, and Wise Counties, Texas. Declaration of Kenneth Simpson, ¶ 8 (attached as Exhibit 4). More than 100,000 veterans live in Tarrant County. *Id*., ¶ 10. MedStar typically responds to several ambulance calls for veterans every day, most of which are emergent calls received through the 9-1-1 system. *Id*., ¶¶ 11, 12. MedStar projects that the final rule will reduce its revenues by $1.4 million in fiscal year 2024 alone. Ex. 4, ¶ 30. Absent another funding source, MedStar will have no choice but to downsize its workforce to bring its costs in line with its revenues. *Id*., ¶ 32.

---

[3] VA could act now by exercising its authority to proceed without conducting notice-and-comment rulemaking that would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

AMED serves 15 municipalities within Blair County, Pennsylvania, and an additional 8 municipalities in Bedford, Cambria, Centre, and Huntington Counties, Pennsylvania. Declaration of Gary Watters, ¶¶ 7, 8 (attached as Exhibit 5). In 2020, more than 8,400 veterans resided in AMED's service area. *Id.*, ¶ 14. AMED responded to 411 ambulance calls for veterans in fiscal year 2022 and has responded to 479 in fiscal year 2023 to date. *Id.*, ¶ 15. Between 95% and 100% of AMED's total ambulance calls are received through the 9-1-1 system. *Id.*, ¶ 16. AMED expects the final rule to cause a $500,000 drop in revenue in 2024, which will force AMED to lay off employees. *Id.*, ¶¶ 28, 29.

VAA and QVAA serve 15 municipalities in Pennsylvania. Declaration of J.R. Henry, ¶¶ 5-6 (attached as Exhibit 6). They responded to 24 ambulance calls for veterans in fiscal year 2022 and have responded to 30 in fiscal year 2023. *Id.*, ¶ 17. The final rule will harm them by reducing their payments for ambulance transports of veterans in fiscal year 2023-2024 by approximately $10,584. *Id.*, ¶ 36.

VAA and QVAA are charitable organizations under Internal Revenue Code § 501(c)(3). *Id.*, ¶¶ 13-14. Any reductions in revenue deprive them of funds needed to deliver services as charitable organizations. *Id.*

## III.    THE ARGUMENTS FOR THE RELIEF SOUGHT

### A.    STANDARD OF REVIEW

Four factors guide this Court's "discretion to issue a stay … : (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Stand. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (internal citations and quotations omitted). A stay may be appropriate where the applicant "establishes that it has a strong likelihood of success on appeal or, where, failing that, it can nonetheless demonstrate a *substantial case* on the merits, *provided* that the other factors militate in [its] favor." *Id.* at 512 (internal citations and quotations omitted). Where the balance of hardships tips decidedly toward the applicant, "it will ordinarily be enough that the [applicant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.* (same).

"Where, as here, the Government is the opposing party, the last two factors merge: the government's interest *is* the public interest." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102-03 (D.C. Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 411 (D.C. Cir. 2016))

(internal quotations omitted).  A party's likelihood of success on the merits is a strong indicator that a stay "would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action."  *Id*. (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

## B.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS

The final rule is not in accordance with 38 U.S.C. §§ 1728 or 111 and exceeds the Secretary's authority under both statutes.  Petitioners are also likely to show that the final rule is arbitrary and capricious for numerous reasons.

### 1.  The final rule is not in accordance with § 1728

In reviewing VA's interpretation of any statute, this Court must determine whether Congress has spoken directly to the precise question at issue. If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and that ends the matter. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

"[W]hen interpreting … any statute, we do not aim for 'literal' interpretations, but neither do we seek to indulge efforts to endow [VA] with maximum bureaucratic flexibility.  We simply seek the law's ordinary meaning."  *Niz-Chavez v. Garland*, 593 U.S. ---, 141 S.Ct. 1474, 1484 (2021).   Also, "every clause and word of a statute should have meaning."  *U.S, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419 (2023) (internal quotations and citations omitted).  We construe statutory

13

provisions "in harmony, not set them at cross-purposes." *Jones v. Hendrix*, 599 U.S. 465, 478 (2023). "We generally resist attributing to Congress an intention to render a statute … internally inconsistent." *Id*., 479 (internal quotations and citations omitted).

In § 1728(a), Congress directed that the Secretary "shall" reimburse eligible veterans "for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111)." Under § 1728(b), the Secretary "may, in lieu of reimbursing such veteran, make payment of the reasonable value of emergency treatment directly" to the provider. Nothing in § 1728 authorizes VA to pay for ambulance services using the "lesser of" methodology from § 111. Section 1728(a) states only that the "customary and usual charges of emergency treatment" include "travel and incidental expenses under the terms and conditions set forth in section 111." Those terms and conditions control *when* VA pays for travel and incidental expenses, *not the amount* VA pays under any provision. *See* 38 U.S.C. §§ 111(b)(1)-(b)(3)(B).

The application of the "lesser of" methodology to transports paid under § 1728 defeats the text and structure of § 1728. It requires payment of the MFS amount, which is neither a "customary and usual charge" under § 1728(a), nor "the reasonable value of the emergency treatment" under § 1728(b). The Secretary has no authority to override § 1728 through rulemaking.

## 2. **The final rule is not in accordance with § 111**

In § 111(a), Congress authorized VA to pay the "actual necessary expense of travel . . . to or from a Department facility or other place," for eligible beneficiaries in connection with vocational rehabilitation or counseling, or for the purpose of examination, treatment, or care. Within the scope of this authorization, which aligns with the language in §§ 1728(a) and (b), Congress gave VA the option to pay "the lesser of the actual charge … or the [MFS amount]" for ambulance transportation "*to or from a Department facility*," unless VA has entered into a contract with the ambulance provider. 38 U.S.C. § 111(b)(3)(C) (emphasis added).

Section 111(b)(3)(C) limits the "lesser of" methodology to non-contract ambulance transports of "a person to or from a Department facility." A "Department facility" is a "VA facility." *See* 38 C.F.R. § 70.2 ("VA means the Department of Veterans Affairs."). A "VA facility" is one run by the VA. Consistent with this logic, the Secretary defines "VA facility" to mean a "VA Medical Center (VAMC), VA Outpatient Clinic (OPC), or VA Community Based Outpatient Clinic (CBOC)." *Id*. Under § 111(b)(3)(C), *only* non-contract ambulance transports to or from these facilities are subject to the "lessor of" methodology.

Section 111(b)(3)(C) thus occupies a narrow niche within § 111 as a whole. It authorizes the Secretary to pay the "lesser of" actual charges or the MFS amount only for a discrete category of travel: non-contract ambulance transports to or from

one of the three types of VA facilities listed in 38 C.F.R. § 70.2.  It does not reach any other travel within the ambit of § 111(a).

By applying the "lesser of" methodology to all non-contract ambulance transports, the final rule eviscerates the textual limit in § 111(b)(3)(C) and the structure of § 111 as a whole.  The Secretary plainly exceeded his authority under § 111 in the final rule.

### 3. Petitioners are likely to show that the final rule is arbitrary and capricious for numerous reasons

In the rulemaking, VA had to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Assoc. of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006); *Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1267 (D.C. Cir. 2009) ("[W]e require the agency to have identified and explained the reasoned basis for its decision."). At every turn, VA failed to state a satisfactory explanation for its choice to apply the "lesser of" methodology instead of paying actual charges under 38 U.S.C. §§ 1703 and 1728. The repeated failure to do so was arbitrary and capricious.

The Petition sets forth six independent reasons why the final rule is arbitrary and capricious. At least three of those reasons establish a strong likelihood of success that warrants a stay pending judicial review.

*First,* as discussed, VA certified under the RFA that the final rule will not have a "significant economic impact on a substantial number of small entities" when VA's own data shows otherwise. VA based its certification on its RIA from 2020, which projected that charges for non-contract ambulance transports would total $1,458,899,847 from 2021 through 2025, and that total payments under the final rule would drop to $1,259,322,348. VA allocated the difference of $199,577,499 across all 25,000 ambulance providers nationwide, on a pro rata basis, to estimate that "the potential impact per vendor [will] be less than 1 percent of their annual reported receipts." 88 Fed. Reg. at 10,034. But VA had data showing that its payments of actual charges for non-contract ambulance transports *in fiscal year 2022 alone* were $1,653,725,407, or $194,825,560 more than its estimate of actual charges for the five-year period of 2021 through 2025. *See* Ex. 1. VA thus premised its certification on an analysis that underestimated actual provider charges—and, by extension, the final rule's economic impact—*by a factor of five.* It was plainly irrational for VA to attest in 2023 that the final rule's economic impact on small entities will be insignificant while in possession of VA data from 2022 showing that VA's economic analysis from 2020 was off *by a factor of five.*

17

The RFA was more than another box for VA to check. It required VA to prepare a final regulatory flexibility analysis containing "a description of the steps VA has taken to minimize the significant economic impact on small entities … ." 5 U.S.C. § 604(a)(5). If VA had complied with the RFA then it would have had to confront the challenges of contracting with thousands small ambulance providers for 9-1-1-initiated transports before it ever finalized the rule.

*Second,* VA similarly failed to resolve the problem that providers raised in relevant and significant comments regarding veterans' continued access to services in rural areas if VA pays only the MFS amount. 88 Fed. Reg. at 10,034. VA responded that it would contract with providers as needed. *Id*. But VA did not grapple with the magnitude or complexity of the contracting that would be required to ensure veterans' access to services, particularly 9-1-1-initiated ambulance transports. *See id*. Indeed, the RIA assumed no increase whatsoever in contracting under the final rule. VA's failure to resolve the rural access and contracting problem during the rulemaking is apparent from the successive provider contracting proposals that VA has rolled out, restructured, and failed to fully implement since publishing the final rule. "[M]erely hearing is not good enough[,] [VA] must respond to serious objections." *Delaware Dept. of Natural Resources and Environmental Control v. E.P.A.*, 785 F.3d 1, 15-16 (D.C. Cir. 2015) (finding rule was arbitrary and capricious where agency failed to sufficiently respond to

comments).  The failure to resolve the rural access and contracting problem—particularly with respect to 9-1-1-initiated ground ambulance transports—was arbitrary and capricious.

*Third*, VA admits that it conducted no independent analysis of the sufficiency or reasonableness of the MFS amount for ambulance providers transporting veterans.  Ex. 2, ¶ 11, Tab 7, MEDSTAR_000295; 88 Fed. Reg. at 10,034.  VA outsourced that responsibility to CMS and the Medicare Payment Advisory Commission (MedPAC), an independent congressional agency, without considering whether they acted rationally in the context of either Medicare or VA programs.  *See Id*.  It is arbitrary and capricious for VA to blindly defer to them without any independent analysis.  *Delaware Dept.*, 785 F.3d at 16; *Foster v. Mabus*, 895 F.Supp.2d 135, 148 (D.D.C. 2012) (vacating Navy decertification that was based solely on Marine Corps decertification).

VA's deference is striking because since 2006, CMS has not conducted annual reviews of the sufficiency of the MFS amount for ground ambulance transports.  *See* 42 C.F.R. § 414.610(g) (2007) (ending annual review of conversion factor used to calculate ambulance base rates).  CMS is currently implementing § 50203(b) of the Bipartisan Budget Act of 2018 by collecting cost, revenue, utilization, and other data from ground ambulance providers through 2024.  MedPAC will use the data to make a recommendation to Congress on the adequacy of the MFS amount.

Notwithstanding this review of the MFS amount, and the comments from providers that the MFS amount is below cost, VA concluded that the sufficiency of the MFS amount was beyond the scope of its rulemaking. The APA demands much more than such blind deference under these circumstances.

### C. PETITIONERS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY OF THE FINAL RULE

To constitute irreparable injury, the harm must be "certain and great," and not merely theoretical. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The harms to Petitioners in this case easily pass that threshold.

Absent a stay, the final rule will become effective in little over three months. It will cut VA payments to levels that will irreparably injure MedStar and AMED by forcing them to lay off employees. *Stand. Havens*, 897 F.2d at 515 (granting stay pending appeal to prevent employee layoffs); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006). It will also irreparably injure VAA and QVAA by depriving them of payments for services they render to veterans in their capacities as charitable organizations. *Texas Children's Hosp. v. Burwell*, 76 F.Supp.3d 224, 243-244 (D.D.C. 2014) (holding that loss of Medicaid payments would irreparably injure non-profits); *cf. Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (finding that rule would irreparably injure non-profit by forcing it to divert resources from its mission); *Step By Step, Inc. v. City of Ogdensburg,* 176

F. Supp. 3d 112, 134–35 (N.D.N.Y. 2016) (same). The irreparable injury factor is thus satisfied and weighs in Petitioners' favor.

### D.    THE PUBLIC INTEREST STRONGLY FAVORS A STAY

The public interest strongly favors a stay. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe*, 984 F.3d at 102-03. Here, Petitioners have shown a strong likelihood of success; they have demonstrated that the final rule is unlawful on its face, and most likely arbitrary and capricious for numerous reasons, including an RFA certification that is manifestly irrational given VA's own payment data. They have also shown irreparable injury. It would be unjust to Petitioners to deny a stay under these circumstances.

Equally important, a stay will ensure that veterans keep their current level of access to ambulance services while this Court reaches the merits. A stay presents no risk for veterans who need emergency care. The final rule does.

VA will not suffer substantial injury from a stay. A stay will simply preserve the status quo that VA established in its May 2022 interpretive rule while this Court reaches the merits. VA may still solicit and make contracts with ambulance providers while judicial review is ongoing.

\*\*\*

The balance of the equities clearly favors Petitioners. This Court should stay the final rule for all the reasons set forth in this Motion.

21

Dated November 1, 2023                    Respectfully submitted,

                                          /s/ Brian Stimson
                                          Brian R. Stimson
                                          Sara M. Lord
                                          ARNALL GOLDEN GREGORY LLP
                                          2100 Pennsylvania Ave., NW, Suite 350S
                                          Washington, D.C.  20037
                                          Main: (202) 677-4030
                                          Brian.Stimson@agg.com
                                          Sara.Lord@agg.com

                                          *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, I caused a copy of the foregoing

Motion for a Stay Pending Judicial Review to be served via CM/ECF upon the

following:

> Director, Commercial Litigation Branch, Civil Division,
> U.S. Department of Justice
> c-natcourts.appeals@usdoj.gov
> United States Department of Justice
> Commercial Litigation Branch, Civil Division
> PO Box 480
> Ben Franklin Station
> Washington, DC 20044

> /s/Brian Stimson
> Brian R. Stimson
> Sara M. Lord
> ARNALL GOLDEN GREGORY LLP
> 2100 Pennsylvania Ave., NW, Suite 350S
> Washington, D.C.  20037
> Main: (202) 677-4030
> Brian.Stimson@agg.com
> Sara.Lord@agg.com

> *Counsel for Petitioners*