2024-1104

United States Court of Appeals
for the Federal Circuit

**METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,**
*Petitioners*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

# CORRECTED UNOPPOSED BRIEF OF THE AMBULANCE ASSOCIATION OF PENNSYLVANIA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER'S MOTION FOR STAY PENDING JUDICIAL REVIEW

Stephen R. Wirth, Esquire

PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS


| | | Page(s) |
|---|---|---|
| TABLE OF AUTHORITIES | | ii-iii |
| CERTIFICATE OF INTEREST | | iv-v |
| INTRODUCTION | | 1 |
| INTEREST OF *AMICUS CURIAE* | | 1-2 |
| ARGUMENT | | 3-13 |
| I. | THE VA'S REIMBURSEMENT REDUCTION WILL ONLY ADD TO THE EXISITNG FINANCIAL CRISIS THAT PENNSYLVANIA AMBULANCE SERVICES ARE ALREADY ENDURING | 3-6 |
| II. | PENNSYLVANIA'S HIGH POPULATION OF VETERANS AND HIGH NUMBER OF VETERAN FACILTIES WILL RESULT IN AN EVEN MORE NEGATIVE IMPACT FROM THE VA RULE TO THE COMMONWEALTH'S AMBULANCE SERVICES AND VETERANS | 6-8 |
| III. | THE VA'S FINAL RULE SHOULD BE DELAYED ALLOWING A MORE THOROUGH AND INDEPENDENT ASSESSMENT OF AMBULANCE SERVICE COSTS AND FOR FURTHER CONTRACTUAL NEGOTIATIONS BETWEEN THE VA AND AMBULANCE SERVICES | 8-13 |
| CERTIFICATE OF COMPLIANCE | | 14 |
| CERTIFICATE OF SERVICE | | 15 |

# TABLE OF AUTHORITIES

STATUTES OR REGULATIONS

38 C.F.R. § 70.30(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

88 Fed. Reg. 10,032 (Feb. 16, 2023)
(to be codified at 38 C.F.R. Part 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

Internal Revenue Code § 501(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pub L. No. 116-260. 134 Stat. 1182, Division BB § 109 . . . . . . . . . . . . . . . . . 7

OTHER AUTHORITIES & RESOURCES

*Ambulance Association of Pennsylvania,* available at:
https://www.aa-pa.org/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ambulance Providers: Costs and Expected Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*,
GAO Report 07-383 (May 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ambulance Providers: Costs and Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*, GAO Report 13-6 (October 1, 2012) . . . . . . . . 5-6

*CMS CY 2023 Public Use file,* available at:
https://www.cms.gov/medicare/payment/fee-schedules/ambulance/ambulance-fee-schedule-public-use-files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Center for Rural Pennsylvania,* available at: https://www.rural.pa.gov/data/rural-urban-definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

McGoldrick, Gillian, *Why Pennsylvania Paramedics Say 'EMS is Dying,'* The Philadelphia Inquirer (Aug. 30, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Medicare Claims Data*, CMS Database, available at: https://data.cms.gov/provider-summary-by-type-of-service/medicare-physician-other-practitioners/medicare-physician-other-practitioners-by-provider-and-service . . . . . . . . . . . . . . . . . . . . . 11

*Medicare Ground Ambulance Data Collection System (GADCS) Required Information for Collection and Reporting*, Updated March 8, 2022, available at: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/Downloads/Medicare-Ground-Ambulance-Quick-Reference.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

Notes of Testimony, Commonwealth of Pennsylvania House of Representatives: House Veterans Affairs & Emergency Preparedness Committee Public Hearing, *Pennsylvania EMS System in Crisis Stakeholder Testimony*, March 1, 2022, available at: https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2022_0025T.pdf. . . . . 3-4

Panizzi, Tawnya, *'EMS is a Must': Pa. EMS Departments Struggle with Funding, Staffing and Increasing calls*, Pittsburgh Tribune-Review, (Oct. 10, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Panizzi, Tawnya, *Unsustainable Funding Model, Shrinking Workforce Leave Ambulance Services in Critical Condition,* Fox Chapel Herald (Oct. 8, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rates that VA Pays for Special Modes of Transportation*, available at: https://www.regulations.gov/document/VA-2020-VHA-0022-0002. . . . . . . . .10

*U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

VA, *Initial Agency Decision on FOIA Request #23-09227-F*, (Aug. 18, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4(a), Counsel for the *Amicus Curiae*, Ambulance Association of Pennsylvania (AAP), certifies the following:

1. The full name of every party or *amicus* represented by me is:

   Ambulance Association of Pennsylvania (AAP).

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent (10%) or more of the stock of the party or *amicus curiae* represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or in a prior proceeding in this case or are expected to appear in this Court are:

   None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending matter:

   None.

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees), pursuant to Fed. Cir. R. 47.4(a)(6):

   None.

Respectfully submitted,

November 21, 2023 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amicus Curiae*

## INTRODUCTION[1]

The Ambulance Association of Pennsylvania ("AAP") is a non-profit, tax-exempt § 501(C)(6) organization currently consisting of two hundred (200) members, who provide approximately eighty percent (80%) of the emergent and non-emergent ground ambulance transports across the Commonwealth of Pennsylvania. Declaration of Heather Sharar, ¶ 4 (attached as Exhibit 1); *Ambulance Association of Pennsylvania,* available at: https://www.aa-pa.org/. Its members embody a vast array of ambulance providers including fire-based, hospital, municipal, and non-profit entities whose services include a significant number of 9-1-1emergency requests in both rural and urban settings. *Id.,* ¶ 5. Nearly eighty-five percent (85%) of AAP membership is comprised of small to mid-sized non-profit ambulance services. *Id.,* ¶ 6.

The AAP serves to advance the needs of its members and to help ensure their survival and sustainability. *Id.,* ¶ 7. AAP objectives include the protection of the financial interests of its members to ensure that those agencies may continue to operate and provide life-saving services. *Id.,* ¶ 8.

## INTEREST OF *AMICUS CURIAE*

According to current regulation, the U.S. Department of Veterans Affairs (hereinafter referred to as "VA") provides payment of the actual charges by the

[1] All parties consented to the filing of this Brief.

provider for non-contracted ambulance services throughout Pennsylvania. 38 C.F.R. § 70.30(a)(4). However, under the VA's final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023) (to be codified at 38 C.F.R. Part 70), which becomes effective on February 16, 2024, the rates paid by the VA will be severely reduced to the "lesser of" the actual charges or the Medicare Fee Schedule ("MFS") amount for *all* ambulance transports unless the VA has contracted with the provider, "in which case the terms of the contract will govern VA payments." 88 Fed. Reg. at 10,036. The MFS amount is invariably less than not only the actual charges, but is also, for many ambulance services, less than the total cost of providing the transport. Sharar Declaration, ¶ 9. As such, the VA's payment reduction will adversely impact the ground and air ambulance services who currently represent the membership of AAP.[2] *Id.*, ¶ 10. AAP anticipates that implementation of the VA's new rule will not only cause substantial financial harm to ambulance services serving our veterans but may also reduce access to needed emergency ambulance services for our veterans. *Id.*, ¶ 11. This could also result in the reduction of ambulance

[2] Nearly all Pennsylvania ambulance services remain non-contracted with the VA. Sharar Declaration, ¶ 12. Further, most ambulance services for veterans across the Commonwealth were 9-1-1 initiated and would not be subject to VA contract reimbursement - even if a contract was in place. *Id.*

services provided to veterans, reductions in ambulance service staffing, and the potential closure of smaller, non-profit ambulance services. *Id.*

## ARGUMENT

### I. THE VA'S REIMBURSEMENT REDUCTION WILL ONLY ADD TO THE EXISITNG FINANCIAL CRISIS THAT PENNSYLVANIA AMBULANCE SERVICES ARE ALREADY ENDURING

Ambulance services throughout Pennsylvania and across the United States are experiencing a major crisis. *Id.,* ¶ 13. Decreased reimbursement from payers - including federal, state, and commercial insurance programs – is crippling the ability to provide prompt and reliable ambulance services. *Id.* Simply put, the reimbursement provided for basic and advanced life support ambulance services has not maintained pace with the ever-increasing costs of medical technology, ambulances and response vehicles, medications, and emergency medical personnel. Id., ¶ 14.

Since the principal mechanism for an ambulance service provider to generate revenue is through reimbursement for patient treatment and transportation, the income must be at least equivalent to or exceed costs to ensure that an ambulance service can adequately function. (Notes of Testimony, Commonwealth of Pennsylvania House of Representatives: House Veterans Affairs & Emergency Preparedness Committee Public Hearing, *Pennsylvania EMS System in Crisis*

*Stakeholder Testimony*, March 1, 2022, at 43-44).

(https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2022_0025T.pdf).

Unfortunately, ambulance services throughout Pennsylvania as well as the United States have historically received *below-cost* reimbursement from Medicare for the services they have rendered.[3] *Id.* at 43-44, 46.

Not only have these ambulance services had to manage with below-cost reimbursement, they have also had to deal with increased overhead expenses, such as increased costs for personal protective equipment ("PPE") and other pandemic-related equipment and increased costs for insurance coverage. *Id.* at 46-48. Furthermore, the industry has seen a stark shortage of workers which in turn has resulted in unstainable, rising wages without a corresponding increase in reimbursement to cover these substantial added costs. *Id.* at 47. Accordingly, ambulance services in Pennsylvania have reported catastrophic losses in revenue. *Id.* As these agencies have strained to simply survive, their ability to provide prompt 9-1-1 emergency response has been greatly impeded.[4] *Id.* at 50-51.

---

[3] The National Emergency Medical Services Advisory Committee (NEMSAC) report on EMS Funding and Reimbursement, December 2, 2016, stated that "ambulance providers receive below-cost reimbursement for 72% of all transports." *Pennsylvania EMS System in Crisis Stakeholder Testimony*, at 44).

[4] In 2021, agencies across the Commonwealth responded to a total of 2,447,932 calls for service, an average of 6,706 call per day. The overwhelming majority of these calls for services were emergency responses to incident scenes. (*Pennsylvania EMS System in Crisis Stakeholder Testimony*, at 39-40).

As such, the VA's new rule will only add to the woefully inadequate reimbursement scheme that has already resulted in the closure of several Pennsylvania ambulance services with many other agencies on the brink of closing.[5] Clearly, as evidenced by two (2) United States Government Accountability Office ('GAO") reports and acknowledged by Congress through legislating temporary add-on payments to ambulance services under Medicare, the MFS amounts implemented under the new VA rule will reimburse ambulance services an amount that is below the cost of providing ambulance services to veterans, taking away essential reimbursement for services provided to veterans that our ambulance services require and have come to expect. *See*, *Ambulance Providers: Costs and Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*, GAO Report 13-6 (October 1, 2012) (median Medicare margin

[5] *See* Panizzi, Tawnya, *'EMS is a Must': Pa. EMS Departments Struggle with Funding, Staffing and Increasing Calls*, Pittsburgh Tribune-Review, (Oct. 10, 2017) https://www.ems1.com/ems-management/articles/ems-is-a-must-pa-ems-departments-struggle-with-funding-staffing-and-increasing-calls-MugqsdRgV11tNNkn/?utm_source=EMS1&utm_campaign=6970397abf-EMAIL_CAMPAIGN_2023_10_10_05_42&utm_medium=email&utm_term=0_13aebf8568-a57a5682c7-%5BLIST_EMAIL_ID%5D); McGoldrick, Gillian, *Why Pennsylvania Paramedics Say 'EMS is Dying,'* The Philadelphia Inquirer (Aug. 30, 2023) https://www.inquirer.com/politics/pennsylvania/ems-philly-lansdale-reimbursement-ambulances-20230830.html?outputType=amp; Panizzi, Tawnya, *Unsustainable Funding Model, Shrinking Workforce Leave Ambulance Services in Critical Condition,* Fox Chapel Herald (Oct. 8, 2023) https://triblive.com/local/valley-news-dispatch/unsustainable-funding-model-shrinking-workforce-leave-ambulance-services-in-critical-condition/.

ranges from -25.5% below cost to 15.3% above cost); *Ambulance Providers: Costs and Expected Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*, GAO Report 07-383 (May 2007) (median Medicare margin ranges from -35% below cost to 2% above cost).

Put simply, basing VA reimbursement on current Medicare Fee Schedule rates would greatly reduce payments for those services and serve as another "nail in the coffin" for many emergency ambulance providers, as it will further deteriorate the ability of those ambulance services to provide critical patient care and ambulance service to veterans, as well as other residents and visitors to their communities. Sharar Declaration, ¶¶ 13, 15.

## II. PENNSYLVANIA'S HIGH POPULATION OF VETERANS AND HIGH NUMBER OF VETERAN FACILTIES WILL RESULT IN AN EVEN MORE NEGATIVE IMPACT FROM THE VA RULE TO THE COMMONWEALTH'S AMBULANCE SERVICES AND VETERANS

As of 2020, Pennsylvania is home to 816,629 veterans, the fourth (4th) highest veteran population nationwide.[6] *U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/.

To serve the medical needs of this large population of veterans, the

[6] More than half of the veteran population of Pennsylvania consists of individuals who are 65 years of age or older. *U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/.

Commonwealth has many VA medical facilities, including forty-nine (49) outpatient care sites, seven (7) inpatient care sites, and twelve (12) medical centers. *Id.* Consequently, it is only logical to deduce that Pennsylvania-based ambulance agencies have substantial contact with veterans on a regular basis.

Thus, if the new VA payment reduction is implemented, the veteran community across the Commonwealth will undoubtedly suffer. Sharar Declaration, ¶ 15. Ambulance services may be unable to provide services to veterans in many cases, and if they are able to provide services, there may be response delays and lower levels of clinical care that can be provided. *Id.* Ambulance services may not be able to afford advanced life support (ALS) paramedic-level staffing of ambulances and may only be able to provide basic life support services (BLS), when a 9-1-1 ambulance is dispatched to a veteran. *Id.*

To our knowledge, there is no federal law or regulatory prohibition on billing veterans directly for the majority of the various ground ambulance services provided to veterans. Further, neither the statutory authority for the new VA rule or the rule itself forecloses balance billing of veterans. Thus, veterans could potentially encounter significant costs for emergency ambulance services that they currently do not have, if the new VA payment reduction rule is implemented.

Since the VA has historically reimbursed ambulance services their actual charges for the majority of the services provided to veterans, there has been no

need for AAP members to reject payments from the VA - at least up until now. It will be much more likely with the inadequate payments under the VA's new payment reduction plan for ambulance services to reject those payments and bill the veteran directly, or balance bill the veteran. Ambulance services certainly don't want to bill veterans directly in any fashion, but they still need to recover their costs of providing these essential ambulance services. But this VA payment reduction could potentially bring them to that point, which could put a tremendous financial burden on individual veterans.

## III. THE VA'S FINAL RULE SHOULD BE DELAYED ALLOWING A MORE THOROUGH AND INDEPENDENT ASSESSMENT OF AMBULANCE SERVICE COSTS AND FOR FURTHER CONTRACTUAL NEGOTIATIONS BETWEEN THE VA AND AMBULANCE SERVICES

The VA's assessment regarding the financial impact of the new rule was substantially inadequate. The VA blatantly disregarded the advice of several commentors who had recommended that the VA allow the Centers for Medicare & Medicaid Services (CMS) to complete a nationwide study of ambulance cost data, so that a fair and appropriate reimbursement rate could be determined.[7] The

---

[7] CMS developed the Ground Ambulance Data Collection System ("GADCS") to meet the requirements described in paragraph (17) of section 1834 (l) of the Social Security Act. CMS is required by law to collect information on costs, revenue, utilization and other information from representative samples of ground ambulance organizations. This information will be analyzed by the Medicare Payment Advisory Commission (MedPAC), a government body independent from CMS, to develop a report to Congress on the adequacy of Medicare payment rates for

GADCS is currently collecting cost data from ambulance services nationwide to assist CMS in determining the sufficiency of the current Medicare Fee Schedule, as well as to explore other methods to reimburse ambulance services for services provided to Medicare patients.

Rather than wait for this congressionally sanctioned report to be completed, incredibly, the VA simply claimed statutory authority to apply the MFS amounts to *all* non-contracted ambulance transports completely without an objective assessment of the costs that ambulance services incur in providing those services, or the financial and operational impact that this decision would have on ambulance services in Pennsylvania and throughout the nation.

The VA further improperly substantiated its position by claiming that the final rule would not have a significant financial impact on a substantial number of small entities (88 Fed. Reg. at 10,034) – a statement that undeniably underestimated the immense number of non-contracted ambulance agencies that

---

ground ambulance services and geographic variations in the cost of furnishing such services. *Medicare Ground Ambulance Data Collection System (GADCS) Required Information for Collection and Reporting*, Updated March 8, 2022, available at: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/Downloads/Medicare-Ground-Ambulance-Quick-Reference.pdf.

currently provide both emergency and non-emergency medical services to veterans.[8]

The VA stated that delaying implementation of the payment reduction rule to February 16, 2024, would allow for more contracts to be negotiated with ambulance services, thus suggesting that this would minimize the adverse impact of the new rule on ambulance services. 88 Fed. Reg. at 10,035. But that simply did not happen – which is another reason to stay implementation of this rule. In fact, the VA has only finalized thirty-three (33) contracts nationwide for VA-initiated ground transports - an appallingly low number since the VA published its final rule on February 16, 2023.[9] Clearly, the VA has not contracted with most ambulance services and thus these ambulance services will be forced to rely on this inadequate reimbursement should the new rule be implemented.

For example, the three (3) Pennsylvania Ambulance services, who are among the named petitioners in this matter, each provide 9-1-1 ambulance service

[8] This statement was also the product of a flawed Regulatory Impact Analysis (RIA) conducted internally by the VA which projected that charges for non-contract ambulance transports would total $1,458,899,847 from 2021 through 2025. *Rates that VA Pays for Special Modes of Transportation*, available at: https://www.regulations.gov/document/VA-2020-VHA-0022-0002. However, in reality, the VA paid $1,653,725,407 for non-contract ambulance transports in 2022 alone. VA, *Initial Agency Decision on FOIA Request #23-09227-F*, p. 5 (Aug. 18, 2023).

[9] *See* Second Declaration of Gary Watters, ¶ 10 (attached as Petitioner's Exhibit 3), Motion for Stay Pending Judicial Review (Case No. 2024-1104).

to veterans without a contract with the VA. As a result of the final rule, each of these ambulance services – as well as hundreds of ambulance services throughout Pennsylvania and the nation - stand to lose thousands of dollars of reimbursement that is essential to their daily operations. This new rule and the resulting reimbursement reduction will cause many ambulance services to suffer an approximate sixty percent (60%) reduction in reimbursement for providing essential ambulance services to veterans from the current payments that they now receive. Sharar Declaration, ¶ 16.

For example, based on data extracted from the 2021 Medicare Claims Data (available from the CMS database at: https://data.cms.gov/provider-summary-by-type-of-service/medicare-physician-other-practitioners/medicare-physician-other-practitioners-by-provider-and-service) there were 499 Pennsylvania ambulance entities that billed ALS1-Emergency (A0427) Medicare fee-for-service claims in 2021 and of those entities, the median charge was $1,200.00. The VA's new rule will slash the reimbursement amount down to the Medicare rate for that service - which in urban areas of Pennsylvania (where approximately 78% of the state's population resides)[10] would equate to just $490.48 of reimbursement under the VA

[10] *Center for Rural Pennsylvania,* available at: https://www.rural.pa.gov/data/rural-urban-definitions.

payment reduction.[11] That is barely *one-third* of the amount currently received for ambulance services rendered to VA patients. This certainly constitutes an unsustainable amount, which is well below the cost of providing those services as documented by the Federal government itself.

Absent a stay, the VA's final rule and payment reductions will take effect in just three (3) months. Simply based on the negative financial impact on ambulance services and the potential reduction in access to veterans to essential life-saving ALS ambulance services and significant out-of-pocket patient costs, at the very least an equitable resolution must involve a more thorough assessment of ambulance service costs *prior* to changing the current VA payment system.

It is imperative that the VA withdraw this new rule until after the GADCS cost-study is completed and recommendations are made before tying any new payment system to an already deficient reimbursement methodology. This stay would properly maintain the status quo until a more appropriate approach – one that adequately considers the sustainability of lifesaving ambulance service and the impact on our veterans - can be developed.

---

[11] *CMS CY 2023 Public Use file,* available at: https://www.cms.gov/medicare/payment/fee-schedules/ambulance/ambulance-fee-schedule-public-use-files.

Respectfully submitted,

November 21, 2023 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(b)(1). The brief has 2,597 words (excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2)).
2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

November 21, 2023 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2023, I electronically filed the foregoing Corrected Unopposed Brief of the Ambulance Association of Pennsylvania (AAP) as *Amicus Curiae* in Support of Petitioner's Motion for Stay Pending Judicial Review with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system, which will serve as e-mail notice of such filing to all counsel registered as CM/ECF users, including the principal counsel for the parties.

Respectfully submitted,

November 21, 2023 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amicus Curiae*

# **EXHIBIT 1**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

| | |
|---|---|
| METROPOLITAN AREA EMS AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY d/b/a AMED, QUAKER VALLEY AMBULANCE AUTHORITY, and VALLEY AMBULANCE AUTHORITY<br><br>Petitioners,<br><br>v.<br><br>DENIS MCDONOUGH, in his official capacity as SECRETARY OF VETERANS AFFAIRS,<br><br>Respondent. | No. 24-1104 |

**DECLARATION OF HEATHER SHARAR**

I, Heather Sharar, testify as follows:

1. I am over the age of eighteen. I provide this declaration voluntarily, for use in *Metropolitan Are EMS Authority et al. v. McDonough*.
2. I am currently the Executive Director of the Ambulance Association of Pennsylvania ("AAP") and have served in that capacity as a full-time employee of the AAP for 17 years.

3. My testimony is based on my direct personal knowledge gained through my work at the AAP, business records of the AAP, board and committee discussions, information supplied to me by members of our association, information from EMS and ambulance service directors around the state, as well information in the public domain.
4. The AAP is a non-profit, tax-exempt § 501(C)(6) organization currently consisting of two hundred (200) members, who provide approximately eighty percent (80%) of the emergent and non-emergent ground ambulance transports across the Commonwealth of Pennsylvania
5. Its members embody a vast array of ambulance providers including fire-based, hospital, municipal, and non-profit entities whose services include a significant number of 9-1-1emergency requests in both rural and urban settings.
6. Nearly eighty-five percent (85%) of its membership is comprised of small to mid-sized ambulance services.
7. As its primary mission, the AAP strives to serve as the lead organization for the advancement of the needs of its members in the emergency and non-emergency ambulance and medical transportation industry to help ensure their survival and sustainability.

8. The AAP is committed to carrying out its objectives, which include the protection of the financial interests of its members to ensure that those agencies may continue to operate and provide life-saving services.
9. The Medicare Fee Schedule amount ("MFS"), the amount which ambulance services in Pennsylvania will be reimbursed with the implementation of the VA rule, is invariably less than not only the actual charges, but is also, for many ambulance services, less than the total cost of providing the transport.
10. VA's payment reduction will adversely impact many of the ground and air ambulance services who currently represent the membership of AAP
11. AAP anticipates that implementation of the VA's new rule will not only cause substantial financial harm to ambulance services serving our veterans but may also reduce access to needed emergency ambulance services for our veterans. This could also result in the reduction of ambulance services provided to veterans, reductions in ambulance service staffing, and the potential closure of smaller, non-profit ambulance services.
12. Almost all Pennsylvania ambulance services remain non-contracted with the VA. Furthermore, most ambulance services for veterans across the Commonwealth are 9-1-1 initiated and therefore would not be subject to VA contract reimbursement.

13. Ambulance services throughout Pennsylvania are experiencing a major crisis. Decreased reimbursement from payers - including federal, state, and commercial insurance programs – has been crippling the ability of our members to provide prompt and reliable ambulance services.

14. The reimbursement provided for basic and advanced life support ambulance services has not maintained pace with the ever-increasing costs of medical technology, ambulances and response vehicles, medications, and emergency medical personnel.

15. If the new VA payment reduction is implemented, the veteran community across the Commonwealth will undoubtedly suffer. Ambulance services may be unable to provide services to veterans in many cases, and if they are able to provide services, there may be response delays and lower levels of clinical care that can be provided. Ambulance services may not be able to afford advanced life support (ALS) paramedic-level staffing of ambulances and may only be able to provide basic life support services (BLS), when a 9-1-1 ambulance is dispatched to a veteran.

16. This new rule and the resulting reimbursement reduction will cause ambulance services in Pennsylvania to suffer an approximate sixty percent (60%) reduction in reimbursement for providing essential ambulance services to veterans from the current payments that they now receive.

***

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

November 7, 2023

/s/ Heather Sharar_______________

Heather Sharar