No. 24-1104

---

## United States Court of Appeals
## for the Federal Circuit

_____

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile
Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY
AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE
MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED

*Petitioners,*

v.

DENIS MCDONOUGH, in his official capacity as
SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

_____

## PETITIONERS' REPLY TO RESPONDENT'S RESPONSE TO PETITIONERS' MOTION FOR STAY PENDING JUDICIAL REVIEW

_____

Brian R. Stimson
Sara M. Lord
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

January 23, 2024

---

## INTRODUCTION

On October 26, 2023, Petitioners petitioned this Court for judicial review of the final rule, entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10032 (Feb. 16, 2023) (hereinafter "the final rule"), which was to become effective on February 16, 2024. *See* Pet. For Review, ECF No. 1-2. After exhausting efforts to obtain an administrative stay of the final rule, Petitioners moved for a stay pending judicial review on November 1, 2023. *See* Pet. Mot. For Stay, ECF No. 3-1.

VA initially argued that a full response to the motion was unnecessary because VA was "currently developing" a proposed rule to delay implementation of the final rule until February 16, 2025. *See* Resp. to Mot. For Stay, ECF No. 17. On November 28, 2023, Petitioners replied that a one-year delay would not moot their motion, and there were no assurances that VA could or would propose and finalize a rule implementing a one-year delay by February 16, 2024. *See* Pet. Reply Supp. Mot. For Stay, ECF No. 18. On December 15, 2023, the Court directed VA to file a substantive response to Petitioners' motion by January 16, 2024. *See* Order, ECF No. 22. On December 29, 2023, without notice and public comment, VA delayed the final rule's effective date until February 16, 2025. *See Delay of Effective Date*,

88 Fed. Reg. 90120 (Dec. 29, 2023).[1]  VA then responded to Petitioners' motion,

arguing that the one-year delay moots the need for a stay, and that the conditions for

a stay are not met.  VA's arguments fail in every respect.

## ARGUMENT

### I.     A One-Year Delay Does Not Moot Petitioners' Motion for a Stay

The one-year delay lacks the assurance of completeness required for

mootness. VA's expressed purpose for the delay is to accommodate what it claimed

were "unforeseen difficulties" in air ambulance broker contracting.

But, the one-year delay is tied to VA's plans to contract with air ambulance

providers, rather than the Court's review of the rule.  Postponing the effective date

of the final rule does not accommodate Petitioners' request *that the rule be stayed*

*pending judicial review*.   It is mere temporary, voluntary cessation.

"[V]oluntary cessation of challenged conduct moots [a motion] . . . *only if it*

*is absolutely clear* that the allegedly wrongful behavior could not reasonably be

expected to recur." *See Military Order of Purple Heart USA v. Sec'y of Veterans*

*Affairs*, 530 F.3d 1293, 1295 (Fed. Cir. 2009), (citing *Adarand Constrs., Inc. v.*

*Slater*, 528 U.S. 216, 222 , 120 S.Ct. 722 (2000)) (emphasis in original); *see also*

---

[1] VA determined, pursuant to 5 U.S.C. § 553(b)(B), that, in this instance, notice and comment rulemaking procedures were "impracticable, unnecessary, or contrary to the public interest," because the potential adverse effects of the rate change on air ambulance providers and veterans' care justified the decision to accelerate straight to a final rule.

*Jacobsen v. Katzer*, 535 F.3d 1373, 1377 n.1 (Fed. Cir. 2008) (same); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328-39 (5th Cir. 2020) (same). As long as the final rule may become effective before the Court reviews it, Petitioners' request for a stay cannot be moot. *See Powell v. McCormack*, 395 U.S. 486, 496-97 (1969) (a motion is "moot when the issues are no longer 'live,' or the parties lack a legally cognizable interest in the outcome").

"[T]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness*." *Adarand Constrs., Inc.*, 528 U.S. at 222 (emphasis in original). Rather than attempt to meet this requirement, VA simply maintains that, as "petitioners will not see any change to the status quo for at least thirteen more months," and "the timing concerns underlying petitioners' motion have dissipated for the time being. . . ." *See* VA Response at 7. Kicking the can down the road is not mootness – especially when VA plans only to address the concerns of *air ambulance providers,* not ground ambulance providers such as Petitioners.

VA's refusal to agree to the requested stay until the Court has completed its review, coupled with its insistence that the Court dismiss, and Petitioners refile the motion in a year, only threaten to further waste time and resources.

3

## II.    Petitioners Satisfy the Conditions for a Stay

### A. Petitioners Are Likely to Succeed on the Merits

#### 1.  The Final Rule Exceeds VA's Statutory Authority to Set Rates for Ambulance Services

Section 1728(a) of Title 38 states that the Secretary shall reimburse veterans "for the *customary and usual charges* of emergency treatment (including travel and incidental expenses *under the terms and conditions set forth in section 111* of this title)."   Subsection (b) states: "the Secretary may … "make payment of the *reasonable value* of emergency treatment" directly to the hospital or whomever paid on the veteran's behalf. (emphasis added in both instances).

The "terms and conditions" in § 111 define when and under what circumstances the VA pays for "travel and incidental expenses," not, as VA would have it, the *amount* VA pays in all circumstances. Read *in conjunction with* § 1728, as it must be, § 111 does not override Congress's directive that VA pay the "customary and usual charges," or "reasonable value" of emergency treatment for veterans.  VA's reading renders § 1728 meaningless, and there is no reason to think Congress intended for § 111(b)(3)(C) to effectively repeal § 1728.

Section 111(a) states that the Secretary "may pay the *actual necessary expense of travel* (including lodging and subsistence), . . . of any person *to or from a Department facility or other place* . . . for the purpose of examination, treatment, or care." (emphasis added).  The 2011 amendment to the statute gave the Secretary

4

*discretion* to pay "the lesser of the actual charge for the transportation *or* the amount determined by the [Medicare Fee Schedule (MFS)] unless the Secretary has entered into a contract for that transportation with the provider," *only and expressly* "[i]n the case of transportation of a person *to or from a Department facility* by ambulance." 38 U.S.C. § 111(b)(3)(C) (emphasis added).  Congress easily could have included travel to and from an "other place" in § 111(b)(3)(C), but chose not to. Congress plainly intended only to give the Secretary discretion to pay the lesser rate in limited circumstances – and *not* for transports to or from "other place[s]."

VA argues that "other place[s]" are Department facilities. But this does not even square with VA regulations, which specify that a "Department facility" is a "VA facility."  *See* 38 U.S.C. § 70.2 ("VA means the Department of Veterans Affairs."). VA regulations expressly define "VA facility" as a "VA Medical Center (VAMC), VA Outpatient Clinic (OPC), or VA Community Based Outpatient Clinic (CBOC)."  *Id.*  "[O]ther place[s]" such as roadsides, personal residences, and private hospitals and urgent clinics are plainly not "VA facilit[ies]" under the regulation.[2]

VA previously recognized and accepted this distinction. The administrative record reveals that VA originally concluded that § 111(b)(3)(C) "is limiting," and

---

[2] VA's related argument that "other place[s]" are within the ambit of § 111(b)(3)(C) because they are VA-authorized facilities under 38 C.F.R. § 70.2 also fails. *See* VA Response at 11. A VA-authorized healthcare facility is, by definition, "a ***non-VA*** healthcare facility where VA has approved care for an eligible beneficiary at VA expense." *See Id.* at 11, n. 4 (emphasis added).

intended to "draft proposed legislation to address a technical change in the law." App'x, 803. VA has never done so.

In applying the "lesser of" methodology to *all* non-contract ambulance transports, VA plainly exceeded the authority granted by Congress. Rulemaking is not a device for agencies to overrule Congress.

### 2.   The Final Rule is Arbitrary and Capricious

Petitioners have presented six independent reasons why the final rule is arbitrary and capricious. Petitioners showed in their motion that at least three of these are compelling enough to warrant granting the stay without any review of the administrative record. VA's cursory response barely scratches the surface.

First, VA's certification under the RFA that the final rule will not have a "significant economic impact on a substantial number of small entities" was not only cursory, but flatly wrong. *See* Petition at 17-19; Petitioners' Motion at 17. The actual charges for non-contract ambulance transports for veterans in fiscal year 2022 alone were $1,653,725,407, or $194,825,560 more than VA's projected estimate of actual charges for the five-year period of 2021 through 2025 – *underestimating the economic impact on providers by a factor of five. Id*.

VA claims that this "discrepancy is hardly surprising, however, given the devastating effects of the COVID-19 pandemic during that period," and argues, that "[n]ew information that came to light months after VA published the Change in

Rates Rule is immaterial to the Court's analysis." *See* VA Response at 11-12. By the time VA published the final rule in February 2023, however, VA was in possession of the actual data for 2020 and 2021. Shortly before publishing the final rule on February 16, 2023, VA published a second Regulatory Impact Analysis (RIA) on January 16, 2023. The second RIA, which projected costs for the years 2024 through 2028, used the same flawed methodology to calculate costs that the original RIA had used. Despite having the data for more recent years, VA *used the same numbers* for the projected costs in 2025 that it had used in the original RIA. Rather than address the fact that its analyses severely underestimated the economic impact on small providers, VA simply asserts that post-2020 information is "immaterial" to the analysis of whether the agency acted arbitrarily and capriciously in promulgating the final rule in 2023. VA's insistence on its flawed economic analysis, without consideration of critical information in its possession, boggles the mind.

Second, Petitioners established that VA failed to address concerns from providers and Congress regarding veterans' continued access to services in rural areas if VA limits payments to the MFS amount. *See* Petition at 16-17; Petitioners' Motion at 18. VA responds, as it responded to providers' concerns at the time: that these concerns can be addressed by contracting with providers. But the projected cost savings touted by VA in both RIAs do not reflect the increased costs of contracting with providers, further upending VA's justification for the rule change.

7

Furthermore, after the final rule was published in February 2023, VA offered confusing and conflicting statements on the extent and scope of the contracts it planned to make with providers. *See* Petitioners' Motion at 7-9. And, while VA says it has further delayed the final rule to allow for contracting with providers, it intends to contract only with brokers of air ambulance services, not the thousands of ground ambulance providers who will still be adversely affected.

Third, VA conducted no independent analysis of the sufficiency or reasonableness of the MFS amount to cover the costs of veteran transports. *See* Petitioners' Motion at 20. VA argues, instead, that Congress expressly told VA to use the MFS to reimburse ambulance services. *See* VA Response at 13 (citing 38 U.S.C. § 111). VA's argument fundamentally misstates and misinterprets the text of § 111(b)(3)(C), disregards the reimbursement framework that Congress established in §§ 111 and 1728, and has no support in case law.

Unlike the mandatory language in § 1728(a), that the Secretary *"shall"* reimburse the "customary and usual" charges of transport, § 111(b)(3)(C) gives the Secretary discretion "in the case of transportation to or from a Department facility*"* to pay the lesser of the actual charge *or* the MFS amount.  Since the statute was amended in 2011, the Secretary has elected—in 38 C.F.R. § 70.30(a)(4)—to pay the "actual cost" for all non-contract ambulance transports. The decision to use the "lesser of" methodology instead requires a rule change. The fact that Congress

identified the MFS schedule as the alternative to the actual cost methodology does not relieve VA of its requirements and obligations under the APA. VA still was required to determine whether the MFS rates are sufficient to meet the unique healthcare needs of the nation's veterans – and it failed to do so. The fact that the MFS is deeply flawed and significantly out of date further testifies to the arbitrariness and capriciousness of the final rule. *See* Petition at 14.

Congress did not mandate that VA adopt the MFS for ambulance transports, VA disregarded and failed to address concerns that veterans' access to healthcare would be restricted, especially in rural areas, and the statutory framework does not authorize VA to use the "lesser of" methodology for all noncontract transports. The final rule is plainly arbitrary and capricious.

### 3.  Petitioners Have Demonstrated Irreparable Harm

VA dismisses Petitioners' irreparable harm as merely temporary and argues that Petitioners could obtain "corrective relief" by prevailing on the merits. *See* VA Response at 14. Irreparable harm does not turn on the duration of the harm as much as it does on the severity of the harm. The economic impact of the final rule on providers will be swift and drastic, with providers forced to lay off employees, cut services, and, in the case of non-profits particularly, forced to divert resources from other aspects of their charitable missions. *See* Petitioners' Motion at 20.

VA attempts to minimize the harm by treating each of these injuries as separate harms, each of which, it argues, is insufficient to sustain a showing of irreparable harm. *See* VA Response at 14-15. But Petitioners have done more than show they will lose employees; they have shown that staffing cuts will have a cascading effect, resulting in reduced healthcare services for the nation's veterans, as well as increased demands on limited charitable resources. These are "certain and great" consequences, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), which are not temporary and remediable through "corrective action." The restoration of ambulance services will not help a veteran who needed and was unable to get ambulance services while the rule was in effect.

### 4.  The Public Interest Strongly Favors a Stay

The final rule exceeds and conflicts with the statutory reimbursement framework, was promulgated arbitrarily and capriciously, and will cause irreparable harm to veterans and others. These circumstances are individually and collectively against the public interest. Denial of the stay risks implementing an unlawful rule, which will cause irreparable harm while it is in effect. An unlawful rule that causes irreparable harm is not in the public interest, and a stay is the only way to prevent the harm in the first instance. *See* Petitioners' Motion at 21.

Finally, VA will not be substantially injured by the stay, as the current rule will remain in effect. Moreover, even if the Court upholds the final rule after

February 16, 2025, the additional period before the rule goes into effect will not substantially impact VA.

## CONCLUSION

For all these reasons, the Court should grant Petitioners' Motion for a Stay. If, however, the Court declines to stay the final rule at this time, Petitioners respectfully request the Court to hold the motion in abeyance, so that, in the event judicial review cannot be completed before the final rule is implemented, the Court may consider the motion to stay the rule.

January 23, 2024

Respectfully submitted,

*/s/ Brian Stimson*
Brian R. Stimson
D.C. Bar No. 1657563
Sara M. Lord
MA Bar No. 546918
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Email: Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2024, I caused a copy of the foregoing

Reply to Respondent's Response to Petitioners' Motion for Stay Pending Judicial

Review to be served via CM/ECF upon the following:

> Director, Commercial Litigation Branch, Civil Division
> U.S. Department of Justice
> c-natcourts.appeals@usdoj.gov
> United States Department of Justice
> Commercial Litigation Branch, Civil Division
> PO Box 480
> Ben Franklin Station
> Washington, DC 20044

> */s/ Brian Stimson*
> Brian R. Stimson
> ARNALL GOLDEN GREGORY LLP
> 2100 Pennsylvania Ave., NW, Suite 350S
> Washington, D.C.  20037
> Main: (202) 677-4030
> Email: Brian.Stimson@agg.com

> *Counsel for Petitioners*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1104

**Short Case Caption:** Metropolitan Area EMS Authority v. Secretary of Veterans Affairs

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 2,529 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/23/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson