No. 24-1104

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

————————————————

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile
Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY
AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE
MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED

*Petitioners,*

v.

DENIS MCDONOUGH, in his official capacity as
SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

_____

**PETITIONERS' OPENING BRIEF**

_____

Brian R. Stimson
Sara M. Lord
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C. 20037
Main: (202) 677-4030
Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

March 8, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1104 |
| **Short Case Caption** | Metropolitan Area EMS Authority et al. v. Secretary of Veterans Affairs |
| **Filing Party/Entity** | Metropolitan Area EMS Authority, Valley Ambulance Authority, Quaker Valley Ambulance Authority, Altoona-Logan Township Mobile Medical Emergency Department |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/08/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Metropolitan Area EMS Authority (Medstar) | None | None |
|  |  |  |
| Valley Ambulance Authority (VAA) | None | None |
|  |  |  |
| Quaker Valley Ambulance Authority (QVAA) | None | None |
|  |  |  |
| Altoona-Logan Township Mobile Medical Emergency Department (AMED) | None | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Arnall Golden Gregory LLP | Brian R. Stimson | Sara M. Lord |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☑ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

STATEMENT OF RELATED CASES...................................................3

JURISDICTIONAL STATEMENT.......................................................3

STATEMENT OF THE ISSUES............................................................3

  A.  The statutory and regulatory regime for the rulemaking...................4

  B.  The relationship between the OIG report and the rulemaking ........................7

  C.  The Secretary's Regulatory Flexibility Act certifications and responses to comments ...................................................................................9

  D.  VA implementation of the final rule through provider contracting................13

SUMMARY OF THE ARGUMENT ...................................................15

STANDARD OF REVIEW ................................................................17

ARGUMENT....................................................................................18

  A.  The final rule is not in accordance with law, and in excess of statutory authority, because it defeats the text and structure of §§ 1728 and 111........18

    1.  The final rule defeats the text and structure of § 1728 by extending § 111(b)(3)(C) to all emergency ambulance transports reimbursed under § 1728 ...................................................................................19

    2.  The final rule defeats the text and structure of § 111 by extending § 111(b)(3)(C) to ambulance transports to and from places other than Department facilities ..................................................................21

  B.  The final rule violates the APA because it is arbitrary and capricious...........24

    1.  VA failed to display awareness that it was changing its legal interpretation of § 1728, much less show good reasons for its change of position...............................................................................25

    2.  The Secretary based his RFA certifications on flawed RIAs and failed to examine VA data that was relevant to the economic analysis.......26

    3.  VA failed to independently evaluate whether the MFS amount is sufficient to provide the healthcare for veterans that Congress has entrusted to VA ...............................................................................30

i

4. VA failed to consider an important part of the problem: its fulfillment of its statutory obligations under the Veterans Community Care Program ....................................................................................................33

5. VA failed to respond sufficiently to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas ...................................................................................34

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT** ..........................36

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Am. Wildlands v. Kempthorne,*
530 F.3d 991 (D.C. Cir. 2008)...........................................................24

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir.
2009) ...........................................................................................13, 29

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n,*
716 F.3d 183 (D.C. Cir. 2013)...........................................................25

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020)...........................................................................20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984)...........................................................................18

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971)...........................................................................25

*City of Arlington, Tex. v. FCC,*
569 U.S. 290 (2013)...........................................................................18

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans
Affairs,*
464 F.3d 1306 (Fed. Cir. 2006) ....................................................3, 17

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.,*
302 F.Supp.3d 1251 (D. Colo. 2018)..................................................28

*Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.,*
785 F.3d 1 (D.C. Cir. 2015) ...........................................................30, 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
591 U.S. ---, 140 S. Ct. 1891 (2020)..................................................25

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)...........................................................................25

*Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021)..................13, 29

iii

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..............................................................25, 26

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)......................................................................19

*Foster v. Mabus*,
   895 F.Supp.2d 135 (D.D.C. 2012).................................................30

*Hirsh v. U.S.*,
   No. 2021-2163, 2022 WL 3209327 (Fed. Cir. Aug. 9, 2022)...........20

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014).....................................................18

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360 (1989)......................................................................25

*Mayo Found. for Med. Educ. & Research v. U.S.*,
   562 U.S. 44 (2011)........................................................................18

*McKinney v. McDonald*,
   796 F.3d 1377 (Fed. Cir. 2015) .................................................3, 18

*Mexichem Fluor, Inc., v. EPA*,
   866 F.3d 451 (D.C. Cir. 2017), *r'hrng en banc denied* (Jan. 26,
   2018) ...........................................................................................26

*Mil. Ord. of the Purple Heart of USA v. Sec'y of Veterans Affairs*,
   580 F.3d 1293 (Fed. Cir. 2009) ......................................................3

*Mortg. Inv'rs Corp. v. Gober*,
   220 F.3d 1375 (Fed. Cir. 2000) ....................................................18

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
   463 U.S. 29 (1983)..............................................24, 27, 32, 33

*Nat. Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005)......................................................................26

*New York v. Fed. Energy Regulatory Comm'n*,
   535 U.S. 1 (2002)..........................................................................16

*Nyeholt v. Sec'y of Veterans Affairs*,
   298 F.3d 1350 (Fed. Cir. 2002) ..........................................................17

*Sw. Airlines Co. v. Saxon*,
   596 U.S. 450 (2022)..........................................................................19

*The Sierra Club v. U.S. Dep't of Agric.*,
   116 F.3d 1482 (7th Cir. 1997) (unpublished) ....................................28

**Statutes**

5 U.S.C. § 603 ......................................................................................10

5 U.S.C. § 604 .................................................................................11, 30

5 U.S.C. § 605 ........................................................................2, 10, 11, 30

5 U.S.C. § 611 .........................................................................................2

5 U.S.C. § 706 ......................................................................2, 16, 17, 18, 24

38 U.S.C. § 101 ....................................................................................20

38 U.S.C. § 111 ........................................3-9, 12, 16, 18-25, 31, 33, 36

38 U.S.C. § 502 ...............................................................................2, 3, 17

38 U.S.C. § 1703 .............................................................................31, 34

38 U.S.C. § 1725 ..................................................................................31

38 U.S.C. § 1728................................3-5, 7, 16-19, 21, 25, 26, 31, 34, 36

**Other Authorities**

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 § 50203(b)
   Stat. 64, 178 (Feb. 9, 2018)................................................................31

Honoring America's Veterans and Caring for Camp Lejeune Families
   Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206
   (Aug. 6, 2012) ................................................................................5, 22

VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56, § 263, 125
   Stat. 711, 732 (Nov. 21, 2011).............................................................5

38 C.F.R. Part 70, Subpart A ........................................................5

38 C.F.R. § 17.4020 ...............................................................34

38 C.F.R. § 70.2 ...........................................................6, 20, 21

38 C.F.R. § 70.30 ..........................................................1, 2, 6

85 Fed. Reg. at 70,553 ........................................................9, 10

85 Fed. Reg. at 70,554 .............................................................10

85 Fed. Reg. at 70,551 ..............................................................7

88 Fed. Reg. at 10,032 .........................................................1, 10

88 Fed. Reg. at 10,033 .............................................................32

88 Fed. Reg. at 10,033-10,035 .............................................11, 12

88 Fed. Reg. at 10,034 ........................................................34, 35

88 Fed. Reg. at 10,035 .............................................................11

88 Fed. Reg. at 10,036 ........................................................6, 10

88 Fed. Reg. at 90,120 ........................................................2, 15

E.O. 12866 ..........................................................9, 10, 11, 29, 30

Federal Rule of Appellate Procedure 15 .........................................2

*Report to the Congress: Medicare and the Health Care Delivery System*, MedPAC (Medicare Payment Advisory Commission) (June 2013)..........................................................................32

*Place*, Webster's Dictionary (1958 edition) ..............................20

## INTRODUCTION

The U.S. Department of Veterans Affairs (VA) currently pays the "actual cost" of ground and air ambulance transports for eligible veterans and beneficiaries pursuant to its regulation at 38 C.F.R. § 70.30(a)(4). VA has done so since 2008.

On February 16, 2023, the Secretary for Veterans Affairs published the final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023). The final rule will amend § 70.30(a)(4) to enable VA to pay the lesser of the actual charge or the Medicare fee schedule (MFS) amount for non-contract ground and air ambulance transports. The inevitable result will be a reduction in the rates paid by VA for non-contract ground and air ambulance transports to levels below the cost of providing the transport.

On October 26, 2023, Metropolitan Area EMS Authority, a.k.a. MedStar Mobile Healthcare (Medstar), Valley Ambulance Authority (VAA), Quaker Valley Ambulance Authority (QVAA), and Altoona Logan Township Mobile Medical Emergency Department Authority (AMED) (together, Petitioners) petitioned this Court for review of the final rule. *See* Pet. For Review, ECF No. 1-2. Petitioners are state or municipal government providers of ground ambulance services. Absent another funding source, the final rule will force Petitioners to downsize their operations through workforce reductions, furloughs, or reduced hours. It will also decrease access to ground ambulance services for veterans, especially in rural areas,

1

and adversely impact healthcare for veterans. Petitioners seek judicial review of the final rule because it is not in accordance with the law, exceeds the statutory authority of the Secretary, and is arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(2)(A) and (C).

On November 1, 2023, Petitioners filed a motion to stay the final rule pending judicial review. *See* Pet. Mot. For Stay, ECF No. 3-1. On December 29, 2023, VA published a new rule to delay the final rule's effective date from February 16, 2024 to February 16, 2025. *Delay of Effective Date*, 88 Fed. Reg. 90,120 (Dec. 29, 2023). VA stated that it was delaying the effective date of the final rule to allow more time for air ambulance contracting. It said nothing about ground ambulance providers, or the concerns the Petitioners have raised. *Id.* On February 5, 2024, the Court deferred Petitioners' motion for stay, pending judicial review by the assigned merits panel. Order, ECF No. 28.

Pursuant to 38 U.S.C. § 502, 5 U.S.C. §§ 605(b) and 611(a)(1)-(2), 5 U.S.C. §§ 706(2)(A) and (C), Federal Rule of Appellate Procedure 15, and Federal Circuit Rule 15(f), Petitioners request that this Court hold unlawful and set aside the amendment of 38 C.F.R. § 70.30(a)(4) in its entirety, and allow the current § 70.30(a)(4) to remain in effect pending any future rulemaking by VA after any remand of this case.

## STATEMENT OF RELATED CASES

There is no appeal in or from a civil action or proceeding in an originating tribunal that was previously before this or any other appellate court. There is similarly no case known to counsel to be pending in this or any other tribunal that will affect or be directly affected by the Court's decision in this case.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 38 U.S.C. § 502 to review substantive, interpretive, and procedural rules promulgated by VA, including "any amendments to those rules, and the process in which those rules are made or amended." *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015); *see also Mil. Ord. of the Purple Heart of USA v. Sec'y of Veterans Affairs*, 580 F.3d 1293, 1296 (Fed. Cir. 2009); *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1314 (Fed. Cir. 2006).

## STATEMENT OF THE ISSUES

1. Whether the final rule is in accordance with the statutory regime for payment for ambulance transports for veterans established in 38 U.S.C. §§ 1728 and 111, and within the authority of the Secretary under the same regime.

2. Whether the final rule is arbitrary and capricious.

# STATEMENT OF THE CASE

## A. The statutory and regulatory regime for the rulemaking

To meet the needs of the nation's veterans and in recognition of their service, Congress has enacted an independent statutory regime for the coverage and payment of veterans' healthcare benefits in Title 38 of the United States Code. The independent statutory regime reflects Congress's awareness that the needs of the nation's veterans differ from the needs of the general population, especially when their needs stem from or are connected to their service. It also evidences Congress's intent to meet veterans' unique needs. In 38 U.S.C. §§ 1728 and 111, Congress established the parameters for ensuring that veterans have sufficient access to ambulance services.

Section 1728(a) states that the Secretary shall reimburse veterans "for the *customary and usual charges* of emergency treatment (including travel and incidental expenses *under the terms and conditions set forth in section 111* of this title)." Subsection (b) states: "In any case where reimbursement would be in order under subsection (a) of this section, the Secretary may, in lieu of reimbursing such veteran, make payment of the *reasonable value* of emergency treatment directly [to the provider]." (emphasis added in both instances).

On May 2, 2022, VA issued an interpretive rule in the form of sub-regulatory guidance explaining the statutory and regulatory framework for payment for non-

contract ambulance transports of veterans. Appx1397-1398. The May 2022 guidance

states that VA pays for unauthorized emergency transports (typically, 9-1-1 calls)

under § 1728 at "[g]enerally billed charges." *Id*.

Section 111 authorizes the Secretary to make beneficiary travel payments in

any fiscal year if the Secretary determines that VA has available funding. Section

111(a) states that the Secretary "may pay the actual necessary expense of travel . . .

of any person *to or from a Department facility or other place* . . . for the purpose of

examination, treatment, or care." (emphasis added). In 2011 and 2012,[1] Congress

amended § 111(b)(3) to give the Secretary discretion in specified, limited

circumstances to pay less than the actual necessary expense of travel:

> In the case of transportation of a person *to or from a Department facility* by ambulance, the Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or [the MFS amount] unless the Secretary has entered into a contract for that transportation with the provider.

38 U.S.C. § 111(b)(3)(C) (emphasis added).

The Secretary implements § 111 through regulations at 38 C.F.R. Part 70,

Subpart A ("Beneficiary Travel and Special Mode of Transportation Under 38

U.S.C. 111"). Payments are covered for six categories of veteran beneficiaries who

---

[1] The VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56, § 263, 125 Stat. 711, 732 (Nov. 21, 2011); The Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206 (Aug. 6, 2012).

travel "to or from a VA facility or VA-authorized health care facility." §§ 70.10(a)(1)-(6). A "special mode of transportation" is defined as "an ambulance, ambulette, air ambulance, wheelchair van, or other mode of transportation specially designed to transport disabled persons." 38 C.F.R. § 70.2. Under the current regulation at 38 C.F.R. § 70.30(a)(4), which was published in 2008, VA pays the "actual cost of a special mode of transportation" for eligible veterans.

The final rule changes the long-standing payment regulation at § 70.30(a)(4). Instead of paying the actual costs of ambulance services, the final rule provides that "VA will pay the lesser of the actual charge for ambulance transportation or … [the MFS amount]" – unless VA "has entered into a contract with the vendor in which case the terms of the contract will govern VA payments." 88 Fed. Reg. at 10,036. The final rule also redefines "ambulance" as "advanced life support, level 1 (ALS1); Advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 C.F.R. 414.605." *Id.* (amending 38 C.F.R. § 70.2)

The change to the regulation at § 70.30(a)(4) has the effect of expanding § 111(b)(3)(C) to apply to *all* non-contract ambulance transports, including those to and from places *other than* Department facilities. The regulatory expansion of § 111(b)(3)(C) departs from the statutory text, which limits payment of the lesser of

the actual charge or the MFS amount to the limited class of transports "to or from a Department facility." The final rule violates the APA because the regulatory expansion is not in accordance with the text or structure of § 111.

The final rule also violates the APA because it reaches ambulance transports within the ambit of § 1728, which are paid at "generally billed charges." The application of the final rule to those transports nullifies § 1728, contrary to basic interpretive principles.

## B. The relationship between the OIG report and the rulemaking

The impetus for the rulemaking was a report from the VA Office of Inspector General (OIG) that faulted VA for failing to realize $11 million in savings for ambulance services between October 1, 2012 and December 31, 2015. According to OIG, VA could have achieved the savings by exercising its discretionary authority under § 111(b)(3)(C) to pay the lesser of the actual charge or the MFS amount. Appx1230, Appx1246-1247. The OIG recommended paying the MFS amount "when savings can be achieved . . . in accordance with 38 U.S.C. Section 111(b)(3)(C)." *Id.* VA concurred with the recommendation and committed to implement it through rulemaking. *Id.*

On November 5, 2020, the Secretary published the proposed rule. *Change in Rates VA Pays for Special Modes of Transportation*, 85 Fed. Reg. at 70,551 (Nov. 5, 2020). In the Regulatory Impact Analysis (RIA) accompanying the proposed rule,

the Chief Economist for VA projected savings, *i.e.*, payment reductions, that were at least four to five times the payment reductions OIG had projected for a similar period in its May 2018 report. OIG projected approximately $23.5 million in total payment reductions for the five-year period of 2019 through 2023. Appx1230, Appx1246-1247. In contrast, the Chief Economist for VA projected total payment reductions of $199,577,500 for the five-year period of 2021 through 2025, including $117,022,899 for the three-year period of 2021 through 2023 that overlapped with the period in the OIG report. *See* Appx1319.

The exponential increase in projected payment reductions indicates that VA applied a broader legal interpretation of § 111(b)(3)(C) than OIG when VA published the rule. In other words, OIG interpreted § 111(b)(3)(C) by its express terms to apply to non-contract ambulance transports to or from Department facilities, as Petitioners argue is the case, while VA went beyond the text of § 111(b)(3)(C) to reach non-contract ambulance transports to and from other places. No other explanation for the increase in projected payment reductions can be discerned from the OIG report or the final rule.

OIG clearly did not consider or recommend a payment policy change of the magnitude proposed by VA. Nor did OIG consider the consequences of such a dramatic change for ground ambulance providers and the veterans they serve if a payment policy change of such magnitude were implemented. The administrative

record, however, is replete with statements from VA that cast the rule change as the implementation of the OIG recommendation. *See e.g.*, Appx1333-1350 (VA responses to Senators Tester, Schatz, Hirono, Hickenlooper, Heinrich, Boozman, Daines, Bennet, Moran), Appx1493-1494 (VA response to Representative Allred), Appx1495-1502 (VA response to various letters from stakeholders). But numbers do not lie. Here, they show that OIG never recommended or even contemplated the interpretation of § 111(b)(3)(C) that VA applied in the final rule.

## C. The Secretary's Regulatory Flexibility Act certifications and responses to comments

The Secretary certified, pursuant to the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612, that the proposed rule would not have a significant economic impact on a substantial number of small entities. 85 Fed. Reg. at 70,553. The Secretary's certification was based on the October 28, 2020 RIA, which estimated that the potential impact of the proposed rule per vendor would be less than 1 percent of their annual reported receipts. *Id.* The RIA assumed that all ambulance providers, including the 2,979 entities identified as small entities, would bear the cost avoidance burden equally. *Id.* The RIA was also the basis for the Secretary's finding that the proposed rule was not a significant regulatory action under Executive Order (E.O.) 12866 because it would not have an annual effect on the economy of $100 million or more. *Id.*; E.O. 12866, § 3(f)(1).

The Secretary's certification enabled VA to avoid preparing an initial regulatory flexibility analysis. 5 U.S.C. §§ 603 605(b); 85 Fed. Reg. at 70,554. It similarly enabled VA to avoid a review under E.O. 12866. E.O. 12866, § 6(a)(3)(A); 85 Fed. Reg. at 70,553. Under such a review, VA would have provided the Office of Management and Budget (OMB) Office of Information and Regulatory Affairs (OIRA) with an explanation of "the manner in which the regulatory action is consistent with a statutory mandate," as well as an assessment of "any adverse effects on the efficient functioning of the economy," including employment, health, and safety. E.O. 12866, § 6(a)(3)(B)(ii) and (C)(ii). OIRA would have then scrutinized the rule using these factors.

The Secretary subsequently published the final rule with only two technical changes on February 16, 2023. 88 Fed. Reg. at 10,032. The final rule also included an RFA certification by the Secretary that the final rule would not have a significant economic impact on a substantial number of small entities, which was based on a revised RIA, dated January 5, 2023. The revised RIA projected a total payment reduction of $223,191,510 for the five years from 2023 through 2028. 88 Fed. Reg. at 10,036. The revised RIA was also the basis for the Secretary's finding that the final rule was not a significant regulatory action under E.O. 12866 because it would not have an annual effect on the economy of $100 million or more. *Id.* Once again,

VA avoided review under E.O 12866 and a regulatory flexibility analysis under the RFA, 5 U.S.C. §§ 604, 605(b).

Aside from the upward adjustment in the projected payment reduction, the revised RIA largely mirrors the original RIA, simply applying the same methodology to a later time period. Like the original RIA, it assumes that all ambulance providers will bear the potential impact of the rule equally and concludes that the potential impact of the rule per vendor will be "less than 1 percent of [their] preliminary receipts." Appx1487.

Commenters raised the concern that the proposed rule would devastate ambulance providers because the MFS amount is inadequate to cover the actual costs of ambulance transports, and VA would invoke the rule to pay the MFS amount "in all cases." *See e.g.*, Appx1351-1358, Appx1364-65, Appx1421-1422.

VA responded that it would pay the lesser of the actual charge or the MFS amount only to *non-contracted* ambulance providers. 88 Fed. Reg. at 10,033-10,035. VA further stated that it was delaying the effective date of the final rule until February 16, 2024, to ensure that ambulance providers had adequate time to adjust to the new methodology, including by "entering into negotiations with VA to contract for payment rates different than those under the [MFS]." 88 Fed. Reg. at 10,035. VA's responses to comments suggested to Petitioners that VA would

negotiate with any willing ground ambulance provider for the transports furnished by the provider.

At the same time, VA dismissed commenters' concerns that the MFS amount is inadequate to cover the actual cost of an ambulance transport. VA asserted that Congress had evidently deemed the MFS amount sufficient because Congress gave VA the discretion to pay the MFS amount when it enacted in § 111(b)(3)(C). VA then punted commenters' concerns to the Centers for Medicare & Medicaid Services (CMS), stating that "VA cannot modify or increase the CMS ambulance fee schedule rates." 88 Fed. Reg. at 10,033-10,035. Ultimately, however, VA reassured commenters that it would retain contracting authority, and that "contracts could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations … ." *Id.*[2]

Any interest that VA had in robust contracting with ground ambulance providers was short-lived. After purporting to delay the effective date of the final rule to allow for contracting with VA, and repeatedly assuring providers that concerns about the adequacy of the MFS were addressable through contracting, VA changed course with ground ambulance providers.

---

[2] VA's assurances of contracting opportunities were inconsistent with the original and revised RIAs, which assumed no increases in provider contracting. Appx1317-1319, Appx1485-1486.

## D. VA implementation of the final rule through provider contracting

VA has implemented the final rule through shifting contracting initiatives rolled out over three industry days in 2023. The statements by VA during the rollout reveal that VA's implementation of the final rule is fluid, and inconsistent with the reasoning that VA set out in the preamble to the rule.[3]

During the first industry day on May 25, 2023, VA told providers that each of the 172 VA Medical Centers (VAMCs) nationwide would "solicit contracts for ground and air ambulance service for [its] entire catchment area," and that contracted rates would be based on market pricing. Appx1770. That statement was consistent with the preamble of the final rule.

VA pivoted from this position at the second industry day on July 20, 2023. It stated that contracting would be limited to VA-initiated ambulance trips and would not include transports initiated through the 9-1-1 system, which would be paid at the

---

[3] The VA transcripts of the VA industry days are not part of the rulemaking record prepared by the Government. Petitioners nonetheless present excerpts of the VA transcripts to the Court because VA's statements show that, since publishing the final rule, VA has offered conflicting interpretations of the final rule, including with respect to the scope of contracting the agency intends to enter into under the final rule, without considering and resolving how VA intends to scope and complete the contracting. The Court should consider VA's statements because excluding them from review of this Petition would "frustrate effective judicial review." *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Alternatively, the Court may take judicial notice of the transcripts because they are from a source whose 'accuracy cannot be reasonably questioned': VA itself. *Euzebio v. McDonough*, 989 F.3d 1305, 1323 (Fed. Cir. 2021).

MFS amount under the final rule. Appx1526, Appx1542. Such transports make up most ground ambulance services. So, after repeatedly highlighting in the preamble to the final rule that providers would be able to contract with VA, VA suddenly turned around and eliminated that option for most of the providers' services.

VA held its third industry day on August 30, 2023. At that meeting, VA admitted that 78% of all VA dollars paid for ambulance services are for transports initiated through the 9-1-1 system. Appx1721. VA also confirmed that it conducted no independent analysis of the reasonableness or sufficiency of the MFS amount that it planned to pay for these transports. Appx709. VA assured providers—contrary to its statements during the second industry day—that it was close to expanding its contracts to include provisions for VA-initiated transports that would enable VA to pay the contract rate for 9-1-1-initiated transports. Appx700.

One VA official, however, was brutally honest. He stated that "the idea of taking [contracting] to every provider is [] gonna be a challenge for sure," and "I don't know if [VA] will be able to get to that." Appx1697. Those statements were prescient. VA has not solicited contracts for 9-1-1-initiated ground ambulance transports, and Petitioners are not aware of any VA solicitations for contracts for such transports. The dearth of provider contracting for 78% of all VA dollars paid for ambulance services is a striking departure from the preamble.

Petitioners read the writing on the wall at the third industry day and moved for an administrative stay of the final rule on September 27, 2023. VA never responded. Petitioners renewed their motion on October 13, 2023, but VA merely acknowledged receipt of the motion. On October 26, 2023, before filing the petition, Petitioners again renewed their motion for an administrative stay. VA acknowledged receipt, but informed Petitioners that the agency intended to treat the motion as a request for rulemaking. On November 1, 2023, Petitioners moved for a stay of the final rule pending judicial review. *See* Pet. Mot. For Stay, ECF No. 3-1.

On December 29, 2023, VA published a new final rule to delay the effective date of the original final rule until February 16, 2025. 88 Fed. Reg. at 90,120. VA's stated purpose in delaying the final rule is "to accommodate unforeseen difficulties in air ambulance broker contracting," which relate to "air ambulance brokers requiring a contract or subcontract in place with all potential air ambulance providers that covers emergency, non-VA initiated trips." *Id.* Nothing in the new final rule suggests that VA plans to contract for 9-1-1-initiated ground ambulance transports, or voluntarily address Petitioners' concerns about the impact of the final rule on ground ambulance providers and the veterans they serve.

## SUMMARY OF THE ARGUMENT

A federal agency may not enact a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right." 5 U.S.C. §§ 706(2)(A), (C). The final rule is not in accordance with, and exceeds, the Secretary's authority to set reimbursement rates for ambulance transports in 38 U.S.C. §§ 1728 and 111. *See, e.g., New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 18 (2002) ("an agency literally has no power to act . . . unless and until Congress confers power upon it.").

The final rule defeats the requirement in § 1728 to pay the "customary and usual charges of emergency treatment" or the "reasonable value of emergency treatment," including emergency ambulance transports.

The final rule also upends § 111. Section 111(a) states broadly that the Secretary pays the "actual necessary expense of travel … to or from a Department facility *or other place[.]*" (emphasis added). Congress gave the Secretary limited discretion in § 111(b)(3)(c) to pay lower rates for ambulance transports to or from Department facilities *only*. The final rule goes far beyond the plain text of § 111(b)(3)(C)—and swallows § 111(a) whole—by paying the "lesser of" the actual charge or the MFS amount for *all* non-contract ambulance transports. The Secretary's regulatory expansion of § 111(b)(3)(c) to reach non-contract ambulance transports to and from places other than Department facilities plainly exceeds Congress's limited grant to the Secretary of discretionary authority to pay the lesser of the actual charge or the MFS amount.

In addition, the final rule is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), in at least five ways. First, the Secretary changed VA's legal interpretation of § 1728 through the final rule and failed to acknowledge and provide a reasoned explanation for doing so. Second, the Secretary certified under the RFA that the rulemaking will not have a significant economic impact on a small number of entities when its own data showed otherwise. Third, VA conducted no independent analysis of the reasonableness or sufficiency of the MFS amount for ambulance providers transporting veterans. Fourth, the Secretary completely failed to consider an important part of the problem: VA's statutory obligations under the Veterans Community Care Program. Fifth, VA failed to sufficiently respond to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas.

## STANDARD OF REVIEW

This Court reviews petitions under § 502 in accordance with the standard set forth in the APA. *See Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350, 1355 (Fed. Cir. 2002). The APA requires a reviewing court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; *see Coal. for Common Sense*, 464 F.3d at 1314. The court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A); *see Mortg. Inv'rs Corp. v. Gober*, 220 F.3d 1375, 1378 (Fed. Cir. 2000); *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015).

## ARGUMENT

### A. The final rule is not in accordance with law, and in excess of statutory authority, because it defeats the text and structure of §§ 1728 and 111

In determining whether agency action is "not in accordance with law" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" under the APA, 5 U.S.C. §§ 706(2)(A) and (C), courts have looked to the process established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The first question is "whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. U.S.*, 562 U.S. 44, 52 (2011). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013). To discern whether Congress has addressed the precise question, the court applies the "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n. 9. These tools include evaluation of the plain statutory text and the overall purpose and structure of the statute, while giving effect, if possible, to every clause and word of the statute. *See Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014). In appropriate cases, the tools may also include evaluation of the drafting history of the statute. *Id.*

The court must read and interpret the statutory language in context of the entire statute and not in isolation. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (citations omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

The final rule defeats the text and structure of both statutes governing VA reimbursement of ambulance transports of veterans: §§ 1728 and 111. It expands the limited discretion to pay the MFS amount in § 111(b)(3)(C) to a degree that renders §§ 1728 and 111(a) meaningless.

1. *The final rule defeats the text and structure of § 1728 by extending § 111(b)(3)(C) to all emergency ambulance transports reimbursed under § 1728*

Section 1728(a) states that the Secretary shall reimburse veterans "for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111 of this title)." In cases "where reimbursement would be in order under subsection (a)," subsection (b) gives the Secretary discretion to pay providers directly for "the reasonable value of emergency treatment." Reimbursement for an emergency ambulance transport is in order under subsection (a) when the provider furnishes the transport "under the terms and conditions set forth in section 111."

The "terms and conditions set forth in section 111" establish when and under what circumstances VA may pay for "travel and incidental expenses." Specifically, § 111(a) states that the Secretary "may pay the actual necessary expense of travel . . . of any person to or from a Department facility or other place . . . for the purpose of examination, treatment, or care." The "Department" means the "Department of Veterans Affairs," or "VA." 38 U.S.C. § 101(1); 38 C.F.R. § 70.2. A "Department facility" is a "VA facility." And a "VA facility" is a "VA Medical Center (VAMC), VA Outpatient Clinic (OPC), or VA Community Based Outpatient Clinic (CBOC)." *Id*. Thus, when an emergency ambulance transport runs to or from a VAMC, OPC, CBOC or "other place," and is for the purpose of examination, treatment, or care, it is reimbursable under the terms and conditions set forth in section 111.

The term "other place" is not defined in the statute or any VA regulation. So, the plain and ordinary meaning of the words control. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 673-74 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *see also Hirsh v. U.S.*, No. 2021-2163, 2022 WL 3209327, *4-6 (Fed. Cir. Aug. 9, 2022) (nonprecedential). When Congress enacted § 111(a) in 1958, the word "place" meant "a particular part of space; a spot; a locality; [or] a building … ." *Place*, Webster's Dictionary (1958 edition). Under that definition, the

places served by ground and air ambulances are many. They include private healthcare facilities,[4] businesses, residences, parks, and accident sites, to name a few.

The final rule is not in accordance with § 1728 because it extends the "lesser of" methodology in § 111(b)(3)(C) to all emergency ambulance transports reimbursed "under the terms and conditions of section 111" and, by extension, § 1728. Nothing in § 1728 or § 111 suggests that Congress intended for the limited grant of discretion in § 111(b)(3)(C) to overrule the statutory directive in § 1728 to pay "customary and usual charges" or the "reasonable value" for emergency ambulance transports. Yet that is exactly what the final rule would achieve. The Court must vacate the final rule on that basis alone.

2. *The final rule defeats the text and structure of § 111 by extending § 111(b)(3)(C) to ambulance transports to and from places other than Department facilities*

As discussed above, § 111(a) states that the Secretary "may pay the actual necessary expense of travel . . . of any person *to or from a Department facility or other place* . . . for the purpose of examination, treatment, or care." (emphasis added). This broad language authorizes the Secretary to pay the actual necessary

---

[4] A private, "VA-authorized healthcare facility" is an "other place," not a "Department facility." The Secretary defines a "VA-authorized healthcare facility" as "a non-VA healthcare facility where VA has approved care for an eligible beneficiary at VA expense." 38 C.F.R. § 70.2. Because a non-VA facility is the opposite of a VA facility, and a VA facility is a Department facility, Department facilities are different from non-VA facilities.

expense (meaning, the actual cost) of travel to or from a VAMC, OPC, CBOC or other place, for the purpose of examination, treatment, and care. The language applies to travel for emergency and non-emergency care, regardless of whether the travel is by ground or air ambulance or other special mode of travel.

Congress amended § 111(b)(3)(C) in 2011 to give the Secretary discretion to pay the lesser of the actual charge or the MFS amount *only and expressly* for non-contract ambulance transportation "to or from a Department facility." Congress could have easily made § 111(b)(3)(C) applicable to travel to and from other places, and thus coextensive with § 111(a). But Congress chose not to do so.

In 2012, Congress had a second opportunity to include travel to and from other places in § 111(b)(3)(C) as part of The Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206 (Aug 6, 2012). Again, Congress chose not to do so.

As originally enacted in 2011, § 113(b)(3)(C) applied "[i]n the case of transportation of a person under subparagraph (B) by ambulance."[5] In 2012,

---

[5] Section 111(b)(3)(B) states: "In the case of travel by a person to or from a Department facility by special mode of travel, the Secretary may provide payment under this section to the provider of the transportation by special mode before determining the eligibility of such person for such payment if the Secretary determines that providing such payment is in the best interest of furnishing care and services. Such a payment shall be made subject to subsequently recovering from such person the amount of the payment if such person is determined to have been ineligible for payment for such travel."

Congress struck the words "under subparagraph (B)" and inserted the words "to or from a Department facility." The fact that Congress twice chose narrower language for § 111(b)(3)(C) than for § 111(a) underscores that the restrictive framing in § 111(b)(3)(C) was deliberate. Congress plainly meant to give the Secretary discretion to pay the MFS amount *only* for transports to or from Department facilities, and *not* for transports to and from other places, like private healthcare facilities.

In 2012, VA itself recognized the limit that Congress imposed on the Secretary's discretion in § 111(b)(3)(C). Specifically, VA told Congress in an appropriations request that § 111(b)(3)(C) "is limiting and VA will draft proposed legislation to address a technical change in the law." Appx803. VA still has not proposed legislation to amend § 111(b)(3)(C).

Instead, VA has attempted to extend § 111(b)(3)(C) through a rule applying the MFS amount to all non-contracted ambulance transports to and from places other than Department facilities. The extension of § 111(b)(3)(C) in the final rule is sweeping; it reaches non-contracted ambulance transports to and from places ranging from private healthcare facilities to businesses, residences, and accident scenes. The result is that the final rule would defeat the statutory directive in § 111(a) to pay the actual necessary expense (meaning, the actual cost) for ambulance

transports to and from the "other places" that represent most ambulance transports of veterans.

VA cannot accomplish through a rule what Congress refrained from doing in the statute. The final rule exceeds the limited grant of discretion to pay the MFS amount in § 111(b)(3)(C). And it upends the overall structure of § 111 by defeating the operation of § 111(a). The Court should vacate the final rule under §§ 706(2)(A) and (C) because it is unlawful.

## B.  The final rule violates the APA because it is arbitrary and capricious

One of the basic procedural requirements of administrative rulemaking is that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily or capriciously if it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view … ." *Id.* at 43 (internal citations and quotation marks omitted); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008). Thus, in evaluating agency actions under the "arbitrary and capricious" standard, courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378, (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, (1971); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).

When an agency changes its position, including by revising a prior legal interpretation, it must "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). When an agency "is not writing on a blank slate," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ---, 140 S. Ct. 1891, 1915 (2020)

1. *VA failed to display awareness that it was changing its legal interpretation of § 1728, much less show good reasons for its change of position*

As discussed earlier, VA issued an interpretive rule on § 1728 in the form of a sub-regulatory guidance document in May 2022. The interpretive rule stated that VA pays for unauthorized emergency transport under § 1728 at "[g]enerally billed charges."

The final rule changes VA's legal interpretation of § 1728 by applying § 111(b)(3)(C) to emergency ambulance transports under § 1728, so that payment is

made at the lesser of the actual charge or the MFS amount instead of "[g]enerally billed charges."

Nowhere in the final rule does VA discuss § 1728, much less acknowledge or offer good reasons for departing from its prior legal interpretation of § 1728. The complete and total failure to address §1728 in the final rule—after publishing an interpretive rule on § 1728 months earlier—was arbitrary and capricious. *Nat. Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (holding that an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."); *Fox Television Stations*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *Mexichem Fluor, Inc., v. EPA*, 866 F.3d 451, 461 (D.C. Cir. 2017), *r'hrng en banc denied* (Jan. 26, 2018) (vacating rule and remanding to EPA to "explain the basis for its conclusion and explain its change in interpretation" of its statutory authority). The Court should vacate the final rule on that ground alone.

2. *The Secretary based his RFA certifications on flawed RIAs and failed to examine VA data that was relevant to the economic analysis*

The Secretary certified under the RFA that neither the proposed rule nor the final rule would have a significant economic impact on a substantial number of small entities. The Secretary premised those certifications on the original and revised RIAs, respectively. In each RIA, the Chief Economist for VA projected the "transfer

savings," *i.e.*, payment reductions, that VA would achieve over five years by migrating payments from billed charges to the MFS amount. Appx1319, Appx1485. He then allocated the payment reductions pro rata across all ambulance providers, estimated the per entity burden "to be less than 1% of preliminary receipts," and deemed the burden insignificant for all ambulance providers. Appx1319, 1487.

The Secretary was required to "examine the relevant data" when he made the RFA certifications. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. He failed to do so because he limited his examination to the RIAs. As it turns out, VA also had data on actual payments for non-contract ambulance transports that showed that the projections in the RIAs were wildly off the mark.

In the original RIA dated October 28, 2020, the Chief Economist projected that from 2021 through 2025, ambulance providers would charge $1,458,899,847 for non-contract ambulance transports, and that under the final rule, VA payments would drop by $199,577,499, from $1,458,899,847 to $1,259,322,348. Appx1319. The Chief Economist bumped those numbers up in the revised RIA dated January 5, 2023. He projected that from 2024 through 2028, ambulance providers would charge $1,701,798,038 for non-contract ambulance transports, and that under the final rule, VA's payments would drop by $223,191,510, from $1,631,516,872 to $1,408,325,365. Appx1485.

After the industry day on July 20, 2023, VA released data in response to a

Freedom of Information Act (FOIA) request that showed that VA actually paid a total of $1,653,725,407 for non-contract ambulance transports *in fiscal year 2022 alone*. Appx1779. The original RIA thus underestimated the total provider charges and the reduction in payments under the final rule by a factor of more than five. Then, *despite the availability of actual ambulance data for 2022 and preceding fiscal years*, the revised RIA *used the same flawed numbers and methodology VA had used in the original RIA*.

The RFA certifications are a classic case of "garbage in, garbage out." *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 302 F.Supp.3d 1251, 1271-72, 1274 (D. Colo. 2018) (holding that agency's reliance on opinion of government expert "knowing it was based on information bereft of key data" was arbitrary and capricious); *The Sierra Club v. U.S. Dep't of Agric.*, 116 F.3d 1482, *12-14 (7th Cir. 1997) (unpublished) (concluding that use of old, suspect data—without explanation for the failure to use better data—was arbitrary and capricious). The certifications are arbitrary and capricious because the Secretary examined only the RIAs, which inexplicably failed to use VA's actual payment data showing a significant economic impact on small entities.[6]

_____

[6] Neither the FOIA response nor the data it contains are part of the rulemaking record prepared by the Government. The fiscal year 2022 data was in the possession of VA *during the rulemaking* and should have been considered in the rulemaking record. Plus, it alone shows that the revised RFA certifications present a "garbage in, garbage out" problem. The fiscal year 2022 data are thus necessary for effective

The RFA certifications are also arbitrary and capricious because the Secretary entirely failed to consider an important aspect of the problem: differences between ambulance providers. Again, the Secretary looked only at the RIAs, in which the Chief Economist assumed without examination or explanation that ambulance providers are fungible and uniformly able to absorb a 1% reduction in preliminary receipts. The Secretary ignored the differences in operations (air versus ground), service area (rural versus urban), case mix (emergency versus non-emergency), and third-party payer mix (VA versus other or no coverage) that impact whether the provider can absorb a 1% reduction without decreasing services. The Secretary's failure to acknowledge and rationally account for the differences in his RFA certifications violated the APA.

The RFA certifications enabled VA to avoid initial and final regulatory flexibility analyses, as well as review under E.O. 12866. Those assessments would have subjected the rule to much stricter scrutiny. VA, for example, would have had to assess the direct costs the rule would impose on ambulance providers (instead of treating ambulance providers as fungible), and evaluate the possible adverse effects of the rule, such as employee layoffs, reduced services, and the erosion of veterans'

---

judicial review and should be considered by the Court. *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1381. Alternatively, the Court may take judicial notice of the data because it is from a source whose 'accuracy cannot be reasonably questioned': VA itself. *Euzebio v. McDonough*, 989 F.3d at 1323.

health. 5 U.S.C. §§ 604, 605; E.O. 12866, §§ 6(B)(ii) and (C)(ii). The result would have been a more rigorous rulemaking, which would have benefited small entities such as Petitioners QVAA and VAA. The Court should vacate the arbitrary and capricious RFA certifications and remand to VA to conduct a more rigorous rulemaking that considers the effects on small providers.

3. *VA failed to independently evaluate whether the MFS amount is sufficient to provide the healthcare for veterans that Congress has entrusted to VA*

VA admits that it conducted no independent analysis of the sufficiency or reasonableness of the MFS for ground ambulance providers transporting veterans. Appx1709.

VA asserts that the MFS amount is nonetheless sufficient for VA programs because CMS and the legislative branch have supposedly deemed it so. VA, however, cannot delegate its rulemaking authority to the legislative branch any more than VA can pass it off to CMS. The APA requires VA to independently assess whether the MFS amount is sufficient for VA programs, and not to categorically defer to CMS or any other part of the Government. *Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.,* 785 F.3d 1, 16 (D.C. Cir. 2015). "[S]uch faith in another agency's decisionmaking fails to account for the very real possibility that the other agency acted improperly or irrationally. Indeed, the other agency's decision could very well be arbitrary and capricious…" *Foster v. Mabus*, 895 F.Supp.2d 135, 148 (D.D.C.

2012) (vacating Navy decertification that was based solely on Marine Corps decertification).

VA's *ipse dixit* reliance on CMS is egregious for two reasons. First, Congress has recognized that the healthcare needs and circumstances of the nation's veterans differ from those of Medicare beneficiaries and has marked them for special consideration through VA. *See, e.g.* 38 U.S.C. §§ 111, 1703, 1725, 1728. Second, Congress has, in fact, ordered a whole-of-government review of CMS rates for paying ground ambulance providers serving Medicare beneficiaries. In § 50203(b) of the Bipartisan Budget Act of 2018 (BBA), Pub. L. No. 115-123, 132 Stat. 64, 178, (Feb. 9, 2018), Congress amended § 1834(l) of the Social Security Act (SSA) to require CMS to collect cost, revenue, utilization, and other data from ground ambulance providers for five years. The amendment also requires the Medicare Payment Advisory Commission (MedPAC), an independent legislative branch agency, to assess and submit a report to Congress on both the data collection and *the adequacy of the MFS for ground ambulance services*. 132 Stat. at 180 (adding SSA §§ 1834(l)(17)(F)(i)-(ii)). It is nonsensical for VA to find that the MFS amount is adequate for VA programs when, at Congress's direction, CMS is collecting years of ground ambulance data as part of a wholesale reassessment of the adequacy of the MFS amount for the Medicare program.

VA's *ipse dixit* reliance on the legislative branch is equally egregious. VA asserts that Congress found the MFS amount sufficient for VA programs for 2025 and future years because Congress granted VA the discretion to pay the MFS amount in 2011. 88 Fed. Reg. at 10,033. But the grant of discretion to choose between paying the actual charge or the MFS amount was not a finding by Congress that the MFS amount is always sufficient for VA programs. Nor does the grant of discretion relieve VA from its obligation under the APA to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. VA has paid the actual cost for non-contract emergency ground ambulance transports since 2008; it is still required to explain why it is rational to pay the MFS amount for such transports beginning in 2025.

VA also cites the "most recent ambulance report" of MedPAC, which supposedly "found that, in aggregate, Medicare ambulance margins were adequate." 88 Fed. Reg. at 10,033. But MedPAC stated only that "Medicare margins appear to be adequate," and did not assess the margins for ground ambulance providers in VA programs. *See Report to the Congress: Medicare and the Health Care Delivery System*, MedPAC (Medicare Payment Advisory Commission), at 185 (June 2013), available at: https://www.medpac.gov/wp-content/uploads/import_data/scrape_files /docs/default-source/reports/jun13_entirereport.pdf (last visited Mar.7, 2024).

Furthermore, the "most recent ambulance report" was published in June 2013 – almost 10 years before the final rule. VA has not satisfactorily explained why a vague statement by MedPAC in 2013 justifies payment of the MFS amount in VA programs beginning in 2025.

Nor has VA squared its *ipse dixit* reliance on the legislative branch with the BBA. Congress plainly questioned the adequacy of the MFS amount for the Medicare program when it ordered a multi-year, whole-of-government review of the MFS amount in the BBA. MedPAC is now poised to issue a report assessing the adequacy of the MFS amount for the Medicare program based on recent data from ground ambulance providers. At no point in the final rule does VA reconcile the MedPAC report from June 2013 or the supposed findings of Congress in 2011 when it enacted § 111(b)(3)(C) with the ongoing, congressionally mandated review of the adequacy of the MFS amount for the Medicare program. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43.

The Court should vacate the final rule because VA's failure to independently assess the sufficiency of the MFS amount for VA programs is arbitrary and capricious.

4. *VA failed to consider an important part of the problem: its fulfillment of its statutory obligations under the Veterans Community Care Program*

The Veterans Community Care Program enables VA to furnish hospital care, medical services, and extended care services to covered veterans through contracts

with "non-Department providers." 38 U.S.C. §§ 1703(a)(1), (c)(1), (d)(1). Under the program, VA must "coordinate the furnishing of hospital care, medical services, and extended care services" to "ensur[e] continuity of care and services[,]" and "that covered veterans do not experience … an unusual or excessive burden in accessing hospital care, medical services, or extended care services." 38 U.S.C. §§ 1703(a)(2)(B), (D). VA currently meets its obligation by paying for some emergency ground ambulance transports at "billed charges" under 38 U.S.C. § 1703 and 38 C.F.R. § 17.4020(c), while paying "billed charges" for unauthorized emergency ground ambulance transports under 38 U.S.C. § 1728. Appx1397-1398. Before publishing the final rule, VA failed to consider whether reducing payments to the MFS amount will force ground ambulance providers to reduce services, and thereby reduce veterans' continuity and access to care under the Veterans Community Care Program. The failure to consider the potential spillover effect on the Veterans Community Care Program was arbitrary and capricious, and yet another reason to vacate the final rule.

5. *VA failed to respond sufficiently to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas*

Providers commented that the rule will reduce veterans' access to ground ambulance services in rural areas. 88 Fed. Reg. at 10,034. Members of Congress raised similar concerns. Appx1324-1332. VA responded in the final rule that it

would contract with providers as needed. 88 Fed. Reg. at 10,034. Even as VA held out the promise of contracting for ground ambulance services during the rulemaking, VA failed to address the magnitude and complexity of the contracting that would be required to maintain veterans' access to emergency ground ambulance transports dispatched through the 9-1-1 system. To achieve that goal, VA would have to contract with thousands of ground ambulance providers nationwide. Nowhere in the final rule does VA assume such robust contracting with ground ambulance providers, much less project what the contracts will cost VA. The failure to resolve the contracting and rural access problems for 9-1-1-initiated ground ambulance transports is a glaring omission in the rulemaking given that 78% of VA dollars paid to ambulance providers are for such transports. Appx1721.

Two things are now obvious from the final rule and VA's statements during the VA industry days. First, VA did not sufficiently respond to relevant and significant comments regarding the effects of the final rule on 78% of the dollars VA pays to ambulance providers. Second, VA did not sufficiently respond because it failed to grapple with the substance of the comments and resolve the policy problem of rural access to 9-1-1-initiated ground ambulance transports. Instead, VA paid lip service to the comments in the final rule by identifying contracting as a measure that VA would revisit after the rulemaking was completed.

"[M]erely hearing is not good enough[,] [VA] must respond to serious objections." *Del. Dep't,* 785 F.3d at 16. VA has neglected to do so throughout the rulemaking process. As a result, the final rule is arbitrary and capricious. The Court should vacate the final rule on that basis alone.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The final rule violates the APA in no less than seven discrete ways. It is unlawful because it defeats the text and structure of § 1728. It is similarly unlawful because it defeats the text and structure of § 111. What is more, it is arbitrary and capricious because the Secretary and VA failed to acknowledge and explain the change in the legal interpretation of § 1728, examine relevant data when making RFA certifications, independently assess the reasonableness and sufficiency of the MFS amount for VA programs, consider the potential spillover effect on the Veterans Community Care Program, and sufficiently respond to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas. Any one of these seven discrete APA violations is a basis for vacating the final rule and remanding this matter to VA. Petitioners seek a vacatur and remand to force VA to meaningfully address the many serious problems that have pervaded the rulemaking since 2020.

March 8, 2024

Respectfully submitted,


/s/ Brian Stimson
Brian R. Stimson
D.C. Bar No. 1657563
Sara M. Lord
MA Bar No. 546918
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Email: Brian.Stimson@agg.com
        Sara.Lord@agg.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, I caused a copy of the foregoing

Opening Brief to be served via CM/ECF upon the following:

>Director, Commercial Litigation Branch, Civil Division
>U.S. Department of Justice
>c-natcourts.appeals@usdoj.gov
>United States Department of Justice
>Commercial Litigation Branch, Civil Division
>PO Box 480
>Ben Franklin Station
>Washington, DC 20044


>*/s/ Brian Stimson*
>Brian R. Stimson
>ARNALL GOLDEN GREGORY LLP
>2100 Pennsylvania Ave., NW, Suite 350S
>Washington, D.C. 20037
>Main: (202) 677-4030
>Email: Brian.Stimson@agg.com
>
>*Counsel for Petitioners*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1104

**Short Case Caption:** Metropolitan Area EMS Authority v. Secretary of Veterans Affairs

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8,707 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/08/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson