2024-1104

---

United States Court of Appeals
for the Federal Circuit

---

**METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,**
*Petitioners*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

# UNOPPOSED BRIEF OF THE AMBULANCE ASSOCIATION OF PENNSYLVANIA AND THE SOUTH DAKOTA AMBULANCE ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS' OPENING BRIEF

---

Stephen R. Wirth, Esquire

PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amici Curiae*

March 13, 2024

# TABLE OF CONTENTS


| | Page(s) |
|---|---|
| TABLE OF AUTHORITIES | ii-v |
| CERTIFICATE OF INTEREST | vi-vii |
| INTRODUCTION | 1-2 |
| INTERESTS OF *AMICI CURIAE* | 3-5 |
| ARGUMENT | 5-26 |
| I. THE VA'S FINAL RULE DOES NOT CONFORM TO THE UNAMBIGUOUSLY EXPRESSED INTENT OF CONGRESS AND CONTRADICTS EXISTING STATUTORY FRAMEWORK | 5-9 |
| II. THE VA'S FINAL RULE IS UNREASONABLE AS A MATTER OF PUBLIC POLICY | 9-26 |
| A. The VA's reimbursement reduction will only add to the existing crises that Pennsylvania and South Dakota ambulance services are already enduring | 10-16 |
| B. Pennsylvania and South Dakota's high population of veterans and high number of veteran facilities will result in an even more negative impact from the VA rule to the ambulance services and veterans of these states | 16-19 |
| C. The VA's final rule must be vacated as the current self-imposed delay is inadequate and only provides temporary relief | 19-26 |
| CERTIFICATE OF COMPLIANCE | 27 |
| CERTIFICATE OF SERVICE | 28 |

# TABLE OF AUTHORITIES

## Statutes & Regulations

38 C.F.R. § 70.2……………………………………………………………………8

38 C.F.R. § 70.30(a)(4)…………………………………………………………..3

38 U.S.C. § 111(a)………………………………………………………………..7-9

38 U.S.C. § 111(b)(3)(C)…………………………………………………...3-4, 9

38 U.S.C. § 1728(a)………………………………………………………………7-8

38 U.S.C. §1728(b)………………………………………………………........7

88 Fed. Reg. 10,032 (Feb. 16, 2023)
(to be codified at 38 C.F.R. Part 70)……………………………………..3, 22-23

88 Fed. Reg. 90120 (Dec. 29, 2023)…………………………………………20

Internal Revenue Code § 501(c)(6)…………………………………………...1

Internal Revenue Code § 501(c)(3)…………………………………………...2

## Cases

*Atilano v. McDonough*, 12 F.4th 1375 (Fed. Cir. 2021)……………………………6

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023)…………………………………...6

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)……………………………………………………......6

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
447 U.S. 102 (1980)………………………………………………………..6

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)……………………………6

*Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021)……………...7

*Kelly v. Robinson*, 479 U.S. 36 (1986)……………………………………………..6

*King v. Burwell*, 576 U.S. 473 (2015)………………………………………………6-7

*Timex, V.I., Inc. v. United* States, 157 F.3d 879 (Fed. Cir. 1998)…………………6

*United States v. Hohri*, 482 U.S. 64 (1987)…………………………………………...6

**Other Authorities & Resources**

*Ambulance Association of Pennsylvania,* available at:
https://www.aa-pa.org/ ..........................................................................................1

*Ambulance Providers: Costs and Expected Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*,
GAO Report 07-383 (May 2007)………………………………………………...12-13

*Ambulance Providers: Costs and Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*, GAO Report 13-6 (October 1, 2012)……………12

*CMS CY 2023 Public Use file,* available at:
https://www.cms.gov/medicare/payment/fee-schedules/ambulance/ambulance-fee-schedule-public-use-files.........................................................................24, 25

*Center for Rural Pennsylvania,* available at: https://www.rural.pa.gov/data/rural-urban-definitions..........................................................................................24

Ferguson, Danielle, *Viability of Rural Ambulance Services in South Dakota at Risk Due to Staffing and Funding Shortages*, Mitchell Daily Republic
(May 3, 2021)…………………………………………………………………13-14

Gamboa, Ryan, *Ambulance Providers Negotiating Reimbursements Amidst New VA Rule*, KRTV News Great Falls (Dec. 22, 2023)……………………………........21

Huber, Makenzie, *New Report Recommends State Efforts to Sustain Rural Ambulance Services*, South Dakota Searchlight (Jan. 2, 2024)…………………...13

McGoldrick, Gillian, *Why Pennsylvania Paramedics Say 'EMS is Dying,'* The Philadelphia Inquirer (Aug. 30, 2023)……………………………………...11-12

*Medicare Claims Data*, CMS Database, available at: https://data.cms.gov/provider-summary-by-type-of-service/medicare-physician-other-practitioners/medicare-physician-other-practitioners-by-provider-and-service........................................24

*Medicare Ground Ambulance Data Collection System (GADCS) Required Information for Collection and Reporting*, Updated March 8, 2022, available at: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/Downloads/Medicare-Ground-Ambulance-Quick-Reference.pdf...................................................................................22

Notes of Testimony, Commonwealth of Pennsylvania House of Representatives: House Veterans Affairs & Emergency Preparedness Committee Public Hearing, *Pennsylvania EMS System in Crisis Stakeholder Testimony*, March 1, 2022, available at: https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2022_0025T.pdf........10-11

Panizzi, Tawnya, *'EMS is a Must': Pa. EMS Departments Struggle with Funding, Staffing and Increasing calls*, Pittsburgh Tribune-Review, (Oct. 10, 2017)…………………………………11-12

Panizzi, Tawnya, *Unsustainable Funding Model, Shrinking Workforce Leave Ambulance Services in Critical Condition,* Fox Chapel Herald (Oct. 8, 2023)…………………………………………..11-12

*Rates that VA Pays for Special Modes of Transportation*, available at: https://www.regulations.gov/document/VA-2020-VHA-0022-0002.....................23

*South Dakota Ambulance Association*, available at: https://sdaa.wildapricot.org/..........................................................................2

*South Dakota's Regional Services Designation Ambulance System Study*, South Dakota Department of Health, November 26, 2023, available at: ems-regional-services-designation-assessment-full-report.pdf (sd.gov)………13-16

Tanner, Mike, *Clark County Ambulance Service at Impasse with County Commission*, Go Watertown Radio (Nov. 10, 2023)……………………………...13

*U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/..............................................................16-17

*U.S. Department of Veterans Affairs Data, State Summaries: South Dakota*, available at: https://www.va.gov/vetdata/docs/SpecialReports/State_Summaries_South_Dakota.pdf..........................................................................................................................17

VA, *Initial Agency Decision on FOIA Request #23-09227-F*, (Aug. 18, 2023)……………………………………………………………23

*Veterans in South Dakota*, available at: https://usafacts.org/topics/veterans/state/south-dakota/........................................17

*Wall Ambulance Service in Danger of Closing, Needs More Funding, Volunteers,* KBH Radio (Feb. 7, 2023)……………………………………………...13, 15-16

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4(a), Counsel for the *amici curiae* certify the following:

1. The full name of every party or *amicus* represented by me is:

    1. Ambulance Association of Pennsylvania (AAP)

    2. South Dakota Ambulance Association (SDAA)

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    None.

3. All parent corporations and any publicly held companies that own 10 percent (10%) or more of the stock of the party or *amicus curiae* represented by me are:

    None.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or in a prior proceeding in this case or are expected to appear in this Court are:

    None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending matter:

    None.

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees), pursuant to Fed. Cir. R. 47.4(a)(6):

   None.

Respectfully submitted,

March 13, 2024

/s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amici Curiae*
Ambulance Association of Pennsylvania
South Dakota Ambulance Association

# INTRODUCTION[1]

The Ambulance Association of Pennsylvania

The Ambulance Association of Pennsylvania ("AAP") is a non-profit, tax-exempt § 501(C)(6) organization currently consisting of two hundred (200) members, who provide approximately eighty percent (80%) of the emergent and non-emergent ground ambulance transports across the Commonwealth of Pennsylvania. Declaration of Heather Harris, ¶ 4 (attached as Exhibit 1); *Ambulance Association of Pennsylvania,* available at: https://www.aa-pa.org/. Its members embody a vast array of ambulance providers including fire-based, hospital, municipal, and non-profit entities whose services include a significant number of 9-1-1emergency requests in both rural and urban settings. *Id.,* ¶ 5. Nearly eighty-five percent (85%) of AAP membership is comprised of small to mid-sized non-profit ambulance services. *Id.,* ¶ 6.

The AAP serves to advance the needs of its members and to help ensure their survival and sustainability. *Id.,* ¶ 7. AAP objectives include the protection of the financial interests of its members to ensure that those agencies may continue to operate and provide life-saving services. *Id.,* ¶ 8.

[1] All parties have consented to the filing of this brief. Furthermore, no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *amici*, their members, and their counsel contributed money to fund this brief.

The South Dakota Ambulance Association

The South Dakota Ambulance Association ("SDAA") is a non-profit, tax-exempt § 501(C)(3) organization currently consisting of a membership that includes fifty-seven (57) ground ambulance providers, one (1) air ambulance provider, as well as seven (7) corporate members. Declaration of Brian Hambek, ¶ 4 (attached as Exhibit 2). The SDAA membership provides over ninety percent (90%) of the emergent and non-emergent ground ambulance transports across South Dakota. *Id.,* ¶ 5. Its ground ambulance membership embodies a vast array of providers including ten (10) fire-based, five (5) hospital-based, thirty-two (32) municipal-based, nine (9) non-profit entities and one (1) for-profit entity whose services include a significant number of 9-1-1emergency requests in mostly rural and super rural settings. *Id.,* ¶ 6.

As its primary mission, the SDAA strives to promote health and safety in the state of South Dakota by providing an organized and unified voice for its members in an effort to advance cooperation, quality of care, ethics, professionalism, and the overall improvement of emergency health care services amongst the various ambulance providers. *Id.,* ¶ 7; *South Dakota Ambulance Association*, available at: https://sdaa.wildapricot.org/. A key part of its mission is also to communicate with intermediaries, legislators, and regulatory bodies to endorse programs that generally benefit the medical transportation industry. *Id.*

## INTERESTS OF *AMICI CURIAE*

Both the AAP and the SDAA membership – and indeed all ground and air ambulance services in these two large states that they respectively represent – will suffer a potentially crippling blow to their long-term sustainability if the VA's new payment scheme is implemented. Thus, these associations have a clear and direct interest in the outcome of this litigation.

According to current regulation, the U.S. Department of Veterans Affairs (hereinafter referred to as the "VA") provides for payment of "[t]he actual cost of a special mode of transportation," including all ground and air ambulance transports, regardless of whether those services are contracted with the VA or whether the travel is "to or from" a VA facility. 38 C.F.R. § 70.30(a)(4). However, under the VA's final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023) (to be codified at 38 C.F.R. Part 70), which becomes effective on February 16, 2025,[2] the rates paid by the VA will be severely reduced to the "lesser of" the actual charges or the Medicare Fee Schedule ("MFS") amount for *all* ambulance transports unless the VA has contracted with the provider, "in which case the terms of the contract will govern VA payments." 88 Fed. Reg. at 10,036. The VA avers that its authority to enact

[2] On December 29, 2023, without notice or public comment, VA delayed the final rule's effective date from February 16, 2024, until February 16, 2025.

this final rule is derived from a 2011 amendment to section 111 of Title 38 which, "[i]n the case of transportation of a person *to or from a Department facility* by ambulance," has afforded the Secretary discretion to pay "the lesser of the actual charge for the transportation or the amount determined by the [MFS] unless the Secretary has entered into a contract for that transportation with the provider." 38 U.S.C. § 111(b)(3)(C) (emphasis added).

The MFS amount is invariably less than not only the actual charges, but is also, for many ambulance services, less than the total cost of providing the transport. Harris Declaration, ¶ 9; Hambek Declaration, ¶ 8. As such, the VA's payment reduction will adversely impact the ground and air ambulance services who currently represent the membership of AAP.[3] Harris Declaration, ¶ 10. AAP anticipates that implementation of the VA's new rule will not only cause substantial financial harm to ambulance services serving our veterans but may also reduce access to needed emergency ambulance services for our veterans. *Id.*, ¶ 11. This could also result in the reduction of ambulance services provided to veterans, reductions in ambulance service staffing, and the potential closure of smaller, non-profit ambulance services. *Id.*

[3] Nearly all Pennsylvania ambulance services remain non-contracted with the VA. Harris Declaration, ¶ 12. Further, most ambulance services for veterans across the Commonwealth were 9-1-1 initiated and would not be subject to VA contract reimbursement - even if a contract was in place. *Id.*

Similarly, the payment reduction as a result of the VA's final rule will also financially burden the ground and air ambulance services who currently represent the membership of SDAA. Hambek Declaration, ¶ 12. Each of the fifty-seven (57) ground ambulance providers of the SDAA remain non-contracted with the VA. *Id.*, ¶ 14. In fact, the VA recently formed its own ambulance service to provide interfacility transports in Western South Dakota. *Id.* Thus, most ambulance services provided by the local EMS agencies to the veteran population throughout South Dakota are 9-1-1 initiated and would not be subject to VA contract reimbursement. *Id.* Consequently, the current financial landscape coupled with the implementation of the VA's final rule may cause ambulance providers in South Dakota to resort to lay-offs, employee pay cuts, and in some cases to permanently close. *Id.*, ¶ 17.

## ARGUMENT

### I. THE VA'S FINAL RULE DOES NOT CONFORM TO THE UNAMBIGUOUSLY EXPRESSED INTENT OF CONGRESS AND CONTRADICTS EXISTING STATUTORY FRAMEWORK

The petitioners accurately assert that the VA's final rule is not in accordance with existing statutory framework and exceeds the statutory authority that was granted by Congress as applying the "lesser of" methodology to all ambulance transports contradicts the unambiguous language of the applicable statutes.

In determining the meaning of a statute, the court's analysis requires employment of the traditional tools of statutory construction. *Atilano v. McDonough*, 12 F.4th 1375, 1380 (Fed. Cir. 2021); *Timex, V.I., Inc. v. United* States, 157 F.3d 879, 882 (Fed. Cir. 1998). At step one, the appellate court asks whether Congress has directly spoken to the precise question at issue. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984). "[T]he 'starting point in every case involving construction of a statute is the language itself." *United States v. Hohri*, 482 U.S. 64, 69, 107 S. Ct. 2246, 96 L. Ed. 2d 51 (1987) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S. Ct. 353, 93 L. Ed. 2d 216 (1986).

The assumption must be that the ordinary meaning of that language accurately expresses the legislative purpose. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). "Absent a clearly expressed legislative intention to the contrary, [the statute's plain] language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S. Ct. 2051, 64 L. Ed. 2d 766 (1980). Furthermore, the court should refrain from reading words into the statutory language that do not exist. *Cargill v. Garland*, 57 F.4th 447, 459-460 (5th Cir. 2023). Therefore, if the statutory text is unambiguous, then the statute's plain meaning controls and the court's inquiry is finished. *King v. Burwell*, 576 U.S. 473,

486, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015). Wherefore, an agency's interpretation that fails to conform to the statutory text must be reversed by the court. *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021).

In the present matter, pursuant to section 1728(a) of Title 38, Congress decreed that the Secretary of Veterans Affairs shall "reimburse veterans eligible for hospital care or medical services under [Chapter 17 of Part II of Title 38] for the *customary and usual charges* of emergency treatment (including *travel and incidental expenses under the terms and conditions set forth in section 111* of this title)." 38 U.S.C. § 1728(a) (emphasis added). Subsection (b) states that the Secretary may "make payment of the *reasonable value* of emergency treatment" to the provider in lieu of reimbursing such veteran directly. 38 U.S.C. §1728(b) (emphasis added). The VA's new payment scheme of reducing payments to the inadequate MFS amount is contrary to the plain meaning of the phrases "customary and usual charges" and "reasonable value" required under the statute.

A plain reading of section 111 clearly indicates that the "terms and conditions" define only those specific circumstances under which VA pays for travel and incidental expenses. However, the VA's interpretation improperly suggests that the "terms and conditions" control and dictate the *amount* that VA pays in every circumstance. Certainly, Congress intended for section 1728 to be considered contemporaneously with the language of section 111 in order to

preserve the explicit directive that the Secretary *shall* reimburse the "customary and usual charges", or "reasonable value" of emergency treatment for veterans. Otherwise, VA's interpretation of section 111 renders section 1728 meaningless. If Congress had intended that section 111 replace the unambiguous meaning of section 1728, it would have overtly stated that purpose or would have simply repealed section 1728 altogether.

Pursuant to section 111(a) the Secretary is permitted to "pay the actual necessary expense of travel (including lodging and subsistence), . . . of any person to or from a *Department facility or other place* . . . for the purpose of examination, treatment, or care." 38 U.S.C. § 111(a) (emphasis added). VA regulations have termed a "Department facility" as a "VA facility" which is further defined as a "VA Medical Center (VAMC), VA Outpatient Clinic (OPC), or VA Community Based Outpatient Clinic (CBOC)." 38 C.F.R. § 70.2. "[O]ther place[s]," which are undoubtedly not "VA facilit[ies]" could therefore include various locations including, but not limited to, roadsides, accident scenes, personal residences, private hospitals/emergency departments, office buildings, public accommodations, behavioral health facilities, and urgent care clinics. *See* Declaration of Kenneth Simpson, ¶ 28 (attached as Petitioner's Exhibit 2), Petition for Review Pursuant to 38 U.S.C. § 502, Case No. 2024-1104 (filed October 31, 2023).

The VA claims that the "or other place" language from section 111(a) also applies to section 111(b)(3)(C), thus extending the discretionary imposition of the MFS fee to encompass *all* non-contracted ambulance transports. It does not. The VA's interpretation is misplaced as it fails to conform to the statutory text, relying on words that simply do not exist in section 111(b)(3)(C). Just as Congress explicitly included "or other place" in section 111(a), it too could have added that exact language to section 111(b)(3)(C). Rather, Congress chose to unambiguously exclude it. As such, Congress clearly intended to refrain from adding it as a means of limiting the ambit of ambulance transports that could be subject to the lesser rate as *only* those "to and from a Department facility." As stated above an "other place" could comprise of a wide variety of locations that Congress simply did not intend to include for the purposes of section 111(b)(3)(C).

Consequently, in accordance with the laws of statutory construction, this Honorable Court must vacate the VA's final rule as it contradicts the plain meaning of the statutory language and exceeds the authority that Congress has bestowed upon the agency.

## II. THE VA'S FINAL RULE IS UNREASONABLE AS A MATTER OF PUBLIC POLICY

If the VA's final rule is not vacated, its implementation will negatively affect ambulance providers throughout Pennsylvania, South Dakota, and across the

nation which will in turn be detrimental to the countless veteran patients who regularly rely on vital healthcare services.

### A. The VA's reimbursement reduction will only add to the existing crises that Pennsylvania and South Dakota ambulance services are already enduring

Ambulance services throughout Pennsylvania, South Dakota, and across the United States are experiencing major crises. Harris Declaration, ¶ 13. Decreased reimbursement from payers - including federal, state, and commercial insurance programs – is crippling the ability to provide prompt and reliable ambulance services. *Id.;* Hambek Declaration, ¶ 13. Simply put, the reimbursement provided for basic and advanced life support ambulance services has not maintained pace with the ever-increasing costs of medical technology, ambulances and response vehicles, medications, and emergency medical personnel. Harris Declaration, ¶ 14.

Since the principal mechanism for any ambulance service provider to generate revenue is through reimbursement for patient treatment and transportation, the income must be at least equivalent to or exceed costs to ensure that an ambulance service can adequately function. (Notes of Testimony, Commonwealth of Pennsylvania House of Representatives: House Veterans Affairs & Emergency Preparedness Committee Public Hearing, *Pennsylvania EMS System in Crisis Stakeholder Testimony*, March 1, 2022, at 43-44). (https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2022_0025T.pdf).

Unfortunately, ambulance services throughout Pennsylvania as well as the United States have historically received *below-cost* reimbursement from Medicare for the services they have rendered.[4] *Id.* at 43-44, 46. Not only have these ambulance services had to manage with below-cost reimbursement, they have also had to deal with increased overhead expenses, such as increased costs for personal protective equipment ("PPE") and other pandemic-related equipment and increased costs for insurance coverage. *Id.* at 46-48. Furthermore, the industry has seen a stark shortage of workers which in turn has resulted in unstainable, rising wages without a corresponding increase in reimbursement to cover these substantial added costs. *Id.* at 47. Accordingly, ambulance services in Pennsylvania have reported catastrophic losses in revenue. *Id.* As these agencies have strained to simply survive, their ability to provide prompt 9-1-1 emergency response has been greatly impeded.[5] *Id.* at 50-51.

As such, the VA's new rule will only add to the woefully inadequate reimbursement scheme that has already resulted in the closure of several

[4] The National Emergency Medical Services Advisory Committee (NEMSAC) report on EMS Funding and Reimbursement, December 2, 2016, stated that "ambulance providers receive below-cost reimbursement for 72% of all transports." *Pennsylvania EMS System in Crisis Stakeholder Testimony*, at 44).

[5] In 2021, agencies across the Commonwealth responded to a total of 2,447,932 calls for service, an average of 6,706 call per day. The overwhelming majority of these calls for services were emergency responses to incident scenes. (*Pennsylvania EMS System in Crisis Stakeholder Testimony*, at 39-40).

Pennsylvania ambulance services with many other agencies on the brink of closing.[6] Clearly, as evidenced by two (2) United States Government Accountability Office ('GAO") reports and acknowledged by Congress through legislating temporary add-on payments to ambulance services under Medicare, the MFS amounts implemented under the new VA rule will reimburse ambulance services an amount that is below the cost of providing ambulance services to veterans. This improper action will take away essential reimbursement for services provided to veterans that our ambulance services require and have come to expect. *See Ambulance Providers: Costs and Medicare Margins Vary Widely; Transports to Beneficiaries Have Increased*, GAO Report 13-6 (October 1, 2012) (median Medicare margin ranges from -25.5% below cost to 15.3% above cost); *Ambulance Providers: Costs and Expected Medicare Margins Vary Widely; Transports to*

---

[6] *See* Panizzi, Tawnya, *'EMS is a Must': Pa. EMS Departments Struggle with Funding, Staffing and Increasing Calls*, Pittsburgh Tribune-Review (Oct. 10, 2017) https://www.ems1.com/ems-management/articles/ems-is-a-must-pa-ems-departments-struggle-with-funding-staffing-and-increasing-calls-MugqsdRgV11tNNkn/?utm_source=EMS1&utm_campaign=6970397abf-EMAIL_CAMPAIGN_2023_10_10_05_42&utm_medium=email&utm_term=0_13aebf8568-a57a5682c7-%5BLIST_EMAIL_ID%5D); McGoldrick, Gillian, *Why Pennsylvania Paramedics Say 'EMS is Dying,'* The Philadelphia Inquirer (Aug. 30, 2023) https://www.inquirer.com/politics/pennsylvania/ems-philly-lansdale-reimbursement-ambulances-20230830.html?outputType=amp; Panizzi, Tawnya, *Unsustainable Funding Model, Shrinking Workforce Leave Ambulance Services in Critical Condition,* Fox Chapel Herald (Oct. 8, 2023) https://triblive.com/local/valley-news-dispatch/unsustainable-funding-model-shrinking-workforce-leave-ambulance-services-in-critical-condition/.

*Beneficiaries Have Increased*, GAO Report 07-383 (May 2007) (median Medicare margin ranges from -35% below cost to 2% above cost).

Ambulance services in South Dakota are facing the same or similar daunting challenges of other providers across the country, exacerbated by changing workforce demographics, a struggling economy, and diminishing reimbursement.[7] *South Dakota's Regional Services Designation Ambulance System Study*, South Dakota Department of Health, November 26, 2023, at 5, available at: ems-regional-services-designation-assessment-full-report.pdf (sd.gov). To aggravate these challenges, the majority of rural emergency medical service (EMS) agencies in South Dakota remain largely volunteer based (though many volunteers receive a small, modest stipend for each call completed), with a forecasted decline in volunteer levels over the next five (5) to ten (10) years.[8] *Id.* As such, recruitment and retention are the greatest challenges facing ambulance services in

---

[7] *See* Huber, Makenzie, *New Report Recommends State Efforts to Sustain Rural Ambulance Services*, South Dakota Searchlight (Jan. 2, 2024) https://southdakotasearchlight.com/2024/01/02/new-report-recommends-state-efforts-to-sustain-rural-ambulance-services/; *Wall Ambulance Service in Danger of Closing, Needs More Funding, Volunteers,* KBH Radio (Feb. 7, 2023) https://kbhbradio.com/wall-ambulance-service-in-danger-of-closing-needs-more-funding-volunteers/; Tanner, Mike, *Clark County Ambulance Service at Impasse with County Commission*, Go Watertown Radio (Nov. 10, 2023) https://www.gowatertown.net/new-clark-county-ambulance-service-at-impasse-with-county-commission/.

[8] With the exception of some ambulance providers that serve the larger cities in South Dakota, the majority serve the vast rural and super rural settings that makeup

South Dakota. *Id.* at 6. The lack of staff is driven by the low number of transports, and related revenue, per year to support career personnel. *Id.* Rural ambulance services cover a vast geographic area with lengthy responses times and transport times to hospitals taking an ambulance and crew out of service for long periods. They simply do not see the call volume needed to cover costs such as equipment, insurance, training or staff. *See Viability of Rural Ambulance Services in South Dakota at Risk Due to Staffing and Funding Shortages.*

Further, South Dakota ambulance services largely depend on payments from insurers, patients, and government programs for funding.[9] *South Dakota's Regional Services Designation Ambulance System Study* at 20-21. However, these payments usually do not cover the costs of responding to an emergency or transporting a patient, let alone cover the overhead for the service. *See Viability of Rural Ambulance Services in South Dakota at Risk Due to Staffing and Funding*

---

the geographical landscape of the state. Hambek Declaration, ¶ 7; *See also*, Ferguson, Danielle, *Viability of Rural Ambulance Services in South Dakota at Risk Due to Staffing and Funding Shortages*, Mitchell Daily Republic (May 3, 2021) https://www.mitchellrepublic.com/community/viability-of-rural-ambulance-services-in-south-dakota-at-risk-due-to-staffing-and-funding-shortages.

[9] The VA is also extremely slow in paying claims. According to the SDAA, many South Dakota ambulance services have experienced numerous occasions where it will take months and even years – up to one (1) to two (2) years in some instances - for the VA to pay valid claims for ambulance transports for veterans. Hambek Declaration, ¶ 11.

*Shortages*. Consequently, these staffing and revenue shortages have made it challenging at best for ambulance services to efficiently operate, leading to major delays in response times and even causing some services to close. *Id.*

During and following the COVID-19 Public Health Emergency (PHE), the demand for emergency health care services surged throughout South Dakota and across the country. Hambek Declaration, ¶ 15. Despite the increased need for services, the number of EMS personnel has continuously declined in South Dakota. *Id.* As promoting volunteerism and retaining current staff were crucial to the survival of these ambulance services, many attempted to incorporate unstainable pay increases and stipends in order to entice new staff and retain current employees and volunteers. *Id.* As a result, the total number of ambulance providers in South Dakota has been reduced from one hundred thirty-two (132) at the beginning of the PHE to one hundred twenty-three (123) as of January 1, 2024. *Id.*, ¶ 16.

Therefore, this current financial landscape coupled with the implementation of the VA's final rule could cause many other ambulance providers in South Dakota to resort to lay-offs, employee pay cuts, and in some cases permanent closings. *Id.*, ¶ 17. Consequently, South Dakota's immense population of rural residents, many of whom are veterans, will likely endure longer response times or lose ambulance services altogether. *South Dakota's Regional Services Designation Ambulance*

*System Study,* at 5, 14, 30; *See also, Wall Ambulance Service in Danger of Closing, Needs More Funding, Volunteers*.

Put simply, basing VA reimbursement on current MFS rates would greatly reduce payments for services and serve as another "nail in the coffin" for many emergency ambulance providers in Pennsylvania and South Dakota, as it will further deteriorate the ability of those ambulance services to provide critical patient care and ambulance service to veterans, as well as other residents and visitors to their communities. Harris Declaration, ¶¶ 13, 15; Hambek Declaration, ¶ 3.

### B. Pennsylvania and South Dakota's high population of veterans and high number of veteran facilities will result in an even more negative impact from the VA rule to the ambulance services and veterans of these states

As of 2020, Pennsylvania is home to 816,629 veterans, the fourth (4th) highest veteran population nationwide.[10] *U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/. To serve the medical needs of this large population of veterans, the Commonwealth has many VA medical facilities, including forty-nine (49)

[10] More than half of the veteran population of Pennsylvania consists of individuals who are 65 years of age or older. *U.S. Department of Veterans Affairs Data, State Summaries: Pennsylvania*, available at: https://www.datahub.va.gov/stories/s/State-Summaries_Pennsylvania/7bt9-ycpy/.

outpatient care sites, seven (7) inpatient care sites, and twelve (12) medical centers. *Id.*

As of 2022, South Dakota has an estimated total veteran population of 56,590. *Veterans in South Dakota*, available at: https://usafacts.org/topics/veterans/state/south-dakota/. This figure represents 8.3% of the entire population of the state – making it the 9th highest veteran population in terms of density. *Id.* Accordingly, South Dakota has a number of VA medical facilities to accommodate its veterans including nine (9) outpatient care sites, three (3) inpatient care sites, and two (2) medical centers. *U.S. Department of Veterans Affairs Data, State Summaries: South Dakota*, available at:https://www.va.gov/vetdata/docs/SpecialReports/State_Summaries_South_Dakota.pdf

Based on these figures, it is only logical to deduce that both Pennsylvania-based and South Dakota-based[11] ambulance agencies have substantial contact with veterans on a regular basis. Thus, if the new VA payment reduction is implemented, the veteran communities across Pennsylvania and South Dakota will undoubtedly suffer. Harris Declaration, ¶ 15; Hambek Declaration, ¶¶ 3, 18. Ambulance services may be unable to provide services to veterans in many cases,

---

[11] The number of VA ambulance transports in South Dakota nearly doubled from 2021 to 2022. *South Dakota's Regional Services Designation Ambulance System Study*, at 20.

and if they are able to provide services, there may be response delays and lower levels of clinical care that can be provided. Harris Declaration, ¶ 15. This will only exacerbate the long response times already suffered by rural South Dakota veterans. *South Dakota's Regional Services Designation Ambulance System Study,* at 5, 14, 30; *See also, New Report Recommends State Efforts to Sustain Rural Ambulance Services.* Ambulance services may not be able to afford advanced life support (ALS) paramedic-level staffing of ambulances and may only be able to provide basic life support services (BLS), when a 9-1-1 ambulance is dispatched to a veteran. Harris Declaration, ¶ 15.

To our knowledge, there is no federal law or regulatory prohibition on billing veterans directly for the majority of the various ground ambulance services provided to veterans. Further, neither the statutory authority for the new VA rule nor the rule itself forecloses balance billing of veterans. Thus, veterans could potentially encounter significant costs for emergency ambulance services that they currently do not have, if the new VA payment reduction rule is implemented. Hambek Declaration, ¶ 18.

Since the VA has historically reimbursed ambulance services their actual charges for the majority of the services provided to veterans, there has been no need for AAP or SDAA members to reject payments from the VA - at least up until now. It will be much more likely with the inadequate payments under the VA's new

payment reduction plan for ambulance services to reject those payments and bill the veteran directly, or balance bill the veteran. *Id.* Ambulance services certainly don't want to bill veterans directly in any fashion, but they still need to recover their costs of providing these essential ambulance services. But this VA payment reduction could potentially bring them to that point, which could put a tremendous financial burden on individual veterans. *Id.*

### C. <u>The VA's final rule must be vacated as the current self-imposed delay is inadequate and only provides temporary relief</u>

The VA's self-imposed delay initially offered a glimmer of hope that perhaps the agency would reconsider its application of a reduced reimbursement rate for *all* non-contracted ground ambulance providers or that it would pursue contract negotiations with more ground ambulance services. That simply has not happened. As evidenced in the posture of the VA's previous response to this Honorable Court, it is clear that the VA still believes the final rule is satisfactory.[12] It has also become increasingly apparent that the VA has no desire to contract with ground ambulance services, especially smaller ambulance services who serve many veterans in rural areas. As such, the only available relief for ground ambulance providers nationwide is for this Honorable Court to vacate the rule.

---

[12] *See* Respondent's Response to Petitioners' Motion for Stay Pending Judicial Review, Case No. 2024-1104 (filed January 16, 2024).

As of November of 2023, the VA had only finalized thirty-three (33) contracts in the entire United States involving VA-initiated ground transports - an appallingly low figure in comparison to the total number of nationwide ambulance services that provide care to veterans - since the VA published its final rule on February 16, 2023.[13] Since the rule delay was officially announced nearly three (3) months ago in December of 2023, both the AAP and SDAA are unaware of the commencement of *any* contractual negotiations between their members and the VA. Clearly, the VA has not contracted with most ground ambulance services. Rather, it is evident that the VA only intended on furthering contract negotiations with air ambulance providers by means of its voluntary rule delay, as it clearly said so.[14] The VA's publication only mentions air ambulance and makes no reference to ground ambulance.

---

[13] *See* Second Declaration of Gary Watters, ¶ 10 (attached as Petitioner's Exhibit 3), Motion for Stay Pending Judicial Review, Case No. 2024-1104 (filed November 11, 2023).

[14] *See Delay of Effective Date*, 88 Fed. Reg. 90120 (Dec. 29, 2023) ("Specifically, the delay of the effective date is necessary to accommodate unforeseen difficulties in *air ambulance broker contracting*. These difficulties relate to *air ambulance brokers requiring a contract or subcontract* in place with all potential *air ambulance providers* that covers emergency, non-VA initiated trips. Based on this feedback and evaluation of the continued effort that would be required by *air ambulance brokers to negotiate and enter into contracts* before February 16, 2024, VA is delaying the effective date of the regulation by one year.") (emphasis added).

Although many ground ambulance providers throughout the country would embrace the opportunity of entering contracts with the VA, several have historically reported difficulties in working collaboratively with the VA in this regard.[15] Thus, the ambulance services that remain non-contracted will be forced to rely on the inadequate reimbursement at the MFS rate once the delay has lapsed and the final rule is eventually implemented on February 16, 2025 – offering more reason for this Honorable Court to intervene.

Furthermore, the VA's unwavering stance in justifying the payment reduction scheme[16] raises concern, calling into question the VA's lack of awareness in the development of the final rule. Specifically, the VA's assessment regarding the financial impact of the new rule was substantially inadequate. The VA blatantly disregarded the advice of several commentors who had recommended that the VA allow the Centers for Medicare & Medicaid Services (CMS) to first complete a nationwide study of ambulance cost data, so that a fair and appropriate

---

[15] *See* Gamboa, Ryan, *Ambulance Providers Negotiating Reimbursements Amidst New VA Rule*, KRTV News Great Falls (Dec. 22, 2023) https://www.krtv.com/news/ambulance-providers-negotiating-reimbursements-amidst-new-va-rule;

[16] *See* Respondent's Response to Petitioners' Motion for Stay Pending Judicial Review, Case No. 2024-1104 (filed January 16, 2024).

reimbursement rate could be determined.[17] The GADCS is currently collecting cost data from ambulance services nationwide to assist CMS in determining the sufficiency of the current Medicare Fee Schedule, as well as to explore other methods to reimburse ambulance services for services provided to Medicare patients.

Rather than wait for this congressionally sanctioned report to be completed, incredibly, the VA simply claimed statutory authority to apply the MFS amounts to *all* non-contracted ambulance transports. This was done completely without *any* objective assessment of the costs that ambulance services incur in providing those services, or the financial and operational impact that this decision would have on ambulance services in Pennsylvania, South Dakota, and throughout the nation.

The VA further improperly substantiated its position by claiming that the final rule would not have a significant financial impact on a substantial number of

---

[17] CMS developed the Ground Ambulance Data Collection System ("GADCS") to meet the requirements described in paragraph (17) of section 1834 (l) of the Social Security Act. CMS is required by law to collect information on costs, revenue, utilization and other information from representative samples of ground ambulance organizations. This information will be analyzed by the Medicare Payment Advisory Commission (MedPAC), a government body independent from CMS, to develop a report to Congress on the adequacy of Medicare payment rates for ground ambulance services and geographic variations in the cost of furnishing such services. *Medicare Ground Ambulance Data Collection System (GADCS) Required Information for Collection and Reporting*, Updated March 8, 2022, available at: https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/Downloads/Medicare-Ground-Ambulance-Quick-Reference.pdf.

small entities (88 Fed. Reg. at 10,034) – a statement that undeniably underestimated the immense number of non-contracted ambulance agencies that currently provide both emergency and non-emergency medical services to veterans.[18]

For example, the three (3) Pennsylvania ambulance services, who are among the named petitioners in this matter, as well as the entire membership of the SDAA, all provide 9-1-1 ambulance service to veterans without a contract with the VA. As a result of the final rule, each of these ambulance services – as well as hundreds of additional ambulance services throughout Pennsylvania, South Dakota, and the nation - stand to lose thousands of dollars of reimbursement that is essential to their daily operations. This new rule and the resulting reimbursement reduction will cause Pennsylvania services to suffer an approximate sixty percent (60%) reduction in reimbursement and South Dakota services to suffer an approximate sixty percent (60%) to seventy-eight percent (78%) reduction in reimbursement for providing essential ambulance services to veterans from the

[18] This statement was also the product of a flawed Regulatory Impact Analysis (RIA) conducted internally by the VA which projected that charges for non-contract ambulance transports would total $1,458,899,847 from 2021 through 2025. *Rates that VA Pays for Special Modes of Transportation*, available at: https://www.regulations.gov/document/VA-2020-VHA-0022-0002. However, in reality, the VA paid $1,653,725,407 for non-contract ambulance transports in 2022 alone. VA, *Initial Agency Decision on FOIA Request #23-09227-F*, p. 5 (Aug. 18, 2023).

current payments that they now receive. Harris Declaration, ¶ 16; Hambek Declaration, ¶ 10.

Based on data extracted from the 2021 Medicare Claims Data (available from the CMS database at: https://data.cms.gov/provider-summary-by-type-of-service/medicare-physician-other-practitioners/medicare-physician-other-practitioners-by-provider-and-service), there were 499 Pennsylvania ambulance entities that billed ALS1-Emergency (A0427) Medicare fee-for-service claims in 2021 and of those entities, the median charge was $1,200.00. The VA's new rule will slash the reimbursement amount down to the Medicare rate for that service - which in urban areas of Pennsylvania (where approximately 78% of the state's population resides)[19] would equate to just $490.48 of reimbursement under the VA payment reduction.[20] That is barely *one-third* of the median charge for ambulance services rendered to VA patients.

Based on the same Medicare Claims Data, there were 46 South Dakota ambulance services that billed ALS1-Emergency (A0427) Medicare fee-for-service claims in 2021 and of those entities, the median charge was $910.20. The

[19] *Center for Rural Pennsylvania,* available at: https://www.rural.pa.gov/data/rural-urban-definitions.

[20] *CMS CY 2023 Public Use file,* available at: https://www.cms.gov/medicare/payment/fee-schedules/ambulance/ambulance-fee-schedule-public-use-files.

Medicare rate for that service in rural areas of South Dakota (where the majority of the SDAA membership serves) would equate to just $533.17 of reimbursement under the VA payment reduction – decreasing the amount currently received for ambulance services rendered to VA patients by nearly half.[21] These figures compiled for Pennsylvania and South Dakota certainly constitute unsustainable amounts, which are well below the cost of providing those services as documented by the Federal government itself.

Absent judicial intervention, the VA's final rule will inevitably be implemented following the VA's voluntary delay period. Simply based on the negative financial impact on ambulance services and the potential reduction in access to veterans to essential life-saving ALS ambulance services and significant out-of-pocket patient costs, *amici curiae* urge this Honorable Court to take the appropriate action. In doing so, the Court should greatly consider the sustainability of lifesaving ambulance service and the impact on our veterans. Accordingly, in addition to the arguments set forth herein, *amici curiae* hereby adopt and support the assertions as presented in Petitioners' Opening Brief and respectfully request that the VA's final rule be vacated.

---

[21] *CMS CY 2023 Public Use file,* available at: https://www.cms.gov/medicare/payment/fee-schedules/ambulance/ambulance-fee-schedule-public-use-files.

Respectfully submitted,

March 13, 2024 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amici Curiae*
Ambulance Association of Pennsylvania
South Dakota Ambulance Association

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(b)(1). The brief has 5,626 words (excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2)).
2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

March 13, 2024 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amici Curiae*
Ambulance Association of Pennsylvania
South Dakota Ambulance Association

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2024, I electronically filed the foregoing Unopposed Brief of the Ambulance Association of Pennsylvania and the South Dakota Ambulance Association as *Amici Curiae* in Support of Petitioners' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system, which will serve as e-mail notice of such filing to all counsel registered as CM/ECF users, including the principal counsel for the parties.

Respectfully submitted,

March 13, 2024 /s/ Stephen R. Wirth

Stephen R. Wirth, Esquire
PAGE, WOLFBERG & WIRTH, LLC
5010 East Trindle Road, Suite 202
Mechanicsburg, PA 17050
(717) 691-0100
swirth@pwwemslaw.com
*Counsel for Amici Curiae*
Ambulance Association of Pennsylvania
South Dakota Ambulance Association

# EXHIBIT 1

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

| | |
|---|---|
| METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,<br><br>Petitioners,<br><br>v.<br><br>SECRETARY OF VETERANS AFFAIRS,<br><br>Respondent. | No. 24-1104 |

**DECLARATION OF HEATHER HARRIS (FORMERLY HEATHER SHARAR)**

I, Heather Harris (formerly Heather Sharar), testify as follows:

1. I am over the age of eighteen. I provide this declaration voluntarily, for use in *Metropolitan Area EMS Authority et al. v. Secretary of Veterans Affairs.*

2. I am currently the Executive Director of the Ambulance Association of Pennsylvania ("AAP") and have served in that capacity as a full-time employee of the AAP for 18 years.

3. My testimony is based on my direct personal knowledge gained through my work at the AAP, business records of the AAP, board and committee discussions, information supplied to me by members of our association, information from EMS and ambulance service directors around the state, as well as information in the public domain.

4. The AAP is a non-profit, tax-exempt § 501(C)(6) organization currently consisting of two hundred (200) members, who provide approximately eighty percent (80%) of the emergent and non-emergent ground ambulance transports across the Commonwealth of Pennsylvania

5. Its members embody a vast array of ambulance providers including fire-based, hospital, municipal, and non-profit entities whose services include a significant number of 9-1-1emergency requests in both rural and urban settings.

6. Nearly eighty-five percent (85%) of its membership is comprised of small to mid-sized non-profit agencies.

7. As its primary mission, the AAP strives to serve as the lead organization for the advancement of the needs of its members in the emergency and non-emergency ambulance and medical transportation industry to help ensure their survival and sustainability.

8. The AAP is committed to carrying out its objectives, which include the protection of the financial interests of its members to ensure that those agencies may continue to operate and provide life-saving services.
9. The Medicare Fee Schedule amount ("MFS"), the amount which ambulance services in Pennsylvania will be reimbursed with the implementation of the VA's final rule, is invariably less than not only the actual charges, but is also, for many ambulance services, less than the total cost of providing the transport.
10. VA's payment reduction will adversely impact many of the ground and air ambulance services who currently represent the membership of AAP.
11. AAP anticipates that implementation of the VA's new rule will not only cause substantial financial harm to ambulance services serving our veterans but may also reduce access to needed emergency ambulance services for our veterans. This could also result in the reduction of ambulance services provided to veterans, reductions in ambulance service staffing, and the potential closure of smaller, non-profit ambulance services.
12. Almost all Pennsylvania ambulance services remain non-contracted with the VA. Furthermore, most ambulance services for veterans across the Commonwealth are 9-1-1 initiated and therefore would not be subject to VA contract reimbursement.

13. Ambulance services throughout Pennsylvania are experiencing a major crisis. Decreased reimbursement from payers - including federal, state, and commercial insurance programs – has been crippling the ability of our members to provide prompt and reliable ambulance services.

14. The reimbursement provided for basic and advanced life support ambulance services has not maintained pace with the ever-increasing costs of medical technology, ambulances and response vehicles, medications, and emergency medical personnel.

15. If the new VA payment reduction is implemented, the veteran community across the Commonwealth will undoubtedly suffer. Ambulance services may be unable to provide services to veterans in many cases, and if they are able to provide services, there may be response delays and lower levels of clinical care that can be provided. Ambulance services may not be able to afford advanced life support (ALS) paramedic-level staffing of ambulances and may only be able to provide basic life support services (BLS), when a 9-1-1 ambulance is dispatched to a veteran.

16. This new rule and the resulting reimbursement reduction will cause ambulance services in Pennsylvania to suffer an approximate sixty percent (60%) reduction in reimbursement for providing essential ambulance services to veterans from the current payments that they now receive.

****************

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

February 29, 2024

/s/ Heather Harris
Heather Harris (formerly Heather Sharar)

# EXHIBIT 2

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

| | |
|---|---|
| METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,<br><br>Petitioners,<br><br>v.<br><br>SECRETARY OF VETERANS AFFAIRS,<br><br>Respondent. | No. 24-1104 |

**DECLARATION OF BRIAN HAMBEK**

I, Brian Hambek, testify as follows:

1. I am over the age of eighteen. I provide this declaration voluntarily, for use in *Metropolitan Area EMS Authority et al. v. Secretary of Veterans Affairs*.
2. I have worked in the Emergency Medical Services industry for the past forty-three (43) years and am the Founder and current President of the South Dakota Ambulance Association ("SDAA") where I have served in that

capacity for the past ten (10) years, since the association's formation in 2014.

3. I am also currently the Director of Spearfish Emergency Ambulance Service, a non-profit EMS agency that provides 9-1-1 ambulance service to a large geographic area in western South Dakota, where we serve many veterans, and where this change in the VA rule will adversely impact my ambulance service and the communities we serve.

4. My testimony is based on my direct personal knowledge gained through my work and experience at the SDAA, business records of the SDAA, board and committee discussions, information supplied to me by members of our association, information from fellow EMS and ambulance service directors around South Dakota and the United States, as well as information in the public domain.

5. The SDAA is a non-profit, tax-exempt § 501(C)(3) organization currently consisting of a membership that includes fifty-seven (57) ground ambulance providers, one (1) air ambulance provider, as well as seven (7) corporate members.

6. The SDAA membership provides over ninety percent (90%) of the emergent and non-emergent ground ambulance transports across South Dakota.

7. Its ground ambulance membership embodies a vast array of providers including ten (10) fire-based, five (5) hospital-based, thirty-two (32) municipal-based, nine (9) non-profit entities and one (1) for-profit entity whose services include a significant number of 9-1-1emergency requests in mostly rural and super rural settings.
8. As its primary mission, the SDAA strives to promote health and safety in the state of South Dakota by providing an organized and unified voice for its members in an effort to advance cooperation, quality of care, ethics, professionalism, and the overall improvement of emergency health care services amongst the various ambulance providers as well as to communicate with intermediaries, legislators, and regulatory bodies to endorse programs that generally benefit the medical transportation industry.
9. The Medicare Fee Schedule amount ("MFS"), the amount which ambulance services in South Dakota will be reimbursed with the implementation of the VA's final rule, is invariably less than not only the actual charges, but also represents less than the total cost of providing an ambulance transport.
10. The resulting reimbursement reduction will cause ambulance services in South Dakota to suffer an approximate sixty percent (60%) to seventy-eight percent (78%) reduction in reimbursement for providing essential ambulance services to veterans from the current payments that they now receive.

11. Further, the VA is extremely slow in paying claims. Our members have experienced numerous occasions where it will take months and even years – up to one (1) to two (2) years in some instances - for the VA to pay valid claims for ambulance transports for veterans.

12. On top of the significant payment delays our members experience, the new payment reduction will only add further financial stress that is already suffered by many of the ambulance providers who currently represent the membership of SDAA.

13. The decreased reimbursement that is received by South Dakota ambulance providers from other payers including federal, state, and commercial insurance programs has also contributed to the financial obstacles in providing adequate services to patients.

14. Each of the fifty-seven (57) ground ambulance providers of the SDAA remain non-contracted with the VA. In fact, the VA recently formed its own ambulance service at one of its facilities to provide interfacility transports in Western South Dakota. Thus, most ambulance services provided by the local EMS agencies to the veteran population throughout South Dakota are 9-1-1 initiated and would not be subject to VA contract reimbursement.

15. During and following the COVID-19 Public Health Emergency (PHE), the demand for emergency health care services surged throughout South Dakota

and across the country. Despite the increased need for services, the number of EMS personnel has sharply declined in South Dakota resulting in higher labor costs for ambulance providers in order to entice new hires as well as retain current employees.

16. As a result, the total number of ambulance providers in South Dakota has been reduced from one hundred thirty-two (132) at the beginning of the PHE to one hundred twenty-three (123) as of January 1, 2024

17. The current financial landscape coupled with the implementation of the VA's final rule could cause many other ambulance providers in South Dakota to resort to lay-offs, employee pay cuts, and in some cases permanent closings.

18. As the VA's substantial reduction in reimbursement would result in ground ambulance providers operating below the costs associated with transports, the veteran patients - most of whom live on a fixed-income and cannot afford the costs associated with their healthcare needs - will ultimately suffer as they may be obligated to assume the responsibility for the unpaid portion of their ambulance bills, or for the full amount of the ambulance service if the ambulance provider rejects an insufficient payment from the VA.

***************

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

February 29, 2024

/s/ Brian Hambek
Brian Hambek