No. 24-1104

United States Court of Appeals
for the Federal Circuit

_____

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile
Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY
AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE
MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,

*Petitioners,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

_____

**PETITIONERS' CORRECTED OPENING BRIEF**

_____

Brian R. Stimson
Sara M. Lord
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

March 21, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1104 |
| **Short Case Caption** | Metropolitan Area EMS Authority et al. v. Secretary of Veterans Affairs |
| **Filing Party/Entity** | Metropolitan Area EMS Authority, Valley Ambulance Authority, Quaker Valley Ambulance Authority, Altoona-Logan Township Mobile Medical Emergency Department |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/21/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Metropolitan Area EMS Authority (Medstar) | None | None |
| Valley Ambulance Authority (VAA) | None | None |
| Quaker Valley Ambulance Authority (QVAA) | None | None |
| Altoona-Logan Township Mobile Medical Emergency Department (AMED) | None | None |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Arnall Golden Gregory LLP | Brian R. Stimson | Sara M. Lord |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

STATEMENT OF RELATED CASES...................................................................3

JURISDICTIONAL STATEMENT........................................................................3

STATEMENT OF THE ISSUES...........................................................................3

  A.  The statutory and regulatory regime for the rulemaking..................................4

  B.  The relationship between the OIG report and the rulemaking .......................7

  C.  The Secretary's Regulatory Flexibility Act certifications and responses to
      comments ................................................................................................9

  D.  VA implementation of the final rule through provider contracting................13

SUMMARY OF THE ARGUMENT ...................................................................15

STANDARD OF REVIEW .................................................................................17

ARGUMENT ......................................................................................................18

  A.  The final rule is not in accordance with law, and in excess of statutory
      authority, because it defeats the text and structure of §§ 1728 and 111........18

    1.  The final rule defeats the text and structure of § 1728 by extending §
        111(b)(3)(C) to all emergency ambulance transports reimbursed under §
        1728 ...................................................................................................19

    2.  The final rule defeats the text and structure of § 111 by extending §
        111(b)(3)(C) to ambulance transports to and from places other than
        Department facilities ..........................................................................21

  B.  The final rule violates the APA because it is arbitrary and capricious...........24

    1.  VA failed to display awareness that it was changing its legal
        interpretation of § 1728, much less show good reasons for its change
        of position..........................................................................................25

    2.  The Secretary based his RFA certifications on flawed RIAs and
        failed to examine VA data that was relevant to the economic analysis.......26

    3.  VA failed to independently evaluate whether the MFS amount is
        sufficient to provide the healthcare for veterans that Congress has
        entrusted to VA .................................................................................30

4853-4545-0159.v4

4. VA failed to consider an important part of the problem: its fulfillment of its statutory obligations under the Veterans Community Care Program ..................................................................................................33

5. VA failed to respond sufficiently to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas ...................................................................................34

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT** ..........................36

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF COMPLIANCE**

**ADDENDUM**

4853-4545-0159.v4

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008)....................................................................24

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir.
   2009) ...................................................................................................13, 29

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*,
   716 F.3d 183 (D.C. Cir. 2013)....................................................................25

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)....................................................................................20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)....................................................................................18

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971)....................................................................................25

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013)....................................................................................18

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans
   Affairs*,
   464 F.3d 1306 (Fed. Cir. 2006) ...............................................................3, 17

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
   302 F.Supp.3d 1251 (D. Colo. 2018).........................................................28

*Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.*,
   785 F.3d 1 (D.C. Cir. 2015).......................................................................30, 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. ---, 140 S. Ct. 1891 (2020)..........................................................25

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)....................................................................................25

*Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021)................................13, 29

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................25, 26

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)............................................................................19

*Foster v. Mabus*,
895 F.Supp.2d 135 (D.D.C. 2012)......................................................30

*Hirsh v. U.S.*,
No. 2021-2163, 2022 WL 3209327 (Fed. Cir. Aug. 9, 2022)............20

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014)..........................................................18

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989)............................................................................25

*Mayo Found. for Med. Educ. & Research v. U.S.*,
562 U.S. 44 (2011)..............................................................................18

*McKinney v. McDonald*,
796 F.3d 1377 (Fed. Cir. 2015) ......................................................3, 18

*Mexichem Fluor, Inc., v. EPA*,
866 F.3d 451 (D.C. Cir. 2017), *r'hrng en banc denied* (Jan. 26,
2018) ....................................................................................................26

*Mil. Ord. of the Purple Heart of USA v. Sec'y of Veterans Affairs*,
580 F.3d 1293 (Fed. Cir. 2009) ............................................................3

*Mortg. Inv'rs Corp. v. Gober*,
220 F.3d 1375 (Fed. Cir. 2000) ..........................................................18

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
463 U.S. 29 (1983)........................................................24, 27, 32, 33

*Nat. Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)............................................................................26

*New York v. Fed. Energy Regulatory Comm'n*,
535 U.S. 1 (2002)................................................................................16

iv

*Nyeholt v. Sec'y of Veterans Affairs*,
  298 F.3d 1350 (Fed. Cir. 2002) ............................................................17

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022).............................................................................19

*The Sierra Club v. U.S. Dep't of Agric.*,
  116 F.3d 1482 (7th Cir. 1997) (unpublished).......................................28

**Statutes**

5 U.S.C. § 603 .........................................................................................10

5 U.S.C. § 604 ....................................................................................11, 30

5 U.S.C. § 605 ........................................................................2, 10, 11, 30

5 U.S.C. § 611 ...........................................................................................2

5 U.S.C. § 706 ..........................................................2, 16, 17, 18, 24

38 U.S.C. § 101 ........................................................................................20

38 U.S.C. § 111 ......................................3-9, 12, 16, 18-25, 31, 33, 36

38 U.S.C. § 502 .......................................................................2, 3, 17

38 U.S.C. § 1703 ................................................................................31, 34

38 U.S.C. § 1725 ......................................................................................31

38 U.S.C. § 1728......................3-5, 7, 16-19, 21, 25, 26, 31, 34, 36

**Other Authorities**

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 § 50203(b)
  Stat. 64, 178 (Feb. 9, 2018)..................................................................31

Honoring America's Veterans and Caring for Camp Lejeune Families
  Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206
  (Aug. 6, 2012) ................................................................................5, 22

VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56, § 263, 125
  Stat. 711, 732 (Nov. 21, 2011)................................................................5

4853-4545-0159.v4

38 C.F.R. Part 70, Subpart A ............................................................5

38 C.F.R. § 17.4020 .........................................................................34

38 C.F.R. § 70.2 ..................................................................6, 20, 21

38 C.F.R. § 70.30 ...................................................................1, 2, 6

85 Fed. Reg. at 70,553 ................................................................9, 10

85 Fed. Reg. at 70,554 ....................................................................10

85 Fed. Reg. at 70,551 ......................................................................7

88 Fed. Reg. at 10,032 ..................................................................1, 10

88 Fed. Reg. at 10,033 ....................................................................32

88 Fed. Reg. at 10,033-10,035 ...............................................11, 12

88 Fed. Reg. at 10,034 ..............................................................34, 35

88 Fed. Reg. at 10,035 ....................................................................11

88 Fed. Reg. at 10,036 ...............................................................6, 10

88 Fed. Reg. at 90,120 ...............................................................2, 15

E.O. 12866 .....................................................9, 10, 11, 29, 30

Federal Rule of Appellate Procedure 15 ......................................2

*Report to the Congress: Medicare and the Health Care Delivery System*, MedPAC (Medicare Payment Advisory Commission) (June 2013)............................................................................32

*Place*, Webster's Dictionary (1958 edition) ...........................20

**INTRODUCTION**

The U.S. Department of Veterans Affairs (VA) currently pays the "actual cost" of ground and air ambulance transports for eligible veterans and beneficiaries pursuant to its regulation at 38 C.F.R. § 70.30(a)(4). VA has done so since 2008.

On February 16, 2023, the Secretary for Veterans Affairs published the final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023). The final rule will amend § 70.30(a)(4) to enable VA to pay the lesser of the actual charge or the Medicare fee schedule (MFS) amount for non-contract ground and air ambulance transports. The inevitable result will be a reduction in the rates paid by VA for non-contract ground and air ambulance transports to levels below the cost of providing the transport.

On October 26, 2023, Metropolitan Area EMS Authority, a.k.a. MedStar Mobile Healthcare (Medstar), Valley Ambulance Authority (VAA), Quaker Valley Ambulance Authority (QVAA), and Altoona Logan Township Mobile Medical Emergency Department Authority (AMED) (together, Petitioners) petitioned this Court for review of the final rule. *See* Pet. For Review, ECF No. 1-2. Petitioners are state or municipal government providers of ground ambulance services. Absent another funding source, the final rule will force Petitioners to downsize their operations through workforce reductions, furloughs, or reduced hours. It will also decrease access to ground ambulance services for veterans, especially in rural areas,

and adversely impact healthcare for veterans. Petitioners seek judicial review of the final rule because it is not in accordance with the law, exceeds the statutory authority of the Secretary, and is arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(2)(A) and (C).

On November 1, 2023, Petitioners filed a motion to stay the final rule pending judicial review. *See* Pet. Mot. For Stay, ECF No. 3-1. On December 29, 2023, VA published a new rule to delay the final rule's effective date from February 16, 2024 to February 16, 2025. *Delay of Effective Date*, 88 Fed. Reg. 90,120 (Dec. 29, 2023). VA stated that it was delaying the effective date of the final rule to allow more time for air ambulance contracting. It said nothing about ground ambulance providers, or the concerns the Petitioners have raised. *Id*. On February 5, 2024, the Court deferred Petitioners' motion for stay, pending judicial review by the assigned merits panel. Order, ECF No. 28.

Pursuant to 38 U.S.C. § 502, 5 U.S.C. §§ 605(b) and 611(a)(1)-(2), 5 U.S.C. §§ 706(2)(A) and (C), Federal Rule of Appellate Procedure 15, and Federal Circuit Rule 15(f), Petitioners request that this Court hold unlawful and set aside the amendment of 38 C.F.R. § 70.30(a)(4) in its entirety, and allow the current § 70.30(a)(4) to remain in effect pending any future rulemaking by VA after any remand of this case.

2

## STATEMENT OF RELATED CASES

There is no appeal in or from a civil action or proceeding in an originating tribunal that was previously before this or any other appellate court. There is similarly no case known to counsel to be pending in this or any other tribunal that will affect or be directly affected by the Court's decision in this case.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 38 U.S.C. § 502 to review substantive, interpretive, and procedural rules promulgated by VA, including "any amendments to those rules, and the process in which those rules are made or amended." *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015); *see also Mil. Ord. of the Purple Heart of USA v. Sec'y of Veterans Affairs*, 580 F.3d 1293, 1296 (Fed. Cir. 2009); *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1314 (Fed. Cir. 2006).

## STATEMENT OF THE ISSUES

1. Whether the final rule is in accordance with the statutory regime for payment for ambulance transports for veterans established in 38 U.S.C. §§ 1728 and 111, and within the authority of the Secretary under the same regime.

2. Whether the final rule is arbitrary and capricious.

4853-4545-0159.v4

## STATEMENT OF THE CASE

### A. The statutory and regulatory regime for the rulemaking

To meet the needs of the nation's veterans and in recognition of their service, Congress has enacted an independent statutory regime for the coverage and payment of veterans' healthcare benefits in Title 38 of the United States Code. The independent statutory regime reflects Congress's awareness that the needs of the nation's veterans differ from the needs of the general population, especially when their needs stem from or are connected to their service. It also evidences Congress's intent to meet veterans' unique needs. In 38 U.S.C. §§ 1728 and 111, Congress established the parameters for ensuring that veterans have sufficient access to ambulance services.

Section 1728(a) states that the Secretary shall reimburse veterans "for the *customary and usual charges* of emergency treatment (including travel and incidental expenses *under the terms and conditions set forth in section 111* of this title)." Subsection (b) states: "In any case where reimbursement would be in order under subsection (a) of this section, the Secretary may, in lieu of reimbursing such veteran, make payment of the *reasonable value* of emergency treatment directly [to the provider]." (emphasis added in both instances).

On May 2, 2022, VA issued an interpretive rule in the form of sub-regulatory guidance explaining the statutory and regulatory framework for payment for non-

4

contract ambulance transports of veterans. Appx1397-1398. The May 2022 guidance states that VA pays for unauthorized emergency transports (typically, 9-1-1 calls) under § 1728 at "[g]enerally billed charges." *Id*.

Section 111 authorizes the Secretary to make beneficiary travel payments in any fiscal year if the Secretary determines that VA has available funding. Section 111(a) states that the Secretary "may pay the actual necessary expense of travel . . . of any person *to or from a Department facility or other place* . . . for the purpose of examination, treatment, or care." (emphasis added). In 2011 and 2012,[1] Congress amended § 111(b)(3) to give the Secretary discretion in specified, limited circumstances to pay less than the actual necessary expense of travel:

> In the case of transportation of a person *to or from a Department facility* by ambulance, the Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or [the MFS amount] unless the Secretary has entered into a contract for that transportation with the provider.

38 U.S.C. § 111(b)(3)(C) (emphasis added).

The Secretary implements § 111 through regulations at 38 C.F.R. Part 70, Subpart A ("Beneficiary Travel and Special Mode of Transportation Under 38 U.S.C. 111"). Payments are covered for six categories of veteran beneficiaries who

---

[1] The VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56, § 263, 125 Stat. 711, 732 (Nov. 21, 2011); The Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206 (Aug. 6, 2012).

4853-4545-0159.v4

travel "to or from a VA facility or VA-authorized health care facility." §§ 70.10(a)(1)-(6). A "special mode of transportation" is defined as "an ambulance, ambulette, air ambulance, wheelchair van, or other mode of transportation specially designed to transport disabled persons." 38 C.F.R. § 70.2. Under the current regulation at 38 C.F.R. § 70.30(a)(4), which was published in 2008, VA pays the "actual cost of a special mode of transportation" for eligible veterans.

The final rule changes the long-standing payment regulation at § 70.30(a)(4). Instead of paying the actual costs of ambulance services, the final rule provides that "VA will pay the lesser of the actual charge for ambulance transportation or … [the MFS amount]" – unless VA "has entered into a contract with the vendor in which case the terms of the contract will govern VA payments." 88 Fed. Reg. at 10,036. The final rule also redefines "ambulance" as "advanced life support, level 1 (ALS1); Advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 C.F.R. 414.605." *Id.* (amending 38 C.F.R. § 70.2)

The change to the regulation at § 70.30(a)(4) has the effect of expanding § 111(b)(3)(C) to apply to *all* non-contract ambulance transports, including those to and from places *other than* Department facilities. The regulatory expansion of § 111(b)(3)(C) departs from the statutory text, which limits payment of the lesser of

6

the actual charge or the MFS amount to the limited class of transports "to or from a Department facility." The final rule violates the APA because the regulatory expansion is not in accordance with the text or structure of § 111.

The final rule also violates the APA because it reaches ambulance transports within the ambit of § 1728, which are paid at "generally billed charges." The application of the final rule to those transports nullifies § 1728, contrary to basic interpretive principles.

## B. The relationship between the OIG report and the rulemaking

The impetus for the rulemaking was a report from the VA Office of Inspector General (OIG) that faulted VA for failing to realize $11 million in savings for ambulance services between October 1, 2012 and December 31, 2015. According to OIG, VA could have achieved the savings by exercising its discretionary authority under § 111(b)(3)(C) to pay the lesser of the actual charge or the MFS amount. Appx1230, Appx1246-1247. The OIG recommended paying the MFS amount "when savings can be achieved . . . in accordance with 38 U.S.C. Section 111(b)(3)(C)." *Id.* VA concurred with the recommendation and committed to implement it through rulemaking. *Id*.

On November 5, 2020, the Secretary published the proposed rule. *Change in Rates VA Pays for Special Modes of Transportation*, 85 Fed. Reg. at 70,551 (Nov. 5, 2020). In the Regulatory Impact Analysis (RIA) accompanying the proposed rule,

the Chief Economist for VA projected savings, *i.e.*, payment reductions, that were at least four to five times the payment reductions OIG had projected for a similar period in its May 2018 report. OIG projected approximately $23.5 million in total payment reductions for the five-year period of 2019 through 2023. Appx1230, Appx1246-1247. In contrast, the Chief Economist for VA projected total payment reductions of $199,577,500 for the five-year period of 2021 through 2025, including $117,022,899 for the three-year period of 2021 through 2023 that overlapped with the period in the OIG report. *See* Appx1319.

The exponential increase in projected payment reductions indicates that VA applied a broader legal interpretation of § 111(b)(3)(C) than OIG when VA published the rule. In other words, OIG interpreted § 111(b)(3)(C) by its express terms to apply to non-contract ambulance transports to or from Department facilities, as Petitioners argue is the case, while VA went beyond the text of § 111(b)(3)(C) to reach non-contract ambulance transports to and from other places. No other explanation for the increase in projected payment reductions can be discerned from the OIG report or the final rule.

OIG clearly did not consider or recommend a payment policy change of the magnitude proposed by VA. Nor did OIG consider the consequences of such a dramatic change for ground ambulance providers and the veterans they serve if a payment policy change of such magnitude were implemented. The administrative

8

record, however, is replete with statements from VA that cast the rule change as the implementation of the OIG recommendation. *See e.g.*, Appx1333-1350 (VA responses to Senators Tester, Schatz, Hirono, Hickenlooper, Heinrich, Boozman, Daines, Bennet, Moran), Appx1493-1494 (VA response to Representative Allred), Appx1495-1502 (VA response to various letters from stakeholders). But numbers do not lie. Here, they show that OIG never recommended or even contemplated the interpretation of § 111(b)(3)(C) that VA applied in the final rule.

### C. The Secretary's Regulatory Flexibility Act certifications and responses to comments

The Secretary certified, pursuant to the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612, that the proposed rule would not have a significant economic impact on a substantial number of small entities. 85 Fed. Reg. at 70,553. The Secretary's certification was based on the October 28, 2020 RIA, which estimated that the potential impact of the proposed rule per vendor would be less than 1 percent of their annual reported receipts. *Id.* The RIA assumed that all ambulance providers, including the 2,979 entities identified as small entities, would bear the cost avoidance burden equally. *Id.* The RIA was also the basis for the Secretary's finding that the proposed rule was not a significant regulatory action under Executive Order (E.O.) 12866 because it would not have an annual effect on the economy of $100 million or more. *Id.*; E.O. 12866, § 3(f)(1).

9

The Secretary's certification enabled VA to avoid preparing an initial regulatory flexibility analysis. 5 U.S.C. §§ 603 605(b); 85 Fed. Reg. at 70,554. It similarly enabled VA to avoid a review under E.O. 12866. E.O. 12866, § 6(a)(3)(A); 85 Fed. Reg. at 70,553. Under such a review, VA would have provided the Office of Management and Budget (OMB) Office of Information and Regulatory Affairs (OIRA) with an explanation of "the manner in which the regulatory action is consistent with a statutory mandate," as well as an assessment of "any adverse effects on the efficient functioning of the economy," including employment, health, and safety. E.O. 12866, § 6(a)(3)(B)(ii) and (C)(ii). OIRA would have then scrutinized the rule using these factors.

The Secretary subsequently published the final rule with only two technical changes on February 16, 2023. 88 Fed. Reg. at 10,032. The final rule also included an RFA certification by the Secretary that the final rule would not have a significant economic impact on a substantial number of small entities, which was based on a revised RIA, dated January 5, 2023. The revised RIA projected a total payment reduction of $223,191,510 for the five years from 2023 through 2028. 88 Fed. Reg. at 10,036. The revised RIA was also the basis for the Secretary's finding that the final rule was not a significant regulatory action under E.O. 12866 because it would not have an annual effect on the economy of $100 million or more. *Id.* Once again,

10

VA avoided review under E.O 12866 and a regulatory flexibility analysis under the RFA, 5 U.S.C. §§ 604, 605(b).

Aside from the upward adjustment in the projected payment reduction, the revised RIA largely mirrors the original RIA, simply applying the same methodology to a later time period. Like the original RIA, it assumes that all ambulance providers will bear the potential impact of the rule equally and concludes that the potential impact of the rule per vendor will be "less than 1 percent of [their] preliminary receipts." Appx1487.

Commenters raised the concern that the proposed rule would devastate ambulance providers because the MFS amount is inadequate to cover the actual costs of ambulance transports, and VA would invoke the rule to pay the MFS amount "in all cases." *See e.g.*, Appx1351-1358, Appx1364-65, Appx1421-1422.

VA responded that it would pay the lesser of the actual charge or the MFS amount only to *non-contracted* ambulance providers. 88 Fed. Reg. at 10,033-10,035. VA further stated that it was delaying the effective date of the final rule until February 16, 2024, to ensure that ambulance providers had adequate time to adjust to the new methodology, including by "entering into negotiations with VA to contract for payment rates different than those under the [MFS]." 88 Fed. Reg. at 10,035. VA's responses to comments suggested to Petitioners that VA would

negotiate with any willing ground ambulance provider for the transports furnished by the provider.

At the same time, VA dismissed commenters' concerns that the MFS amount is inadequate to cover the actual cost of an ambulance transport. VA asserted that Congress had evidently deemed the MFS amount sufficient because Congress gave VA the discretion to pay the MFS amount when it enacted in § 111(b)(3)(C). VA then punted commenters' concerns to the Centers for Medicare & Medicaid Services (CMS), stating that "VA cannot modify or increase the CMS ambulance fee schedule rates." 88 Fed. Reg. at 10,033-10,035. Ultimately, however, VA reassured commenters that it would retain contracting authority, and that "contracts could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations … ." *Id.*[2]

Any interest that VA had in robust contracting with ground ambulance providers was short-lived. After purporting to delay the effective date of the final rule to allow for contracting with VA, and repeatedly assuring providers that concerns about the adequacy of the MFS were addressable through contracting, VA changed course with ground ambulance providers.

---

[2] VA's assurances of contracting opportunities were inconsistent with the original and revised RIAs, which assumed no increases in provider contracting. Appx1317-1319, Appx1485-1486.

12

**D. VA implementation of the final rule through provider contracting**

VA has implemented the final rule through shifting contracting initiatives rolled out over three industry days in 2023. The statements by VA during the rollout reveal that VA's implementation of the final rule is fluid, and inconsistent with the reasoning that VA set out in the preamble to the rule.[3]

During the first industry day on May 25, 2023, VA told providers that each of the 172 VA Medical Centers (VAMCs) nationwide would "solicit contracts for ground and air ambulance service for [its] entire catchment area," and that contracted rates would be based on market pricing. Appx1770. That statement was consistent with the preamble of the final rule.

VA pivoted from this position at the second industry day on July 20, 2023. It stated that contracting would be limited to VA-initiated ambulance trips and would not include transports initiated through the 9-1-1 system, which would be paid at the

---

[3] The VA transcripts of the VA industry days are not part of the rulemaking record prepared by the Government. Petitioners nonetheless present excerpts of the VA transcripts to the Court because VA's statements show that, since publishing the final rule, VA has offered conflicting interpretations of the final rule, including with respect to the scope of contracting the agency intends to enter into under the final rule, without considering and resolving how VA intends to scope and complete the contracting. The Court should consider VA's statements because excluding them from review of this Petition would "frustrate effective judicial review." *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Alternatively, the Court may take judicial notice of the transcripts because they are from a source whose 'accuracy cannot be reasonably questioned': VA itself. *Euzebio v. McDonough*, 989 F.3d 1305, 1323 (Fed. Cir. 2021).

13

MFS amount under the final rule. Appx1526, Appx1542. Such transports make up most ground ambulance services. So, after repeatedly highlighting in the preamble to the final rule that providers would be able to contract with VA, VA suddenly turned around and eliminated that option for most of the providers' services.

VA held its third industry day on August 30, 2023. At that meeting, VA admitted that 78% of all VA dollars paid for ambulance services are for transports initiated through the 9-1-1 system. Appx1721. VA also confirmed that it conducted no independent analysis of the reasonableness or sufficiency of the MFS amount that it planned to pay for these transports. Appx709. VA assured providers—contrary to its statements during the second industry day—that it was close to expanding its contracts to include provisions for VA-initiated transports that would enable VA to pay the contract rate for 9-1-1-initiated transports. Appx700.

One VA official, however, was brutally honest. He stated that "the idea of taking [contracting] to every provider is [] gonna be a challenge for sure," and "I don't know if [VA] will be able to get to that." Appx1697. Those statements were prescient. VA has not solicited contracts for 9-1-1-initiated ground ambulance transports, and Petitioners are not aware of any VA solicitations for contracts for such transports.  The dearth of provider contracting for 78% of all VA dollars paid for ambulance services is a striking departure from the preamble.

14

Petitioners read the writing on the wall at the third industry day and moved for an administrative stay of the final rule on September 27, 2023. VA never responded. Petitioners renewed their motion on October 13, 2023, but VA merely acknowledged receipt of the motion. On October 26, 2023, before filing the petition, Petitioners again renewed their motion for an administrative stay. VA acknowledged receipt, but informed Petitioners that the agency intended to treat the motion as a request for rulemaking. On November 1, 2023, Petitioners moved for a stay of the final rule pending judicial review. *See* Pet. Mot. For Stay, ECF No. 3-1.

On December 29, 2023, VA published a new final rule to delay the effective date of the original final rule until February 16, 2025. 88 Fed. Reg. at 90,120. VA's stated purpose in delaying the final rule is "to accommodate unforeseen difficulties in air ambulance broker contracting," which relate to "air ambulance brokers requiring a contract or subcontract in place with all potential air ambulance providers that covers emergency, non-VA initiated trips." *Id.* Nothing in the new final rule suggests that VA plans to contract for 9-1-1-initiated ground ambulance transports, or voluntarily address Petitioners' concerns about the impact of the final rule on ground ambulance providers and the veterans they serve.

## SUMMARY OF THE ARGUMENT

A federal agency may not enact a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right." 5 U.S.C. §§ 706(2)(A), (C). The final rule is not in accordance with, and exceeds, the Secretary's authority to set reimbursement rates for ambulance transports in 38 U.S.C. §§ 1728 and 111. *See, e.g., New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 18 (2002) ("an agency literally has no power to act . . . unless and until Congress confers power upon it.").

The final rule defeats the requirement in § 1728 to pay the "customary and usual charges of emergency treatment" or the "reasonable value of emergency treatment," including emergency ambulance transports.

The final rule also upends § 111. Section 111(a) states broadly that the Secretary pays the "actual necessary expense of travel … to or from a Department facility *or other place[.]*" (emphasis added). Congress gave the Secretary limited discretion in § 111(b)(3)(c) to pay lower rates for ambulance transports to or from Department facilities *only*. The final rule goes far beyond the plain text of § 111(b)(3)(C)—and swallows § 111(a) whole—by paying the "lesser of" the actual charge or the MFS amount for *all* non-contract ambulance transports. The Secretary's regulatory expansion of § 111(b)(3)(c) to reach non-contract ambulance transports to and from places other than Department facilities plainly exceeds Congress's limited grant to the Secretary of discretionary authority to pay the lesser of the actual charge or the MFS amount.

In addition, the final rule is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), in at least five ways. First, the Secretary changed VA's legal interpretation of § 1728 through the final rule and failed to acknowledge and provide a reasoned explanation for doing so. Second, the Secretary certified under the RFA that the rulemaking will not have a significant economic impact on a small number of entities when its own data showed otherwise. Third, VA conducted no independent analysis of the reasonableness or sufficiency of the MFS amount for ambulance providers transporting veterans. Fourth, the Secretary completely failed to consider an important part of the problem: VA's statutory obligations under the Veterans Community Care Program. Fifth, VA failed to sufficiently respond to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas.

## STANDARD OF REVIEW

This Court reviews petitions under § 502 in accordance with the standard set forth in the APA. *See Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350, 1355 (Fed. Cir. 2002). The APA requires a reviewing court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; *see Coal. for Common Sense*, 464 F.3d at 1314. The court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A); *see Mortg. Inv'rs Corp. v. Gober*, 220 F.3d 1375, 1378 (Fed. Cir. 2000); *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015).

## ARGUMENT

### A. The final rule is not in accordance with law, and in excess of statutory authority, because it defeats the text and structure of §§ 1728 and 111

In determining whether agency action is "not in accordance with law" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" under the APA, 5 U.S.C. §§ 706(2)(A) and (C), courts have looked to the process established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The first question is "whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. U.S.*, 562 U.S. 44, 52 (2011). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013). To discern whether Congress has addressed the precise question, the court applies the "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n. 9. These tools include evaluation of the plain statutory text and the overall purpose and structure of the statute, while giving effect, if possible, to every clause and word of the statute. *See Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014). In appropriate cases, the tools may also include evaluation of the drafting history of the statute. *Id.*

18

The court must read and interpret the statutory language in context of the entire statute and not in isolation. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (citations omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

The final rule defeats the text and structure of both statutes governing VA reimbursement of ambulance transports of veterans: §§ 1728 and 111. It expands the limited discretion to pay the MFS amount in § 111(b)(3)(C) to a degree that renders §§ 1728 and 111(a) meaningless.

1. *The final rule defeats the text and structure of § 1728 by extending § 111(b)(3)(C) to all emergency ambulance transports reimbursed under § 1728*

Section 1728(a) states that the Secretary shall reimburse veterans "for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111 of this title)." In cases "where reimbursement would be in order under subsection (a)," subsection (b) gives the Secretary discretion to pay providers directly for "the reasonable value of emergency treatment." Reimbursement for an emergency ambulance transport is in order under subsection (a) when the provider furnishes the transport "under the terms and conditions set forth in section 111."

19

The "terms and conditions set forth in section 111" establish when and under what circumstances VA may pay for "travel and incidental expenses." Specifically, § 111(a) states that the Secretary "may pay the actual necessary expense of travel . . . of any person to or from a Department facility or other place . . . for the purpose of examination, treatment, or care." The "Department" means the "Department of Veterans Affairs," or "VA." 38 U.S.C. § 101(1); 38 C.F.R. § 70.2. A "Department facility" is a "VA facility." And a "VA facility" is a "VA Medical Center (VAMC), VA Outpatient Clinic (OPC), or VA Community Based Outpatient Clinic (CBOC)." *Id*. Thus, when an emergency ambulance transport runs to or from a VAMC, OPC, CBOC or "other place," and is for the purpose of examination, treatment, or care, it is reimbursable under the terms and conditions set forth in section 111.

The term "other place" is not defined in the statute or any VA regulation. So, the plain and ordinary meaning of the words control. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 673-74 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *see also Hirsh v. U.S.*, No. 2021-2163, 2022 WL 3209327, *4-6 (Fed. Cir. Aug. 9, 2022) (nonprecedential). When Congress enacted § 111(a) in 1958, the word "place" meant "a particular part of space; a spot; a locality; [or] a building … ." *Place*, Webster's Dictionary (1958 edition). Under that definition, the

places served by ground and air ambulances are many. They include private healthcare facilities,[4] businesses, residences, parks, and accident sites, to name a few.

The final rule is not in accordance with § 1728 because it extends the "lesser of" methodology in § 111(b)(3)(C) to all emergency ambulance transports reimbursed "under the terms and conditions of section 111" and, by extension, § 1728. Nothing in § 1728 or § 111 suggests that Congress intended for the limited grant of discretion in § 111(b)(3)(C) to overrule the statutory directive in § 1728 to pay "customary and usual charges" or the "reasonable value" for emergency ambulance transports. Yet that is exactly what the final rule would achieve. The Court must vacate the final rule on that basis alone.

2. *The final rule defeats the text and structure of § 111 by extending § 111(b)(3)(C) to ambulance transports to and from places other than Department facilities*

As discussed above, § 111(a) states that the Secretary "may pay the actual necessary expense of travel . . . of any person *to or from a Department facility or other place* . . . for the purpose of examination, treatment, or care." (emphasis added). This broad language authorizes the Secretary to pay the actual necessary

---

[4] A private, "VA-authorized healthcare facility" is an "other place," not a "Department facility." The Secretary defines a "VA-authorized healthcare facility" as "a non-VA healthcare facility where VA has approved care for an eligible beneficiary at VA expense." 38 C.F.R. § 70.2. Because a non-VA facility is the opposite of a VA facility, and a VA facility is a Department facility, Department facilities are different from non-VA facilities.

expense (meaning, the actual cost) of travel to or from a VAMC, OPC, CBOC or other place, for the purpose of examination, treatment, and care. The language applies to travel for emergency and non-emergency care, regardless of whether the travel is by ground or air ambulance or other special mode of travel.

Congress amended § 111(b)(3)(C) in 2011 to give the Secretary discretion to pay the lesser of the actual charge or the MFS amount *only and expressly* for non-contract ambulance transportation "to or from a Department facility." Congress could have easily made § 111(b)(3)(C) applicable to travel to and from other places, and thus coextensive with § 111(a). But Congress chose not to do so.

In 2012, Congress had a second opportunity to include travel to and from other places in § 111(b)(3)(C) as part of The Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206 (Aug 6, 2012). Again, Congress chose not to do so.

As originally enacted in 2011, § 113(b)(3)(C) applied "[i]n the case of transportation of a person under subparagraph (B) by ambulance."[5] In 2012,

---

[5] Section 111(b)(3)(B) states: "In the case of travel by a person to or from a Department facility by special mode of travel, the Secretary may provide payment under this section to the provider of the transportation by special mode before determining the eligibility of such person for such payment if the Secretary determines that providing such payment is in the best interest of furnishing care and services. Such a payment shall be made subject to subsequently recovering from such person the amount of the payment if such person is determined to have been ineligible for payment for such travel."

Congress struck the words "under subparagraph (B)" and inserted the words "to or from a Department facility." The fact that Congress twice chose narrower language for § 111(b)(3)(C) than for § 111(a) underscores that the restrictive framing in § 111(b)(3)(C) was deliberate. Congress plainly meant to give the Secretary discretion to pay the MFS amount *only* for transports to or from Department facilities, and *not* for transports to and from other places, like private healthcare facilities.

In 2012, VA itself recognized the limit that Congress imposed on the Secretary's discretion in § 111(b)(3)(C). Specifically, VA told Congress in an appropriations request that § 111(b)(3)(C) "is limiting and VA will draft proposed legislation to address a technical change in the law." Appx803. VA still has not proposed legislation to amend § 111(b)(3)(C).

Instead, VA has attempted to extend § 111(b)(3)(C) through a rule applying the MFS amount to all non-contracted ambulance transports to and from places other than Department facilities. The extension of § 111(b)(3)(C) in the final rule is sweeping; it reaches non-contracted ambulance transports to and from places ranging from private healthcare facilities to businesses, residences, and accident scenes. The result is that the final rule would defeat the statutory directive in § 111(a) to pay the actual necessary expense (meaning, the actual cost) for ambulance

transports to and from the "other places" that represent most ambulance transports of veterans.

VA cannot accomplish through a rule what Congress refrained from doing in the statute. The final rule exceeds the limited grant of discretion to pay the MFS amount in § 111(b)(3)(C). And it upends the overall structure of § 111 by defeating the operation of § 111(a). The Court should vacate the final rule under §§ 706(2)(A) and (C) because it is unlawful.

## B.  The final rule violates the APA because it is arbitrary and capricious

One of the basic procedural requirements of administrative rulemaking is that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily or capriciously if it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view … ." *Id.* at 43 (internal citations and quotation marks omitted); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008). Thus, in evaluating agency actions under the "arbitrary and capricious" standard, courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378, (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, (1971); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).

When an agency changes its position, including by revising a prior legal interpretation, it must "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). When an agency "is not writing on a blank slate," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. ---, 140 S. Ct. 1891, 1915 (2020)

1. *VA failed to display awareness that it was changing its legal interpretation of § 1728, much less show good reasons for its change of position*

As discussed earlier, VA issued an interpretive rule on § 1728 in the form of a sub-regulatory guidance document in May 2022. The interpretive rule stated that VA pays for unauthorized emergency transport under § 1728 at "[g]enerally billed charges."

The final rule changes VA's legal interpretation of § 1728 by applying § 111(b)(3)(C) to emergency ambulance transports under § 1728, so that payment is

made at the lesser of the actual charge or the MFS amount instead of "[g]enerally billed charges."

Nowhere in the final rule does VA discuss § 1728, much less acknowledge or offer good reasons for departing from its prior legal interpretation of § 1728. The complete and total failure to address §1728 in the final rule—after publishing an interpretive rule on § 1728 months earlier—was arbitrary and capricious. *Nat. Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (holding that an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."); *Fox Television Stations*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *Mexichem Fluor, Inc., v. EPA*, 866 F.3d 451, 461 (D.C. Cir. 2017), *r'hrng en banc denied* (Jan. 26, 2018) (vacating rule and remanding to EPA to "explain the basis for its conclusion and explain its change in interpretation" of its statutory authority). The Court should vacate the final rule on that ground alone.

2. *The Secretary based his RFA certifications on flawed RIAs and failed to examine VA data that was relevant to the economic analysis*

The Secretary certified under the RFA that neither the proposed rule nor the final rule would have a significant economic impact on a substantial number of small entities. The Secretary premised those certifications on the original and revised RIAs, respectively. In each RIA, the Chief Economist for VA projected the "transfer

26

savings," *i.e.*, payment reductions, that VA would achieve over five years by migrating payments from billed charges to the MFS amount. Appx1319, Appx1485. He then allocated the payment reductions pro rata across all ambulance providers, estimated the per entity burden "to be less than 1% of preliminary receipts," and deemed the burden insignificant for all ambulance providers. Appx1319, 1487.

The Secretary was required to "examine the relevant data" when he made the RFA certifications. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. He failed to do so because he limited his examination to the RIAs. As it turns out, VA also had data on actual payments for non-contract ambulance transports that showed that the projections in the RIAs were wildly off the mark.

In the original RIA dated October 28, 2020, the Chief Economist projected that from 2021 through 2025, ambulance providers would charge $1,458,899,847 for non-contract ambulance transports, and that under the final rule, VA payments would drop by $199,577,499, from $1,458,899,847 to $1,259,322,348. Appx1319. The Chief Economist bumped those numbers up in the revised RIA dated January 5, 2023. He projected that from 2024 through 2028, ambulance providers would charge $1,701,798,038 for non-contract ambulance transports, and that under the final rule, VA's payments would drop by $223,191,510, from $1,631,516,872 to $1,408,325,365. Appx1485.

After the industry day on July 20, 2023, VA released data in response to a

27

Freedom of Information Act (FOIA) request that showed that VA actually paid a total of $1,653,725,407 for non-contract ambulance transports *in fiscal year 2022 alone*. Appx1779. The original RIA thus underestimated the total provider charges and the reduction in payments under the final rule by a factor of more than five. Then, *despite the availability of actual ambulance data for 2022 and preceding fiscal years*, the revised RIA *used the same flawed numbers and methodology VA had used in the original RIA*.

The RFA certifications are a classic case of "garbage in, garbage out." *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 302 F.Supp.3d 1251, 1271-72, 1274 (D. Colo. 2018) (holding that agency's reliance on opinion of government expert "knowing it was based on information bereft of key data" was arbitrary and capricious); *The Sierra Club v. U.S. Dep't of Agric.*, 116 F.3d 1482, *12-14 (7th Cir. 1997) (unpublished) (concluding that use of old, suspect data—without explanation for the failure to use better data—was arbitrary and capricious). The certifications are arbitrary and capricious because the Secretary examined only the RIAs, which inexplicably failed to use VA's actual payment data showing a significant economic impact on small entities.[6]

---

[6] Neither the FOIA response nor the data it contains are part of the rulemaking record prepared by the Government. The fiscal year 2022 data was in the possession of VA *during the rulemaking* and should have been considered in the rulemaking record. Plus, it alone shows that the revised RFA certifications present a "garbage in, garbage out" problem. The fiscal year 2022 data are thus necessary for effective

The RFA certifications are also arbitrary and capricious because the Secretary entirely failed to consider an important aspect of the problem: differences between ambulance providers. Again, the Secretary looked only at the RIAs, in which the Chief Economist assumed without examination or explanation that ambulance providers are fungible and uniformly able to absorb a 1% reduction in preliminary receipts. The Secretary ignored the differences in operations (air versus ground), service area (rural versus urban), case mix (emergency versus non-emergency), and third-party payer mix (VA versus other or no coverage) that impact whether the provider can absorb a 1% reduction without decreasing services. The Secretary's failure to acknowledge and rationally account for the differences in his RFA certifications violated the APA.

The RFA certifications enabled VA to avoid initial and final regulatory flexibility analyses, as well as review under E.O. 12866. Those assessments would have subjected the rule to much stricter scrutiny. VA, for example, would have had to assess the direct costs the rule would impose on ambulance providers (instead of treating ambulance providers as fungible), and evaluate the possible adverse effects of the rule, such as employee layoffs, reduced services, and the erosion of veterans'

---

judicial review and should be considered by the Court. *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1381. Alternatively, the Court may take judicial notice of the data because it is from a source whose 'accuracy cannot be reasonably questioned':  VA itself. *Euzebio v. McDonough*, 989 F.3d at 1323.

health. 5 U.S.C. §§ 604, 605; E.O. 12866, §§ 6(B)(ii) and (C)(ii). The result would have been a more rigorous rulemaking, which would have benefited small entities such as Petitioners QVAA and VAA. The Court should vacate the arbitrary and capricious RFA certifications and remand to VA to conduct a more rigorous rulemaking that considers the effects on small providers.

3. *VA failed to independently evaluate whether the MFS amount is sufficient to provide the healthcare for veterans that Congress has entrusted to VA*

VA admits that it conducted no independent analysis of the sufficiency or reasonableness of the MFS for ground ambulance providers transporting veterans. Appx1709.

VA asserts that the MFS amount is nonetheless sufficient for VA programs because CMS and the legislative branch have supposedly deemed it so. VA, however, cannot delegate its rulemaking authority to the legislative branch any more than VA can pass it off to CMS. The APA requires VA to independently assess whether the MFS amount is sufficient for VA programs, and not to categorically defer to CMS or any other part of the Government. *Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.,* 785 F.3d 1, 16 (D.C. Cir. 2015). "[S]uch faith in another agency's decisionmaking fails to account for the very real possibility that the other agency acted improperly or irrationally. Indeed, the other agency's decision could very well be arbitrary and capricious…" *Foster v. Mabus*, 895 F.Supp.2d 135, 148 (D.D.C.

2012) (vacating Navy decertification that was based solely on Marine Corps decertification).

VA's *ipse dixit* reliance on CMS is egregious for two reasons. First, Congress has recognized that the healthcare needs and circumstances of the nation's veterans differ from those of Medicare beneficiaries and has marked them for special consideration through VA. *See, e.g.* 38 U.S.C. §§ 111, 1703, 1725, 1728. Second, Congress has, in fact, ordered a whole-of-government review of CMS rates for paying ground ambulance providers serving Medicare beneficiaries. In § 50203(b) of the Bipartisan Budget Act of 2018 (BBA), Pub. L. No. 115-123, 132 Stat. 64, 178, (Feb. 9, 2018), Congress amended § 1834(l) of the Social Security Act (SSA) to require CMS to collect cost, revenue, utilization, and other data from ground ambulance providers for five years. The amendment also requires the Medicare Payment Advisory Commission (MedPAC), an independent legislative branch agency, to assess and submit a report to Congress on both the data collection and *the adequacy of the MFS for ground ambulance services*. 132 Stat. at 180 (adding SSA §§ 1834(l)(17)(F)(i)-(ii)). It is nonsensical for VA to find that the MFS amount is adequate for VA programs when, at Congress's direction, CMS is collecting years of ground ambulance data as part of a wholesale reassessment of the adequacy of the MFS amount for the Medicare program.

31

VA's *ipse dixit* reliance on the legislative branch is equally egregious. VA asserts that Congress found the MFS amount sufficient for VA programs for 2025 and future years because Congress granted VA the discretion to pay the MFS amount in 2011. 88 Fed. Reg. at 10,033. But the grant of discretion to choose between paying the actual charge or the MFS amount was not a finding by Congress that the MFS amount is always sufficient for VA programs. Nor does the grant of discretion relieve VA from its obligation under the APA to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. VA has paid the actual cost for non-contract emergency ground ambulance transports since 2008; it is still required to explain why it is rational to pay the MFS amount for such transports beginning in 2025.

VA also cites the "most recent ambulance report" of MedPAC, which supposedly "found that, in aggregate, Medicare ambulance margins were adequate." 88 Fed. Reg. at 10,033. But MedPAC stated only that "Medicare margins appear to be adequate," and did not assess the margins for ground ambulance providers in VA programs. *See Report to the Congress: Medicare and the Health Care Delivery System*, MedPAC (Medicare Payment Advisory Commission), at 185 (June 2013), available at: https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun13_entirereport.pdf (last visited Mar.7, 2024).

Furthermore, the "most recent ambulance report" was published in June 2013 – almost 10 years before the final rule. VA has not satisfactorily explained why a vague statement by MedPAC in 2013 justifies payment of the MFS amount in VA programs beginning in 2025.

Nor has VA squared its *ipse dixit* reliance on the legislative branch with the BBA. Congress plainly questioned the adequacy of the MFS amount for the Medicare program when it ordered a multi-year, whole-of-government review of the MFS amount in the BBA. MedPAC is now poised to issue a report assessing the adequacy of the MFS amount for the Medicare program based on recent data from ground ambulance providers. At no point in the final rule does VA reconcile the MedPAC report from June 2013 or the supposed findings of Congress in 2011 when it enacted § 111(b)(3)(C) with the ongoing, congressionally mandated review of the adequacy of the MFS amount for the Medicare program. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43.

The Court should vacate the final rule because VA's failure to independently assess the sufficiency of the MFS amount for VA programs is arbitrary and capricious.

*4. VA failed to consider an important part of the problem: its fulfillment of its statutory obligations under the Veterans Community Care Program*

The Veterans Community Care Program enables VA to furnish hospital care, medical services, and extended care services to covered veterans through contracts

with "non-Department providers." 38 U.S.C. §§ 1703(a)(1), (c)(1), (d)(1). Under the program, VA must "coordinate the furnishing of hospital care, medical services, and extended care services" to "ensur[e] continuity of care and services[,]" and "that covered veterans do not experience … an unusual or excessive burden in accessing hospital care, medical services, or extended care services." 38 U.S.C. §§ 1703(a)(2)(B), (D). VA currently meets its obligation by paying for some emergency ground ambulance transports at "billed charges" under 38 U.S.C. § 1703 and 38 C.F.R. § 17.4020(c), while paying "billed charges" for unauthorized emergency ground ambulance transports under 38 U.S.C. § 1728. Appx1397-1398. Before publishing the final rule, VA failed to consider whether reducing payments to the MFS amount will force ground ambulance providers to reduce services, and thereby reduce veterans' continuity and access to care under the Veterans Community Care Program. The failure to consider the potential spillover effect on the Veterans Community Care Program was arbitrary and capricious, and yet another reason to vacate the final rule.

5. *VA failed to respond sufficiently to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas*

Providers commented that the rule will reduce veterans' access to ground ambulance services in rural areas. 88 Fed. Reg. at 10,034. Members of Congress raised similar concerns. Appx1324-1332. VA responded in the final rule that it

would contract with providers as needed. 88 Fed. Reg. at 10,034. Even as VA held out the promise of contracting for ground ambulance services during the rulemaking, VA failed to address the magnitude and complexity of the contracting that would be required to maintain veterans' access to emergency ground ambulance transports dispatched through the 9-1-1 system. To achieve that goal, VA would have to contract with thousands of ground ambulance providers nationwide. Nowhere in the final rule does VA assume such robust contracting with ground ambulance providers, much less project what the contracts will cost VA. The failure to resolve the contracting and rural access problems for 9-1-1-initiated ground ambulance transports is a glaring omission in the rulemaking given that 78% of VA dollars paid to ambulance providers are for such transports. Appx1721.

Two things are now obvious from the final rule and VA's statements during the VA industry days. First, VA did not sufficiently respond to relevant and significant comments regarding the effects of the final rule on 78% of the dollars VA pays to ambulance providers. Second, VA did not sufficiently respond because it failed to grapple with the substance of the comments and resolve the policy problem of rural access to 9-1-1-initiated ground ambulance transports. Instead, VA paid lip service to the comments in the final rule by identifying contracting as a measure that VA would revisit after the rulemaking was completed.

"[M]erely hearing is not good enough[,] [VA] must respond to serious objections." *Del. Dep't,* 785 F.3d at 16. VA has neglected to do so throughout the rulemaking process. As a result, the final rule is arbitrary and capricious. The Court should vacate the final rule on that basis alone.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The final rule violates the APA in no less than seven discrete ways. It is unlawful because it defeats the text and structure of § 1728. It is similarly unlawful because it defeats the text and structure of § 111. What is more, it is arbitrary and capricious because the Secretary and VA failed to acknowledge and explain the change in the legal interpretation of § 1728, examine relevant data when making RFA certifications, independently assess the reasonableness and sufficiency of the MFS amount for VA programs, consider the potential spillover effect on the Veterans Community Care Program, and sufficiently respond to relevant and significant comments regarding veterans' continued access to ground ambulance services in rural areas. Any one of these seven discrete APA violations is a basis for vacating the final rule and remanding this matter to VA. Petitioners seek a vacatur and remand to force VA to meaningfully address the many serious problems that have pervaded the rulemaking since 2020.

March 21, 2024

Respectfully submitted,

/s/ Brian Stimson
Brian R. Stimson
D.C. Bar No. 1657563
Sara M. Lord
MA Bar No. 546918
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C.  20037
Main: (202) 677-4030
Email: Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2024, I caused a copy of the foregoing

Opening Brief to be served via CM/ECF upon the following:

>Director, Commercial Litigation Branch, Civil Division
>U.S. Department of Justice
>c-natcourts.appeals@usdoj.gov
>United States Department of Justice
>Commercial Litigation Branch, Civil Division
>PO Box 480
>Ben Franklin Station
>Washington, DC 20044


>*/s/ Brian Stimson*
>Brian R. Stimson
>ARNALL GOLDEN GREGORY LLP
>2100 Pennsylvania Ave., NW, Suite 350S
>Washington, D.C.  20037
>Main: (202) 677-4030
>Email: Brian.Stimson@agg.com
>
>*Counsel for Petitioners*

4853-4545-0159.v4

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1104

**Short Case Caption:** Metropolitan Area EMS Authority v. Secretary of Veterans Affairs

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __8,707__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __03/21/2024__

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson

Save for Filing

ADDENDUM

applicable provisions of this section and part 385 of this title, sufficient to allow each applicable copyright owner to assess the manner in which the digital music provider determined the adjustment and the accuracy of the adjustment. As appropriate, an adjustment may be calculated using estimates permitted under paragraph (d)(2) of this section.

(iii) Where applicable, the particular sound recordings and uses to which the adjustment applies.

(iv) A description of the reason(s) for the adjustment.

(4) In the case of an underpayment of royalties, the digital music provider shall pay the difference to the mechanical licensing collective contemporaneously with delivery of the statement of adjustment or promptly after being notified by the mechanical licensing collective of the amount due. A statement of adjustment and its related royalty payment may be delivered together or separately, but if delivered separately, the payment must include information reasonably sufficient to allow the mechanical licensing collective to match the statement of adjustment to the payment.

(5) In the case of an overpayment of royalties, the mechanical licensing collective shall appropriately credit or offset the excess payment amount and apply it to the digital music provider's account, or upon request, issue a refund within a reasonable period of time.

(6)(i) A statement of adjustment must be delivered to the mechanical licensing collective no later than 6 months after the occurrence of any of the scenarios specified by paragraph (k)(6)(ii) of this section, where such an event necessitates an adjustment. Where more than one scenario applies to the same cumulative statement of account at different points in time, a separate 6-month period runs for each such triggering event.

(ii) A statement of adjustment may only be made:

(A) Except as otherwise provided for by paragraph (c)(5) of this section, where the digital music provider discovers, or is notified of by the mechanical licensing collective or a copyright owner, licensor, or author (or their respective representatives, including an administrator or a collective management organization) of a relevant sound recording or musical work that is embodied in such a sound recording, an inaccuracy in the cumulative statement of account, or in the amounts of royalties owed, based on information that was not previously known to the digital music provider despite its good-faith efforts;

(B) When making an adjustment to a previously estimated input under paragraph (d)(2) of this section;

(C) Following an audit of a digital music provider that concludes after the cumulative statement of account is delivered and that has the result of affecting the computation of the royalties payable by the digital music provider (*e.g.,* as applicable, an audit by a sound recording copyright owner concerning the amount of applicable consideration paid for sound recording copyright rights); or

(D) In response to a change in applicable rates or terms under part 385 of this title.

(7) A statement of adjustment must be certified in the same manner as a cumulative statement of account under paragraph (j) of this section.

(l)(1) Subject to the provisions of 17 U.S.C. 115, a digital music provider and the mechanical licensing collective may agree in writing to vary or supplement the procedures described in this section, including but not limited to pursuant to an agreement to administer a voluntary license, provided that any such change does not materially prejudice copyright owners owed royalties required to be transferred to the mechanical licensing collective for the digital music provider to be eligible for the limitation on liability described in 17 U.S.C. 115(d)(10). The procedures surrounding the certification requirements of paragraph (j) of this section may not be altered by agreement. This paragraph (l)(1) does not empower the mechanical licensing collective to agree to alter any substantive requirements described in this section, including but not limited to the required royalty payment and accounting information and sound recording and musical work information.

(2) The mechanical licensing collective shall maintain a current, free, and publicly accessible online list of all agreements made pursuant to paragraph (l)(1) of this section that includes the name of the digital music provider (and, if different, the trade or consumer-facing brand name(s) of the service(s), including any specific offering(s), through which the digital music provider engages, or has engaged at any time during the period identified in paragraph (c)(1) of this section, in covered activities) and the start and end dates of the agreement. Any such agreement shall be considered a record that a copyright owner may access in accordance with 17 U.S.C. 115(d)(3)(M)(ii). Where an agreement made pursuant to paragraph (l)(1) of this section is made pursuant to an agreement to administer a voluntary

license or any other agreement, only those portions that vary or supplement the procedures described in this section and that pertain to the administration of a requesting copyright owner's musical works must be made available to that copyright owner.

(m) Each digital music provider shall, for a period of at least seven years from the date of delivery of a cumulative statement of account or statement of adjustment to the mechanical licensing collective, keep and retain in its possession all records and documents necessary and appropriate to support fully the information set forth in such statement (except that such records and documents that relate to an estimated input permitted under paragraph (d)(2) of this section must be kept and retained for a period of at least seven years from the date of delivery of the statement containing the final adjustment of such input).

Dated: October 30, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–24528 Filed 11–4–20; 8:45 am]

**BILLING CODE 1410–30–P**

---

**DEPARTMENT OF VETERANS AFFAIRS**

**38 CFR Part 70**

**RIN 2900–AP89**

**Change in Rates VA Pays for Special Modes of Transportation**

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's (VHA) beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule (AFS) established by the Centers for Medicare & Medicaid Services (CMS). For travel by modes other than ambulance, VA proposes to establish a payment methodology based on states' posted rates or the actual charge. VA would replace this payment methodology for travel by modes other than ambulance at

some time in the future, once VA has collected enough data to develop a new methodology.

**DATES:** Comments must be received on or before January 4, 2021.

**ADDRESSES:** Comments may be submitted through *www.Regulations.gov.* Comments received will be available at *regulations.gov* for public viewing, inspection or copies.

**FOR FURTHER INFORMATION CONTACT:** Paul Perry, Deputy Director, Veterans Transportation Program (10NB2G), Veterans Health Administration, Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420, (404) 828–5691 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** Pursuant to 38 U.S.C. 111, VA provides beneficiary travel benefits to eligible veterans who need to travel in connection with vocational rehabilitation, counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care. Regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) are in part 70 of title 38, CFR. See also Executive Order 11302. Under part 70, VA pays for a "special mode of transportation" when that travel is medically required, the beneficiary is unable to defray the cost of that transportation, and VHA approved the travel in advance or the travel was undertaken in connection with a medical emergency. See 38 CFR 70.2 (defining the term "[s]pecial mode of transportation"), and 38 CFR 70.4(d) (establishing criteria for approval of special mode travel). We propose to amend these regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C), which permits VA to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Medicare Part B AFS established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)), unless VA has entered into a contract for that transportation. Additionally, VA proposes to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services. VA would use this payment methodology while VA collects data for the purpose of developing a new payment methodology. In doing so, VA would establish two (2) categories of special modes of transportation for purposes of determining the payment rate: Travel by ambulance, which would be defined in 38 CFR 70.2, and travel by modes other than ambulance. We

believe that these changes would reduce improper payments and help eliminate payment error, waste, and abuse in line with the goals of Executive Order 13520.

## §70.2  Definitions

We propose to add a definition of "ambulance" that would be necessary in administering payments for special mode transportation. VA would define ambulance by cross-referencing the CMS regulations related to coverage and payment for ambulance services. See 42 CFR 410.40, 410.41, and Part 414, Subpart H. VA proposes to define ambulance to mean advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those services are defined in 42 CFR 414.605. Consistent with 42 CFR 414.605, the definitions of these terms would apply to ground (both land and water) ambulance services and to air ambulance services unless otherwise specified. Currently Medicare Part B covers these levels of ambulance services under 42 CFR 410.40(c), as well as paramedic ALS intercept, when applicable criteria are met. VA would exclude paramedic ALS intercept (PI) because this service involves arriving on scene, providing initial care, and intermittent accompaniment of a person on an ambulance. Paramedic ALS intercept does not involve actual transport of the person, and the vendor may charge for mere arrival on scene rather than providing care during transport. VA would not pay for this charge because PI does not involve active care during transportation from the point of emergency to the final location. CMS regulations are an appropriate reference source in our proposed definition of "ambulance" because VA is proposing to rely on the Medicare Part B AFS payment rates in its new ambulance payment methodology as authorized by 38 U.S.C. 111(b)(3)(C). VA would make this change in an effort to maintain uniformity with CMS and eliminate confusion for vendors.

## §70.30  Payment Principles

Under current 38 CFR 70.30(a)(4), VA pays the "actual cost of a special mode of transportation." Current 38 CFR 70.30(a)(4) has not been revised to reflect VA's payment authority for travel by ambulance in 38 U.S.C. 111(b)(3)(C), and this proposed rule would implement that authority in 38 CFR 70.30(a)(4). Moreover, VA would revise 38 CFR 70.30(a)(4) to prescribe a payment methodology for travel by

modes other than ambulance while VA collects data for the purpose of developing a new payment methodology. The new payment methodology would be the subject of a separate and later rulemaking.

We would restructure the current language in 38 CFR 70.30(a)(4) to distinguish between travel by ambulance and travel by modes other than ambulance in new 38 CFR 70.30(a)(4)(i) and 70.30(a)(4)(ii), respectively. Additionally, VA would state that the proposed payment methodologies for special modes of transportation would apply notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120, which relates to payment or reimbursement of the expenses of emergency treatment under 38 U.S.C. 1728. Proposed 70.30(a)(4) would also specify that the payment methodologies for travel by ambulance and travel by modes other than ambulance would not apply when VA has entered into a contract with the vendor. When VA has entered into a contract with the vendor, the terms of the contract would govern VA's payments. Finally, proposed 70.30(a)(4) would define the term "posted rate" for purposes of the payment methodology for travel by modes other than ambulance, discussed further below.

Proposed 38 CFR 70.30(a)(4)(i) would establish in regulation a new payment methodology for travel by ambulance. VA would adopt the Medicare Part B AFS for transport by ambulance, and we would pay for ambulance services based on the lesser of either the AFS payment amount or the actual charge, unless (as would be stated in 38 CFR 70.30(a)(4)) VA has executed a contract for ambulance services from the vendor in which case the terms of the contract would govern VA payments. For ALS1 and BLS, the AFS includes rates for emergency and nonemergency transportation. For purposes of proposed section 70.30(a)(4)(i), VA would apply the applicable CMS rate based on the vendor's coded invoice. New 38 CFR 70.30(a)(4)(i) would read as follows: "Travel by ambulance: VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l))."

Proposed 38 CFR 70.30(a)(4)(ii) would establish in regulation a payment methodology for travel by modes other than ambulance. Unlike travel by ambulance, there are no existing Medicare Part B payment rates for transport by modes other than

ambulance to include wheelchair and stretcher van services. While Medicare Part B does not currently cover these services, there are Healthcare Common Procedure Coding System (HCPCS) codes for them, and CMS makes reference to the published Medicaid rates in each respective state. In this proposed rule, we refer to the published Medicaid rates in each respective state as ''posted rates.'' If a state has a posted rate, then VA would be able to access it. Relying on posted rates alone, however, would present two challenges: (1) VA cannot direct vendors to one source to obtain the posted rate for these services, and (2) not every state has posted rates for these services or makes them available. Because of this, VA proposes to establish a payment methodology for these other types of special mode of transportation services, while VA collects data for the purpose of developing a new payment methodology, which would be the subject of a separate and later rulemaking.

Proposed 38 CFR 70.30(a)(4) would define the term ''posted rate'' for purposes of section 70.30(a)(4)(ii) to mean ''the applicable Medicaid rate for the special mode transport in the state or states where the vendor is domiciled or where transport occurred (''involved states'').'' Proposed 38 CFR 70.30(a)(4)(ii)(A)–(C) would create a payment methodology to pay the lesser of either: (1) A state's posted rate for these services, or (2) the vendor's actual charge. VA would undertake this action as stated above to comport with Executive Order 13520. By paying the lowest rate between a state's posted rate or the vendor's actual charge, VA would actively reduce the possibility of waste and abuse in a major VA program.

VA recognizes that some vendors provide services only in states where they are domiciled or are domiciled in states other than the ones in which they provide services. VA would attempt to account for both singular and multi-jurisdictional vendors. VA also recognizes that transport can occur across state lines, and we would account for this in the payment methodology. For situations where the vendor provides services in a state or states other than where the vendor is domiciled, or where special mode transport occurs across state lines, VA would pay the lowest posted rate among the states involved or the actual charge, whichever is lowest. If the states involved have no posted rate, then VA would pay the vendor's actual charge. We would make this change in an effort to control costs where we work with regional or national vendors who

provide services in multiple jurisdictions, and the posted rates in the areas where they deliver services are lower or higher than the vendor's state or states of domicile. In the absence of a posted rate for an involved state, VA would pay the lowest among the posted rates of the other state or states or the vendor's actual charge. Proposed 70.30(a)(4)(ii) would read as follows: ''Travel by modes other than ambulance: VA will pay the lesser of: (A) The vendor's actual charge. (B) The posted rate in the state where the vendor is domiciled. If the vendor is domiciled in more than one state, the lowest posted rate among all involved states. (C) The posted rate in the state where transport occurred. If transport occurred in more than one state, the lowest posted rate among all involved states. NOTE TO PARAGRAPH (a)(4)(ii): In the absence of a posted rate for an involved state, VA will pay the lowest among the available posted rates or the vendor's actual charge.''

After utilizing this methodology for an initial 90 calendar day period after this rule becomes final in the **Federal Register**, VA would analyze the payments made to vendors for travel by modes other than ambulance and determine whether we have enough payment data (*e.g.,* arithmetic average of actual charges, locality rates, or posted rates) to develop a new methodology. If VA determines that it has enough payment data, then VA would develop a payment methodology using the lowest possible rate. If VA does not have enough payment data to create a methodology after the initial 90 calendar day period, then VA would continue to collect data for as many 90 calendar day intervals as VA would deem necessary to gather sufficient payment data, which we do not anticipate exceeding 18 months from the effective date of the final rule. Subsequently, VA would propose a new methodology for travel by modes other than ambulance in a separate rulemaking in the **Federal Register**.

## Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This proposed rule would have no such effect on State, local, and tribal governments, or on the private sector.

## Paperwork Reduction Act

This proposed rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

## Executive Orders 12866, 13563, and 13771

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Information and Regulatory Affairs has determined that this rule is not a significant regulatory action under Executive Order 12866.

VA's impact analysis can be found as a supporting document at *http:// www.regulations.gov,* usually within 48 hours after the rulemaking document is published. Additionally, a copy of the rulemaking and its impact analysis are available on VA's website at *http:// www.va.gov/orpm/,* by following the link for ''VA Regulations Published From FY 2004 Through Fiscal Year to Date.''

This proposed rule is expected to be an E.O. 13771 deregulatory action. Details on the estimated cost savings of this proposed rule can be found in the rule's economic analysis.

## Regulatory Flexibility Act

The Secretary hereby certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601–612. VA estimates that this proposed rule would potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally. The per entity burden is estimated to be less than 1% of preliminary receipts for all entities in NAICS Code 621910. VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care

Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99% of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1% of small entities within these NAICS Codes are estimated to be impacted by this proposed rule. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

## Catalog of Federal Domestic Assistance

The Catalog of Federal Domestic Assistance numbers and titles for the programs affected by this document are 64.008—Veterans Domiciliary Care; 64.012—Veterans Prescription Service; 64.013—Veterans Prosthetic Appliances; 64.014—Veterans State Domiciliary Care; 64.015—Veterans State Nursing Home Care; 64.026—Veterans State Adult Day Health Care; 64.029—Purchase Care Program; 64.035—Veterans Transportation Program; 64.040—VHA Inpatient Medicine; 64.041—VHA Outpatient Specialty Care; 64.042—VHA Inpatient Surgery; 64.043—VHA Mental Health Residential; 64.044—VHA Home Care; 64.045—VHA Outpatient Ancillary Services; 64.046—VHA Inpatient Psychiatry; 64.047—VHA Primary Care; 64.048—VHA Mental Health clinics; 64.049—VHA Community Living Center; 64.050—VHA Diagnostic Care.

## List of Subjects in 38 CFR Part 70

Administrative practice and procedure, Alcohol abuse, Alcoholism, Claims, Day care, Dental health, Drug abuse, Foreign relations, Government contracts, Grant programs—health, Grant programs—veterans, Health care, Health facilities, Health professions, Health records, Homeless, Medical and dental schools, Medical devices, Medical research, Mental health programs, Nursing homes, Philippines, Reporting and recordkeeping requirements, Scholarships and fellowships, Travel and transportation expenses, Veterans.

## Signing Authority

The Secretary of Veterans Affairs, or designee, approved this document and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs. Brooks D. Tucker, Assistant Secretary for Congressional and Legislative

Affairs, Performing the Delegable Duties of the Chief of Staff, Department of Veterans Affairs, approved this document on October 28, 2020, for publication.

**Consuela Benjamin,**

*Regulations Development Coordinator, Office of Regulation Policy & Management, Office of the Secretary, Department of Veterans Affairs.*

For the reasons set forth in the preamble, the Department of Veterans Affairs proposes to amend 38 CFR part 70 as follows:

## PART 70—VETERANS TRANSPORTATION PROGRAMS

■ 1. The authority citation for part 70 is revised to read as follows:

**Authority:** 38 U.S.C. 101, 111, 111A, 501, 1701, 1714, 1720, 1728, 1782, 1783, E.O. 11302, and E.O. 13520.

■ 2. Amend § 70.2, by adding in alphabetical order the definition "Ambulance" to read as follows:

*Ambulance* for this subpart, means advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 CFR 414.605.

\*    \*    \*    \*    \*

■ 3. In § 70.30 amend paragraph (a)(4) to read as follows:

**§ 70.30    Payment principles.**

(a) \* \* \*

(4) VA payments for special modes of transportation will be made in accordance with this section, unless VA has entered into a contract with the vendor in which case the terms of the contract will govern VA payments. This section applies notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120. For purposes of paragraph (ii), the term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the state or states where the vendor is domiciled or where transport occurred ("involved states").

(i) Travel by ambulance: VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).

(ii) Travel by modes other than ambulance: VA will pay the lesser of:

(A) The vendor's actual charge.

(B) The posted rate in the state where the vendor is domiciled. If the vendor is domiciled in more than one state, the lowest posted rate among all involved states.

(C) The posted rate in the state where transport occurred. If transport occurred in more than one state, the lowest posted rate among all involved states.

**Note to paragraph (a)(4)(ii) of this section:** In the absence of a posted rate for an involved state, VA will pay the lowest among the available posted rates or the vendor's actual charge.

\*    \*    \*    \*    \*

[FR Doc. 2020–24261 Filed 11–4–20; 8:45 am]

**BILLING CODE 8320–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

**[EPA–R05–OAR–2020–0388; FRL–10016–08–Region 5]**

## Air Plan Approval; Ohio; Base Year Emission Inventories and Emissions Statement Rule Certification for the 2015 Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve, under the Clean Air Act (CAA), a revision to the State Implementation Plan (SIP) submitted by the Ohio Environmental Protection Agency on July 24, 2020. The CAA establishes emission inventory requirements for all ozone nonattainment areas. The revision will address the emission inventory requirements for the Cleveland, Ohio (OH) nonattainment area and the Ohio portion of the Cincinnati, Ohio-Kentucky (Cincinnati) ozone nonattainment area, as designated under the 2015 ozone National Ambient Air Quality Standard (NAAQS or standard). Also, EPA is proposing to approve Ohio's certification that its stationary annual emissions statement regulation, which has been previously approved by EPA under a prior ozone standard, satisfies the CAA emissions statement rule requirement for the Cleveland and Cincinnati nonattainment areas under the 2015 ozone NAAQS.

**DATES:** Comments must be received on or before December 7, 2020.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2020–0388 at *http://www.regulations.gov* or via email to *blakley.pamela@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* For either manner of

add, in their places, the text ''electronic submittals'' and ''*https://www.uscg.mil/HQ/MSC*'', respectively.

### § 162.018–8  [Amended]

■ 50. In § 162.018–8(a), remove the text ''submitting the VSP electronically'' and ''*http://www.uscg.mil/HQ/MSC*'' and add, in their places, the text ''electronic submittals'' and ''*https://www.uscg.mil/HQ/MSC*'', respectively.

### § 162.050–7  [Amended]

■ 51. In § 162.050–7(a), remove the text ''submitting the VSP electronically'' and ''*http://www.uscg.mil/HQ/MSC*'' and

add, in their places, the text ''electronic submittals'' and ''*https://www.uscg.mil/HQ/MSC*'', respectively.

### PART 163—CONSTRUCTION

■ 52. The authority citation for part 163 is revised to read as follows:

**Authority:** 46 U.S.C. 3306, 3703; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

$$GM = \frac{(N)(P \times D)^{2/3}(s)(h)}{K\Delta(f/B)}$$

\* \* \* \* \*

(d) \* \* \*

$$HA = \frac{2\,(N)(P \times D)^{2/3}(s)(h)(\cos\theta)}{K\Delta}$$

\* \* \* \* \*

### PART 178—INTACT STABILITY AND SEAWORTHINESS

■ 55. The authority citation for part 178 is revised to read as follows:

**Authority:** 43 U.S.C. 1333; 46 U.S.C. 2103, 3306, 3703; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

### § 178.450  [Amended]

■ 56. In § 178.450(a), remove the text ''Basis Drainage'' and add, in its place, the text ''Basic Drainage''.

Dated: January 25, 2023.

**Michael Cunningham,**
*Chief, Office of Regulations and Administrative Law.*

[FR Doc. 2023–01938 Filed 2–15–23; 8:45 am]

**BILLING CODE 9110–04–P**

### PART 173—SPECIAL RULES PERTAINING TO VESSEL USE

■ 53. The authority citation for part 173 is revised to read as follows:

**Authority:** 43 U.S.C. 1333; 46 U.S.C. 2113, 3306, 5115; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

■ 54. In § 173.095, revise the equations in paragraphs (b) and (d) to read as follows:

### § 173.095  Towline pull criterion.

\* \* \* \* \* \*

(b) \* \* \*

### DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 70

**RIN 2900–AP89**

### Change in Rates VA Pays for Special Modes of Transportation

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** The Department of Veterans Affairs (VA) amends its beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology will apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA will pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare and Medicaid Services. For travel by modes other than ambulance, VA will establish a payment methodology based

on States' posted rates or the actual charge.

**DATES:** The rule is effective February 16, 2024.

**FOR FURTHER INFORMATION CONTACT:** Ben Williams, Director, Veterans Transportation Program (15MEM), Veterans Health Administration, Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420, (404) 828–5691. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:** Pursuant to section 111 of title 38 United States Code (U.S.C.), VA provides beneficiary travel benefits to eligible individuals who need to travel in connection with vocational rehabilitation, counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care. Regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) are in part 70 of title 38 Code of Federal Regulations (CFR). Under part 70, VA has established limiting criteria to pay for a

"special mode of transportation" when that travel is medically required, the beneficiary is unable to defray the cost of that transportation, and VHA approved the travel in advance or the travel was undertaken in connection with a medical emergency. See 38 CFR 70.2 (defining the term "[s]pecial mode of transportation"), and 38 CFR 70.4(d) (establishing criteria for approval of special mode travel).

On November 5, 2020, VA proposed amending its beneficiary travel regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C), which permits VA to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Centers for Medicare and Medicaid (CMS) Medicare Part B Ambulance Fee Schedule (hereafter referred to the CMS ambulance fee schedule) established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)), unless VA has entered into a contract for that transportation. Additionally, VA proposed to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services, which would be used while VA collects data for the purpose of developing a new payment methodology. See 85 FR 70551. We provided a 60-day comment period that ended on January 4, 2021, and we received six comments, five of which were substantive comments. Those five comments all raised similar concerns to 38 CFR 70.30(a)(4) introductory text and (a)(4)(i) and (ii) as proposed, related to using the CMS ambulance fee schedule or the posted rates from each State. We first clarify one aspect of the regulation for the commenters in general, and then address more specific concerns of the individual commenters as applicable (we note that we refer to issues raised by a "commenter" or "commenters" below). Based on the summary and responses below, we adopt the proposed rule as final with two nonsubstantive changes.

After the close of the comment period, VA received several Congressional letters that expressed some concerns also raised in comments. At Congress' request, VA also attended four meetings with members of Congress and their staff between December 20, 2022, and December 22, 2022, during which VA outlined the terms of the proposed rule.

## General Clarification for Commenters

At the outset of our responses, we note that we read the commenters' assertions to rely on the assumption that the proposed rule would create a scenario where VA in all cases will shift from paying billed charges to instead paying amounts derived from the CMS ambulance fee schedule. We first clarify that § 70.30(a)(4)(i) as proposed would only provide that VA pay the lesser of actual charges or the rates determined under the CMS ambulance fee schedule if VA has not otherwise entered into a contract with a vendor of special mode transportation (to include ambulance transport) as provided in § 70.30(a)(4) as proposed. Therefore, VA's payment of rates as determined under the CMS ambulance fee schedule, to the extent they would be lesser than actual charges under § 70.30(a)(4)(i) as proposed, is only enabled if VA has not otherwise entered into a contract under § 70.30(a)(4) as proposed. If VA enters into a contract under § 70.30(a)(4), such contract could provide for an agreed rate that may be different than the CMS ambulance fee schedule. Therefore, it is not an accurate assumption that in all cases VA will pay rates that result from the CMS ambulance fee schedule. We make this clarification so that our additional responses below can be understood in that context.

## Specific Concerns Raised by Individual Commenters

One commenter asserted that VA using Medicare rates for ambulance transports is a bad idea because those rates are below what it actually costs to transport patients, and subsequently that VA would receive horrible service and veterans would suffer. Further, the commenter asserted that if a patient is not Medicare covered or is under the age of 65, the rates for ambulance transports should be higher, and that each hospital (we assume the commenter was referring to each VA medical facility) should instead enter into contracts with agreed upon rates.

Regarding the assertion that Medicare rates are inadequate to cover the actual costs of ambulance transport, we do not make changes from the proposed rule. Congress granted VA the discretion in 38 U.S.C. 111(b)(3)(C) to use the CMS ambulance fee schedule as part of VA's methodology to calculate ambulance payments, ostensibly finding such schedule to be sufficient. Further, in its most recent ambulance report, the Medicare Payment Advisory Commission (MedPAC), *www.medpac.gov*, found that, in aggregate, Medicare ambulance margins were adequate, and VA has no cause or expertise to challenge that finding. Regarding the assertion that VA's use of the CMS ambulance fee schedule would result in bad service for VA and veterans, VA is not aware of, and the commenter did not provide evidence to demonstrate that veterans are currently receiving preferential treatment from ambulance providers by virtue of VA paying billed charges or that such preferential treatment would stop were VA to pay CMS ambulance fee schedule rates in the absence of a contract. Additionally, that assertion would assume that ambulance carriers and operators do not apply their professional certification or other standards and ethics in all cases regardless of whether an individual is a veteran, which VA does not believe to be the case. VA has no reason to doubt that the same level of ambulance services would be provided regardless of the payment source or amount of payment for ambulance services.

Regarding the assertion that there should be higher rates paid for ambulance for individuals who are not covered by Medicare or who are below the age of 65, we do not make any changes from the proposed rule. VA does not adopt multiple rate structures or schedules that are dependent on age or other health insurance coverage as VA health care benefits are not private insurance. Rather, VA benefits are created by statute and administered by regulations, through which VA pays for certain services provided to individuals who meet the administrative eligibility and other clinical criteria, without regard to factors such as age. Regarding the assertion that VA medical facilities should contract for adequate rates, we do not make any changes from the proposed rule and reiterate from our responses above that VA will retain the authority in this final rule to enter into contracts with ambulance providers and pay the agreed-upon negotiated rate. We make no changes to the regulation based on this comment.

One commenter, a provider of air ambulance transport, asserted that VA's proposed change to use the CMS ambulance fee schedule would hinder their ability to continue to serve rural areas because the CMS ambulance fee schedule reimburses less than 50 percent of their operational costs, which would cause a loss of several millions of dollars for their company and would impact the rest of emergency air medical services provided throughout the United States. This commenter further asserted that, although they have submitted comments to CMS to review and adjust air ambulance rates under the CMS ambulance fee schedule, such adjustments have not occurred in a manner to keep up with increased costs in providing this transport. The commenter opined that this lack of adjustment in CMS ambulance fee schedule rates, combined with the

effects that COVID–19 has had in increasing transport costs and deteriorating their payer mix, make their provision of services less sustainable.

Regarding the commenter's assertions that the rates determined under the CMS ambulance fee schedule are inadequate and would hinder their ability to serve rural areas, and that CMS should adjust their ambulance fee schedule in any particular manner, we are not making any changes from the proposed rule. VA cannot modify or increase the CMS ambulance fee schedule rates. We further reiterate that § 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation (to include air ambulance transport), and the terms of that contract would govern the payment rates for such transport. Such contracts could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations, such as for rural areas, or to include any additional consideration of difficulties presented during the COVID–19 pandemic. Regarding the assertion that changes in the final rule to permit VA to pay the lesser or the billed charges or the CMS ambulance fee schedule rates would have a detrimental effect on their business we do not make changes from the proposed rule but rely on the Regulatory Flexibility Act section of the proposed rule where VA has estimated there will not be a significant economic impact on vendors of ambulance services because the potential impact per vendor has been estimated to be less than 1 percent of their annual reported receipts, using North American Industry Classification System (NAICS) Code 62910. Therefore, in addition to the ability for ambulance providers to contract with VA for potentially different rates under the final rule, VA has analyzed that any potential effect on ambulance providers would not be significant. We make no changes to the regulation based on this comment.

One commenter, also a provider of air ambulance transport, more specifically asserted that indexing government reimbursement to the CMS ambulance fee schedule was a gross miscalculation that is poorly timed, as this fee schedule is flawed and cutting reimbursement rates during a global pandemic is unconscionable. This commenter urged that, rather than cutting reimbursements for air ambulance care for veterans, VA should work with the Department of Health and Human Services (HHS) to reform the CMS ambulance fee schedule to bring rates closer to actual costs of providing the service. We do not make any changes to the rule as proposed

based on this comment. We restate from our responses above that we believe VA's use of this schedule is appropriate. Regarding the assertion that it is poor timing for VA to implement this change during the COVID–19 pandemic, we reiterate that § 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation to provide for different rates as VA determines may be justified based on local considerations (for instance, to address any difficulties due to the COVID–19 pandemic). Regarding the assertion that CMS should adjust their ambulance fee schedule in any particular manner, or that VA should engage with HHS to reform this schedule, we do not make changes from the proposed rule as those subjects are beyond the scope of the proposed rule.

One commenter, a trade association representing providers of air ambulance services, offered more specific data regarding the background of air ambulance transport in support of establishing actual costs, as well as background on the establishment of the CMS ambulance fee schedule in support of the assertion that the schedule has not been adjusted appropriately to keep up with actual costs. This commenter also more specifically asserted that, should VA move to parity with the CMS ambulance fee schedule, the cost of uncompensated care will only increase, furthering the increased costs shifted to commercial payors or, should those costs not be covered, leading to the increased closure of air ambulance bases, which would increasingly impact low-volume rural areas and other areas with a higher portion of Medicare and Medicaid beneficiaries, as well as VA beneficiaries. This commenter also expressed concern that any effort by the government to limit payments during the global health crisis presented by COVID–19 may be disastrous and have far-reaching consequences for the healthcare and emergency medical systems. Ultimately, this commenter urged VA to delay the implementation of this proposal and revisit the proposed changes only after appropriate data has been collected and analyzed by CMS to determine a fair reimbursement rate, and to otherwise delay any decision to limit payments to providers until the end of the COVID–19 pandemic.

We do not make any changes from the proposed rule based on this commenter's assertions. Regarding the assertions that CMS rates are inadequate, we restate that Congress granted VA the discretion in 38 U.S.C. 111(b)(3)(C) to use the CMS ambulance fee schedule as part of VA's

methodology to calculate ambulance payments (ostensibly finding such schedule to be sufficient), and VA has no cause to question the most recent MedPAC report finding that Medicare ambulance margins were adequate.

Regarding the assertion that VA should delay implementation of § 70.30(a)(4) until more data can be collected by CMS to adjust their ambulance fee schedule, the comment alluded to "recent legislation passed by Congress" that "will create a federal database of air ambulance costs which we hope will allow for CMS to modernize the current" ambulance fee schedule. We believe the comment may be referencing provisions of title I (No Surprises Act) and title II (Transparency) of Division BB of the Consolidated Appropriations Act (CAA), 2021 (Pub. L. 116–260). We are aware of a notice of proposed rulemaking published on September 16, 2021 (86 FR 51730), that would implement certain provisions of title I (No Surprises Act) and title II (Transparency) of Division BB of the CAA. Among other things, this proposed rule would increase transparency by requiring group health plans and health insurance issuers in the group and individual markets, and Federal Employee Health Benefits carriers, to submit certain information about air ambulance services to the Secretaries of Health and Human Services (HHS), Labor, and the Treasury, and the Director of the Office of Personnel Management, as applicable, and by requiring providers of air ambulance services to submit certain information to the Secretaries of HHS and Transportation. The information submitted under this proposed rule will include specific elements outlined in law that are necessary for HHS, along with the Department of Transportation, to develop a comprehensive public report on air ambulance services. VA does not have a clear understanding as to how this public report would be used, or whether HHS or CMS may use the report or any product of the required reporting under the proposed rule to determine (as we believe is suggested by the commenter) whether changes to the ambulance fee schedule are warranted.

Because VA does not have a sense of whether changes to the CMS ambulance fee schedule could be pending as suggested by the commenter, VA will not delay the implementation of this final rule until such time as any changes to CMS ambulance rates may occur. We note that because VA is referencing the CMS fee schedule in general in this regulation and not the specific amount

that is currently established in the CMS fee schedule, any changes to the CMS rates will be automatically applicable without the need for future rulemaking. VA will, however, delay the effective date of this final rule until February 16, 2024, to ensure that ambulance providers have adequate time to adjust to VA's new methodology for calculating ambulance rates. Such adjustment could include ambulance providers entering into negotiations with VA to contract for payment rates different than those under the CMS fee schedule.

Regarding the assertion that VA should delay implementation of § 70.30(a)(4) until the end of the COVID–19 pandemic, VA is not in a position to know when that time may be, although as stated above VA will delay the implementation of the final rule to provide additional time for vendors of special mode transportation who are concerned with the CMS fee schedule to enter into a contract with VA. Such contracts could provide for a different rate, in the event that VA determined different rates may be justified based on local considerations (to include any additional difficulties presented during the COVID–19 pandemic, or for rural areas as the commenter asserted such areas could be disproportionately affected).

One commenter asserted that some of the information presented in the proposed rule would make it more difficult for patients to access transportation assistance, and specifically opposed the payment methodology in proposed § 70.30(a)(4) for travel by modes other than ambulance. The commenter noted that the problem with this methodology was that the resulting rates (given that they were available for each State) are often quoted as lower than what the actual transportation cost may be. The commenter further inquired as to what happens with any remaining balance, and whether the patient is responsible for the payment of transportation services. Ultimately, the commenter asserted that there needed to be further clarification regarding this methodology for modes of transportation other than ambulance, and that VA should continue to pay for the total cost of non-ambulance transport until more data can be collected and another proposed rule submitted regarding a different methodology.

Regarding the assertions of the commenter that the quoted rates per State for non-ambulance transports are lower than actual costs of such transportation, we do not make any changes from the proposed rule. Similar

to our responses regarding adequacy of rates for ambulance transport, we believe it is reasonable and appropriate to rely on posted rates as available per State. Using the rates posted by States ensures consistency and predictability for how much VA will pay to vendors in each State. Section 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation (to travel by modes other than ambulance under § 70.30(a)(4)(ii) as proposed), and the terms of that contract would govern the payment rates for such transport. Such contracts could provide for a different rate in the event that VA determines that may be justified based on local considerations. We further note that, based on the Regulatory Flexibility Act section of proposed rule, VA has estimated there will not be a significant economic impact on non-ambulance vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) because VA estimates that over 99 percent of its payments to vendors potentially covered within these NAICS Codes are made pursuant to a contract.

Regarding the commenter's inquiry related to billing by non-ambulance providers of veterans for any remaining balance after VA payment for the transport, over 99 percent of these non-ambulance transports are paid for by VA under contract, and the terms of such contracts indicate that payment by VA constitutes payment in full and extinguishes any liability on the part of the individual transported. For the remaining 1 percent of non-ambulance providers that we estimate are not covered by a contract, we do not have knowledge that such providers bill veterans for any remaining balance after receipt of VA's payment. However, if VA becomes aware of such billing of veterans for any remaining balance, we could propose an additional regulatory revision to address that issue in a future rulemaking. We do not make any changes from the proposed rule.

Regarding the commenter's request that VA delay implementation of the methodology for non-ambulance transports until more data can be collected, we will be delaying implementation of the final rule until February 16, 2024, and additional data will be obtained once this rule is implemented. We stated in the proposed rule that after utilizing this methodology for an initial 90 calendar day period after this rule becomes final in the **Federal Register**, VA will analyze the payments made to vendors for travel by modes other than ambulance and

determine whether we have enough payment data (*e.g.,* arithmetic average of actual charges, locality rates, or posted rates) to develop a new payment methodology. If VA determines that it has enough payment data, then VA will develop a payment methodology using the lowest possible rate. If VA does not have enough payment data to create a new methodology after the initial 90 calendar day period, then VA would continue to collect data for as many 90 calendar day intervals as VA would deem necessary to gather sufficient payment data, which we do not anticipate exceeding 18 months from the effective date of the final rule. Subsequently, VA would propose a new methodology for travel by modes other than ambulance in a separate rulemaking in the **Federal Register**.

### Technical Changes Not Based on Comments

VA makes technical changes not based on comments. The first is to move the last sentence from § 70.30(a)(4) as proposed to instead be placed in § 70.30(a)(4)(ii)(B), which occurs after § 70.30(a)(4)(ii)(A)(*3*) (§ 70.30(a)(4)(ii)(C) as proposed). The new language in § 70.30(a)(4)(ii)(B) will provide that the term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the State or States where the vendor is domiciled or where transport occurred ("involved States"). And, in the absence of a posted rate for an involved State, VA will pay the lowest among the available posted rates or the vendor's actual charge. This is not a substantive change, but rather moving language into one location so that all interpretation of the meaning of the term "posted rate" in § 70.30(a)(4)(ii) is located in one place.

Second, we are amending the language to capitalize the word "State" in the regulations affected by the proposed rule to be consistent with how VA capitalizes the word "State" throughout our regulations.

Based on the rationale set forth in the proposed rule and in this document, we are adopting the provisions of the proposed rule as final with the changes noted above.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity).

Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Information and Regulatory Affairs has determined that this rule is not a significant regulatory action under Executive Order 12866. The Regulatory Impact Analysis associated with this rulemaking can be found as a supporting document at *https://www.regulations.gov*.

## Regulatory Flexibility Act

The Secretary hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601–612. VA estimates that this final rule will potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally. The per entity burden is estimated to be less than 1 percent of preliminary receipts for all entities in NAICS Code 621910.

VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99 percent of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1 percent of small entities within these NAICS Codes are estimated to be impacted by this final rule. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

## Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This final rule will have no such effect on State, local, and tribal governments, or on the private sector.

## Paperwork Reduction Act

This final rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

## Catalog of Federal Domestic Assistance

The catalog of Federal Domestic Assistance numbers and titles affected by this document are 64.040, VHA Inpatient Medicine (C, D), 64.041, VHA Outpatient Specialty Care (C), 64.042, VHA Inpatient Surgery (C), 64.043, VHA Mental Health Residential (C), 64.044, VHA Home Care (C), 64.045, VHA Outpatient Ancillary Services (C), 64.046, VHA Inpatient Psychiatry (C), 64.047, VHA Primary Care (C), 64.048, VHA Mental Health clinics (C), 64.049, VHA Community Living Center (C), 64.050, VHA Diagnostic Care (C).

## Congressional Review Act

Pursuant to the Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (known as the Congressional Review Act) (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a major rule, as defined by 5 U.S.C. 804(2).

## List of Subjects in 38 CFR Part 70

Administrative practice and procedure, Alcohol abuse, Alcoholism, Claims, Day care, Dental health, Drug abuse, Foreign relations, Government contracts, Grant programs—health, Grant programs—veterans, Health care, Health facilities, Health professions, Health records, Homeless, Medical and dental schools, Medical devices, Medical research, Mental health programs, Nursing homes, Philippines, Reporting and recordkeeping requirements, Scholarships and fellowships, Travel and transportation expenses, Veterans.

## Signing Authority

Denis McDonough, Secretary of Veterans Affairs, approved this document on February 6, 2023, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Consuela Benjamin,**

*Regulation Development Coordinator Office of Regulation Policy & Management, Office of General Counsel, Department of Veterans Affairs.*

For the reasons stated in the preamble, the Department of Veterans Affairs amends 38 CFR part 70 as follows:

## PART 70—VETERANS TRANSPORTATION PROGRAMS

■ 1. The authority citation for part 70 is revised to read as follows:

**Authority:** 38 U.S.C. 101, 111, 111A, 501, 1701, 1714, 1720, 1728, 1782, and 1783; E.O. 11302, 31 FR 11741, 3 CFR, 1966–1970 Comp., p. 578; and E.O. 13520, 74 FR 62201, 3 CFR, 2009 Comp., p. 274.

■ 2. In § 70.2, add a definition for "Ambulance" in alphabetical order to read as follows:

## § 70.2    Definitions.

\*    \*    \*    \*    \*

*Ambulance,* as used in this subpart, means advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 CFR 414.605.

\*    \*    \*    \*    \*

■ 3. In § 70.30 revise paragraph (a)(4) to read as follows:

## § 70.30    Payment principles.

(a) \* \* \*

(4) VA payments for special modes of transportation will be made in accordance with this section, unless VA has entered into a contract with the vendor in which case the terms of the contract will govern VA payments. This section applies notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120.

(i) *Travel by ambulance.* VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).

(ii) *Travel by modes other than ambulance.* (A) VA will pay the lesser of:

(*1*) The vendor's actual charge.

(*2*) The posted rate in the State where the vendor is domiciled. If the vendor is domiciled in more than one State, the lowest posted rate among all involved States.

(*3*) The posted rate in the State where transport occurred. If transport occurred in more than one State, the lowest posted rate among all involved States.

(B) The term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the State or States where the vendor is domiciled or where transport occurred ("involved States"). In the absence of a posted rate for an involved State, VA will pay the lowest among the available posted rates or the vendor's actual charge.

\*    \*    \*    \*    \*

§§ 70.1, 70.2, 70.3, 70.4, 70.10, 70.20, 70.21, 70.30, 70.31, 70.32, 70.40, 70.41, 70.42, 70.50, 70.70, 70.71, 70.72, 70.73   [Amended]

■ 4. Part 70 is further amended in the following sections by removing the parenthetical authority citation at the end of the section:
■ a. Section 70.1.
■ b. Section 70.2.
■ c. Section 70.3.
■ d. Section 70.4.
■ e. Section 70.10.
■ f. Section 70.20.
■ g. Section 70.21.
■ h. Section 70.30.
■ i. Section 70.31.
■ j. Section 70.32.
■ k. Section 70.40.
■ l. Section 70.41.
■ m. Section 70.42.
■ n. Section 70.50.
■ o. Section 70.70.
■ p. Section 70.71.
■ q. Section 70.72.
■ r. Section 70.73.

[FR Doc. 2023–03013 Filed 2–15–23; 8:45 am]

BILLING CODE 8320–01–P

---

## POSTAL REGULATORY COMMISSION

### 39 CFR Part 3055

[Docket No. RM2022–7; Order No. 6439]

RIN 3211–AA32

### Reporting of Service Performance

**AGENCY:** Postal Regulatory Commission.

**ACTION:** Final rule.

**SUMMARY:** This Commission adopts rules which revise the Postal Service's service performance reporting requirements and includes additions required by recent postal legislation.

**DATES:** This rule is effective March 20, 2023.

**ADDRESSES:** For additional information, Order No. 6439 can be accessed electronically through the Commission's website at *https://www.prc.gov.*

**FOR FURTHER INFORMATION CONTACT:** David A. Trissell, General Counsel, at 202–789–6820.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Relevant Statutory Requirements
II. Background
III. Basis and Purpose of Final Rules

## I. Relevant Statutory Requirements

Section 3652(e)(1) of title 39 of the United States Code requires the Commission to prescribe the content and form of the public reports that the Postal Service files with the Commission. 39 U.S.C. 3652(e)(1). In doing so, the Commission must attempt to provide the public with timely information that is adequate to allow it to assess the lawfulness of Postal Service rates, should attempt to avoid unnecessary or unwarranted Postal Service effort and expense, and must endeavor to protect the confidentiality of commercially sensitive information. *See id.* The Commission may initiate proceedings to improve the quality, accuracy, or completeness of Postal Service reporting whenever it determines that the service performance data have become significantly inadequate, could be significantly improved, or otherwise require revision as necessitated by the public interest. 39 U.S.C. 3652(e)(2).

Additionally, section 3692 directs the Postal Service to develop and maintain a publicly available online "dashboard" that provides weekly service performance data for Market Dominant products and mandates that the Commission provide reporting requirements for this Postal Service dashboard as well as "recommendations for any modifications to the Postal Service's measurement systems necessary to measure and publish the performance information" located on the dashboard. 39 U.S.C. 3692(b)(2), (c). The Postal Service is also authorized to provide certain nonpostal services to the public and other Governmental agencies and consequently required to periodically report the quality of service for these nonpostal services. *See* 39 U.S.C. 3703–3705.

## II. Background

Pursuant to 39 U.S.C. 503, 3652, 3653, 3692 and 3705, the Commission initiated Docket No. RM2022–7 to update the service performance reporting requirements codified in 39 CFR part 3055 and make the aforementioned additions for dashboard and nonpostal product reporting. On April 26, 2022, the Commission issued Order No. 6160, proposing several modifications to the reporting requirements, providing an opportunity for interested persons to comment, and appointing a Public Representative.[1] Included among these suggested modifications were proposals to require the Postal Service to report average actual days to delivery and point impact data, information regarding the performance for each national operating plan target, and data about mail excluded from measurement. Order No.

6160 at 5–6. The Commission also solicited comments on how best to effectuate the statutes requiring the Postal Service to report on nonpostal products and implement a performance dashboard. *Id.* at 6–8.

The Commission received a wide range of comments in response to Order No. 6160, both discussing the suggested revisions and proposing additional amendments to the reporting requirements. In response, on September 21, 2022, the Commission issued Order No. 6275, revising the previously-proposed reporting requirements, presenting the requirements as draft regulations, and providing another opportunity for interested persons to comment.[2] Again, the Commission received a variety of comments in response.

## III. Basis and Purpose of Final Rules

After reviewing the commenters' suggestions and analysis, the Commission issues the following revisions to the rules proposed in Order No. 6275. Most rules have not been changed substantively; those that have are addressed below.

First, proposed § 3055.2(m)—which relates to required annual reporting on the Postal Service's Site-Specific Operating Plan (SSOP)—is revised to state that the Postal Service must provide a description of each SSOP, including operation completion time performance for each SSOP measurement category.

Second, proposed § 3055.21—which specifies the annual service performance reporting requirements for the Postal Service—is revised so that proposed § 3055.21(b) specifies that the Postal Service need not identify point impact data for USPS Marketing Mail Every Door Direct Mail or USPS Marketing Mail Destination Delivery Unit Entry Saturation Flats.

Third, proposed § 3055.25—which describes the reporting requirements for nonpostal services—is revised to specify that the Postal Service provide the measure of the quality of service for nonpostal service products annually. Additionally, paragraph (b) is added to specify that the Postal Service may report service performance in a qualitative manner where the quality of nonpostal service itself cannot be measured using on-time service performance. Paragraph (c) is also added to specify that quality of service performance for interagency agreements shall be reported for the program as a

---

[1] Advance Notice of Proposed Rulemaking to Revise Periodic Reporting of Service Performance, April 26, 2022 (Order No. 6160).

[2] Notice of Proposed Rulemaking to Revise Periodic Reporting of Service Performance, September 21, 2022 (Order No. 6275).