2024-1104

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

METROPOLITAN AREA EMS AUTHORITY aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY dba AMED,

Petitioners,

v.

SECRETARY OF VETERANS AFFAIRS,

Respondent.

---

Petition for review pursuant to 38 U.S.C. § 502

---

# BRIEF OF RESPONDENT

---


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

BORISLAV KUSHNIR
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044

Attorneys for Respondent

Of Counsel:

BRYAN THOMPSON
Deputy Chief Counsel

ASHLEY CEDARS
General Attorney
Office of General Counsel
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420


April 17, 2024

# TABLE OF CONTENTS

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS .......... 3

I. Nature Of The Case .......... 3

II. Statement Of Facts .......... 3

A. The Pre-2011 Framework Governing VA's Payment Of Healthcare-Related Transportation Expenses .......... 3

B. The Statutory Change Congress Enacted In 2011 .......... 6

C. VA Efforts To Implement The Statutory Change .......... 7

D. Procedural History .......... 13

SUMMARY OF THE ARGUMENT .......... 14

ARGUMENT .......... 15

I. Jurisdiction And Standard Of Review .......... 15

II. Petitioners Forfeited Almost All Of Their Arguments On Appeal By Failing To Raise Them During The Rulemaking Process .......... 17

III. The Change In Rates Rule Does Not Exceed Statutory Authority .......... 21

A. The Final Rule Is Consistent With 38 U.S.C. § 111 .......... 21

B. The Final Rule Is Also Consistent With 38 U.S.C. § 1728 .......... 29

IV. The Change In Rates Rule Is Not Arbitrary And Capricious .......... 30

A. The Final Rule Is Based On A Statutory Revision Rather Than A VA Change In Legal Interpretation .......... 30

B. The Court May Not Second-Guess The Economic Analysis Underlying The 2020 RIA And The RFA Certification...........32

C. Congress Has Determined That The CMS Rates Are Sufficient, And Nothing Required VA To Conduct An Independent Analysis Of The Issue .........................................38

D. VA Reasonably Determined That Its Goal Of Maintaining Continuity Of Care, Whether Or Not Tied To The Veterans Community Care Program, Is Not In Jeopardy ........................41

E. VA Reasonably Addressed The Issue Of Continued Access To Ambulance Services In Rural areas....................................42

CONCLUSION ..........................................................................................45

# TABLE OF AUTHORITIES

## Cases

*A Squared Joint Venture v. United States*,
145 Fed. Cl. 676 (2019)....................37

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005).................... 18, 19

*Alenco Commc'ns, Inc. v. FCC*,
201 F.3d 608 (5th Cir. 2000).................... 35, 36

*Am. Petroleum Inst. v. U.S. Dep't of Interior*,
81 F.4th 1048 (10th Cir. 2023)....................17

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
789 F.3d 1206 (11th Cir. 2015)....................39

*Ass'n of Priv. Sector Coll. & Univ. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012).................... 43, 44

*Axiom Res. Mgmt., Inc. v. United States*,
564 F.3d 1374 (Fed. Cir. 2009)....................45

*Beaudette v. McDonough*,
93 F.4th 1361 (Fed. Cir. 2024)....................27

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)....................16

*Camp v. Pitts*,
411 U.S. 138 (1973)....................44

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................22

*City of Arlington, Tex. v. FCC*,
569 U.S. 290 (2013)....................38

*City of Portland, Or. v. EPA*,
507 F.3d 706 (D.C. Cir. 2007)....44

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
833 F.3d 1136 (9th Cir. 2016)....17

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015)....40

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
895 F.3d 90 (D.C. Cir. 2018)....17

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....32

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....22

*Euzebio v. McDonough*,
989 F.3d 1305 (Fed. Cir. 2021)....45

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....16, 30, 32

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....16

*Foster v. Mabus*,
895 F. Supp. 2d 135 (D.D.C. 2012)....40

*Gay v. McDonough*,
No. 2021-1226, 2021 WL 4944470 (Fed. Cir. Oct. 25, 2021)....37

*Helicopter Ass'n Int'l, Inc. v. FAA*,
722 F.3d 430 (D.C. Cir. 2013)....34, 35

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013)....19, 20

*La. Envtl. Action Network v. U.S. EPA*,
382 F.3d 575 (5th Cir. 2004) .......... 19

*Mass. Dep't of Telecomm. & Cable v. FCC*,
983 F.3d 28 (1st Cir. 2020) .......... 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 16, 36

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .......... 28

*Nat'l Mining Ass'n v. United Steel Workers*,
985 F.3d 1309 (11th Cir. 2021) .......... 34

*Nat'l Multi Hous. Council v. U.S. EPA*,
292 F.3d 232 (D.C. Cir. 2002) .......... 19

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001) .......... 17

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
981 F.3d 1360 (Fed. Cir. 2020) .......... 39

*Nat'l Wildlife Fed'n v. EPA*,
286 F.3d 554 (D.C. Cir. 2002) .......... 19

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) .......... 25, 28

*Nyeholt v. Sec'y of Veterans Affs.*,
298 F.3d 1350 (Fed. Cir. 2002) .......... 15

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) .......... 37

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 18

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
415 F.3d 1078 (9th Cir. 2005) .......... 35

*Sanitary Bd. of City of Charleston, W. Va. v. Wheeler*,
918 F.3d 324 (4th Cir. 2019) .......... 17

*St. Marys Cement Inc. v. U.S. EPA*,
782 F.3d 280 (6th Cir. 2015) .......... 19

*State of N.C. Bus. Enter. Program v. United States*,
110 Fed. Cl. 354 (2013) .......... 37

*U.S. Cellular Corp. v. FCC*,
254 F.3d 78 (D.C. Cir. 2001) .......... 35

*United States v. L. A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) .......... 17, 18

*United States v. Mead Corp.*,
533 U.S. 218 (2001) .......... 22

*Universal Health Servs., Inc. v. Thompson*,
363 F.3d 1013 (9th Cir. 2004) .......... 19

*Veteran Warriors, Inc. v. Sec'y of Veterans Affs.*,
29 F.4th 1320 (Fed. Cir. 2022), *cert. denied sub nom.*
*Veteran Warriors, Inc. v. McDonough*, 143 S. Ct. 775 (2023) .......... 22, 28

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
832 F.3d 654 (7th Cir. 2016) .......... 35

**Statutes**

5 U.S.C. § 553(c) .......... 9, 18

5 U.S.C. § 603(a) .......... 33

5 U.S.C. § 605(b) .......... 37

5 U.S.C. § 611 ....................................................................................................35

5 U.S.C. § 706 ....................................................................................................16

38 U.S.C. § 111(a) ........................................................................ 3, 23, 24, 26

38 U.S.C. § 111(b)(1) ..........................................................................................25

38 U.S.C. § 111(b)(3) ..................................................................................... *passim*

38 U.S.C. § 111(b)(4) ..........................................................................................26

38 U.S.C. § 501 ..................................................................................................5, 22

38 U.S.C. § 502 ..................................................................................................39

38 U.S.C. § 1703 ................................................................................................42

38 U.S.C. § 1728 ......................................................................................... *passim*

42 U.S.C. § 1395m(*l*) ...........................................................................................41

VOW to Hire Heroes Act of 2011,
Pub. L. No. 112-56, 125 Stat. 711 (Nov. 21, 2011) ............................. 6, 7, 29-30

**Regulations**

38 C.F.R. § 70.2 ........................................................................... 5, 23, 24

38 C.F.R. § 70.10 ................................................................................................27

38 C.F.R. § 70.30 ................................................................................................5, 12

Change in Rates VA Pays for Special Modes of Transportation,
85 Fed. Reg. 70,551 (Nov. 5, 2020) (Proposed Rule) ................... 9, 30-31, 32, 36

Change in Rates VA Pays for Special Modes of Transportation,
88 Fed. Reg. 10,032 (Feb. 16, 2023) (Final Rule) ...................................... *passim*

Delay of Effective Date,
88 Fed. Reg. 90,120 (Dec. 29, 2023) ....................................................................13

Exec. Order No. 11,302,
31 Fed. Reg. 11,741 (Sept. 6, 1966)...................................................................5, 22

Exec. Order No. 12,866,
58 Fed. Reg. 51,735 (Sept. 30, 1993)........................................................ 33, 34, 35

**Legislative Matterials**

157 CONG. REC. H7643-07 (Nov. 16, 2011)..............................................................6

H.R. REP. NO. 112-242 (Oct. 11, 2011) ..............................................................6, 28

**Other Authorities**

WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
(2d ed. 1957)..................................................................................................23

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, respondent's counsel states that he is unaware of any other appeal in or from this same action that was previously before this Court or any other appellate court under the same or similar title. Counsel further states that he is unaware of any cases pending before this Court or any other court that may directly affect or be directly affected by this Court's decision in this appeal.

2024-1104

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

METROPOLITAN AREA EMS AUTHORITY aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY dba AMED,

Petitioners,

v.

SECRETARY OF VETERANS AFFAIRS,

Respondent.

BRIEF OF RESPONDENT

## INTRODUCTION

This case concerns the rates that the Department of Veterans Affairs (VA) pays for certain transportation expenses, including ambulance services, incurred by eligible beneficiaries. Prior to 2011, VA generally paid the rates actually charged by transportation providers. But in 2011, after expressing concern about VA overpaying for transportation services, Congress enacted legislation authorizing VA to pay providers the lesser of the actual rates charged or the reimbursement rates within Medicare's fee schedule. VA has since promulgated a rule to effectuate that legislative mandate. *See* Change in Rates VA Pays for Special

Modes of Transportation, 88 Fed. Reg. 10,032 (Feb. 16, 2023) (Change in Rates Rule or Final Rule).

Petitioners, all of whom are providers of ground ambulance services that may see their reimbursement rates decrease going forward, challenge the Final Rule on a host of grounds. In particular, they argue that the Final Rule contravenes two statutory provisions and is arbitrary and capricious for five separate reasons.

Petitioners forfeited all but one of their arguments on appeal by failing to raise them during the rulemaking process, which has deprived VA of the opportunity to address these concerns in the first instance. But even if the Court were to consider petitioners' arguments, it should reject them as meritless. Petitioners' statutory arguments fail to give effect to the plain statutory text and the canons of statutory interpretation the Court must use in its analysis. And their arbitrary and capricious arguments either impose unjustified obligations on VA, exceed the Court's review power, or both.

For the reasons set forth more fully below, the Court should deny the petition for review.

## STATEMENT OF THE ISSUES

1. Whether petitioners waived all arguments not raised before VA during the rulemaking process.

2. Whether the Change in Rates Rule is arbitrary and capricious or otherwise not in accordance with law.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### I. Nature Of The Case

Petitioners seek review of a final VA rule entitled Change in Rates VA Pays for Special Modes of Transportation, 88 Fed. Reg. 10,032 (Feb. 16, 2023), pursuant to 38 U.S.C. § 502.[1, 2] In particular, petitioners contend that the Final Rule is arbitrary and capricious and not in accordance with law.

### II. Statement Of Facts

#### A. The Pre-2011 Framework Governing VA's Payment Of Healthcare-Related Transportation Expenses

By statute, VA has discretionary authority to pay for certain travel expenses incurred by eligible beneficiaries for medical purposes like examination, treatment, or care. *See* 38 U.S.C. § 111. Under this authority, "the Secretary may pay the actual necessary expense of travel (including lodging and subsistence) . . . of any person to or from a Department facility or other place . . ." *Id.* at § 111(a). The

---

[1] The Final Rule can also be found in the rulemaking record at Appx1-6.

[2] "Appx__" refers to pages in the Joint Appendix.

statute further states that "[i]n the case of travel by a person to or from a Department facility by special mode of travel, the Secretary may provide payment under this section to the provider of the transportation by special mode before determining the eligibility of such person for such payment" if certain conditions are met. *Id.* at § 111(b)(3)(B). This provision authorizes VA to directly pay providers for certain transportation services provided to eligible veterans.

Congress echoed this authority in the portion of Title 38 that addresses the more specific topic of reimbursing veterans with service-connected conditions for certain emergency medical expenses. There, Congress has provided that "[t]he Secretary shall, under such regulations as the Secretary prescribes, reimburse veterans eligible for hospital care or medical services under this chapter for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111 of this title) . . ." 38 U.S.C. § 1728(a). Where a veteran would be eligible for such reimbursement, Congress has further provided that "the Secretary may, in lieu of reimbursing such veteran, make payment of the reasonable value of emergency treatment directly . . . to the hospital or other health facility furnishing the emergency treatment." *Id.* at § 1728(b)(1). This provision again authorizes VA to pay certain transportation providers directly, so long as the payment complies with the requirements of Section 111.

VA has broad statutory authority to prescribe all rules and regulations that are necessary or appropriate to carry out its mission. 38 U.S.C. § 501. In addition, Executive Order No. 11,302 specifically empowers VA to prescribe rules and regulations to implement 38 U.S.C. § 111. Exec. Order No. 11,302 at § 5, 31 Fed. Reg. 11,741 (Sept. 6, 1966).

Pursuant to this authority, VA promulgated a regulation that confirmed its intent to pay "[t]he actual cost of a special mode of transportation" when an eligible veteran actually incurs travel expenses. 38 C.F.R. § 70.30(a)(4).[3] The Handbook applicable to the Veterans Health Administration (VHA), a component of VA, likewise states that "[e]ligible Veterans and beneficiaries may obtain beneficiary travel reimbursement for . . . [t]he actual cost of a special mode of transportation." Appx32-33 (Section 9.a(1)(b)(3)). A veteran is eligible for such reimbursement whenever they travel "to or from a VA facility or VA-authorized health care facility." Appx31-32 (Section 7). And VHA may either reimburse the beneficiary for travel expenses already incurred or make a payment directly to the provider that actually offered the transportation service. Appx39 (Section 19.b).

[3] The term "special mode of transportation" in this context refers to "an ambulance, ambulette, air ambulance, wheelchair van, or other mode of transportation specially designed to transport disabled persons." 38 C.F.R. § 70.2.

### B. The Statutory Change Congress Enacted In 2011

In early 2011, Congress began working on legislation primarily concerned with veterans' transition to civilian employment. As part of this effort, Congress also decided to amend VA's statutory authority to pay for transportation services to "prevent[] [VA] from being overcharged for the provision of ambulance services by non-VA providers to certain veterans." H.R. REP. NO. 112-242 at 9 (Oct. 11, 2011). The House of Representatives Committee on Veterans' Affairs recognized that, "[u]nder current law, VA reimburses ambulance companies for services rendered to veterans enrolled in the VA health care system." *Id.* at 17. That reimbursement rate, however, was "well above the rate used to determine reimbursement under Medicare," which led "[t]he [Obama] Administration [to] request[] that Congress end this practice and authorize reimbursement at the lesser of the actual rates charged [or] the rates authorized under Medicare." *Id.* The House Committee adopted this request while expressing its "expectation that ambulance providers will accept payment at the Medicare rate and not bill veterans directly." *Id.* The Senate Committee on Veterans' Affairs agreed with this approach. *See* 157 CONG. REC. H7643-07, H7657 (Nov. 16, 2011) (adopting the proposed amendment from the House bill as part of a compromise agreement).

On November 21, 2011, Congress enacted the VOW to Hire Heroes Act of 2011. *See* Pub. L. No. 112-56, §§ 201-65, 125 Stat. 711, 712-33 (Nov. 21, 2011).

As part of the Act, Congress added a provision to 38 U.S.C. § 111 to authorize VA to pay certain providers of transportation services the lesser of the actual rates charged or the reimbursement rates authorized by the Centers for Medicare and Medicaid Services (CMS). *Id.* at § 263, 125 Stat. at 732. The new provision, Section 111(b)(3)(C), thus currently states:

> In the case of transportation of a person to or from a Department facility by ambulance, the Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or the amount determined by the fee schedule established under section 1834(*l*) of the Social Security Act (42 U.S.C. 1395m(*l*)) unless the Secretary has entered into a contract for that transportation with the provider.

38 U.S.C. § 111(b)(3)(C). Other than adding subsection (b)(3)(C), the Act left the remaining provisions within Section 111 unchanged.

### C. <u>VA Efforts To Implement The Statutory Change</u>

In May 2018, the VA Office of Inspector General (OIG) audited a VHA program for determining eligibility and reimbursement of special modes of transportation. *See* Appx1229-1271. OIG conducted the audit because VHA's reimbursements nearly quadrupled between 2006 and 2016, and because OIG received a complaint alleging that VHA's failure to use the Medicare rates had resulted in significant overpayment. Appx1233. OIG's audit ultimately substantiated the overpayment complaint. At most of the VHA facilities examined, VHA overpaid for ambulance services by an average of 60 percent over the

Medicare rates. Appx1236. In fact, OIG found that paying the actual rates charged led to an overpayment of $11 million over the span of three years, and it determined that continuing to do so may result in an overpayment of $23.5 million between 2018 and 2023. *Id.* OIG accordingly recommended that VA "implement policy to use CMS rates, when applicable, in order to reduce unnecessary [transportation] expenditures." Appx1237; *see also* Appx1255. VA leadership concurred with OIG's recommendation. *See* Appx1238; Appx1255-1256. The following year, VA announced its intent to propose a rule change that would implement the authority granted by Congress through 38 U.S.C. § 111(b)(3)(C). *See* Appx1320.

VA's Chief Economist conducted a Regulatory Impact Analysis (the 2020 RIA) with respect to the contemplated rule change. *See* Appx1321-1325. Therein, she determined that transition to Medicare's transportation rates, which "would apply in the absence of a contract between VA and a vendor," was unlikely to have a significant impact on providers because "[m]ost of VA's payments for [certain types of] services (estimated at over 99%) are made pursuant to a contract between VA and the wheelchair or stretcher van service vendor." Appx1322. Nonetheless, the Chief Economist estimated that "the proposed revisions would reduce improper payments and help eliminate payment error, waste, and abuse" because the "[u]se of CMS rates . . . for non-contracted ambulance providers would help maintain

uniformity with CMS, eliminate confusion for vendors, and help VA control costs." Appx1323. The Chief Economist projected the expected savings to total $199.6 million for the period between 2021 and 2025. *Id.* This conclusion was based on an estimation of the non-contract billed charges VA was expected to pay for fiscal year 2021, and a comparison between that figure and the Medicare rates. Appx1324-1325. Finally, the Chief Economist also certified that the rule change "would not have a significant economic impact on a substantial number of small entities." Appx1325.

In November 2020, VA proposed the rule change Congress had expressly authorized. *See* Change in Rates VA Pays for Special Modes of Transportation, 85 Fed. Reg. 70,551 (Nov. 5, 2020) (Proposed Rule).[4] As part of the Proposed Rule, VA certified that additional requirements of the Regulatory Flexibility Act (RFA) did not apply because the rule change "would not have a significant economic impact on a substantial number of small entities." *Id.* at 70,553.

VA's publication of the Proposed Rule triggered a 60-day comment period. *See* 5 U.S.C. § 553(c). VA received only six comments, five of which were substantive. *See* Appx1357-1371.[5] The commenters, primarily air ambulance

---

[4] The Proposed Rule can also be found in the rulemaking record at Appx1326-1329.

[5] The non-substantive comment, submitted anonymously, merely stated the word "[g]ood." Appx1369.

carriers and their trade groups, all argued that utilizing the CMS rates for transportation services would fail to adequately compensate them, which would in turn lower the level of services and cause harm to America's veterans. *See id.* Importantly, however, none of the commenters suggested in their comments that the Proposed Rule might exceed statutory authority. *See id.* Nor did any of the commenters argue that VA had improperly changed a legal interpretation, that the RFA certification or the underlying 2020 RIA were flawed, that VA had an obligation to independently study the sufficiency of the CMS rates, or that the Proposed Rule might undermine the Veterans Community Care Program. *See id.* Petitioners did not themselves participate in the rulemaking process. *Id.* (no submissions from MedStar Mobile Healthcare, Valley Ambulance Authority, Quaker Valley Ambulance Authority, or AMED).[6]

VA's Chief Economist conducted a second Regulatory Impact Analysis (the 2023 RIA) after the comment period had closed. *See* Appx1489-1493. The Chief Economist updated the projected savings that would result from VA's adoption of

[6] After the comment period had closed, several members of Congress and other stakeholders also submitted letters expressing similar concerns. *See* Appx1330-1338; Appx1405-1407; Appx1487-1488; Appx1509-1512. As was true for the comments submitted during the comment period, none of these letters argued that the Proposed Rule might exceed statutory authority, that VA had improperly changed a legal interpretation, that the RFA certification or the underlying 2020 RIA were flawed, that VA had an obligation to independently study the sufficiency of the CMS rates, or that the Proposed Rule might undermine the Veterans Community Care Program. *See id.*

the Proposed Rule, which would total an estimated $223.2 million for the period between 2024 and 2028. Appx1491. The methodology used to reach this conclusion was the same as the methodology used for the 2020 RIA. *See* Appx1491-1492. And, as before, the Chief Economist certified that the rule change "will not have a significant economic impact on a substantial number of small entities." Appx1493.

VA issued the Final Rule in February 2023. *See* 88 Fed. Reg. at 10,032. Responding to the comments that expressed concerns about adequacy of the CMS rates, VA offered a twofold explanation. First, VA stressed that Congress granted it the authority to pay CMS rates in lieu of billed rates, which represents congressional judgment that the CMS rates were appropriate. *Id.* at 10,033. This judgment was also backed-up by real-world evidence: VA noted that the Medicare Payment Advisory Commission, or MedPAC,[7] had recently found that, "in aggregate, Medicare ambulance margins were adequate." *Id.* And second, VA reiterated that the Change in Rates Rule will give VHA "the option to enter into a contract with a vendor of special mode transportation (to include air ambulance transport)," which "could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations, such as for rural

[7] MedPAC is an independent congressional agency that provides information on access to care and quality of care under Medicare. *See* MedPAC—What We Do, *available at* https://www.medpac.gov/what-we-do/ (last visited on April 15, 2024).

areas, or to include any additional consideration of difficulties presented during the COVID-19 pandemic." *Id.* at 10,034. In other words, to the extent CMS rates may prove insufficient, the issue may be resolved through contracting.

The Final Rule thus amended the VA regulation that governs the payment of transportation expenses, 38 C.F.R. § 70.30, to add the following language:

> (a) Subject to the other provisions of this section and subject to the deductibles required under § 70.31, VA will pay the following for beneficiary travel by an eligible beneficiary when travel expenses are actually incurred:
>
> * * *
>
> (4) VA payments for special modes of transportation will be made in accordance with this section, unless VA has entered into a contract with the vendor in which case the terms of the contract will govern VA payments. This section applies notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120.
>
> (i) Travel by ambulance. VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(*l*) of the Social Security Act (42 U.S.C. 1395m(*l*)).
>
> (ii) Travel by modes other than ambulance.
>
> (A) VA will pay the lesser of:
>
> (1) The vendor's actual charge.
>
> (2) The posted rate in the State where the vendor is domiciled. If the vendor is domiciled in more than one State,

> the lowest posted rate among all involved States.
>
> (3) The posted rate in the State where transport occurred. If transport occurred in more than one State, the lowest posted rate among all involved States.
>
> (B) The term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the State or States where the vendor is domiciled or where transport occurred ("involved States"). In the absence of a posted rate for an involved State, VA will pay the lowest among the available posted rates or the vendor's actual charge.

88 Fed. Reg. at 10,036. The Change in Rates Rule was originally scheduled to take effect on February 16, 2024. *Id.* at 10,032.

### D. **Procedural History**

Eight months after VA published the Final Rule – and only three and a half months before the rule change was scheduled to take effect – petitioners asked the Court to review the Change in Rates Rule pursuant to 38 U.S.C. § 502. Soon after the Court docketed their petition, petitioners filed a motion for an administrative stay of the Change in Rates Rule pending the completion of judicial review. *See* Pet. Mot. for Stay, ECF No. 3-1. As the parties briefed the merits of petitioners' motion, VA published a final rule to delay the Change in Rates Rule's effective date by one year, or until February 16, 2025. *See* Delay of Effective Date, 88 Fed. Reg. 90,120 (Dec. 29, 2023) (Delay Rule). The Secretary argued that the Delay

Rule renders petitioners' motion moot, as it allows the Court to complete judicial review of the Change in Rates Rule without taking the extraordinary step of ordering a pre-adjudication remedy. *See* Sec'y Resp., ECF No. 26. The Court, however, deferred the motion to the merits panel assigned to the case, set a briefing schedule, and ordered the case to be placed on the July 2024 oral argument calendar. *See Per Curiam* Order, ECF No. 28.

## SUMMARY OF THE ARGUMENT

First and foremost, the Court should deny the petition because petitioners forfeited all but one of their arguments. Neither petitioners nor any other interested party raised the concerns petitioners articulate in their opening brief during the public comment period following publication of the Proposed Rule. This failure violates one of the most basic principles of administrative law: objections to an agency's rulemaking must be brought to the agency in the first instance. Having failed to raise their arguments with VA during the rulemaking process, petitioners forfeited most of their arguments on appeal.

If the Court were to nonetheless consider petitioners' forfeited arguments, it should reject them on the merits. First, the Final Rule does not exceed statutory authority. Petitioners' attempt to parse the language of 38 U.S.C. § 111 fails to recognize that Congress used the phrase "to or from a Department facility" as shorthand for the phrase "to or from a Department facility or other place." Our

reading of Section 111 is supported not only by textual cues and established canons of statutory interpretation, but also the longstanding regulatory practice that predates the addition of subsection (b)(3)(C). And petitioners' argument about 38 U.S.C. § 1728 fails because this statutory provision expressly incorporates the reimbursement framework within Section 111.

Petitioners' arbitrary and capricious arguments are equally unavailing. Because Congress unconditionally authorized VA to pay the CMS rates, the Court may not impose additional requirements on VA. Nor may the Court second-guess an economic analysis that has been expressly reserved from judicial review. And petitioners' suggestion that VA failed to reasonably address several matters is belied by the reasoned and thorough explanation provided by the agency.

The Court should accordingly deny the petition for review. After doing so, the Court should deny as moot petitioners' motion for stay pending judicial review.

## ARGUMENT

### I. Jurisdiction And Standard Of Review

Pursuant to 38 U.S.C. § 502, this Court has exclusive jurisdiction to review certain rulemaking actions by the Secretary of Veterans Affairs. The standard of review applicable to petitions filed under Section 502 is the familiar standard articulated in the Administrative Procedure Act (APA). *Nyeholt v. Sec'y of Veterans Affs.*, 298 F.3d 1350, 1355 (Fed. Cir. 2002). Under this standard, a court

may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Courts reviewing agency action under the APA standard of review are tasked with ensuring that the promulgating agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This standard is not a siren call to second-guess agency decisionmaking, as "a court is not to substitute its judgment for that of the agency." *Id.* (quoting *State Farm*, 463 U.S. at 513). Nor is it an opportunity to reject agency decisionmaking over minor shortcomings or inconsistencies. In fact, the Supreme Court has repeatedly held that courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513-14 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). So long as the agency action under review is "reasonable and reasonably explained," the agency has satisfied the APA standard of review. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Supreme Court has described the APA standard of review as both "deferential," *Prometheus Radio*, 592 U.S. at 423, and "narrow," *Fox Television*, 556 U.S. at 513. This Court has similarly stated that APA review "is highly

deferential to the actions of the agency." *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1372 (Fed. Cir. 2001) (internal quotations omitted). Indeed, many courts have held that the APA standard is so deferential that it acts as a presumption that agency action is valid. *See Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 895 F.3d 90, 100 (D.C. Cir. 2018) (explaining that review under the APA "is highly deferential and presumes agency action to be valid" (internal quotations omitted)); *see also Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1058 (10th Cir. 2023); *Mass. Dep't of Telecomm. & Cable v. FCC*, 983 F.3d 28, 34 (1st Cir. 2020); *Sanitary Bd. of City of Charleston, W. Va. v. Wheeler*, 918 F.3d 324, 333 (4th Cir. 2019); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016).

## II. Petitioners Forfeited Almost All Of Their Arguments On Appeal By Failing To Raise Them During The Rulemaking Process

It is a foundational principle of administrative law that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). The obligation to first present all objections to the relevant agency is grounded in "orderly procedure and good administration," as well as "[s]imple fairness to those who are engaged in the tasks of administration," which counsel that issues should be raised with the agency "while it has opportunity for correction." *Id.*

When it comes to a rulemaking subject to notice-and-comment, the comment period is the appropriate time for raising objections to the relevant agency. Under the APA, agencies engaged in certain kinds of rulemaking are required to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The comment period thus presents interested parties with an opportunity to engage with proposed rulemaking. If, however, interested parties fail to take advantage of that opportunity, the promulgating agency loses its ability to consider the issues raised and take corrective measures, as appropriate, before finalizing the proposed rule. Allowing such latent objections to then be raised in court would be neither part of "orderly procedure and good administration" nor "fair[] to those who are engaged in the tasks of administration." *L. A. Tucker Truck Lines*, 344 U.S. at 37.

Against this backdrop, the Court of Appeals for the District of Columbia Circuit has long held that "a party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration" during the comment period. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005). This forfeiture rule is so strong that the D.C. Circuit has described it as "a near

absolute bar against raising new issues—factual or legal—on appeal in the administrative context." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002). And the D.C. Circuit has applied this rule to preclude litigants from raising a myriad of latent objections never raised during the rulemaking process. Thus, it has rejected as forfeited arguments that an agency had failed to consider important factual or legal matters, *see Advocs. for Highway & Auto Safety*, 429 F.3d at 1148-50; arguments that an agency lacked statutory authority to promulgate the rule in question, *see Koretoff v. Vilsack*, 707 F.3d 394, 397-99 (D.C. Cir. 2013); and even arguments that the resulting rule is unconstitutional, *see Nat'l Multi Hous. Council v. U.S. EPA*, 292 F.3d 232, 233 n.2 (D.C. Cir. 2002).

Other courts of appeals have followed the D.C. Circuit's lead. *See, e.g., St. Marys Cement Inc. v. U.S. EPA*, 782 F.3d 280, 287 (6th Cir. 2015); *La. Envtl. Action Network v. U.S. EPA*, 382 F.3d 575, 584 (5th Cir. 2004); *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). For the reasons described above, this Court should likewise adopt a forfeiture rule to preclude litigants from raising objections that VA had no opportunity to address during rulemaking.

Here, petitioners argue on appeal that, in promulgating the Change in Rates Rule, VA exceeded its statutory authority under 38 U.S.C. §§ 111 and 1728, *see* Pet. Br. at 18-24; that VA had improperly changed a legal interpretation, *id.* at 25-

26; that the 2020 RIA was flawed and therefore incapable of supporting the Secretary's RFA certification, *id.* at 26-30; that VA had an obligation to independently study the sufficiency of the CMS rates, *id.* at 30-33; and that the Final Rule contravenes the Veterans Community Care Program, *id.* at 33-34.[8] Not one of these objections, however, was brought up during the 60-day comment period following publication of the Proposed Rule, either by petitioners themselves or any commenter. The comments received did not suggest that the Change in Rates Rule, if adopted, would contravene Sections 111 or 1728 of Title 38; in fact, these statutory provisions were never even mentioned. *See* Appx1357-1371. Nor did any of the comments mention the 2020 RIA or the RFA certification, the Veterans Community Care Program, or a basis to impose a duty on VA to independently study the sufficiency of the CMS rates. *Id.* By failing to raise these issues during the rulemaking process, petitioners have forfeited them on appeal.[9]

---

[8] We do not suggest that petitioners' remaining argument – that VA failed to adequately respond to comments about ambulance services in rural areas, Pet. Br. at 34-36 – is subject to forfeiture.

[9] As noted, VA also received letters from several members of Congress and other stakeholders after the comment period had closed. *See* Appx1330-1338; Appx1405-1407; Appx1487-1488; Appx1509-1512. Because these letters were received outside the period for public comment, they cannot overcome the forfeiture rule. *See Koretoff*, 707 F.3d at 397-98 (holding that arguments raised before the comment period had begun did not preserve the issue for appeal). Regardless, even if considered, these letters are incapable of overcoming forfeiture because they likewise failed to raise arguments about VA's statutory authority, VA's supposed changed in legal interpretation, the 2020 RIA, the RFA

## III. The Change In Rates Rule Does Not Exceed Statutory Authority

On the merits, petitioners begin by arguing that the Change in Rates Rule exceeds the Secretary's statutory authority under both Sections 111 and 1728 of Title 38. *See* Pet. Br. at 18-24.[10] For the reasons explained below, neither provision conflicts with the Final Rule.

### A. The Final Rule Is Consistent With 38 U.S.C. § 111

Petitioners primarily argue on appeal that the Change in Rates Rule exceeds a limitation on the Secretary's authority that is built into Section 111. They point out that subsection (a) of that provision, which permits VA to pay "the actual necessary expense of travel," applies to travel "to or from a Department facility or other place." Pet. Br. at 21-22. On the other hand, subsection (b)(3)(C) of Section 111, through which Congress authorized VA to pay providers the CMS rates, applies only to travel "to or from a Department facility." *Id.* at 22. According to petitioners, by not repeating the words "or other place" in subsection (b)(3)(C), "Congress plainly meant to give the Secretary discretion to pay the [CMS rates] *only* for transports to or from Department facilities, and *not* for transports to and from other places, like private healthcare facilities." *Id.* at 23.

---

certification, VA's alleged obligation to independently study the sufficiency of the CMS rates, or the Veterans Community Care Program.

[10] Amici make the same argument in their brief. *See* Amici Br. at 5-9.

As explained, VA is empowered to implement 38 U.S.C. § 111 through regulation. *See* 38 U.S.C. § 501; Exec. Order No. 11,302 at § 5, 31 Fed. Reg. 11,741. When that is the case, the Court must "defer to VA regulations interpreting the statutory framework." *Veteran Warriors, Inc. v. Sec'y of Veterans Affs.*, 29 F.4th 1320, 1326 (Fed. Cir. 2022), *cert. denied sub nom. Veteran Warriors, Inc. v. McDonough*, 143 S. Ct. 775 (2023) (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). Such deference to VA is accomplished through the framework established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Id.* at 1327. Analysis under *Chevron* proceeds in two steps. At step one, the Court asks "whether Congress has directly spoken to the precise question at issue." *Id.* (quoting *Chevron*, 467 U.S. at 842). This initial question requires the Court to "employ[] traditional tools of statutory construction," including all "traditional canons" of statutory interpretation. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018). "If the intent of Congress is clear, that is the end of the matter, and [the Court] must give effect to the unambiguously expressed intent of Congress." *Veteran Warriors*, 29 F.4th at 1327 (internal quotations omitted). "If, however, the statute is silent or ambiguous with respect to the specific issue, [the Court] proceed[s] to step two of the *Chevron* framework, at which [the Court]

determine[s] whether the agency's answer is based on a permissible construction of the statute." *Id.* (internal quotations omitted).

The Court need not go beyond *Chevron* step one in this case, because 38 U.S.C. § 111 plainly establishes that Congress authorized VA to pay the CMS rates for all travel covered by subsection (a). This conclusion is supported by the text and structure of Section 111, as well as the regulatory background against which Congress was legislating when it added subsection (b)(3)(C).

Subsection (a) of Section 111 creates a general authorization for VA to pay for travel (and establishes several general restrictions on that authorization) in providing that "the Secretary may pay the actual necessary expense of travel . . . of any person to or from a Department facility or other place . . . ." 38 U.S.C. § 111(a). As petitioners correctly recognize, *see* Pet. Br. at 20, the term "Department facility" refers to any VA Medical Center, VA Outpatient Clinic, or VA Community Based Outpatient Clinic. 38 C.F.R. § 70.2. The term "other place," which is not defined by statute or regulation, refers to any place that is not a "Department facility." *See Other*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1957) ("Being the one of two (or more) distinct from the one already mentioned or understood[.]"). Such "other place" may include any "VA-authorized health care facility," which VA has defined as "a *non-*

*VA health care facility* where VA has approved care for an eligible beneficiary at VA expense." 38 C.F.R. § 70.2 (emphasis added).

Although Congress used the full phrase "a Department facility or other place" in the first sentence of subsection (a), it also used the shorthand "a Department facility" in the second sentence. *See* 38 U.S.C. § 111(a). That second sentence of subsection (a) merely explains another statutory term that appears in the first sentence ("actual necessary expense of travel"), thus indicating that the phrase "a Department facility" in the second sentence carries precisely the same scope as the phrase "a Department facility or other place" from the first sentence. Subsection (a) thus demonstrates that Congress had used "a Department facility" as shorthand for "a Department facility or other place" within Section 111.

Subsection (b) of Section 111 sets out additional parameters for making the payments generally authorized under subsection (a) in specific circumstances. Thus, for instance, subsections (b)(1) and (b)(2) address the categories of persons whose travel is eligible for reimbursement, whereas subsection (b)(3) addresses VA's authority to reimburse special modes of travel. *See generally* 38 U.S.C. § 111(b). Petitioners correctly point out that subsection (b), including subsection (b)(3)(C), references travel to or from "a Department facility," without repeating the words "or other place." *See id.* But in light of Congress's use of the same phrasing in the second sentence of subsection (a), reference to "a Department

facility" in subsection (b) is merely shorthand for "a Department facility or other place." Congress had also stated throughout subsection (b) that payment is authorized to the extent it is "provided for in this section" or made "under this section." *See id.* at §§ 111(b)(1), (b)(2), (b)(3)(A). These repeated references to Section 111 as a whole demonstrate that all of Section 111 applies to VA facilities and non-VA facilities alike, just as Congress made clear in the very first sentence of this Section.

The First Circuit's decision in *New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38 (1st Cir. 2021), may be instructive to the Court's analysis. The Court there was faced with two clauses of the Wire Act: the first referencing transmissions related to "bets or wagers on any sporting event or contest," and the second referencing transmissions related only to "bets or wagers." *Id.* at 54. The Court rejected the argument that the two clauses were substantively distinct, and concluded instead that the phrasing in the second clause was merely shorthand for the first clause. The Court noted that Congress had used shorthand in other portions of the Wire Act, which "may suggest a broader pattern of borrowing by shorthand." *Id.* at 57. The Court then determined that "Congress's consistent syntactic approach anticipated that a term, which is explicitly qualified in one instance, could be read as similarly qualified in other instances, at least where necessary to avoid odd and unlikely results." *Id.* at 58. One oddity that should be

avoided, the Court observed, is "a lack of parallelism between Clause One and Clause Two." *Id.*

As in *New Hampshire Lottery Commission*, Congress exhibited a pattern of employing shorthand in Section 111 by using "a Department facility" to reference "a Department facility or other place" within the first two sentences of subsection (a). And here, as there, it would have made little sense for Congress to broadly refer to travel to or from "a Department facility or other place" within the general grant of authority in subsection (a), yet narrow that scope within the additional payment parameters established in subsection (b).

In fact, petitioners' interpretation of Section 111, if accepted, would preclude VA from paying for other types of transportation charges altogether. In Section 111(a), Congress provided that the "actual necessary expense of travel" that VA is authorized to pay may include "travel by air." 38 U.S.C. § 111(a). Congress then provided further guidance on when travel by air is reimbursable in Section 111(b)(4). *See id.* at § 111(b)(4). In both provisions, however, Congress stated that travel by air may be paid when it is "the only practicable way" to "reach a Department facility." *Id.* at §§ 111(a), (b)(4). If, as petitioners suggest, "a Department facility" is a narrower term than "a Department facility or other place," then VA would not have statutory authority to pay for travel by air to non-VA facilities, including all VA-authorized health care facilities. Such an interpretation

would reduce the travel reimbursements VA is now providing, to the detriment of veterans and other beneficiaries who require travel by air for their treatment.

In light of the text and structure of 38 U.S.C. § 111, the most natural reading of this provision is that all of it – including subsection (b)(3)(C) – applies to travel to or from VA facilities *and* non-VA facilities.

VA's longstanding regulatory practice further supports this reading of Section 111. Before Congress added subsection (b)(3)(C) to the statutory text, VA had permitted beneficiaries to recover the cost of travel to or from VA facilities and non-VA facilities alike. A VA regulation in place since 2008 explains that beneficiary travel benefits are available to any veteran "who travels to or from a VA facility *or VA-authorized health care facility*." 38 C.F.R. § 70.10(a) (emphasis added). The VHA Beneficiary Travel Handbook contains the same broad language. *See* Appx31-32. When adding subsection (b)(3)(C) to Section 111, Congress is presumed to have known of VA's regulatory practice. *See Beaudette v. McDonough*, 93 F.4th 1361, 1368 (Fed. Cir. 2024) (when interpreting statutes, the Court "presume[s] Congress legislates with knowledge of existing statutes and regulations"). Congress thus had no reason to think that the phrase "a Department facility" would be interpreted as anything other than shorthand for "a Department facility or other place."

Petitioners offer a single argument to the contrary: Congress could have used the full phrase "a Department facility or other place" in subsection (b)(3)(C), but it elected not to do so. *See* Pet. Br. at 22-23. As explained, however, Congress's decision to continue using the shorthand form of this phrase is unsurprising given the pattern of using this shorthand throughout subsections (a) and (b), as well as VA's longstanding regulatory interpretation of Section 111. Besides, the mere fact that "there are many ways to improve the clarity" of statutory text should not disturb the Court's analysis of legislation as written. *N.H. Lottery Comm'n*, 986 F.3d at 60 (rejecting a similar argument).

If, notwithstanding the above, the Court nonetheless concludes that Section 111 is silent or ambiguous on the question whether Congress intended subsection (b)(3)(C) to cover travel to or from non-VA facilities, then the Court would proceed to step two of *Chevron*. *See Veteran Warriors*, 29 F.4th at 1327. The Court must "defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (internal quotations omitted). And here, given Congress's concerns about the rising cost of VA reimbursements for transportation services, *see* H.R. REP. NO. 112-242 at 9, 17, a broader interpretation of 38 U.S.C. § 111(b)(3)(C) is an eminently reasonable

policy choice. If the Court reaches step two of *Chevron*, it should defer to VA's permissible interpretation of Section 111.

### B. <u>The Final Rule Is Also Consistent With 38 U.S.C. § 1728</u>

Petitioners also claim that the Change in Rates Rule contravenes Section 1728. Specifically, they argue that because the Final Rule exceeds the Secretary's authority under Section 111(b)(3)(C), it is necessary inconsistent with Section 1728 as well. *See* Pet. Br. at 21. Petitioners are wrong for two separate reasons.

*First*, Section 1728(a), which governs VA's authority to reimburse eligible veterans for certain emergency treatment, states that travel and incidental expenses are covered only "under the terms and conditions set forth in section 111 of this title." 38 U.S.C. § 1728(a). In referencing Section 111 in this manner, Congress has expressly incorporated Section 111 into the reimbursement framework of Section 1728. As explained above, the Change in Rates Rule is entirely consistent with Section 111. Because petitioners' argument about Section 111 is plainly incorrect, their secondary argument about Section 1728 must therefore fail as well.

*Second*, Congress stated in Section 1728(b) that VA should pay only "the reasonable value of emergency treatment." 38 U.S.C. § 1728(b). In 2011, Congress authorized VA to pay providers of special modes of transportation the CMS rates, thus in effect determining that the CMS rates represent a "reasonable value" for such transportation services. *See* VOW to Hire Heroes Act of 2011,

Pub. L. No. 112-56 at § 263, 125 Stat. at 732. As a result, the Change in Rates Rule is in line with Section 1728(b).

## IV. The Change In Rates Rule Is Not Arbitrary And Capricious

Petitioners next contend that the Change in Rates Rule is arbitrary and capricious for a variety of reasons. *See* Pet. Br. at 24-36. These arguments lack merit.

### A. The Final Rule Is Based On A Statutory Revision Rather Than A VA Change In Legal Interpretation

Petitioners begin by claiming that VA changed its legal interpretation of Section 1728. Pet. Br. at 25. Relying primarily on *Brand X* and *Fox Television*, petitioners then argue that the change in interpretation was arbitrary and capricious because VA did not expressly discuss Section 1728 in the Final Rule. *Id.* at 26.

Petitioners are correct, of course, that an agency must "display awareness that it is changing position," as "[a]n agency may not . . . depart from a prior policy *sub silentio* . . ." *Fox Television*, 556 U.S. at 515. But this principle is inapplicable here. VA did not promulgate the Change in Rates Rule because it altered its interpretation of existing law; it did so because Congress enacted *new* legislation that gave VA *new* authority. *See* VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56 at § 263, 125 Stat. at 732. Indeed, both the Proposed Rule and the Final Rule make clear that VA's efforts are a direct consequence of Congress adding subsection (b)(3)(C) to 38 U.S.C. § 111. *See* Proposed Rule, 85 Fed. Reg.

at 70,552 ("We propose to amend these regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C) . . ."); Final Rule, 88 Fed. Reg. at 10,033 ("On November 5, 2020, VA proposed amending its beneficiary travel regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C) . . ."). To the extent there was a policy change here, that change came from Congress, not VA.

Petitioners point to "an interpretive rule . . . in the form of a sub-regulatory guidance document" to show that VA changed its position about the rates it pays for special modes of transportation. Pet. Br. at 25. That "sub-regulatory guidance document," however, is nothing more than a fact sheet designed to provide veterans a simple summary of relevant VHA policies. *See* Appx1403-1404. Petitioners offer no authority – and we are aware of none – to suggest that an informational document that does not purport to set official Government policy can somehow constrain an agency's future actions.

More fundamentally, though, petitioners' focus on 38 U.S.C. § 1728 is itself misplaced. True, the fact sheet cites Section 1728 in stating that VHA pays for authorized transportation and unauthorized emergency transportation at "[g]enerally billed charges." Appx1404. But as explained, Section 1728 provides that VHA's payment of such charges may only be made "under the terms and conditions set forth in section 111 of this title." 38 U.S.C. § 1728(a). In expressly

changing the terms and conditions within Section 111, Congress thus changed VA's obligations under Section 1728 as well.

Finally, even if VA can be said to have changed its position, petitioners' suggestion that such a change imposed additional burdens on VA is incorrect. The Supreme Court has held that there is "no basis in the Administrative Procedure Act or in [the Court's] opinions for a requirement that all agency change be subjected to more searching review" than the normal APA inquiry. *Fox Television*, 556 U.S. at 514. Thus, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And here, VA satisfied this standard by repeatedly stating that it proposed the Change in Rates Rule because of the authority Congress granted it in 38 U.S.C. § 111(b)(3)(C). *See* Proposed Rule, 85 Fed. Reg. at 70,552; Final Rule, 88 Fed. Reg. at 10,033. Nothing more is required to satisfy the highly deferential arbitrary and capricious standard.

### B. The Court May Not Second-Guess The Economic Analysis Underlying The 2020 RIA And The RFA Certification

Petitioners also challenge the 2020 RIA and the RFA certification accompanying the Proposed Rule. According to petitioners, the 2020 RIA was "wildly off the mark" because it "underestimated the total provider charges and the reduction in payments under the [F]inal [R]ule by a factor of more than five." Pet. Br. at 27-28. Petitioners claim that this alleged error then led to an arbitrary and

capricious RFA certification, as the certification was based on the 2020 RIA. *Id.* at 28. In addition, petitioners contend that the RFA certification was arbitrary and capricious because VA failed to consider differences between ambulance providers, including differences in operation, service area, case mix, and third-party payor mix. *Id.* at 29.

Before we address petitioners' specific arguments, it is important to understand the legal framework governing the 2020 RIA. As relevant here, the VA Chief Economist prepared the 2020 RIA to determine compliance with two sources of law: Executive Order No. 12,866 and the RFA. The former requires promulgating agencies to "assess both the costs and the benefits of the intended regulation." Exec. Order No. 12,866 at § 1(b)(6), 58 Fed. Reg. 51,735 (Sept. 30, 1993). In this respect, the VA Chief Economist concluded that further compliance with Executive Order No. 12,866 was unnecessary because "[t]his rulemaking will not have an annual effect on the economy of $100 million or more." Appx1321 (paragraph 1). The latter source of law, on the other hand, requires promulgating agencies to assess a regulation's impact on small businesses. *See* 5 U.S.C. § 603(a). On this score, the VA Chief Economist concluded that further compliance with the RFA was unnecessary because "this proposed rule would not

have a significant economic impact on a substantial number of small entities." Appx1325.[11]

The distinction between Executive Order No. 12,866 and the RFA is an important one. The Executive Order provides that it "does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." Exec. Order No. 12,866 at § 10, 58 Fed. Reg. 51,735. This means that the Executive Order "neither creates private rights, nor is an agency's failure to comply with [this] order[] subject to judicial review." *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013); *see also Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 (11th Cir. 2021). Petitioners thus cannot challenge VA's compliance with Executive Order No. 12,866 – or, more specifically, VA's assessment of the Proposed Rule's costs and benefits – before this Court.

The conclusion above is fatal to petitioners' arguments about the 2020 RIA. Petitioners are correct that, as part of the 2020 RIA, the VA Chief Economist

---

[11] Confusingly, the cover page to the 2020 RIA states affirmatively that "[t]his rulemaking will have a significant economic impact on a substantial number of small entities." Appx1321 (paragraph 2). As written, this sentence is inconsistent with the RFA analysis in the 2020 RIA itself, *see* Appx1325, which leads to the conclusion that the VA Chief Economist erroneously omitted the word "not" from the cover page. The Chief Economist corrected this typo in the 2023 RIA. *See* Appx1489 (stating that "[t]his rulemaking will *not* have a significant economic impact on a substantial number of small entities" (emphasis added)).

reviewed the volume of billed transportation charges and projected that the Change in Rates Rule will likely result in benefits, in the form of cost savings, totaling $199.6 million for the period between 2021 and 2025. Appx1325. This discussion, however, only serves to satisfy the cost-benefit analysis required by Executive Order No. 12,866. The Chief Economist's analysis of the Proposed Rule's anticipated costs and benefits is not reviewable. *See* Exec. Order No. 12,866 at § 10, 58 Fed. Reg. 51,735; *Helicopter Ass'n*, 722 F.3d at 439.

An agency's compliance with the RFA, on the other hand, is judicially reviewable. 5 U.S.C. § 611(a)(1). Courts have stressed, however, that "[t]he RFA is a procedural rather than substantive agency mandate." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). Courts therefore review agency compliance with the RFA "only to determine whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA." *Id.* (internal quotations omitted); *see also Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 683 (7th Cir. 2016); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1101 (9th Cir. 2005); *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001).

Within the RFA portion of the 2020 RIA, VA determined that the Change in Rates Rule "would not have a significant economic impact on a substantial number of small entities." Appx1325. This conclusion was based on two premises: that

ambulance service providers "would bear VA's cost avoidance equally," and that other types of providers would not be substantially affected because "over 99% of [VA] payments . . . are made pursuant to a contract." *Id.* VA reiterated these determinations, almost verbatim, in both the Proposed Rule, *see* 85 Fed. Reg. at 70,554-55, and the Final Rule, *see* 88 Fed. Reg. at 10,036.

Petitioners, however, do not challenge *any* of VA's findings about the Change in Rates Rule's anticipated impact on small businesses. Petitioners do not dispute that ambulance service providers are expected to bear VA's cost avoidance equally. *See* Pet. Br. at 26-30. Nor do they disagree that other types of providers, including special needs transportation providers, are overwhelmingly paid pursuant to contractual arrangements. *See id.* The Court, therefore, has no reason to doubt that VA "made a reasonable, good-faith effort to carry out the mandate of the RFA." *Alenco Commc'ns*, 201 F.3d at 625.

Petitioners' claim that VA failed to consider important differences between ambulance providers, *see* Pet. Br. at 29, fares no better. The Supreme Court has held that, "[n]ormally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. But this doctrine is not an open invitation to bring up tangential matters that the promulgating agency had no occasion to consider during rulemaking. "Whether an agency has overlooked 'an important aspect of the

problem[]' . . . turns on what a relevant substantive statute makes 'important.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996). This is so, the Ninth Circuit has explained, because "[i]n law, unlike religion or philosophy, there is nothing which is necessarily important or relevant." *Id.*; *see also Gay v. McDonough*, No. 2021-1226, 2021 WL 4944470, at *4 (Fed. Cir. Oct. 25, 2021) (unpublished) (recognizing that "[w]hether an agency has failed to address an important aspect of a problem, and is arbitrary and capricious for that reason, can turn on the specific statutes and regulations that govern the agency").[12]

Here, petitioners point to nothing in the RFA that required VA to distinguish among transportation service providers when considering the Proposed Rule's anticipated effects on small businesses. *See* Pet. Br. at 29. Nor would such a requirement make sense. The RFA certification within the Proposed Rule and the Final Rule serves to establish that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). So long as the promulgating agency takes all affected small businesses into consideration as a group, it plainly satisfies the RFA's mandate.

---

[12] The Court of Federal Claims has repeatedly adopted the Ninth Circuit's formulation of the phrase "important aspect of the problem" in the bid protest context, where the court reviews agency action under the APA standard of review. *See, e.g., A Squared Joint Venture v. United States*, 145 Fed. Cl. 676, 683 (2019); *State of N.C. Bus. Enter. Program v. United States*, 110 Fed. Cl. 354, 363 (2013).

### C. Congress Has Determined That The CMS Rates Are Sufficient, And Nothing Required VA To Conduct An Independent Analysis Of The Issue

Petitioners argue that VA had an obligation to independently study whether the CMS rates would adequately compensate transportation service providers. Pet. Br. at 30. According to petitioners, VA's failure to conduct such a study, and its decision to instead rely on the authority it received through 38 U.S.C. § 111(b)(3)(C), is arbitrary and capricious. *Id.* at 30-33.

In making this argument, petitioners gloss over the most important consideration for understanding an agency's legal obligations: the statutory text. *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) (when it comes to Federal agencies, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress"). In Section 111(b)(3)(C), Congress empowered VA to "pay the provider of the transportation the lesser of the actual charge for the transportation or the amount determined by the [CMS fee schedule]." 38 U.S.C. § 111(b)(3)(C). Other than instances in which transportation services are governed by a contractual relationship, this statutory grant of discretion was unequivocal, as Congress did not impose any stipulations or conditions that VA had to satisfy before exercising its option. *Id.* Congress could have, as petitioners suggest, tied VA's use of the CMS rates to an economic analysis of the unique medical needs of veterans. Yet Congress elected not to

employ such language. The absence of any conditions from the text of Section 111(b)(3)(C) demonstrates that VA has no statutory obligation to do anything further before it can implement the authority Congress expressly granted it.

The conclusion above is reinforced by the fact that Congress knew precisely how to impose conditions on VA's exercise of discretion when it wished to do so. In Section 111(b)(3)(B), for instance, Congress authorized VA to directly pay "the provider of the transportation by special mode before determining the eligibility of such person for such payment." 38 U.S.C. § 111(b)(3)(B). But this discretion comes with a statutory caveat: VA may only make such direct payments "if the Secretary determines that providing such payment is in the best interest of furnishing care and services." *Id.* In contrast, Section 111(b)(3)(C) does not place any conditions on VA's exercise of discretion. "Where Congress knows how to say something but chooses not to, its silence is controlling." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) (cited with approval in *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1386 (Fed. Cir. 2020)).[13]

[13] The Court, of course, is without jurisdiction to second-guess *Congress's* decisions to (1) authorize VA's use of the CMS rates, and (2) impose no statutory limitations on VA's exercise of that authority. *See* 38 U.S.C. § 502 (only granting the Court jurisdiction to review "[a]n action of the Secretary"). For this reason, amici's policy arguments about the wisdom of permitting VA to use the CMS rates, *see* Amici Br. at 9-19, should not disturb the Court's analysis.

Petitioners assert that "VA . . . cannot delegate its rulemaking authority to the legislative branch any more than VA can pass it off to CMS." Pet. Br. at 30. VA, however, has done neither. Exercising the discretion within Section 111(b)(3)(C) still required VA to conduct its own notice-and-comment rulemaking, which VA has done through the Proposed Rule and the Final Rule. And VA did not "pass off" its rulemaking authority to CMS; it simply used rulemaking to adopt the CMS fee schedule because *Congress expressly authorized it to do so*. Petitioners do not explain, let alone persuasively establish, why VA could not do precisely what Congress empowered it to do.[14]

Finally, petitioners complain that VA's decision to promulgate the Change in Rates Rule was unreasonable due to an ongoing review of the CMS rates for ground ambulance services. Pet. Br. at 31, 33.[15] If anything, this review demonstrates the reasonableness of Congress's decision to authorize VA's use of the CMS rates. CMS has the resources and expertise necessary to determine

[14] The cases petitioners cite in their opening brief, *see* Pet. Br. at 30-31, are readily distinguishable. *Delaware Department of Natural Resources and Environmental Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015), involved an agency's reliance on a prior rulemaking (which could itself have been arbitrary and capricious) rather than any express statutory authority (which cannot be arbitrary and capricious by definition). And *Foster v. Mabus*, 895 F. Supp. 2d 135 (D.D.C. 2012), was not a rulemaking case at all, but rather an adjudication without any direct guidance from Congress.

[15] This particular sub-argument is not subject to forfeiture either, as one commenter noted the ongoing review of the CMS rates, *see* Appx1357-1358, and another discussed recent legislation on the subject, *see* Appx1361.

whether the current fee schedule adequately compensates providers of ground ambulance services. This is so, in part, because CMS is required to account for various considerations when setting the fee schedule, including inflationary pressures and "appropriate regional and operational differences." 42 U.S.C. § 1395m(*l*)(2). If, utilizing its resources and expertise, CMS finds that the current schedule is inadequate, then it has the tools to increase the rates as appropriate. Such an increase, in turn, will apply to VA just as it does to CMS.

In fact, in response to a comment received during the rulemaking process, VA offered this very explanation in the Final Rule. *See* 88 Fed. Reg. at 10,034-35 ("We note that because VA is referencing the CMS fee schedule in general in this regulation and not the specific amount that is currently established in the CMS fee schedule, any changes to the CMS rates will be automatically applicable without the need for future rulemaking."). This reasonable explanation as to why the ongoing review does not preclude VA from promulgating the Change in Rates Rule satisfies the highly deferential arbitrary and capricious standard.

### D. VA Reasonably Determined That Its Goal Of Maintaining Continuity Of Care, Whether Or Not Tied To The Veterans Community Care Program, Is Not In Jeopardy

Petitioners next contend that VA failed to consider its obligations under the Veterans Community Care Program. Pet. Br. at 33-34. According to petitioners,

this Program requires VA to ensure continuity of care and access to medical services. *Id.* at 34 (quoting 38 U.S.C. § 1703).

Although no commenter invoked the Veterans Community Care Program during the rulemaking process, commenters did suggest that VA's adoption of the CMS rates might decrease the level of care veterans will receive in the future. *See, e.g.,* Appx1359, Appx1363, Appx1371. VA fully addressed these concerns in the Final Rule. VA explained that MedPAC "found that, in aggregate, Medicare ambulance margins were adequate, and VA has no cause or expertise to challenge that finding." Final Rule, 88 Fed. Reg. at 10,033. VA further explained that there is no evidence to suggest that transportation service providers had offered veterans a higher level of service than that offered to Medicare patients due to the difference in funding. *Id.* VA accordingly concluded that it "has no reason to doubt that the same level of ambulance services would be provided [to veterans] regardless of the payment source or amount of payment for ambulance services." *Id.* This was a reasonable explanation of VA's decision to reject unsubstantiated claims that the level of care might decrease as a result of the Change in Rates Rule.

### E. VA Reasonably Addressed The Issue Of Continued Access To Ambulance Services In Rural areas

Petitioners' final argument is that VA failed to address comments, made by various commenters during the rulemaking process, about adequacy of the CMS rates for ambulance service providers that operate in rural areas. Pet. Br. at 34-36.

The Final Rule, however, belies this contention. VA directly responded to such concerns by explaining that the Change in Rates Rule "would provide VA the option to enter into a contract with a vendor of special mode transportation . . . , and the terms of that contract would govern the payment rates for such transport." Final Rule, 88 Fed. Reg. at 10,034. This is a significant tool in the effort to ensure adequate services, VA explained, because "[s]uch contracts could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations, such as for rural areas." *Id.* VA's reliance on contracting is entirely consistent with the statutory text. *See* 38 U.S.C. § 111(b)(3)(C) (authorizing VA to pay providers the CMS rates, "unless the Secretary has entered into a contract for that transportation with the provider").

Petitioners contend that VA's reasonable explanation merely "paid lip service" to the issues brought up in the comments. Pet. Br. at 35. This position is perplexing given that VA not only restated the concerns raised, but also offered a solution – as explicitly authorized by statute – for how to solve the potential problem. And as the Court considers this argument, it is important to keep in mind that "[a]n agency's obligation to respond" to comments submitted during rulemaking "is not particularly demanding." *Ass'n of Priv. Sector Coll. & Univ. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (internal quotations omitted). Indeed, the D.C. Circuit has held that an agency's responses to comments need only show

that the agency had "thought" about the objections raised and "provided reasoned replies." *City of Portland, Or. v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007). VA's substantive response easily satisfies this minimal standard.

But petitioners do not appear to categorically reject contracting as a solution to the unique problems facing providers of ground ambulance services in rural areas. Instead, they seem to take issue with VA's perceived unwillingness to undertake contracting on a large enough scale. Petitioners' perception is based on remarks made by VA personnel at two industry days held months after the Final Rule had been published. *See* Pet. Br. at 13-14, 35.

Such post-rulemaking statements, however, cannot serve as a basis for challenging the Change in Rates Rule. In applying the arbitrary and capricious standard, "the focal point for judicial review should be the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), such that the Court is "limited to assessing the record that was actually before the agency," *Ass'n of Priv. Sector Coll. & Univ.*, 681 F.3d at 441. Materials created after the Final Rule had already been published – and are therefore, by definition, not part of the record before the agency during rulemaking – are incapable of showing arbitrary and capricious action.

In a footnote, petitioners suggest that the Court may consider transcripts of the post-rulemaking industry days because they are accurate and because their

consideration is required for effective judicial review. *See* Pet. Br. at 13 n.3. Both arguments lack merit, as they fail to appreciate the uniquely limited nature of APA review. Whether information is accurate has nothing to do with its relevancy to a rulemaking challenge; unsurprisingly, the case petitioners cite for this proposition, *Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021), is not a rulemaking challenge at all, but is instead an appeal from a decision of the Court of Appeals for Veterans Claims, which may consider extra-record materials when appropriate. *See id.* at 1323 n.9. And in *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009), a bid protest in which the Court applies the APA standard of review, this Court *rejected* an attempt to add *post-hoc* materials to the administrative record without a corresponding explanation of why the omission of such materials would have necessarily "frustrated effective judicial review." *Id.* at 1381. Likewise here, petitioners' failure to explain why post-rulemaking remarks are necessary for the Court's review of the rulemaking itself is fatal to their cause.

## CONCLUSION

For these reasons, the Court should deny the petition. The Court should also deny as moot petitioners' motion for stay pending judicial review.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Borislav Kushnir
BORISLAV KUSHNIR
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-5928
Facsimile: (202) 353-0461
Email: Steven.Kushnir@usdoj.gov

Attorneys for Respondent

Of Counsel:

BRYAN THOMPSON
Deputy Chief Counsel

ASHLEY CEDARS
General Attorney
Office of General Counsel
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

April 17, 2024

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1104

**Short Case Caption:** Metropolitan Area EMS Authority v. Secretary of Veterans Affairs

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 11,484 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 04/17/2024

Signature: /s/ Borislav Kushnir

Name: Borislav Kushnir

Save for Filing