**No. 24-1104**

United States Court of Appeals
for the Federal Circuit

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,

*Petitioners,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

# PETITIONERS' REPLY BRIEF

Brian R. Stimson
Sara M. Lord
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C. 20037
Main: (202) 677-4030
Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

May 8, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1104

**Short Case Caption** Metropolitan Area EMS Authority et al. v. Secretary of Veterans Affairs

**Filing Party/Entity** Metropolitan Area EMS Authority, Valley Ambulance Authority, Quaker Valley Ambulance Authority, Altoona-Logan Township Mobile Medical Emergency Department Authority

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/08/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Metropolitan Area EMS Authority (Medstar) | None | None |
| | | |
| Valley Ambulance Authority (VAA) | None | None |
| | | |
| Quaker Valley Ambulance Authority (QVAA) | None | None |
| | | |
| Altoona-Logan Township Mobile Medical Emergency Department Authority(AMED) | None | None |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Arnall Golden Gregory LLP | Brian R. Stimson | Sara M. Lord |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**INTRODUCTION**........................................................................................**1**

**ARGUMENT**..............................................................................................**3**

A. Petitioners have not forfeited their right to judicial review of any issues........3

B. VA's reading of §§ 1728 and 111 turns on irrelevant case law and runs contrary to the proper cannons of statutory construction ................................8

C. The final rule still violates the APA because it is arbitrary and capricious ...15

1. Even now, VA fails to display awareness that it changed its interpretation of § 1728, much less show good reasons for the change ......15

2. VA's parsing of the Secretary's RFA certifications highlights the arbitrariness and capriciousness of the certifications..................................16

3. VA's argument that Congress freed the agency from reasoned decision making in § 111(b)(3)(C) would upend the APA .......................................19

4. VA still fails to consider its obligations under the Veterans Community Care Program.........................................................................................21

5. VA's responses to comments do not show how VA ventilated the major policy issue of rural access and provider contracting .................................22

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**..........................**24**

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF COMPLIANCE**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005) .......... 4

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009) .......... 24

*Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43 (D.D.C. 2020) .......... 4

*Beard v. Gen. Servs. Admin.*, 801 F.2d 1318 (Fed. Cir. 1986) .......... 5

*Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307 (Fed. Cir. 2003) .......... 5

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .......... 13, 15

*Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.*, 785 F.3d 1 (D.C. Cir. 2015) .......... 23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .......... 19, 20

*Garcia v. U.S.*, 469 U.S. 70 (1984) .......... 10

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) .......... 16

*Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020) .......... 19

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) .......... 4

*Lindahl v. Office of Personnel Management*,
470 U.S. 768 (1985) ........ 20

*Lone Star OB/GYN Assocs. v. Aetna Health Inc.*,
579 F.3d 525 (5th Cir. 2009) ........ 12

*Nat. Res. Def. Council v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014) ........ 4

*New Hampshire Lottery Commission v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ........ 9, 10

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ........ 16

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ........ 10

*Small Refiner Lead Phase-Down Task Force v. Usepa*,
705 F.2d 506 (D.C. Cir. 1983) ........ 6

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
578 U.S. 590 (2016) ........ 20

*U.S. v. Williams*,
553 U.S. 285 (2008) ........ 11

*U.S. v. Woods*,
571 U.S. 31 (2013) ........ 10

*Viegas v. Shinseki*,
705 F.3d 1374 (Fed. Cir. 2013) ........ 10

**Statutes**

5 U.S.C. § 553 ........ 16, 20

5 U.S.C. § 701 ........ 19

38 U.S.C. § 111 ........ 1, 2, 5, 6, 8-16, 19, 20

38 U.S.C. § 502 ........ 20

38 U.S.C. § 1703 ........ 21

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50203, 132 Stat. 64, 178 (Feb. 9, 2018)....14

Caregivers and Veterans Omnibus Health Services Act of 2010, Pub. L. No. 111-163, § 305(b), 124 Stat. 1130, 1151 (May 5, 2010)....8

Veterans' Benefits, Pub. L. No. 85-857, § 111(a), 72 Stat. 1105, 1113 (Sept. 2, 1958)....8

**Other Authorities**

38 C.F.R. § 70.2....11

38 C.F.R. § 70.10....12

85 Fed. Reg. at 70,551....7

88 Fed. Reg. at 10,032....1

*Airfare*, Oxford Dictionary of English 35 (2010)....11

Executive Order No. 12,866....16, 17

*Place*, Webster's Dictionary (1958 edition)....11

## INTRODUCTION

The U.S. Department of Veterans Affairs (VA) argues that Petitioners forfeited their arguments against the final rule entitled *Change in Rates VA Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023) (Final Rule), that VA had statutory authority to publish the Final Rule, and that the Final Rule is not arbitrary or capricious. VA is wrong across the board.

Petitioners forfeited nothing. All their arguments raise issues that were before VA during the comment period, challenge key assumptions by VA in the rulemaking, or present pure issues of statutory construction. None fall within the law requiring the administrative exhaustion of issues prior to judicial review.

VA contends that the Final Rule is on solid legal ground because the words "Department facility" and "other place" in § 111(a) are "shorthand" for one another, thus making the discretionary rate authority in § 111(b)(3)(C) applicable to *all* ambulance transports covered by VA. But different words mean different things. Congress reinforced that fundamental principle in § 111(a) by using the word "or" to separate the words "Department facility" from the words "other place." Nothing in §§ 111 or 1728 supports VA's counter-textual, sweeping interpretation of § 111(b)(3)(C), and the Court should reject it out of hand.

VA's defense of the Secretary's Regulatory Flexibility Act (RFA) certifications is equally flimsy. The Secretary certified that the rule would not have

a significant impact on a substantial number of small entities, based on the Chief Economists' calculations and pro rata allocations of aggregate cost avoidance across all ambulance providers. VA contends that Petitioners have not challenged the allocations and cannot challenge the calculations. In fact, Petitioners challenged both and neither one is reasonable; VA's data shows that the aggregate cost avoidance and per-entity burden numbers are off by a factor of five.

VA spends the rest of its Brief raising Congress as a shield from judicial review. VA asserts that Congress, not the agency, changed the agency's interpretation of § 1728 without acknowledging that the change was made. According to VA, Congress deemed the MFS amount sufficient, and, therefore, no assessment of the sufficiency of that amount—or its potential impact on the Veterans Community Care Program—was required. VA also maintains that it responded adequately to stakeholders' comments by reiterating that Congress deemed the MFS sufficient. The common thread running through all VA's arguments is the idea that Congress freed VA from judicial review when it enacted § 111(b)(3)(C). Congress, however, did no such thing. VA had to acknowledge and give good grounds for reinterpreting § 1728, had to make a non-arbitrary and non-capricious decision to pay the MFS amount instead of the actual charge for ambulance transports, and had to respond adequately to comments. It did none of those things.

The Court should vacate the Final Rule under the Administrative Procedure Act (APA) and remand to the agency for further proceedings.

## ARGUMENT

### A. Petitioners have not forfeited their right to judicial review of any issues

Petitioner's arguments are all timely and eligible for adjudication, and VA's response that Petitioners have forfeited most, but not all, of their arguments is misplaced. While VA points to a line of cases from the U.S. Court of Appeals for the District of Columbia, barring plaintiffs from advancing issues that were not previously raised with the agency during the comment period, Resp. Br. at 17-20, the issues presented by Petitioners *were* raised with VA during the comment period. To the extent that certain issues were not raised during the comment period, Petitioners' arguments challenge "key assumptions" VA made in the Final Rule, and such arguments may be raised here for the first time. Furthermore, the Court can always adjudicate arguments about the statutory authority of an agency, particularly where, as here, the arguments are concerned only with statutory interpretation, and do not require the development of a factual record, the application of any agency expertise, or the exercise of administrative discretion.

The purpose of administrative exhaustion, referred to by the VA as "the forfeiture rule," Resp. Br. at 18, and also referred to as issue exhaustion or issue waiver in case law, is to "ensure that the agency is given the first opportunity to bring

its expertise to bear on the resolution of a challenge to a rule." *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (quoting *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998)); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1149 (D.C. Cir. 2005) ("The distinction between 'issue exhaustion' and 'issue waiver' is illusive, to say the least. Indeed, both terms appear in the case law without apparent distinction, and they are sometimes treated as if synonymous.").

Administrative exhaustion "is not a license for agency passivity." *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018). "Agencies always bear the affirmative burden of examining a key assumption when promulgating and explaining a non-arbitrary, non-capricious rule . . . . That means that an agency must justify a key assumption underlying its regulation *even if no one objects during the comment period*." *Id.* (cleaned up) (emphasis added).

While VA points out that Petitioners did not submit comments, Resp. Br. at 10, the determining factor is whether the agency "actually considered the issue" during the rulemaking process, and not which party raised the issue. *See Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43, 49 (D.D.C. 2020) (citing *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 & n.10 (D.C. Cir. 1983) and *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996)).

Further, the failure to present questions related to constitutional or statutory authority at the administrative level does not prevent parties from raising those issues for the first time in court where "[r]esolution of the statutory issue does not require the development of a factual record, the application of agency expertise, or the exercise of administrative discretion." *Beard v. Gen. Servs. Admin.*, 801 F.2d 1318, 1321 (Fed. Cir. 1986) (internal quotes omitted) (citing *R.R. Yardmasters of America v. Harris*, 721 F.2d 1332, 1338–39 (D.C. Cir. 1983)); *see also Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1313 (Fed. Cir. 2003) (finding administrative exhaustion inapplicable to issue that was, in part, a constitutional question).

In sum, this Court can consider, and adjudicate, arguments on issues that were raised in comments or otherwise considered by VA during the comment period. The Court can also consider Petitioners' arguments that challenge "key assumptions" underlying VA's rulemaking, as well as Petitioners' arguments that challenge VA's statutory authority and involve only statutory interpretation.

Each of Petitioners' arguments fall under at least one of these three categories, and in some cases more than one of these categories.

Petitioners' challenge to VA's statutory authority under §§ 1728 and 111 is strictly a matter of statutory interpretation. *See Briggs*, 331 F.3d at 1313. Further, VA states in the Final Rule—in the section responding to comments—that "Congress granted VA the discretion in 38 U.S.C. 111(b)(3)(C) to use the CMS

ambulance fee schedule as part of VA's methodology to calculate ambulance payments, ostensibly finding such schedule to be sufficient." Appx2. This statement contains the key assumptions that VA has statutory authority for the Final Rule under § 111(b)(3)(C), and that Congress deemed the MFS amount sufficient. *See* Resp. Br. at 18-24 and 30-33.

VA's unacknowledged change in its legal interpretation of § 1728 was another key assumption in the Final Rule. Petitioners have learned *since the comment period ended* that VA believes it can apply § 111(b)(3)(C) to all claims for emergency ambulance transports under § 1728 and intends do so. Because this change was neither acknowledged nor discernable from the Proposed Rule, Petitioners could not possibly have raised concerns about the change during the comment period, and their challenge to the rule on this basis has not been forfeited.

Petitioner's argument that the Secretary's RFA certifications were arbitrary and capricious challenges key assumptions by VA about the significance of the economic impact of the Final Rule on small entities. Those key assumptions include the aggregate costs avoided through the Final Rule, and the allocation of the aggregate cost avoidance across ambulance providers. *See Small Refiner Lead Phase-Down Task Force v. Usepa*, 705 F.2d 506, 535 (D.C. Cir. 1983) (finding that plaintiff could challenge a "vital assumption" underlying the agency's model, even if no one raised that objection during the comment period). In the Final Rule, both

commenters and VA identified numerous differences between ambulance providers that bear on the reasonableness of VA's key assumption about the allocation of the aggregate cost avoidance. Appx3 (commenter warning that payment of the MFS amount would "increasingly impact low-volume rural areas and other areas with a higher portion of Medicare and Medicaid beneficiaries, as well as VA beneficiaries."), Appx4 (VA noting that it might contract with providers when "different rates may be justified based on local considerations".).[1]

Petitioners' arguments that VA failed to independently evaluate the sufficiency of the MFS amount—and failed to consider the impact of the MFS amount on the Veterans Community Care Program—challenge VA's key assumption that the MFS amount is sufficient. Also, numerous commenters placed the sufficiency of the MFS amount squarely on the table by expressing the concern that rising costs would outpace the MFS amount, and thus decrease healthcare for veterans. *See e.g.*, Appx1357-1359, Appx1360, Appx1365-1368, Appx1370-1371.[2]

---

[1] Petitioners could not have raised the issue of the calculation of the aggregate cost avoidance during the comment period because VA had not yet released critical data under the Freedom of Information Act. Because Petitioners could not have raised the argument during the comment period, and VA has tacitly agreed that the data is part of the administrative record, Petitioners did not forfeit the issue.

[2] Petitioners could not have raised the issue of VA's reliance on the 2013 study by the Medicare Payment Advisory Commission (MedPAC) during the comment period because VA did not mention the MedPAC study in its notice of proposed rulemaking. *See Change in Rates VA Pays for Special Modes of Transportation*, 85

Petitioners did not forfeit any issues they raise here. Each of Petitioners' arguments is tethered to the comments, challenges one of VA's key assumptions, is strictly a matter of statutory interpretation, or is some combination of the same.

**B. VA's reading of §§ 1728 and 111 turns on irrelevant case law and runs contrary to the proper cannons of statutory construction**

VA reads § 111 to authorize the payment of the MFS amount for all ambulance transports covered under § 111 based on a previously unheard-of cannon of statutory construction that VA dubs congressional "shorthand."

VA's theory is that Congress enacted § 111(a) in 1958 to provide that the Secretary shall "pay the actual necessary expense of travel … of any person to or from a Department facility or *other place* … ." Veterans' Benefits, Pub. L. No. 85-857, § 111(a), 72 Stat. 1105, 1113 (Sept. 2, 1958) (emphasis added). Fifty-two years later, in 2010, Congress added the second sentence of § 111(a) to provide that the "[a]ctual necessary expense of travel includes the reasonable costs of airfare if travel by air is the only practical way to reach a Department facility." Caregivers and Veterans Omnibus Health Services Act of 2010, Pub. L. No. 111-163, § 305(b), 124 Stat. 1130, 1151 (May 5, 2010). Because Congress omitted the words "other place" from the second sentence of § 111(a) in 2010, and then from § 111(c)(3)(C) in 2011

---

Fed. Reg. 70,551 (Nov. 5, 2020) (Proposed Rule). Because Petitioners could not have raised the issue during the comment period, they did not forfeit the issue.

and 2012, VA argues that the words "other place" are supposedly congressional "shorthand" for the words "Department facility." Resp. Br. at 24-25. On this basis, VA argues that § 111(c)(3)(C) applies to all ambulance transports covered under both § 111 and § 1728. *Id*. at 27, 29-30.

The novel "shorthand" cannon is entirely made up and wilts under scrutiny. VA premises its purported cannon solely on *New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38, 54 (1st Cir. 2021) (cleaned up), in which the U.S. Court of Appeals for the First Circuit considered the Government's application of "the rule of the last antecedent," which "provides that a limiting clause should ordinarily be read as modifying only the noun or phrase that it immediately follows." Resp. Br. at 25-27. The Government applied the rule to a single sentence in the Wire Act that prohibits the use of the wires to transmit "bets or wagers or information assisting in the placing of bets or wagers *on any sporting event or contest*, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers … ." *New Hampshire Lottery Commission*, 986 F.3d at 45, 55-56 (citing 18 U.S.C. § 1084). The Government argued that the phrase "on any sporting event or contest" limited the scope of the first clause of the sentence, but not the second clause, which applied more broadly to bets or wages outside the context of sporting events or contests. *Id.*

The First Circuit disagreed, finding that the phrase "on any sporting event or contest" limited the scope of *both clauses in the same sentence*. *Id*., 57. The phrase "bets or wagers" in the second clause was "shorthand" for the phrase "bets or wagers … on any sporting event or contest" in the first clause of the same sentence because that interpretation avoided constitutional questions, as well as incongruous and absurd results in the application of both clauses. *Id*., 57-58. Nowhere in *New Hampshire Lottery Commission* did the First Circuit adopt a new cannon of construction where two distinct phrases are deemed "shorthand" when Congress repeats only one *in subsequent sentences or provisions of a statute*.

Furthermore, the text and structure of § 111 are radically different from the single sentence analyzed in *New Hampshire Lottery Commission*. The words "other place" are separated from the words "Department facility" by the word "or" in the first sentence of § 111(a), which shows that Congress distinguished "other place[s]" from "Department facilit[ies]." *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise; here it does not." (internal citations omitted)); *see also U.S. v. Woods*, 571 U.S. 31, 45-46 (2013) (citing *Reiter*); *Garcia v. U.S.*, 469 U.S. 70, 72 (1984) (same); *Viegas v. Shinseki*, 705 F.3d 1374, 1378 (Fed. Cir. 2013) (same).

The words "other place" are also broader than—and in no way limit or qualify—the words "Department facility" in the first sentence of § 111(a). When interpreting broad words, the "commonsense canon of *noscitur a sociss*" counsels that they be given more precise content by the neighboring words with which they are associated. *U.S. v. Williams*, 553 U.S. 285, 294-95 (2008). Here, the words "other place" should logically be read to include any "particular part of space" or "locality," *Place*, Webster's Dictionary (1958 edition), that is served by an ambulance but is not a "Department facility." Reading "other place" to mean "Department facility" is illogical and makes the words surplusage.

VA searches for supporting interpretive cues elsewhere in § 111, but there are none to be found. Initially, VA looks to the second sentence of § 111(a): "Actual necessary expense of travel includes the reasonable costs of airfare if travel by air is the only practical way to reach a Department facility." That sentence, however, deals with "airfare," meaning "the price to be paid by an aircraft passenger for a particular journey." *Airfare*, Oxford Dictionary of English 35 (2010). A conventional aircraft is not an ambulance under any relevant statute or VA regulation. *See* 38 C.F.R. 70.2. Veterans served by air ambulances dispatched through the 9-1-1 system during medical emergencies are patients of the air ambulances (not mere passengers). The second sentence of § 111(a) plainly reaches only commercial air travel to or from "a Department facility."

VA next looks to §§ 111(b)(1), (b)(2), (b)(3)(A), and (b)(3)(B), which apply to payments that VA makes under § 111. Resp. Br. 24-26. Sections 111(b)(1) and (b)(2) establish the terms and conditions for VA coverage for travel—including "travel to or from a Department facility" that is "medically required to be performed by a special mode of travel"—for specific categories of veterans and other persons. Sections (b)(3)(A) and (b)(3)(B) establish additional terms and conditions for VA coverage for travel performed by any one of the numerous special modes of travel, including ambulances. In contrast to the coverage language in §§ 111(b)(3)(A) and (b)(3)(B), § 111(b)(3)(C) enables VA to choose to pay either one of two rates for transportation to or from a Department facility by ambulance.

The establishment of terms and conditions for coverage in §§ 111(b)(1), (b)(2), (b)(3)(A), and (b)(3)(B) says nothing about how broadly the discretionary rate authority in § 111(b)(3)(C) applies to the range of ambulance transports that VA covers under § 111. *Cf. Lone Star OB/GYN Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 530-31 (5th Cir. 2009) (distinguishing between coverage and rate for healthcare services in ERISA context). None of the subsections of § 111 support VA's interpretation of "other place" as "shorthand" for "Department facility."

VA's "longstanding regulatory practice" is likewise devoid of interpretive cues that support VA's argument. VA notes that its regulation at 38 C.F.R. § 70.10(a) and the VHA Beneficiary Travel Handbook have recognized since 2008 that

beneficiary travel benefits are available to any veteran "who travels to or from a VA facility or VA authorized health care facility." Resp. Br. at 27. The dispute is not whether these benefits are available, but whether VA has the statutory authority to pay the lower MFS amount for ambulance transports to or from "other place[s]," including VA-authorized health care facilities. The recognition of travel benefits in the VA regulations and guidance says nothing about how broadly the rate authority in § 111(b)(3)(C) applies across the ambulance transports covered by VA.

In short, the text of § 111 is unambiguous and consistent with the structure of the statute. Section 111(a) authorizes payment of "the actual necessary expense of travel … of any person to or from a Department facility or other place" on the terms and conditions set out in § 111(a), (b)(1), (b)(2), (b)(3)(A), and (b)(3)(B). When the terms or conditions are met, the authority to pay the lower MFS amount established in § 111(b)(3)(C) extends *only* to ambulance transports to or from "a Department facility." The interpretation of § 111 thus ends at the first step of the analysis under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

So does the analysis of § 1728. VA argues that its interpretations of §§ 1728 and 111 are harmonious because § 1728(a) says beneficiary travel is covered "under the terms and conditions set forth in section 111," and § 111(b)(3)(C) sets out terms and conditions for coverage. Resp. Br. at 29. But that is plainly incorrect; VA covers beneficiary travel under § 111(a), (b)(1), (b)(2), (b)(3)(A), and (b)(3)(B), but not §

111(b)(3)(C), which gives VA limited authority to pay the MFS amount for ambulance transports to or from Department facilities. The rate that VA pays for that subset of ambulance transports under § 111(b)(3)(C) has no bearing on the VA coverage of ambulance transports under other subsections of § 111.

VA argues alternatively that Congress "in effect" determined in § 111(b)(3)(C) that the MFS amount is "the reasonable value of emergency treatment" under § 1728(b). Resp. Br. at 29-30. But the phrase "reasonable value" appears nowhere in § 111. Section 111(b)(3)(C) only authorizes VA to make a non-arbitrary and non-capricious choice between paying the actual charge and the MFS amount for a defined subset of covered ambulance transports. In 2018, seven years after enacting § 111(b)(3)(C), Congress ordered a whole-of-government review of the sufficiency of the MFS amount for ground ambulance providers in the Medicare program. Bipartisan Budget Act of 2018 (BBA), Pub. L. No. 115-123, § 50203, 132 Stat. 64, 178, (Feb. 9, 2018). VA's argument that Congress forever blessed the most current MFS amount as "the reasonable value of emergency treatment" for veterans under all circumstances for all time cannot be right as a matter of law or fact.

Nowhere in the Final Rule does VA find that the current MFS amount is the "reasonable value of emergency treatment" for ground ambulance providers in VA programs under § 1728. The fact that VA could not bring itself to find in its own rule

that the MFS amount is the "reasonable value of emergency treatment" underscores that its position at *Chevron* step one lacks merit.

### C. The final rule still violates the APA because it is arbitrary and capricious

#### 1. *Even now, VA fails to display awareness that it changed its interpretation of § 1728, much less show good reasons for the change*

VA agrees that it must display awareness and provide good grounds for any change in its legal interpretation of § 1728 to comply with its obligations under the APA. VA argues, however, that it did not change its interpretation. Resp. Br. at 30.

VA first posits that it was Congress, not VA, that changed VA's legal interpretation when Congress enacted § 111(b)(3)(C) in 2011. Resp. Br. at 30. But Congress enacted § 111(b)(3)(C) without touching § 1728 and has not amended the relevant parts of § 1728 since. Moreover, since the enactment of § 111(b)(3)(C), VA's policy has been to pay the "reasonable value of emergency treatment" under § 1728 by reimbursing ambulance providers' claims at "[g]enerally billed charges." *See* Appx1403-1404. VA has now published a Final Rule stating that VA will reimburse nearly all such claims at the MFS amount, without acknowledging its underlying re-interpretation of § 1728. Congress did not publish the Final Rule. Nor did it authorize VA to disregard its obligations under the APA.

VA next asks the Court to ignore VA's prior interpretation of § 1728 because it was revealed through a fact sheet. VA admits that the fact sheet is a "summary of relevant VHA policies" that "cites Section 1728 in stating that VHA pays for …

unauthorized emergency transportation at '[g]enerally billed charges.'" *See* Resp. Br. at 31. To avoid the problem that raises, VA argues that the fact sheet "is an informational document that does not purport to set official Government policy." *Id*. The APA, however, authorizes agencies to issue interpretive rules and statements of policy through informal guidance documents. *See* 5 U.S.C. § 553(d)(2); *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). Also, the informality of such documents is immaterial when the Government admits the policy or rule existed. *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (finding that USCIS had to acknowledge its change to policy that it set forth in lesson plan).

VA cannot cure the procedural defect in the Final Rule by pointing to the existence of § 111(b)(3)(C). The Final Rule is still arbitrary and capricious.

2. *VA's parsing of the Secretary's RFA certifications highlights the arbitrariness and capriciousness of the certifications*

VA asserts that Petitioners' challenge to the Secretary's certifications under the RFA are nothing more than second-guessing of VA's unreviewable cost-benefit analyses under Executive Order No. 12,866. Not so.

The Secretary certified that neither the Proposed nor the Final Rule would have a significant economic impact on a substantial number of small entities. He based the certifications on the Chief Economists' assumptions in Regulatory Impact Analyses (RIAs) that all ambulance providers "would bear VA's cost avoidance equally." VA posits that the assumption that providers would bear the aggregate cost

avoidance equally is reviewable, but the calculations of the aggregate cost avoidance are not,[3] and Petitioners are not challenging the equal allocation of the aggregate cost avoidance. Resp. Brief at 34-36. That argument is too cute by half.

The Chief Economists determined there was no significant impact on a substantial number of small entities in four steps. First, they calculated the aggregate cost avoidance. Second, they assumed that all ambulance providers would bear the aggregate cost avoidance equally. Third, they estimated the resulting per entity burden "to be less than 1% of preliminary receipts." Fourth, they found that impacts of less than 1% of preliminary receipts were insignificant. *See* Appx1325, Appx1493. The Chief Economists could not have judged the significance of those impacts without first calculating and then allocating the aggregate cost avoidance. The calculations *and* allocations of the aggregate cost avoidance must both be reviewable because they are integral parts of the overall determinations.

What is more, Petitioners are challenging the Chief Economists' assumptions that all ambulance providers would bear the aggregate cost avoidance equally. Pet. for Review at 17-18 ("[T]he RIA simply allocated the projected economic impact across all providers and failed to consider whether the providers are large or small,

---

[3] VA suggests that Petitioners challenge the lawfulness of the agency's analyses under EO 12,866. Petitioners do not; they merely point out that VA bypassed certain analyses under EO 12,866 that would have fully ventilated the problems with the RIAs that tainted the Secretary's RFA certifications.

serve rural or urban areas, or offer emergent or non-emergent transports.”); Pet. Brief at 29 (“[T]he Chief Economist assumed without examination or explanation that ambulance providers *are fungible* and uniformly able to absorb a 1% reduction in preliminary receipts.” (emphasis added)). The claim that Petitioners have failed to dispute those assumptions in this litigation is flatly wrong.

VA argues in the alternative that the Secretary’s RFA certifications pass muster because VA made “a reasonable, good faith effort to carry out the mandate of the RFA.” Resp. Br. at 35. But the calculations of aggregate cost avoidance were anything but reasonable when VA ignored its own data showing that the total provider charges and reduction in payments were off by a factor of more than five. Appx1779. The calculations of the per-entity burden were also off by a factor of five because VA based them on the calculations of aggregate cost avoidance. The apparent result of ignoring the data is an increase in the per-entity burden from approximately 1% to 5% of preliminary receipts. VA has not even acknowledged an increase, much less said whether the resulting per-entity burden is significant. VA’s use of bad data to calculate wildly inaccurate figures—and its ongoing use of those figures to justify its Final Rule—is textbook arbitrary and capricious conduct.

VA’s fallback argument is that differences between ambulance providers—which should have been considered when allocating the aggregate cost avoidance—were “tangential matters that [VA] had no occasion to consider during the

rulemaking." Resp. Br. at 36-67. That argument is wrong too. In the Final Rule, one commenter warned that payment of the MFS amount would "increasingly impact low-volume rural areas and other areas with a higher portion of Medicare and Medicaid beneficiaries, as well as VA beneficiaries." Appx3. VA itself stated that it might contract with ambulance providers when "different rates may be justified based on local considerations." *Id.*, Appx4. The differences between ambulance providers were front and center during the rulemaking process, and were ignored not only by the Chief Economists, but also by the Secretary himself.

The Secretary's RFA certifications are arbitrary and capricious because they are based on bad data and an unexplained and unfounded assumption regarding the allocation of aggregate cost avoidance across ambulance providers.

3. *VA's argument that Congress freed the agency from reasoned decision making in § 111(b)(3)(C) would upend the APA*

Congress made final agency actions judicially reviewable under the APA, except to the extent that a statute precludes judicial review, or the agency action is committed to agency discretion by law. 5 U.S.C. §§ 701(a)(1)-(2). Congress thus established "a basic presumption of judicial review for one suffering legal wrong because of an agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). "The presumption can only be overcome by clear and convincing evidence of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (same). The

Supreme Court reads the exception for agency action committed to agency discretion "quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Regents*, 140 S. Ct. at 1981 (same).

Here, VA argues that its decision to pay the MFS amount is effectively unreviewable because Congress imposed express conditions on VA's decision making in § 111, but not specifically in § 111(b)(3)(C). *See* Resp. Br. at 39. The identification of express conditions on VA's decision making in another subsection of § 111 comes nowhere close to rebutting the presumption of judicial review of VA's decisions under § 111(b)(3)(C). *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 601 (2016) (express judicial review provisions did not rebut presumption of judicial review under the APA); *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 782 (1985) (same). The argument that the absence of express conditions defeats judicial review would upend the APA and well-settled Supreme Court precedent. The Court should reject it out of hand.

VA argues in the alternative that the Final Rule is neither arbitrary nor capricious because it was published through notice-and-comment rulemaking. Resp. Br. at 40. But VA had an obligation to conduct rulemaking. 38 U.S.C. § 502; 5 U.S.C. § 553. The fulfillment of that obligation does not free VA from the APA requirement that the Final Rule be neither arbitrary nor capricious.

VA has not and cannot satisfy the APA. With the Final Rule, VA has chosen to pay the MFS amount without conducting any analysis of the sufficiency of that amount for ambulance providers in VA programs. VA chose to use the MFS amount even as the Government is conducting a multi-year assessment of the sufficiency of the MFS amount for ambulance providers in the Medicare program, under the BBA. VA never grappled with the fact that Congress questioned the sufficiency of the MFS amount for Medicare providers *by enacting the BBA*. Instead, VA donned blinders and stated that it would implement any future changes to the MFS without rulemaking. The APA requires more than willful blindness to the BBA. The Court should vacate the Final Rule because there is barely any reasoning behind it.

4. *VA still fails to consider its obligations under the Veterans Community Care Program*

Under the Veterans Community Care Program, VA must "coordinate the furnishing of hospital care, medical services, and extended care services" to "ensur[e] continuity of care and services[,]" and "that covered veterans do not experience … an unusual or excessive burden in accessing hospital care, medical services, or extended care services." 38 U.S.C. §§ 1703(a)(2)(B), (D). To meet that obligation, VA currently pays for certain ground ambulance transports at "billed charges." Appx1403-1404. Petitioners argued that VA failed to consider an important part of the problem: whether reducing payments to the MFS amount would

force ground ambulance providers to reduce services, ultimately reducing access and continuity of care for veterans under the Veterans Community Care Program.

VA's counterargument misses the boat entirely. VA cites the 2013 MedPac report, and says, VA "has no reason to doubt that the same level of ambulance services would be provided to veterans regardless of the payment source or amount of payment for ambulance services." Resp. Br. at 42. The MedPac report, however, is now a decade old and scarcely addresses the sufficiency of the MFS amount. Also, the concern is not that ground ambulance providers will single out and deliver lower-level care to veterans. The concern is that ground ambulance providers will reduce their service areas, or stop service altogether, to the detriment of all patients, including veterans. VA's continuing misunderstanding of this important part of the problem confirms that the Final Rule is arbitrary and capricious.

5. *VA's responses to comments do not show how VA ventilated the major policy issue of rural access and provider contracting*

VA acknowledges that providers submitted relevant and significant comments expressing their concern that payment of the MFS amount would reduce veterans' access to ground ambulance services in rural areas. VA replied that Congress and Centers for Medicare and Medicaid Services (CMS) found the MFS amount sufficient, and baldly acknowledged provider contracting as an option for preserving access, which VA considers a sufficient response under the APA.

But "an agency must respond sufficiently to enable us to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Del. Dep't of Nat. Res. and Envtl. Control v. E.P.A.,* 785 F.3d 1, 15 (D.C. Cir. 2015) (cleaned up). It must "engage with the commenters' … argument." *Id*. It cannot "seek[] to excuse its inadequate responses by passing the entire issue off onto a different agency. Administrative law does not permit such a dodge." *Id*. (citing *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C.Cir. 1987) (per curiam)).

The D.C. Circuit applied these standards in *Delaware Department of Natural Resources* to find that "wan responses" to commenters violated the APA. The commenters argued that an EPA rule "threaten[ed] the efficiency and reliability of the energy markets by creating incentives for backup generators to … force out more efficient, traditional power generators." *Id*., 14. EPA rejected the notion that EPA was responsible for managing market competition and characterized the market competition argument as an environmental concern. *Id*., 15. Because EPA failed to engage with the argument, the D.C. Circuit vacated the rule. *Id*.

VA's responses here were similarly "wan." VA passed the issue of the sufficiency of the MFS amount for rural areas off onto Congress and CMS. Then VA acknowledged provider contracting as an option for preserving rural access, without allowing the public to see how VA ventilated the major policy issue of rural access and provider contracting, and why VA reacted to the issue the way it did.

VA's failure to sufficiently respond to comments was a harbinger of things to come. As Petitioners pointed out in their opening brief, VA has now disclosed that 78% of all VA dollars paid to ambulance providers are for 9-1-1 initiated ground ambulance transports, and VA is not contracting for such transports. Pet. Brief at 35 (citing Appx1721). At a bare minimum, VA should have disclosed in its Proposed Rule and in its responses to comments in its Final Rule that it planned to forego provider contracting for 78% of its total ambulance spend and explained why. The failure to do so was arbitrary and capricious.[4]

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Final Rule is not in accordance with law and is arbitrary and capricious. The Court should set aside the Final Rule under the APA, and remand to VA.

---

[4] VA invites the Court to disregard VA's disclosure of its policy on provider contracting for 9-1-1-initiated ground ambulance transports because the disclosure came after the Final Rule. To do so would frustrate judicial review of VA's responses to comments on the major policy issue of rural access and provider contracting. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). The Court should reject the invitation.

May 8, 2024

Respectfully submitted,

*/s/ Brian Stimson*

Brian R. Stimson
D.C. Bar No. 1657563
Sara M. Lord
MA Bar No. 546918
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C. 20037
Main: (202) 677-4030
Email: Brian.Stimson@agg.com
Sara.Lord@agg.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2024, I caused a copy of the foregoing Reply Brief to be served via CM/ECF upon the following:

Director, Commercial Litigation Branch, Civil Division
U.S. Department of Justice
c-natcourts.appeals@usdoj.gov
United States Department of Justice
Commercial Litigation Branch, Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044

*/s/ Brian Stimson*
Brian R. Stimson
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, D.C. 20037
Main: (202) 677-4030
Email: Brian.Stimson@agg.com

*Counsel for Petitioners*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1104

**Short Case Caption:** Metropolitan Area EMS Authority v. Secretary of Veterans Affairs

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 5,921 words.

- ☐ the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

- ☐ the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 05/08/2024

Signature: /s/ Brian R. Stimson

Name: Brian R. Stimson

Save for Filing