No. 24-1104

# United States Court of Appeals
# for the Federal Circuit

---

METROPOLITAN AREA EMS AUTHORITY, aka MedStar Mobile
Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY
AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE
MEDICAL EMERGENCY DEPARTMENT AUTHORITY, dba AMED,

*Petitioners,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

## CORRECTED JOINT APPENDIX

---

BRIAN R. STIMSON
SARA LORD
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, D.C.
Tel.: (202) 677-4030
brian.stimson@agg.com
sara.lord@agg.com

*Counsel for Petitioners*

| Document Description | Page |
| --- | --- |
| VA Notice of Final Rulemaking — Change in Rates VA Pays for Special Modes of Transportation, RIN 2900-AP89, 88 FR 10032 (February 16, 2023) | Appx1 |
| VHA Handbook 1601B.05, Beneficiary Travel, July 23, 2010 | Appx26 |
| Excerpts From FY 2013 Funding and FY 2014 Advance Appropriations Request, Medical Programs and Information Technology Programs, Volume II | Appx798 |
| Department of Veterans Affairs, Office of Inspector General, Veterans Health Administration, The Beneficiary Travel Program, Special Mode of Transportation, Eligibility and Payment Controls, Report No. 15-0022-139, May 7, 2018 | Appx1229 |
| VA Unified Agenda of Federal Regulatory and Deregulatory Actions – Semiannual Regulatory Agenda, 84 Fed. Reg. 71,185 (December 26, 2019) | Appx1320 |
| Regulatory Impact Analysis, Change in Rates that VA Pays for Special Modes of Transportation, RIN 2900-AP89(P), October 28, 2020 | Appx1321 |
| VA Notice of Proposed Rulemaking — Change in Rates VA Pays for Special Modes of Transportation, RIN 2900-AP89, 85 Fed. Reg. 70,551 (November 4, 2020) | Appx1326 |
| Congressional Response Letters regarding November 4, 2020 Proposed Rule:<br>(1) From Senators Tester, Hickenlooper, Hirono, and Schatz, September 19, 2022<br>(2) From Senators Heinrich and Boozman, October 27, 2022<br>(3) From Senator Daines, November 17, 2022<br>(4) From Senator Bennet, December 9, 2022<br>(5) From Senator Moran, December 15, 2022 | Appx1330 |

4857-8911-4302.v2

| | |
|---|---|
| VA Response to Congressional Letters regarding November 4, 2020 Proposed Rule:<br>　(1) To Senator Tester, January 17, 2023<br>　(2) To Senator Schatz, January 17, 2023<br>　(3) To Senator Hirono, January 17, 2023<br>　(4) To Senator Hickenlooper, January 17, 2023<br>　(5) To Senator Heinrich, January 17, 2023<br>　(6) To Senator Boozman, January 17, 2023<br>　(7) To Senator Daines, January 17, 2023<br>　(8) To Senator Bennet, January 17, 2023<br>　(9) To Senator Moran, January 17, 2023 | Appx1339 |
| Public Comments on November 4, 2020 Proposed Rule:<br>　(1) From Carolyn Mayle, Air Methods Corporation, Document ID: VA-2020-VHA-0022-0008<br>　(2) From Debbie Cavalry, PHA, Inc., Document ID: VA-2020-VHA-0022-0003<br>　(3) From Cameron Curtis and Deborah Boudreaux, The Association of Air Medical Services (AAMS), Document ID: VA-2020-VHA-0022-0007<br>　(4) From Christopher Hall, PHI Health, LLC, Document ID: VA-2020-VHA-0022-0006<br>　(5) From Anonymous, Document ID: VA-2020-VHA-0022-0004<br>　(6) From Kimberly Cox, Document ID: VA-2020-VHA-0022-0005 | Appx1357 |
| VHA, Office of Community Care, Ambulance Transportation Fact Sheet, November 3, 2021 | Appx1403 |
| Letter from Congressmembers Kirkpatrick, Bacon, Bentz, and Gallego, August 8, 2022 | Appx1405 |
| Letter from Brad Gerfin, Deputy Chief of Medical Operations, and Robert Ridgeway III, Medical Control Physician, Clarendon County Fire Rescue, November 8, 2022 | Appx1427 |
| Letter from Ron Sattelmaier, Fire Chief-Paramedic, Water Wheel Fire & Medical District, November 11, 2022 | Appx1428 |

| | |
|---|---|
| Letter from Congressmember Allred, December 20, 2022 | Appx1487 |
| Regulatory Impact Analysis, Change in Rates that VA Pays for Special Modes of Transportation, RIN 2900-AP89(P), January 5, 2023 | Appx1489 |
| VA Response Letter to Congressmember Allred, January 19, 2023 | Appx1499 |
| VA Response Letter to Jack Du Teil, President, The Military Coalition, January 19, 2023 | Appx1501 |
| VA Response Letter to American Ambulance Association, January 20, 2023 | Appx1503 |
| VA Response Letter to Ron Sattelmeir, Fire Chief — Paramedic, Water Wheel Fire and Paramedic District, January 20, 2023 | Appx1505 |
| VA Response Letter to Carol Kolson, President/CEO, Mesquite Chamber of Commerce, January 20, 2023 | Appx1507 |
| Letter from Congressman Bishop, Jr., February 9, 2023 | Appx1509 |
| Letter from Senators Tester and Moran, February 15, 2023 | Appx1511 |

4857-8911-4302.v2

| Materials Outside the Rulemaking Record | |
|---|---|
| Document Description | Page |
| Excerpts from transcript of VA Industry Day, July 20, 2023 | Appx1524 |
| Excerpts from transcript of VA Industry Day, August 30, 2023 | Appx1696 |
| VA Industry Day Presentation, May 25, 2023 | Appx1764 |
| VA Freedom of Information Act (FOIA) Response, August 18, 2023 | Appx1776 |

| Fed. Cir. R. 30(a)(1)(A)(i) – Certified List | |
|---|---|
| Document Description | Page |
| Index of rulemaking record filed by Secretary of Veterans Affairs pursuant to Fed. Cir. R. 17(b)(3) | Appx1782 |

add, in their places, the text "electronic submittals" and "*https://www.uscg.mil/ HQ/MSC*", respectively.

### § 162.018–8    [Amended]

■ 50. In § 162.018–8(a), remove the text "submitting the VSP electronically" and "*http://www.uscg.mil/HQ/MSC*" and add, in their places, the text "electronic submittals" and "*https://www.uscg.mil/ HQ/MSC*", respectively.

### § 162.050–7    [Amended]

■ 51. In § 162.050–7(a), remove the text "submitting the VSP electronically" and "*http://www.uscg.mil/HQ/MSC*" and add, in their places, the text "electronic submittals" and "*https://www.uscg.mil/ HQ/MSC*", respectively.

## PART 163—CONSTRUCTION

■ 52. The authority citation for part 163 is revised to read as follows:

**Authority:** 46 U.S.C. 3306, 3703; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

## PART 173—SPECIAL RULES PERTAINING TO VESSEL USE

■ 53. The authority citation for part 173 is revised to read as follows:

**Authority:** 43 U.S.C. 1333; 46 U.S.C. 2113, 3306, 5115; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

■ 54. In § 173.095, revise the equations in paragraphs (b) and (d) to read as follows:

### § 173.095    Towline pull criterion.

\* \* \* \* \* \*

(b) \* \* \*

$$GM = \frac{(N)(P \times D)^{2/3}(s)(h)}{K\Delta(f/B)}$$

\* \* \* \* \*

(d) \* \* \*

$$HA = \frac{2\,(N)(P \times D)^{2/3}(s)(h)(\cos\theta)}{K\Delta}$$

\* \* \* \* \*

## PART 178—INTACT STABILITY AND SEAWORTHINESS

■ 55. The authority citation for part 178 is revised to read as follows:

**Authority:** 43 U.S.C. 1333; 46 U.S.C. 2103, 3306, 3703; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; DHS Delegation No. 00170.1, Revision No. 01.3.

### § 178.450    [Amended]

■ 56. In § 178.450(a), remove the text "Basis Drainage" and add, in its place, the text "Basic Drainage".

Dated: January 25, 2023.

**Michael Cunningham,**
*Chief, Office of Regulations and Administrative Law.*

[FR Doc. 2023–01938 Filed 2–15–23; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 70

### RIN 2900–AP89

### Change in Rates VA Pays for Special Modes of Transportation

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** The Department of Veterans Affairs (VA) amends its beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology will apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA will pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare and Medicaid Services. For travel by modes other than ambulance, VA will establish a payment methodology based on States' posted rates or the actual charge.

**DATES:** The rule is effective February 16, 2024.

**FOR FURTHER INFORMATION CONTACT:** Ben Williams, Director, Veterans Transportation Program (15MEM), Veterans Health Administration, Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420, (404) 828–5691. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:** Pursuant to section 111 of title 38 United States Code (U.S.C.), VA provides beneficiary travel benefits to eligible individuals who need to travel in connection with vocational rehabilitation, counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care. Regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) are in part 70 of title 38 Code of Federal Regulations (CFR). Under part 70, VA has established limiting criteria to pay for a

"special mode of transportation" when that travel is medically required, the beneficiary is unable to defray the cost of that transportation, and VHA approved the travel in advance or the travel was undertaken in connection with a medical emergency. See 38 CFR 70.2 (defining the term "[s]pecial mode of transportation"), and 38 CFR 70.4(d) (establishing criteria for approval of special mode travel).

On November 5, 2020, VA proposed amending its beneficiary travel regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C), which permits VA to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Centers for Medicare and Medicaid (CMS) Medicare Part B Ambulance Fee Schedule (hereafter referred to as the CMS ambulance fee schedule) established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)), unless VA has entered into a contract for that transportation. Additionally, VA proposed to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services, which would be used while VA collects data for the purpose of developing a new payment methodology. See 85 FR 70551. We provided a 60-day comment period that ended on January 4, 2021, and we received six comments, five of which were substantive. Those five comments all raised similar concerns to 38 CFR 70.30(a)(4) introductory text and (a)(4)(i) and (ii) as proposed, related to using the CMS ambulance fee schedule or the posted rates from each State. We first clarify one aspect of the regulation for the commenters in general, and then address more specific concerns of the individual commenters as applicable (we note that we refer to issues raised by a "commenter" or "commenters" below). Based on the summary and responses below, we adopt the proposed rule as final with two nonsubstantive changes.

After the close of the comment period, VA received several Congressional letters that expressed some concerns also raised in comments. At Congress' request, VA also attended four meetings with members of Congress and their staff between December 20, 2022, and December 22, 2022, during which VA outlined the terms of the proposed rule.

## General Clarification for Commenters

At the outset of our responses, we note that we read the commenters' assertions to rely on the assumption that the proposed rule would create a scenario where VA in all cases will shift from paying billed charges to instead paying amounts derived from the CMS ambulance fee schedule. We first clarify that § 70.30(a)(4)(i) as proposed would only provide that VA pay the lesser of actual charges or the rates determined under the CMS ambulance fee schedule if VA has not otherwise entered into a contract with a vendor of special mode transportation (to include ambulance transport) as provided in § 70.30(a)(4) as proposed. Therefore, VA's payment of rates as determined under the CMS ambulance fee schedule, to the extent they would be lesser than actual charges under § 70.30(a)(4)(i) as proposed, is only enabled if VA has not otherwise entered into a contract under § 70.30(a)(4) as proposed. If VA enters into a contract under § 70.30(a)(4), such contract could provide for an agreed rate that may be different than the CMS ambulance fee schedule. Therefore, it is not an accurate assumption that in all cases VA will pay rates that result from the CMS ambulance fee schedule. We make this clarification so that our additional responses below can be understood in that context.

## Specific Concerns Raised by Individual Commenters

One commenter asserted that VA using Medicare rates for ambulance transports is a bad idea because those rates are below what it actually costs to transport patients, and subsequently that VA would receive horrible service and veterans would suffer. Further, the commenter asserted that if a patient is not Medicare covered or is under the age of 65, the rates for ambulance transports should be higher, and that each hospital (we assume the commenter was referring to each VA medical facility) should instead enter into contracts with agreed upon rates.

Regarding the assertion that Medicare rates are inadequate to cover the actual costs of ambulance transport, we do not make changes from the proposed rule. Congress granted VA the discretion in 38 U.S.C. 111(b)(3)(C) to use the CMS ambulance fee schedule as part of VA's methodology to calculate ambulance payments, ostensibly finding such schedule to be sufficient. Further, in its most recent ambulance report, the Medicare Payment Advisory Commission (MedPAC), *www.medpac.gov*, found that, in aggregate, Medicare ambulance margins were adequate, and VA has no cause or expertise to challenge that finding. Regarding the assertion that VA's use of the CMS ambulance fee schedule would result in bad service for VA and veterans, VA is not aware of, and the commenter did not provide evidence to demonstrate that veterans are currently receiving preferential treatment from ambulance providers by virtue of VA paying billed charges or that such preferential treatment would stop were VA to pay CMS ambulance fee schedule rates in the absence of a contract. Additionally, that assertion would assume that ambulance carriers and operators do not apply their professional certification or other standards and ethics in all cases regardless of whether an individual is a veteran, which VA does not believe to be the case. VA has no reason to doubt that the same level of ambulance services would be provided regardless of the payment source or amount of payment for ambulance services.

Regarding the assertion that there should be higher rates paid for ambulance for individuals who are not covered by Medicare or who are below the age of 65, we do not make any changes from the proposed rule. VA does not adopt multiple rate structures or schedules that are dependent on age or other health insurance coverage as VA health care benefits are not private insurance. Rather, VA benefits are created by statute and administered by regulations, through which VA pays for certain services provided to individuals who meet the administrative eligibility and other clinical criteria, without regard to factors such as age. Regarding the assertion that VA medical facilities should contract for adequate rates, we do not make any changes from the proposed rule and reiterate from our responses above that VA will retain the authority in this final rule to enter into contracts with ambulance providers and pay the agreed-upon negotiated rate. We make no changes to the regulation based on this comment.

One commenter, a provider of air ambulance transport, asserted that VA's proposed change to use the CMS ambulance fee schedule would hinder their ability to continue to serve rural areas because the CMS ambulance fee schedule reimburses less than 50 percent of their operational costs, which would cause a loss of several millions of dollars for their company and would impact the rest of emergency air medical services provided throughout the United States. This commenter further asserted that, although they have submitted comments to CMS to review and adjust air ambulance rates under the CMS ambulance fee schedule, such adjustments have not occurred in a manner to keep up with increased costs in providing this transport. The commenter opined that this lack of adjustment in CMS ambulance fee schedule rates, combined with the

**10034**    **Federal Register** / Vol. 88, No. 32 / Thursday, February 16, 2023 / Rules and Regulations

effects that COVID–19 has had in increasing transport costs and deteriorating their payer mix, make their provision of services less sustainable.

Regarding the commenter's assertions that the rates determined under the CMS ambulance fee schedule are inadequate and would hinder their ability to serve rural areas, and that CMS should adjust their ambulance fee schedule in any particular manner, we are not making any changes from the proposed rule. VA cannot modify or increase the CMS ambulance fee schedule rates. We further reiterate that § 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation (to include air ambulance transport), and the terms of that contract would govern the payment rates for such transport. Such contracts could provide for a different rate as agreed, in the event that VA determined it may be justified based on local considerations, such as for rural areas, or to include any additional consideration of difficulties presented during the COVID–19 pandemic. Regarding the assertion that changes in the final rule to permit VA to pay the lesser or the billed charges or the CMS ambulance fee schedule rates would have a detrimental effect on their business we do not make changes from the proposed rule but rely on the Regulatory Flexibility Act section of the proposed rule where VA has estimated there will not be a significant economic impact on vendors of ambulance services because the potential impact per vendor has been estimated to be less than 1 percent of their annual reported receipts, using North American Industry Classification System (NAICS) Code 62910. Therefore, in addition to the ability for ambulance providers to contract with VA for potentially different rates under the final rule, VA has analyzed that any potential effect on ambulance providers would not be significant. We make no changes to the regulation based on this comment.

One commenter, also a provider of air ambulance transport, more specifically asserted that indexing government reimbursement to the CMS ambulance fee schedule was a gross miscalculation that is poorly timed, as this fee schedule is flawed and cutting reimbursement rates during a global pandemic is unconscionable. This commenter urged that, rather than cutting reimbursements for air ambulance care for veterans, VA should work with the Department of Health and Human Services (HHS) to reform the CMS ambulance fee schedule to bring rates closer to actual costs of providing the service. We do not make any changes to the rule as proposed

based on this comment. We restate from our responses above that we believe VA's use of this schedule is appropriate. Regarding the assertion that it is poor timing for VA to implement this change during the COVID–19 pandemic, we reiterate that § 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation to provide for different rates as VA determines may be justified based on local considerations (for instance, to address any difficulties due to the COVID–19 pandemic). Regarding the assertion that CMS should adjust their ambulance fee schedule in any particular manner, or that VA should engage with HHS to reform this schedule, we do not make changes from the proposed rule as those subjects are beyond the scope of the proposed rule.

One commenter, a trade association representing providers of air ambulance services, offered more specific data regarding the background of air ambulance transport in support of establishing actual costs, as well as background on the establishment of the CMS ambulance fee schedule in support of the assertion that the schedule has not been adjusted appropriately to keep up with actual costs. This commenter also more specifically asserted that, should VA move to parity with the CMS ambulance fee schedule, the cost of uncompensated care will only increase, furthering the increased costs shifted to commercial payors or, should those costs not be covered, leading to the increased closure of air ambulance bases, which would increasingly impact low-volume rural areas and other areas with a higher portion of Medicare and Medicaid beneficiaries, as well as VA beneficiaries. This commenter also expressed concern that any effort by the government to limit payments during the global health crisis presented by COVID–19 may be disastrous and have far-reaching consequences for the healthcare and emergency medical systems. Ultimately, this commenter urged VA to delay the implementation of this proposal and revisit the proposed changes only after appropriate data has been collected and analyzed by CMS to determine a fair reimbursement rate, and to otherwise delay any decision to limit payments to providers until the end of the COVID–19 pandemic.

We do not make any changes from the proposed rule based on this commenter's assertions. Regarding the assertions that CMS rates are inadequate, we restate that Congress granted VA the discretion in 38 U.S.C. 111(b)(3)(C) to use the CMS ambulance fee schedule as part of VA's

methodology to calculate ambulance payments (ostensibly finding such schedule to be sufficient), and VA has no cause to question the most recent MedPAC report finding that Medicare ambulance margins were adequate.

Regarding the assertion that VA should delay implementation of § 70.30(a)(4) until more data can be collected by CMS to adjust their ambulance fee schedule, the comment alluded to ''recent legislation passed by Congress'' that ''will create a federal database of air ambulance costs which we hope will allow for CMS to modernize the current'' ambulance fee schedule. We believe the comment may be referencing provisions of title I (No Surprises Act) and title II (Transparency) of Division BB of the Consolidated Appropriations Act (CAA), 2021 (Pub. L. 116–260). We are aware of a notice of proposed rulemaking published on September 16, 2021 (86 FR 51730), that would implement certain provisions of title I (No Surprises Act) and title II (Transparency) of Division BB of the CAA. Among other things, this proposed rule would increase transparency by requiring group health plans and health insurance issuers in the group and individual markets, and Federal Employee Health Benefits carriers, to submit certain information about air ambulance services to the Secretaries of Health and Human Services (HHS), Labor, and the Treasury, and the Director of the Office of Personnel Management, as applicable, and by requiring providers of air ambulance services to submit certain information to the Secretaries of HHS and Transportation. The information submitted under this proposed rule will include specific elements outlined in law that are necessary for HHS, along with the Department of Transportation, to develop a comprehensive public report on air ambulance services. VA does not have a clear understanding as to how this public report would be used, or whether HHS or CMS may use the report or any product of the required reporting under the proposed rule to determine (as we believe is suggested by the commenter) whether changes to the ambulance fee schedule are warranted.

Because VA does not have a sense of whether changes to the CMS ambulance fee schedule could be pending as suggested by the commenter, VA will not delay the implementation of this final rule until such time as any changes to CMS ambulance rates may occur. We note that because VA is referencing the CMS fee schedule in general in this regulation and not the specific amount

that is currently established in the CMS fee schedule, any changes to the CMS rates will be automatically applicable without the need for future rulemaking. VA will, however, delay the effective date of this final rule until February 16, 2024, to ensure that ambulance providers have adequate time to adjust to VA's new methodology for calculating ambulance rates. Such adjustment could include ambulance providers entering into negotiations with VA to contract for payment rates different than those under the CMS fee schedule.

Regarding the assertion that VA should delay implementation of § 70.30(a)(4) until the end of the COVID–19 pandemic, VA is not in a position to know when that time may be, although as stated above VA will delay the implementation of the final rule to provide additional time for vendors of special mode transportation who are concerned with the CMS fee schedule to enter into a contract with VA. Such contracts could provide for a different rate, in the event that VA determined different rates may be justified based on local considerations (to include any additional difficulties presented during the COVID–19 pandemic, or for rural areas as the commenter asserted such areas could be disproportionately affected).

One commenter asserted that some of the information presented in the proposed rule would make it more difficult for patients to access transportation assistance, and specifically opposed the payment methodology in proposed § 70.30(a)(4) for travel by modes other than ambulance. The commenter noted that the problem with this methodology was that the resulting rates (given that they were available for each State) are often quoted as lower than what the actual transportation cost may be. The commenter further inquired as to what happens with any remaining balance, and whether the patient is responsible for the payment of transportation services. Ultimately, the commenter asserted that there needed to be further clarification regarding this methodology for modes of transportation other than ambulance, and that VA should continue to pay for the total cost of non-ambulance transport until more data can be collected and another proposed rule submitted regarding a different methodology.

Regarding the assertions of the commenter that the quoted rates per State for non-ambulance transports are lower than actual costs of such transportation, we do not make any changes from the proposed rule. Similar

to our responses regarding adequacy of rates for ambulance transport, we believe it is reasonable and appropriate to rely on posted rates as available per State. Using the rates posted by States ensures consistency and predictability for how much VA will pay to vendors in each State. Section 70.30(a)(4) as proposed would provide VA the option to enter into a contract with a vendor of special mode transportation (to travel by modes other than ambulance under § 70.30(a)(4)(ii) as proposed), and the terms of that contract would govern the payment rates for such transport. Such contracts could provide for a different rate in the event that VA determines that may be justified based on local considerations. We further note that, based on the Regulatory Flexibility Act section of proposed rule, VA has estimated there will not be a significant economic impact on non-ambulance vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) because VA estimates that over 99 percent of its payments to vendors potentially covered within these NAICS Codes are made pursuant to a contract.

Regarding the commenter's inquiry related to billing by non-ambulance providers of veterans for any remaining balance after VA payment for the transport, over 99 percent of these non-ambulance transports are paid for by VA under contract, and the terms of such contracts indicate that payment by VA constitutes payment in full and extinguishes any liability on the part of the individual transported. For the remaining 1 percent of non-ambulance providers that we estimate are not covered by a contract, we do not have knowledge that such providers bill veterans for any remaining balance after receipt of VA's payment. However, if VA becomes aware of such billing of veterans for any remaining balance, we could propose an additional regulatory revision to address that issue in a future rulemaking. We do not make any changes from the proposed rule.

Regarding the commenter's request that VA delay implementation of the methodology for non-ambulance transports until more data can be collected, we will be delaying implementation of the final rule until February 16, 2024, and additional data will be obtained once this rule is implemented. We stated in the proposed rule that after utilizing this methodology for an initial 90 calendar day period after this rule becomes final in the **Federal Register**, VA will analyze the payments made to vendors for travel by modes other than ambulance and

determine whether we have enough payment data (e.g., arithmetic average of actual charges, locality rates, or posted rates) to develop a new payment methodology. If VA determines that it has enough payment data, then VA will develop a payment methodology using the lowest possible rate. If VA does not have enough payment data to create a new methodology after the initial 90 calendar day period, then VA would continue to collect data for as many 90 calendar day intervals as VA would deem necessary to gather sufficient payment data, which we do not anticipate exceeding 18 months from the effective date of the final rule. Subsequently, VA would propose a new methodology for travel by modes other than ambulance in a separate rulemaking in the **Federal Register**.

## Technical Changes Not Based on Comments

VA makes technical changes not based on comments. The first is to move the last sentence from § 70.30(a)(4) as proposed to instead be placed in § 70.30(a)(4)(ii)(B), which occurs after § 70.30(a)(4)(ii)(A)(3) (§ 70.30(a)(4)(ii)(C) as proposed). The new language in § 70.30(a)(4)(ii)(B) will provide that the term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the State or States where the vendor is domiciled or where transport occurred ("involved States"). And, in the absence of a posted rate for an involved State, VA will pay the lowest among the available posted rates or the vendor's actual charge. This is not a substantive change, but rather moving language into one location so that all interpretation of the meaning of the term "posted rate" in § 70.30(a)(4)(ii) is located in one place.

Second, we are amending the language to capitalize the word "State" in the regulations affected by the proposed rule to be consistent with how VA capitalizes the word "State" throughout our regulations.

Based on the rationale set forth in the proposed rule and in this document, we are adopting the provisions of the proposed rule as final with the changes noted above.

## Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity).

Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Information and Regulatory Affairs has determined that this rule is not a significant regulatory action under Executive Order 12866. The Regulatory Impact Analysis associated with this rulemaking can be found as a supporting document at *https://www.regulations.gov.*

**Regulatory Flexibility Act**

The Secretary hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601–612. VA estimates that this final rule will potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally. The per entity burden is estimated to be less than 1 percent of preliminary receipts for all entities in NAICS Code 621910.

VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99 percent of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1 percent of small entities within these NAICS Codes are estimated to be impacted by this final rule. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

**Unfunded Mandates**

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This final rule will have no such effect on State, local, and tribal governments, or on the private sector.

**Paperwork Reduction Act**

This final rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

**Catalog of Federal Domestic Assistance**

The catalog of Federal Domestic Assistance numbers and titles affected by this document are 64.040, VHA Inpatient Medicine (C, D), 64.041, VHA Outpatient Specialty Care (C), 64.042, VHA Inpatient Surgery (C), 64.043, VHA Mental Health Residential (C), 64.044, VHA Home Care (C), 64.045, VHA Outpatient Ancillary Services (C), 64.046, VHA Inpatient Psychiatry (C), 64.047, VHA Primary Care (C), 64.048, VHA Mental Health clinics (C), 64.049, VHA Community Living Center (C), 64.050, VHA Diagnostic Care (C).

**Congressional Review Act**

Pursuant to the Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (known as the Congressional Review Act) (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a major rule, as defined by 5 U.S.C. 804(2).

**List of Subjects in 38 CFR Part 70**

Administrative practice and procedure, Alcohol abuse, Alcoholism, Claims, Day care, Dental health, Drug abuse, Foreign relations, Government contracts, Grant programs—health, Grant programs—veterans, Health care, Health facilities, Health professions, Health records, Homeless, Medical and dental schools, Medical devices, Medical research, Mental health programs, Nursing homes, Philippines, Reporting and recordkeeping requirements, Scholarships and fellowships, Travel and transportation expenses, Veterans.

**Signing Authority**

Denis McDonough, Secretary of Veterans Affairs, approved this document on February 6, 2023, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Consuela Benjamin,**

*Regulation Development Coordinator Office of Regulation Policy & Management, Office of General Counsel, Department of Veterans Affairs.*

For the reasons stated in the preamble, the Department of Veterans Affairs amends 38 CFR part 70 as follows:

**PART 70—VETERANS TRANSPORTATION PROGRAMS**

■ 1. The authority citation for part 70 is revised to read as follows:

**Authority:** 38 U.S.C. 101, 111, 111A, 501, 1701, 1714, 1720, 1728, 1782, and 1783; E.O. 11302, 31 FR 11741, 3 CFR, 1966–1970 Comp., p. 578; and E.O. 13520, 74 FR 62201, 3 CFR, 2009 Comp., p. 274.

■ 2. In § 70.2, add a definition for "Ambulance" in alphabetical order to read as follows:

**§ 70.2    Definitions.**

\*    \*    \*    \*    \*

*Ambulance,* as used in this subpart, means advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 CFR 414.605.

\*    \*    \*    \*    \*

■ 3. In § 70.30 revise paragraph (a)(4) to read as follows:

**§ 70.30    Payment principles.**

(a) \*  \*  \*

(4) VA payments for special modes of transportation will be made in accordance with this section, unless VA has entered into a contract with the vendor in which case the terms of the contract will govern VA payments. This section applies notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120.

(i) *Travel by ambulance.* VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).

(ii) *Travel by modes other than ambulance.* (A) VA will pay the lesser of:

(*1*) The vendor's actual charge.

(*2*) The posted rate in the State where the vendor is domiciled. If the vendor is domiciled in more than one State, the lowest posted rate among all involved States.

(*3*) The posted rate in the State where transport occurred. If transport occurred in more than one State, the lowest posted rate among all involved States.

(B) The term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the State or States where the vendor is domiciled or where transport occurred ("involved States"). In the absence of a posted rate for an involved State, VA will pay the lowest among the available posted rates or the vendor's actual charge.

\*    \*    \*    \*    \*

§§ 70.1, 70.2, 70.3, 70.4, 70.10, 70.20, 70.21, 70.30, 70.31, 70.32, 70.40, 70.41, 70.42, 70.50, 70.70, 70.71, 70.72, 70.73 [Amended]

■ 4. Part 70 is further amended in the following sections by removing the parenthetical authority citation at the end of the section:

■ a. Section 70.1.
■ b. Section 70.2.
■ c. Section 70.3.
■ d. Section 70.4.
■ e. Section 70.10.
■ f. Section 70.20.
■ g. Section 70.21.
■ h. Section 70.30.
■ i. Section 70.31.
■ j. Section 70.32.
■ k. Section 70.40.
■ l. Section 70.41.
■ m. Section 70.42.
■ n. Section 70.50.
■ o. Section 70.70.
■ p. Section 70.71.
■ q. Section 70.72.
■ r. Section 70.73.

[FR Doc. 2023–03013 Filed 2–15–23; 8:45 am]
BILLING CODE 8320–01–P

## POSTAL REGULATORY COMMISSION

### 39 CFR Part 3055

[Docket No. RM2022–7; Order No. 6439]

RIN 3211–AA32

### Reporting of Service Performance

**AGENCY:** Postal Regulatory Commission.
**ACTION:** Final rule.

**SUMMARY:** This Commission adopts rules which revise the Postal Service's service performance reporting requirements and includes additions required by recent postal legislation.

**DATES:** This rule is effective March 20, 2023.

**ADDRESSES:** For additional information, Order No. 6439 can be accessed electronically through the Commission's website at *https://www.prc.gov.*

**FOR FURTHER INFORMATION CONTACT:**
David A. Trissell, General Counsel, at 202–789–6820.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Relevant Statutory Requirements
II. Background
III. Basis and Purpose of Final Rules

### I. Relevant Statutory Requirements

Section 3652(e)(1) of title 39 of the United States Code requires the Commission to prescribe the content and form of the public reports that the Postal Service files with the Commission. 39 U.S.C. 3652(e)(1). In doing so, the Commission must attempt to provide the public with timely information that is adequate to allow it to assess the lawfulness of Postal Service rates, should attempt to avoid unnecessary or unwarranted Postal Service effort and expense, and must endeavor to protect the confidentiality of commercially sensitive information. *See id.* The Commission may initiate proceedings to improve the quality, accuracy, or completeness of Postal Service reporting whenever it determines that the service performance data have become significantly inadequate, could be significantly improved, or otherwise require revision as necessitated by the public interest. 39 U.S.C. 3652(e)(2).

Additionally, section 3692 directs the Postal Service to develop and maintain a publicly available online "dashboard" that provides weekly service performance data for Market Dominant products and mandates that the Commission provide reporting requirements for this Postal Service dashboard as well as "recommendations for any modifications to the Postal Service's measurement systems necessary to measure and publish the performance information" located on the dashboard. 39 U.S.C. 3692(b)(2), (c). The Postal Service is also authorized to provide certain nonpostal services to the public and other Governmental agencies and consequently required to periodically report the quality of service for these nonpostal services. *See* 39 U.S.C. 3703–3705.

### II. Background

Pursuant to 39 U.S.C. 503, 3652, 3653, 3692 and 3705, the Commission initiated Docket No. RM2022–7 to update the service performance reporting requirements codified in 39 CFR part 3055 and make the aforementioned additions for dashboard and nonpostal product reporting. On April 26, 2022, the Commission issued Order No. 6160, proposing several modifications to the reporting requirements, providing an opportunity for interested persons to comment, and appointing a Public Representative.[1] Included among these suggested modifications were proposals to require the Postal Service to report average actual days to delivery and point impact data, information regarding the performance for each national operating plan target, and data about mail excluded from measurement. Order No. 6160 at 5–6. The Commission also solicited comments on how best to effectuate the statutes requiring the Postal Service to report on nonpostal products and implement a performance dashboard. *Id.* at 6–8.

The Commission received a wide range of comments in response to Order No. 6160, both discussing the suggested revisions and proposing additional amendments to the reporting requirements. In response, on September 21, 2022, the Commission issued Order No. 6275, revising the previously-proposed reporting requirements, presenting the requirements as draft regulations, and providing another opportunity for interested persons to comment.[2] Again, the Commission received a variety of comments in response.

### III. Basis and Purpose of Final Rules

After reviewing the commenters' suggestions and analysis, the Commission issues the following revisions to the rules proposed in Order No. 6275. Most rules have not been changed substantively; those that have are addressed below.

First, proposed § 3055.2(m)—which relates to required annual reporting on the Postal Service's Site-Specific Operating Plan (SSOP)—is revised to state that the Postal Service must provide a description of each SSOP, including operation completion time performance for each SSOP measurement category.

Second, proposed § 3055.21—which specifies the annual service performance reporting requirements for the Postal Service—is revised so that proposed § 3055.21(b) specifies that the Postal Service need not identify point impact data for USPS Marketing Mail Every Door Direct Mail or USPS Marketing Mail Destination Delivery Unit Entry Saturation Flats.

Third, proposed § 3055.25—which describes the reporting requirements for nonpostal services—is revised to specify that the Postal Service provide the measure of the quality of service for nonpostal service products annually. Additionally, paragraph (b) is added to specify that the Postal Service may report service performance in a qualitative manner where the quality of nonpostal service itself cannot be measured using on-time service performance. Paragraph (c) is also added to specify that quality of service performance for interagency agreements shall be reported for the program as a

---

[1] Advance Notice of Proposed Rulemaking to Revise Periodic Reporting of Service Performance, April 26, 2022 (Order No. 6160).

[2] Notice of Proposed Rulemaking to Revise Periodic Reporting of Service Performance, September 21, 2022 (Order No. 6275).

**Department of Veterans Affairs**
**Veterans Health Administration**
**Washington, DC  20420**

**Corrected Copy**
**7/23/2010**

**VHA HANDBOOK 1601B.05**
**Transmittal Sheet**
**July 21, 2010**

## BENEFICIARY TRAVEL

**1.  REASON FOR ISSUE.**  This Veterans Health Administration (VHA) Handbook provides information on the Department of Veterans Affairs (VA) Beneficiary Travel Program that went into effect on July 30, 2008.

**2.  SUMMARY OF MAJOR CHANGES.**  Public Law 111-163, Section 305(f) requires VA to "revise the Veterans Health Administration Handbook 1601B.05 to clarify that an allowance for travel based on mileage paid under section 111(a) of title 38, United States Code, may exceed the cost of such travel by public transportation regardless of medical necessity."  By direction of the Under Secretary for Health, VHA Handbook 1601B.05, Beneficiary Travel, subparagraph 9a(1)(a), is revised to read:  "Notwithstanding the regulations in title 38 Code of Federal Regulations (CFR) Part 70, an allowance for travel based on mileage may exceed the cost of such travel by public transportation regardless of medical necessity."

**3.  RELATED ISSUES.**  None.

**4.  RESPONSIBLE OFFICE.**  The Chief Business Office (16) is responsible for the contents of this VHA Handbook.  Questions may be addressed to 202-254-0384.

**5.  RESCISSIONS.**  VHA Handbook 1601B.05, "Beneficiary Travel" dated July 29, 2008 is rescinded.

**6.  RECERTIFICATION.**  This VHA Handbook is scheduled for recertification on or before the last working day of July 2015.

JRobert A. Petzel, M.D.
Under Secretary for Health

DISTRIBUTION:      E-mailed to the VHA Publications Distribution List  7/21/2010

**T-1**

**July 21, 2010**  **Corrected Copy 7/23/2010**  **VHA HANDBOOK 1601B.05**

## CONTENTS

### BENEFICIARY TRAVEL

**PARAGRAPH**                                                                 **PAGE**

1. Purpose ...................................................................................................... 1

2. Authority .................................................................................................... 1

3. Definitions ................................................................................................. 1

4. Scope ......................................................................................................... 3

5. Applying for Beneficiary Travel ............................................................... 4

6. Where to Apply ......................................................................................... 4

7. Veterans Eligible for Beneficiary Travel .................................................. 4

8. Non-Veterans Eligible for Beneficiary Travel .......................................... 5

9. Beneficiary Travel Expenses That Are Paid ............................................. 5

10. Deductible Payment Requirements and Exceptions ............................... 8

11. Payment of Beneficiary Travel ............................................................... 9

12. Criteria for Approval .............................................................................. 9

13. False Statements by Beneficiaries to Obtain Payment for Travel Expenses ...................... 10

14. Appealing the Denial of a Beneficiary Travel Claim ........................... 10

15. Other Considerations ............................................................................. 10

16. Special Mode of Transportation ........................................................... 11

17. Travel Authorization ............................................................................. 11

18. Recovery of Payment ............................................................................. 12

19. Reimbursement or Prior Payment ......................................................... 12

20. Reduced Fares ....................................................................................... 12

**BENEFICIARY TRAVEL**

## 1. PURPOSE

This Veterans Health Administration (VHA) Handbook provides information on Department of Veterans Affairs (VA) policy for beneficiary travel. ***NOTE:*** *For more information on the Beneficiary Travel program see http://vaww1.va.gov/cbo/apps/policyguides/index.asp . This is an internal VA Web site not available to the public.*

## 2. AUTHORITY

The authorities for VHA policies for beneficiary travel are provided by the following:

a. Title 38 United States Code (U.S.C.), Section 111, Payments or allowances for beneficiary travel.

b. Title 38 Code of Federal Regulations (CFR), Section 70.1, Purpose and scope.

c. Title 38 CFR § 70.2, Definitions.

d. Title 38 CFR § 70.3, Determination of Secretary.

e. Title 38 CFR § 70.4, Criteria for Approval,

f. Title 38 CFR § 70.10, Eligible persons.

g. Title 38 CFR § 70.20 ,Application.

h. Title 38 CFR § 70.21, Where to apply.

i. Title 38 CFR § 70.30, Payment principles.

j. Title 38 CFR § 70.31, Deductibles.

k. Title 38 CFR § 70.32, Reimbursement or prior payment.

l. Title 38 CFR § 70.40, Administrative procedures.

m. Title 38 CFR § 70.41, Recovery of payments.

n. Title 38 CFR § 70.42, False statements.

o. Title 38 CFR § 70.50, Reduced fare requests.

## 3. DEFINITIONS

a. **Attendant.** An attendant is an individual traveling with a beneficiary who is eligible for beneficiary travel and requires the aid and/or physical assistance of another person.

1

b. **Beneficiary**.  A beneficiary is a person determined eligible for VHA benefits.

c. **Claimant.**  A claimant is a Veteran (or the Veteran's guardian) who received services  at the hospital, clinic, or community resource that provided the services, or the person other than the Veteran who paid for the services.

d. **Clinician**.  A clinician is a Physician, Physician Assistant (PA), Nurse Practitioner (NP), Psychologist, or other independent licensed practitioner.

e. **Deductible.**  A deductible is a specified amount required by law to be withheld from a VA beneficiary travel payment in some circumstances.

f. **Emergency Treatment.**  Emergency treatment refers to treatment for a condition of such a nature that a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health.  This standard would be met if there were an emergency medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

g. **Examination, Treatment, or Care**.  Examination, Treatment, or Care refers to services provided under the Medical Benefit Package as defined in title 38 CFR §17.38.  ***NOTE:  For purposes of this Handbook, this term also includes extended care services.***

h. **Irregular Discharge**.  Irregular discharge refers to the release of a competent patient from a VA or VA-authorized hospital, nursing home, or domiciliary care due to: refusal, neglect or obstruction of examination or treatment; leaving without the approval of the treating health care clinician; or disorderly conduct and discharge is the appropriate disciplinary action.

i. **Medically Indicated.**  Medically indicated refers to the determination by a VA health care clinician that a particular treatment, service, and/or specialized mode of transportation is medically required.

j. **Nearest Appropriate VA Facility.**  Nearest appropriate VA facility refers to the closest VA facility properly equipped and staffed to provide the care and treatment medically indicated by the patient's condition.

k. **Special Mode of Transportation.**  Special mode of transportation is defined as an ambulance, ambulette, air ambulance, wheelchair van, or other mode of transportation specially designed to transport disabled persons (this does not include a mode of transportation not specifically designed to transport disabled persons, such as a bus, subway, taxi, train, or airplane).  A modified, privately-owned vehicle, with special adaptive equipment and/or capable of transporting disabled persons is not a special mode of transportation.

l. **Unable to Defray.**  Unable to defray refers to the situation of any Veteran who:

2

**Corrected Copy
7/23/2010**

(1)  Is an enrolled or otherwise eligible Veteran who has income for the year (as defined under 38 U.S.C. § 1503) immediately preceding the application for beneficiary travel that does not exceed the maximum annual rate of pension that the beneficiary would receive under 38 U.S.C. § 1521 (as adjusted under 38 U.S.C. § 5312) if the beneficiary were eligible for pension during that year.

(2)  Is able to demonstrate that due to circumstances such as loss of employment, or incurrence of a disability, their income in the year of travel will not exceed the maximum annual rate of pension that the beneficiary would receive under 38 U.S.C. § 1521 (as adjusted under 38 U.S.C. § 5312) if the beneficiary were eligible for pension.

(3)  Has a service-connected (SC) disability rating of at least 30 percent.

(4)  Is traveling in connection with treatment of a SC disability.

m.  **United States.**  The United States covers the states, territories, and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

n.  **VA-authorized Health Care Facility**.  A VA-authorized health care facility is a non-VA health care facility where VA has approved care for an eligible beneficiary at VA expense.

o.  **VA Facility.**  VA facility means a VA Medical Center, VA Outpatient Clinic (OPC), or VA Community-based Outpatient Clinic (CBOC).

## 4.  SCOPE

This Handbook provides details on the following topics:

a.  Veterans eligible for beneficiary travel;

b.  Non-veterans eligible for beneficiary travel;

c.  Beneficiary travel expenses that are paid;

d.  Beneficiary travel expenses that are not paid;

e.  Deductible payment requirement and exceptions;

f.  Payment of beneficiary travel;

g.  False statements by beneficiaries to obtain payment for travel expenses;

h.  Appealing the denial of a beneficiary travel claim;

i.  Transportation for care;

j.  Special mode of transportation;

3

k. Travel authorization forms; and

l. Non-VA transportation resources.

## 5. APPLYING FOR BENEFICIARY TRAVEL

a. A claimant may apply for beneficiary travel orally or in writing but must provide VA the receipt for each expense other than for mileage.

b. A claimant must apply for payment of beneficiary travel within 30 calendar days after completing beneficiary travel that does not include special mode transportation.

c. For beneficiary travel that includes a special mode of transportation, a claimant must apply for payment of beneficiary travel and obtain approval from VA prior to travel. However, if the travel included a special mode of transportation and the claimant without prior approval applies for payment of the beneficiary travel within 30 calendar days after the travel is completed, the application will be considered timely submitted if the travel was for emergency treatment.

d. For travel that includes meals and/or lodging, a claimant must apply for and receive approval prior to obtaining the meals and/or lodging in order to receive payment.

e. If a determination is made that additional information is needed to make a determination, the claimant will be notified in writing of the deficiency and will be requested to provide additional information. If the claimant has not responded to the request within 30 days, the Chief of the Business Office, or other designee, may decide the claim prior to the expiration of the 1 year submission period required by 38 U.S.C. § 5103(b)(1) based on all the information contained in the file, including any information obtained on behalf of the claimant. If the Chief of the Business Office, or other designee, does so, and the claimant subsequently provides the information within 1 year of the date of the request, the Chief of the Business Office, or other designee, must re-adjudicate the claim.

f. If a person becomes eligible for payment of beneficiary travel after the travel takes place, payment may be made if the person applies for travel benefits within 30 days of the date when the person became eligible for travel benefits.

g. The date of an application for beneficiary travel is the postmark date, if mailed; or the date of submission if hand delivered or provided electronically or orally.

## 6. WHERE TO APPLY

Claimants for beneficiary travel must submit information to the Chief of the Business Office, or other designee, at the VA facility responsible for the medical care or services being provided and for which travel is required.

## 7. VETERANS ELIGIBLE FOR BENEFICIARY TRAVEL PAYMENTS

The following Veterans are eligible for payment of beneficiary travel payments:

4

**Corrected Copy**
**7/23/2010**

a. A Veteran who travels to or from a VA facility or VA-authorized health care facility in connection with treatment or care for a SC disability (regardless of percent of disability).

b. A Veteran with a SC disability rated at 30 percent or more who travels to or from a VA facility or VA-authorized health care facility for examination, treatment, or care for any condition.

c. A Veteran who travels to a VA facility or VA-authorized health care facility for a scheduled compensation and pension (C&P) examination.

d. A Veteran receiving pension under 38 U.S.C. § 1521, who travels to or from a VA facility or VA-authorized health care facility for examination, treatment, or care.

e. A Veteran whose annual income (as determined under 38 U.S.C. § 1503) does not exceed the maximum annual rate of pension that the Veteran would receive under 38 U.S.C. § 1521 (as adjusted under 38 U.S.C. § 5312) if the Veteran was eligible for pension and travels to or from a VA facility or VA authorized health care facility for examination, treatment, or care.

## 8. NON-VETERANS ELIGIBLE FOR BENEFICIARY TRAVEL

a. **Allied Beneficiaries.** For Allied Beneficiaries, as defined by 38 U.S.C. § 109, travel is subject to a reimbursement agreement by the government concerned. For information on the beneficiary travel eligibility of Allied Beneficiaries, see VHA Handbook 1601D.02.

b. **Attendants.** Someone other than a VA employee, who is accompanying and assisting a Veteran or beneficiary eligible for beneficiary travel payments, when such beneficiary is medically determined to require the presence of the attendant because of a physical or mental condition.

c. **Beneficiaries of Other Federal Agencies.** Travel for beneficiaries of other Federal agencies may be authorized travel incident to medical services rendered upon requests of those agencies, subject to a reimbursement agreement by those agencies.

d. **Other Persons.** A member of a Veteran's immediate family, a Veteran's legal guardian, or a person in whose household the Veteran certifies an intention to live, if such person is traveling for consultation, professional counseling, training, or mental health services concerning a Veteran who is receiving care for a SC disability; or a member of a Veteran's immediate family, if the person is traveling for bereavement counseling relating to the death of the Veteran in the active military, naval, or air service in the line of duty and under circumstances not due to the Veteran's own misconduct.

## 9. BENEFICIARY TRAVEL EXPENSES THAT ARE PAID

a. **Beneficiary Reimbursable Expenses and Amounts.** Eligible Veterans and beneficiaries may obtain beneficiary travel reimbursement for the following expenses:

(1) The per mile rate established by the Secretary of Veterans Affairs for the period of travel for use of privately owned vehicle or the actual cost for use of the most economical common

carrier (bus, train, taxi, airplane, etc.), for travel to and from VA or VA authorized health care subject to the following:

(a)  Notwithstanding the regulations in 38 CFR Part 70, an allowance for travel based on mileage may exceed the cost of such travel by public transportation regardless of medical necessity.

(b)  Payment for a common carrier may not exceed the amount allowed for a privately owned vehicle unless travel by a privately owned vehicle is not reasonably accessible or travel by a common carrier is determined to be medically necessary.

(2)  The actual cost of ferry fares, bridge tolls, road tolls, tunnel tolls.

(3)  The actual cost of a special mode of transportation.

(4)  The actual cost for meals, lodging, or both, not to exceed 50 percent of the amount allowed for government employees under 5 U.S.C. § 5702, when VA determines that an overnight stay is required.  Factors VA may consider in making that determination include, but are not limited to the following:

(a)  The distance the Veteran must travel.

(b)  The time of day when VA scheduled the Veteran's appointment.

(c)  The weather conditions or congestion conditions affecting the travel.

(d)  The Veteran's medical condition and its impact on the ability to travel.

***NOTE:***  *As required by law, each time the Federal government makes a change in mileage rates payable under title 5 U.S.C. §§ 5702 and 5704 for Federal employee travel by privately-owned vehicle, but not less frequently than annually, the Secretary shall conduct an investigation of the actual costs of travel, including lodging and subsistence.  In conducting the investigation, the Secretary shall consult with the Administrator of the General Services Administration, the Secretary of Transportation, and Veterans' Service Organizations.  As part of the investigation, the Secretary shall review and consider various factors including vehicle depreciation, state and Federal vehicle taxes and the costs of gasoline, oil, maintenance, accessories, parts, tires, and insurance.  However, to the extent that the Administrator of General Services has, within a reasonable period of time, conducted an investigation of travel costs that included the factors described in this paragraph, the Secretary may consider that investigation in lieu of conducting a separate investigation with respect to the findings of those individual factors.*

b.  **Attendant Reimbursable Expenses and Amounts**

(1)  For shared travel in a privately owned vehicle, payments are limited to the amount for one beneficiary.  For example, if a beneficiary and an attendant travel in the same automobile or if two beneficiaries travel in the same automobile, the amount for mileage will be limited to the amount for one beneficiary.

**6**

**Corrected Copy
7/23/2010**

(2)  The actual cost for meals, lodging, or both, may be paid when VA determines that an overnight stay is required.  Factors VA may consider in making that determination are the same as those for the Veteran noted in subparagraph 9a(4).

c. **Payment Considerations**

(1)  Except as otherwise allowed under this Handbook, payment is limited to travel from a beneficiary's residence to the nearest VA facility where the care or services could be provided and from such VA facility to the beneficiary's residence.

(2)  Payment may be made for travel from a beneficiary's residence to the nearest non-VA facility where the care or services could be provided and from such facility to the beneficiary's residence if VA determines that it is necessary to obtain the care or services at a non-VA facility.

(3)  If a beneficiary's residence changed while receiving care or services, payment for the return trip will be for travel to the new residence, except that payment may not exceed the amount that would be allowed from the facility where the care or services could have been provided that is nearest to the new residence.  ***NOTE***:  *For example, if during a period of care or services in Baltimore, a beneficiary changes his or her address from Baltimore to Detroit, payment for the return trip would be limited to that allowed for traveling to the new residence from the nearest facility to the new residence in Detroit where the care or services could have been provided.*

(4)  Payment may be made for travel from or to a place where the beneficiary is staying (if the beneficiary is not staying at the beneficiary's residence) but the payment may not exceed the amount that would be payable for travel under preceding subparagraph 9c(1) or subparagraph 9c(2), as applicable.

(5)  If the beneficiary is in a terminal condition at a VA facility or other facility under VA auspices and travels to a non-VA medical facility for the purpose of being nearer to his or her residence, payment may be made for travel to the medical facility receiving the beneficiary for such purposes.

(6)  On a case-by-case basis, payment for travel may be paid for any distance if it is financially favorable to the government (for example, payment for travel could be allowed to a more distant nursing home when admission to that nursing home is a prerequisite to qualify for community assistance that would more than offset the additional travel payment).

(7)  Beneficiary travel will not be paid under the following circumstances:

(a)  The payment of travel would be counterproductive to the therapy being provided and such determination is recorded in the patient's medical records, and the Chief of the Service or a designee reviewed and approved the determination by signature in the patient's medical record.

(b)  Return travel for a beneficiary receiving an irregular discharge.

7

(c)  For emergency transportation of Veterans for non-SC conditions in non-VA facilities when the payment for transportation is covered by 38 CFR §§ 17.1000 through 17.1008 as authorized by 38 U.S.C. 1725.

## 10.  DEDUCTIBLE PAYMENT REQUIREMENTS AND EXCEPTIONS

a.  **Beneficiary Travel Deductible Amounts.**  The deductible for beneficiary travel is $3.00 per one-way trip ($6.00 for a round-trip).

(1)  The deductible requirement is subject to a monthly maximum amount of $18.00 or six one-way (three round) trips whichever occurs first.

(2)  Upon reaching $18.00 in deductibles or six one-way (three round) trips whichever occurs first, travel payments made for the balance of that particular month will be free of deductible charges.

b.  **Exceptions to the Beneficiary Travel Deductible.**  The deductible does not apply when:

(1)  Travel is by way of special mode of transportation;

(2)  Travel is for a scheduled C&P examination;

(3)  Travel is by a non-Veteran;

(4)  Travel is by an attendant;

(5)  Travel is by a donor; or

(6)  The deductible would cause a severe financial hardship as described in subparagraph 10c.

c.  **Waiver of the Beneficiary Travel Deductible.**  The deductible requirement shall be waived when it would cause the Veteran severe financial hardship.  Severe financial hardship is considered if the Veteran:

(1)  Is in receipt of a VA pension; or

(2)  Has an income for the year immediately preceding the application for beneficiary travel that does not exceed the VA national means test household income threshold; or

(3)  Is able to demonstrate that due to circumstances such as loss of employment, or incurrence of a disability , their income in the year of travel will not exceed the VA national means test household income threshold for that year.

*NOTE:  A Veteran whose income (as determined under 38 U.S.C. § 1503) does not exceed the maximum annual rate of pension that the Veteran would receive under 38 U.S.C. § 1521 (as adjusted under 38 U.S.C.§ 5312) if the Veteran were eligible for pension during that year is eligible for a waiver because the maximum annual rate of pension is below the VA national means test household threshold.*

8

**Corrected Copy
7/23/2010**

*NOTE:  The current household income thresholds can be found at the Internet Web site address* *http://www.va.gov/healtheligibility/Library/pubs/VAIncomeThresholds/VAIncomeThresholds.pdf*

d.  **Waiver Period.**  A Veteran granted a waiver must promptly inform VA of any household income status change during the waiver period that results in the Veteran no longer meeting the requirements outlined under subparagraph 10c.  Waivers are valid:

(1)  Through the end of the calendar year in which the application was made; or

(2)  Until there is a change in the beneficiary's household income during the calendar year in which the application was made that results in the beneficiary no longer meeting the requirement outlined under paragraph 10c.

## 11.  PAYMENT OF BENEFICIARY TRAVEL

a.  **When Payments Are Made.**  Payments are made on a reimbursement basis *after* the travel has occurred, with the following exceptions:

(1)  Upon completion of examination, treatment, or care, payment may be made before the return travel has occurred; and

(2)  In the case of travel by special mode of transportation, VA may provide payment for beneficiary travel to the provider of transportation before determining eligibility of such person for such payment if VA determines the travel is for emergency treatment and the beneficiary or other person made a claim that the beneficiary is eligible for the travel.

b.  **Recipients of Payments.**  Payment is usually made to the beneficiary.  However, the beneficiary travel payment may be made directly to the person or organization that paid for or provided the travel when satisfactory evidence is presented.

## 12.  CRITERIA FOR APPROVAL

a.  Payment for Beneficiary Travel will be approved if:

(1)  The travel was made to obtain care or services for a person who is eligible for beneficiary travel under paragraphs 7 and 8;

(2)  The travel was in connection with care for which such person was eligible under the laws administered by VA;

(3)  Application was made in accordance with paragraph 5; and

(4)  All of the requirements of this part for payment are met; or

(5)  Any failure to obtain the care or services was due to actions by officials of VA or persons acting on behalf of VA.

**9**

b.  When a claimant requests payment for beneficiary travel after the provision of care or services and the travel did not include a special mode of transportation, VA will approve round-trip payment only if the travel was:

(1)  In connection with care or services that were scheduled with VHA prior to arrival at the VHA-designated facility, or

(2)  For emergency treatment.

c.  When a claimant requests payment for beneficiary travel for care or services that were not scheduled with VHA prior to arrival at the facility and not emergency treatment and the travel did not include a special mode of transportation, VA will not approve round-trip payment but will approve payment for the return trip if VHA actually provided care or services.

d.  Except as provided under paragraph 19, when payment for beneficiary travel is requested for travel that includes a special mode of transportation, VA will approve payment if:

(1)  The travel is medically required;

(2)  The beneficiary is unable to defray the cost of such transportation; and

(3)  A VA clinician approved the travel prior to travel in the special mode of transportation or the travel was undertaken in connection with a medical emergency.

## 13.  FALSE STATEMENTS BY BENEFICIARIES TO OBTAIN PAYMENT FOR TRAVEL EXPENSES

a.  Persons who make false statements for the purpose of obtaining payment for travel expenses when making claims for travel are subject to prosecution under applicable laws.

b.  VA must take appropriate action to recapture any fraudulent payments under applicable law and VA regulations.

## 14.  APPEALING THE DENIAL OF A BENEFICIARY TRAVEL CLAIM

When a beneficiary travel claim is denied, the claimant must be:

a.  Provided written notice of the decision and advised of reconsideration rights under title 38 CFR § 17.133, and

b.  Provided with VA Form 4107VHA, Your Rights to Appeal Our Decision (see http://www4.va.gov/vaforms/va/pdf/VA4107VHA.pdf ).

## 15.  OTHER CONSIDERATIONS

a.  **Travel for Research Purposes**

**10**

(1)  In accordance with title 38 CFR § 17.85(b)(3) and 17.102(g), when a research subject is injured while participating in a VA Research and Development Committee-approved research protocol and the VA health care facility where the injury occurred is not capable of providing the required hospital care or medical services for the research-related injuries, transportation may be authorized to transport the research subject to a non-VA health care facility.  Such transportation expenses will be charged to the Research appropriation.

(2)  The research site (VA health care facility) where the research subject was enrolled, and at which the injury occurred, is responsible for travel expenses related to the injury.

*NOTE:  If it is necessary to transfer a research subject to another VA facility because the research facility cannot provide the required care, travel expenses (in both directions) will be paid from research funds at the facility where the subject was enrolled.*

(3)  Research participants are not eligible for beneficiary travel transportation solely as it relates to the research project.  Such travel may be reimbursed from the research project funds, if appropriate.

b.  **Foreign Travel**

(1)  Travel performed in foreign countries for the purpose of examination or treatment in a foreign country at VA expense can only be authorized by the Foreign Medical Programs (FMP) or Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA). Both programs are administered by staff at the Health Administration Center (HAC), Denver, CO.  For more information on the HAC's programs see http://www.va.gov/hac/hacmain.asp. *NOTE:  This does not apply when the beneficiaries are in the Republic of the Philippines.*

(2)  No travel payment is authorized when a Veteran residing in a foreign country travels to the U.S. for authorized examination or treatment at VA expense.  *NOTE:  Exceptions are made when a portion of the trip is performed within the borders of the U.S.*

c.  **Travel for Active Duty Beneficiaries.**  Reimbursement for travel of Department of Defense (DOD) beneficiaries, both Active Duty and TRICARE, is the responsibility of DOD. VA only provides transportation to these individuals when there is an agreement that DOD will reimburse VA for such travel.

16.  **SPECIAL MODE OF TRANSPORTATION.**

A special mode of transportation can be utilized for beneficiary transportation when:

a.  A beneficiary is eligible for Beneficiary Travel as outlined in paragraph 7 and 8 of this Handbook; and

b.  A VHA health care clinician determines that this mode of transport is clinically required.

17.  **TRAVEL AUTHORIZATION**

Beneficiary travel is authorized in advance in one of the following ways:

a.  The beneficiary is scheduled for an outpatient visit in the Veterans Information Systems and Technology Architecture (VistA) and presents for and is seen for the scheduled appointment.

b.  The beneficiary is scheduled for admission and is admitted to the VA facility.

## 18.  RECOVERY OF PAYMENT

Payment for Beneficiary Travel made to persons ineligible for such payment are subject to recapture under applicable law, including the provisions of title 38 CFR §§1.900 through 1.953.

## 19.  REIMBURSEMENT OR PRIOR PAYMENT

a.  Payment will be made on a reimbursement basis after the travel has occurred, except that:

(1)  Upon completion of examination, treatment, or care, payment may be made before the return travel has occurred, and

(2)  In the case of travel by a person to or from a VA facility by special mode of transportation, VA may provide payment for beneficiary travel to the provider of the transportation before determining eligibility of such person for such payment if VA determines that the travel is for emergency treatment and the beneficiary or other person made a claim that the beneficiary is eligible for payment for the travel.

b.  Payment will be made to the beneficiary, except that VA may make a beneficiary travel payment to a person or organization other than the beneficiary upon satisfactory evidence that the person or organization actually provided or paid for the travel.

## 20.  REDUCED FARES

a.  Printed reduced-fare requests for use by eligible beneficiaries and their attendants when traveling at their own expense to or from any VA facility or VA-authorized facility for authorized VA health care are available from any VA medical facility.

b.  This request form is used to ask transportation providers, such as bus companies, for a reduced fare.  Whether to grant a reduced fare is determined by the transportation provider and not VA.

**12**



# *Proposed Legislation*

(dollars in thousands)

| Legislative Proposals | FY2013 | FY 2013 Collections |
|---|---|---|
| Smoke-Free Environment................................................................................... | ($7,200) | |
| Remove Requirement VA Reimb. Certain Employees for Prof. Educ........................ | ($325) | |
| Clarify Breach of Agreement under Employee Incentive Scholarship Prg.................... | ($38) | |
| Change in collection and verification of Veteran income....................................... | ($2,438) | |
| Medicare Ambulatory Rates for Beneficiary Travel............................................... | ($17,092) | |
| Allow VA to Release Patient Info to Health Plans................................................. | | $34,000 |
| Consider VA a Participating Provider for "Purpose of Reimbursement"..................... | | $91,000 |
| **Legislative Proposals Total** | **($27,093)** | **$125,000** |

### Smoke-Free Environment

| Dollars in Thousands ($000) | | | |
| --- | --- | --- | --- |
| Obligations | Collections | Appropriation | FTE |
| ($7,200) | | ($7,200) | |

**Proposed Program Change in Law:**

The proposal would reverse the requirement for designated smoking areas at VA facilities, as required by Public Law 102-585 §526. It would eliminate all smoking on the grounds of all VA health care facilities in order to make them completely smoke-free.

**Current Law or Practice:**

Section 526 of Public Law 102-585, enacted in 1992, requires the Veterans Health Administration (VHA) to provide suitable smoking areas, either an indoor area or detached building, for patients who desire to smoke tobacco products.

**Justification:**

Currently, there are no VA health care facilities with smoke-free grounds because of Public Law 102-585 that requires designated smoking areas for patients. Because of this requirement, the Department of Veterans Affairs continues to fall far behind the public and private sectors in this area. As a result, Veterans, VHA health care providers, and visitors do not have the same level of protection from the hazardous effects of secondhand smoke exposure as patients and employees in other systems.

For example, as of January 2, 2012 there are 2,994 local and/or state/territory/commonwealth hospitals, health care systems and clinics, and four national health care systems (Kaiser Permanente, Mayo Clinic, SSM Health Care, and CIGNA Corporation), in the United States that have adopted 100% smoke-free policies that extend to all their facilities, grounds, and office buildings. Numerous Department of Defense medical treatment facilities (MTF) have become tobacco-free as well. In addition, on July 1, 2011, the U. S. Department of Health and Human Services (HHS) adopted a policy banning the use of all tobacco products (including cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco products, and e-cigarettes) at all times on its grounds, making all facilties tobacco-free. With this, HHS became the first Federal agency to implement a tobacco-free policy.

Almost 46 years after the landmark 1964 Surgeon General Report on the health effects of smoking, tobacco use remains the leading cause of preventable death and disease in the United States, accounting for more deaths than HIV/AIDS, alcohol and drug abuse, automobile accidents, fires, homicides and suicides combined.  Smoking is responsible for 1 in every 5 deaths or nearly 440,000 preventable deaths in the United States each year (U.S. Surgeon General Report 2006; U.S. Surgeon General Report 2010).

Research on the health effects of secondhand smoke has greatly increased in the last two decades.  In 1992, the Environmental Protection Agency (EPA) designated secondhand smoke as a Class A carcinogen and the 2006 U.S. Surgeon General Report concluded that "there is no risk-free level of exposure to secondhand smoke" (U.S. Surgeon General Report, 2006).  It is estimated that exposures to secondhand smoke account for more than 3,000 deaths from lung cancer, approximately 46,000 deaths from coronary heart disease, and 430 newborn deaths from sudden infant death syndrome (SIDS) in the United States each year (U.S. Surgeon General Report, 2006; U.S. Surgeon General Report, 2010).

The U.S. Surgeon General issued its 30th tobacco-related Surgeon General Report since 1964, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease* (December 9, 2010). This report concluded that "exposure to tobacco smoke-even occasional smoking or secondhand smoke- - - causes immediate damage to your body that can lead to serious illness or death". The U.S. Surgeon General Report reviewed the body of clinical research to date and reported that even brief exposures to secondhand smoke can "cause cardiovascular disease and could trigger acute cardiac events, such as health attack", by causing damage to blood vessels and increased clotting.

As the Nation's largest single health care system and a national leader in health care, VHA has fallen far behind the health care community in this regard.  This was not the case in 1992 when VHA led nationally on smoke-free policies.  The medical research since that time has demonstrated the serious and sometime life-threatening consequences of secondhand smoke exposures. In a 2009 Institute of Medicine (IOM) Report, *Combating Tobacco Use in Military and Veteran Populations,* an IOM expert committee stated the requirement for smoking areas at VA health care facilities "has precluded VA from going entirely smoke-free" and it "prevents VA from protecting its patients, employees, and visitors from exposure to tobacco smoke and also hinders efforts to encourage tobacco cessation".  The IOM Committee recommended that Congress provide legislation to allow VHA health care facilities to adopt smoke-free grounds.

While in the past there had been resistance to smoke-free policies, there have been a number of successes in adopting policies that may not have been accepted a decade ago. A notable example is that of North Carolina, a state that has long been recognized as a home to the tobacco industry and tobacco farming.  As of July 6, 2009 all public and private hospitals in North Carolina became smoke-free. A December 2009 publication authored by policy leaders at The Joint Commission noted that at the end of 2009, the majority of U.S hospitals would have a smoke-free campus.  The article noted the Department of Veterans Affairs health care system as an exception because of legislation that "makes it virtually impossible for VA hospitals to adopt a completely smoke-free campus" (Williams, Hafner  et al. 2009).

The provisions of Public Law 102-586 that require smoking areas are not consistent with nearly two decades of medical and scientific literature that followed.  An October 2009 IOM Report, *Secondhand Smoke Exposure and Cardiovascular Effects: Making Sense of the Evidence*, reviewed the U.S. and international evidence and concluded that secondhand smoke exposure increased the risk of coronary health disease and heart attacks by 25 to 30 percent and that smoking bans reduce heart attacks.  The IOM Report concluded, "Given the prevalence of heart attacks, and the resultant deaths, smoking bans can have a substantial impact on public health.  The savings, as measured in human lives, is undeniable".

The clear health benefits of smoke-free policies have been supported by a number of studies to date. An Indiana University study found that after a countywide smoking ban was implemented, hospital admissions for non-smokers with no other risk factors for acute myocardial infarction (MI) or heart attack dropped by 70% (Seo & Torabi, 2007).  In addition, additional studies have found significant decreases in the rates of total admissions for heart attacks following smoke-free policies in Helena, Montana and Pueblo, Colorado  When Pueblo, Colorado banned smoking in all public places, the number of adults hospitalized for heart disease dropped by 41% in just three years (Sargent, Shepard, and Glantz, 2004; Bartecchi et al., 2006).  International studies have also found similar effects following the implementation of smoke-free policies in Scotland and Italy (Pell et al., 2008; Cesaroni et al., 2008).

Because of the increasing knowledge about the health effects of secondhand smoke, there have also been a number of cases where nonsmoker employees who have been harmed by such exposures have successfully filed lawsuits or disability claims against their employers.  In 1995, a widower of an employee of a VA hospital was awarded a death benefit on the grounds that his wife's fatal lung cancer was caused by exposure to secondhand smoke while treating patients (CDC, 2006).

Legislation to make the grounds of all VA health care facilities smoke-free would be a Veteran-centric measure that would serve to protect the right and health of the large majority of Veterans who do not smoke. Currently, approximately 20% of Veterans enrolled in VA health care are smokers, while approximately 80% are non-smokers. Many of the non-smokers are also older Veterans who may be at higher risk for cardiac or other conditions that could make them even more vulnerable to the cardiovascular events associated with secondhand smoke. As with patients of other health care systems, Veteran patients have a right to be protected from secondhand smoke exposures when seeking health care at a VA facility. For Veterans who are inpatients, nicotine replacement therapy is currently available so they would not have to experience nicotine withdrawal during hospital admissions.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | ($7,200) | ($7,318) | ($7,440) | ($7,566) | ($7,697) | ($37,221) |
| Collections.................... | | | | | | |
| Appropriation.............. | ($7,200) | ($7,318) | ($7,440) | ($7,566) | ($7,697) | ($37,221) |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | ($7,833) | ($7,973) | ($8,118) | ($8,268) | ($8,423) | ($77,836) |
| Collections.................... | | | | | | |
| Appropriation.............. | ($7,833) | ($7,973) | ($8,118) | ($8,268) | ($8,423) | ($77,836) |

**Removal of Requirement that VA Reimburse Certain Employees Appointed under Title 38, Section 7401(1) for Expenses Incurred for Continuing Professional Education**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| ($325) | | ($325) | |

**Proposed Program Change in Law:**

Eliminate title 38, United States Code, section 74ll, that states "The Secretary shall reimburse any full-time board-certified physician or dentist appointed under section 7401 (1) of this title for expenses incurred, up to $1,000 per year, for continuing professional education."

**Current Law or Practice:**

Section 7411 was added to title 38 as part of the 1991 physician's pay bill that increased the special pay available for physicians and dentists. This provision, which was not part of a VA legislative initiative, created an entitlement to reimbursement for physicians and dentists. No other occupations in the Veterans Health Administration (VHA) are entitled to reimbursement for continuing medical education expenses.

**Justification:**

VHA has a long history of providing educational and training support to all clinical and administrative staff. VHA has been supporting the continuing professional education of physicians and dentists long before the 1991 inclusion of Section 7411 in title 38. The Employee Education System and VA Learning University offer a large course catalog with opportunities for physicians and dentists, as well as other occupations, to obtain continuing professional education at VA expense. Medical centers and VA networks have either clinical education coordinators or Associate Chiefs of Staff for Education who oversee professional education for physicians and dentists. VHA will continue to manage training and education funding within long standing parameters in conjunction with published policies at the national and local levels.

Given this infrastructure, there is no value to the Department in having section 7411 remain in the statute. In fact the entitlement for full-time, board-certified, physicians and dentists to be reimbursed up to $1,000 each year can have a significant adverse impact on the ability of most facilities to fund needed

continuing education for employees in other critical health care occupations. If every full-time, board certified physician and dentist requested $1,000 in reimbursement, the potential annual cost would be approximately $325 million. This provision results in physicians and dentists having an entitlement to a share of the continuing education budget that far exceeds their percentage of the population that have continuing education needs. Continuance of the entitlement in section 7411 is no longer necessary since the physician and dentist pay system makes VHA more competitive in the marketplace for board certified physicians and dentists, and VA no longer needs this incentive for recruitment purposes.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations............. | ($325) | ($325) | ($325) | ($325) | ($325) | ($1,625) |
| Collections............. | | | | | | |
| Appropriation........ | ($325) | ($325) | ($325) | ($325) | ($325) | ($1,625) |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations............. | ($325) | ($325) | ($325) | ($325) | ($325) | ($3,250) |
| Collections............. | | | | | | |
| Appropriation........ | ($325) | ($325) | ($325) | ($325) | ($325) | ($3,250) |

**Amend 38 USC Section 7675, which Defines Liability for Breach of Agreement under the Employee Incentive Scholarship Program (EISP)**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| ($38) | | ($38) | |

**Proposed Program Change in Law:**

This proposal would amend title 38, United States Code, chapter 76, section 7675, subchapter VI, to provide that full-time student participants in the EISP would have the same liability as part-time students for breaching an agreement by leaving VA employment.

**Current Law or Practice:**

The current statute clearly limits liability to part-time student status participants who leave VA employment prior to completion of their education program. This allows a scholarship participant who meets the definition of full-time student to leave VA employment prior to completion of the education program, breaching the agreement with no liability. This proposal would require liability for breaching the agreement by leaving VA employment for both full- and part-time students. All other employee recruitment/retention incentive programs have a service obligation and liability component.

**Justification:**

This proposal would result in cost savings for the Department by recovering the education funds provided to employees who leave VA employment prior to fulfilling their agreement. Additionally, by promoting employee retention, the funds used to recruit and train replacement employees would also be saved. The proposal provides a direct positive impact on the provision of care for Veterans by health care professionals as it retains those individuals for service in the Veterans Health Administration (VHA).

As reflected below, the proposal does not result in costs to the Department. There are direct cost savings for VHA related to the recovery of funds from scholarship participants who leave VA employment prior to completion of their education program. There are 7,412 EISP participants (cumulative 1999 – January 2008). Of those participants, it is estimated that 0.4% are classified as full-time students and will leave VA employment prior to completion of their education program.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | ($38) | ($38) | ($39) | $0 | $0 | ($115) |
| Collections.................. | | | | | | |
| Appropriation.............. | ($38) | ($38) | ($39) | $0 | $0 | ($115) |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | $0 | $0 | $0 | $0 | $0 | ($115) |
| Collections.................. | | | | | | |
| Appropriation.............. | $0 | $0 | $0 | $0 | $0 | ($115) |

**Change in Collection and Verification of Veteran Income**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| ($2,438) | | ($2,438) | |

**Proposed Program Change in Law:**

This proposal revises the way VA conducts collection and verification of income information from Veterans for enrollment determinations regarding inability to defray necessary expenses.

VA proposes to adopt the current methodology used for initial benefit determinations for purposes of Medicare Part B premiums. In determining such income the Social Security Administration (SSA) electronically queries the Internal Revenue Service (IRS) Federal income tax database for the beneficiary's tax return from 2 years before the effective premium calendar year (e.g., 2010 income determines 2012 premiums) as opposed to asking the beneficiary to self-report their income.

Specifically, amends title 38 U.S.C. § 1722(f)(1) to state:

(1) The term "attributable income" means the income of a veteran for the most recently available year determined in the same manner as the manner in which a determination is made of the total amount of income by which the rate of pension for such veteran under § 1521 of this title would be reduced if such veteran were eligible for pension under that section.

**Current Law or Practice:**

Veterans currently self-report (via a means test) their previous calendar year's income and an enrollment determination is made based on this information. In 1986, Public Law 99-972, the Consolidated Omnibus Budget Reconciliation Act of 1985, authorized VA to establish a means test program to determine when a Veteran shall be considered as unable to defray the expenses of necessary care. This process determines who is eligible for health care based on income, and whether they are to be billed for certain copays. The financial evaluation process under this section includes consideration of a Veteran's income under 38 U.S.C. § 1722(a)(3).

Once the information is provided, title 5 U.S.C., § 5521, 26 U.S.C. § 6103(l)(7) of the Internal Revenue Code, and 38 U.S.C. § 5317 established authority for the

Veterans Health Administration (VHA) to verify Veterans' self-reported attributable income information against records maintained by the IRS and SSA.

**Justification**:

The Health Eligibility Center (HEC) currently verifies the Veteran's self-reported income though this may lag up to 2 years after its submission (the IRS tax records for a previous year are not available until July in a current year). This process can be further delayed due to the administrative and information technology time it takes to collect and process the matched data files and then begin working the potential cases. The HEC's conversion rate in reassignments to higher priority groups or disenrollment (e.g., verifying through IRS tax records that a Veteran's income is higher than what he/she self-reported) is approximately 95% for reviewed cases. As a result, affected Veterans are back billed (often more than 1 year) for copayments for their previous medical care and some are disenrolled due to their income and/or net worth exceeding established means test thresholds. Despite providing appeal rights during this process, it is not a Veteran-centric approach or a particularly efficient and effective use of VA resources.

Finally, once income eligible Veterans are enrolled they are required to submit to a means test renewal on the anniversary of their verified enrollment date each year and this process involves multiple mailings of reminders from the medical centers (90 days to expiration, 60 days, 30 days, etc.). Changing this renewal process to leverage technology will substantially reduce the opportunity for self-reported errors, improve client satisfaction, and largely reduce field time in mailing reminders and manually entering means test responses. This proposal eliminates this inefficiency after initial enrollment by completely computerizing the income verification process through automatic IRS queries for each year that a Veteran is enrolled and is income eligible.

**10-Year Cost Table**:

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations............. | ($2,438) | ($2,523) | ($2,611) | ($2,702) | ($2,797) | ($13,071) |
| Collections............. | | | | | | |
| Appropriation........ | ($2,438) | ($2,523) | ($2,611) | ($2,702) | ($2,797) | ($13,071) |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations............. | ($2,895) | ($2,996) | ($3,101) | ($3,210) | ($3,210) | ($28,483) |
| Collections............. | | | | | | |
| Appropriation........ | ($2,895) | ($2,996) | ($3,101) | ($3,210) | ($3,210) | ($28,483) |

**Medicare Ambulatory Rates for Beneficiary Travel**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| ($17,092) | | ($17,092) | |

**Proposed Program Change in Law:**

VA proposes to amend 38 U.S.C. §111 to authorize VA to reimburse vendors for authorized special mode (ambulance, wheelchair, van, etc.) transportation at the appropriate local prevailing Medicare ambulance rate when a negotiated contract rate has not been established.

**Current Law or Practice:**

VA is currently required to reimburse for any authorized special mode transportation at the "actual necessary expense", which equates to either the contracted or billed rate. This does not include the exception of emergency transportation in relation to unauthorized non-VA emergency medical care claims under 38 U.S.C. §1725, "Reimbursement for emergency treatment", in accordance with 38 U.S.C. §111, "Payments or allowances for beneficiary travel".

**Justification:**

While some VA health care facilities have contracts with local transportation providers with rates at or below Medicare reimbursement rates, many stations are unable to secure such contracts, or such contracts are limited to pre-authorized transport. As a result, facilities find that billed charges for emergency or non-contract transportation are often significantly higher (up to 3-4 times) than the Medicare rates. VA expects that it would experience significant savings in ambulance costs should Medicare payment rates be implemented. Under section 263 of the VOW to Hire Heroes Act of 2011 (Title II of Public Law 112-56), the provision is limiting and VA will draft proposed legislation to address a technical change in the law.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations............ | ($17,092) | ($16,838) | ($15,952) | ($15,715) | ($15,497) | ($81,094) |
| Collections............ | | | | | | |
| Appropriation........ | ($17,092) | ($16,838) | ($15,952) | ($15,715) | ($15,497) | ($81,094) |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations............. | ($15,281) | ($15,069) | ($14,860) | ($14,653) | ($14,653) | ($155,610) |
| Collections............ | | | | | | |
| Appropriation........ | ($15,281) | ($15,069) | ($14,860) | ($14,653) | ($14,653) | ($155,610) |

**Allow VA to Release Patient Information to Health Plans**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| $0 | $34,000 | $0 | |

**Proposed Program Change in Law**:

To amend 38 U.S.C. 7332(b) to include a provision for the disclosure of VA records of the identity, diagnosis, prognosis or treatment of a patient relating to drug abuse, alcoholism or alcohol abuse, infection with the human immunodeficiency virus (HIV) or sickle cell anemia to health plans for the purpose of VA obtaining reimbursement for care.

**Current Law or Practice:**

Disclosures of VA records of the identity, diagnosis, prognosis or treatment of a patient relating to drug abuse, alcoholism or alcohol abuse, infection with HIV or sickle cell anemia permitted without patient prior written consent are discussed in 38 U.S.C. 7332(b). The term "consent" is used in the same context as the term "authorization" in the Department of Health and Human Services (HHS) Health Insurance Portability and Accountability Act (HIPAA) privacy regulations, 45 CFR Parts 160 and 164. The Veterans Health Administration (VHA) is prohibited from disclosing information identifying a patient as having been treated for drug abuse, alcoholism or alcohol abuse, HIV infection, or sickle cell anemia (referred to as 7332-protected information in the rest of the document) for any purposes not outlined in 38 U.S.C. 7332 unless a signed, written consent is obtained from the patient.

**Justification:**

In 1986, Congress authorized legislation giving VA authority to bill private insurers for care provided to insured nonservice-connected Veterans. In 1990, this authority was expanded to allow VA to collect for the treatment of nonservice-connected conditions of insured service-connected Veterans. In 1997, Public Law 105-33 established the current Medical Care Collection Fund (MCCF). With the enactment of the Balanced Budget Act of 1997 (BBA), Congress changed the third party program into one designed to supplement VA's medical care appropriations by allowing VA to retain all third party collections and some other copayments. VA can use these funds to provide medical care to Veterans and to pay for its medical care collection expenses.

Under 38 U.S.C. 1729, VA has authority to recover from health plans or health insurance carriers the reasonable charges for treatment of a Veteran's nonservice-connected disabilities. To recover reasonable charges and obtain reimbursement for care, VA must submit bills or claims containing diagnostic code information to the health plan or health insurance carrier for the admission or episode of care. If during the admission or episode of care the Veteran was diagnosed and treated for drug abuse, alcoholism or alcohol abuse, infection with HIV or sickle cell anemia, this information is communicated via the diagnostic codes on the bill or claim to the health plan or health insurance carrier.

Under the HHS HIPAA privacy regulations, 45 CFR 164.506(c),VA is given authority to disclose any health information to health plans required for payment of care and services provided to the patient. In addition, under the Privacy Act, the Department has promulgated a routine use in the billing and collection system of records which authorizes disclosure of health information to health plans for reimbursement for care provided to the patient. However, under 38 U.S.C. 7332 VA must obtain signed, written consents to bill health plans for each treatment of a patient relating to drug abuse, alcoholism or alcohol abuse, infection with HIV or sickle cell anemia.

Often it is not possible to obtain the signed, written consent from the patient to bill the health plan or health insurance carrier for a variety of reasons. Some patients refuse to sign the written consent, while other patients are incapacitated at the time of care, and written requests to the patient following treatment often result in no response.

One of the major clinical areas affected by the current statutory language is testing for and care of HIV infection within VA. As of 2009, fewer than 10 percent of all Veterans in VA care had been tested for HIV infection, resulting in delays in diagnosis, preventable deaths, and avoidable health care expenditures. Congress recently removed significant statutory barriers to HIV testing in VA by enacting Public Law 110-387, which repealed long-standing restrictions in 38 U.S.C 7333 against wide-spread HIV testing within VA, as well as an obsolete requirement for written informed consent prior to such testing. Congress has also directed VA via House Appropriation Committee reports to implement expanded testing.

VHA's Office of Public Health has been proactively removing unnecessary barriers to HIV testing in VHA, not only as part of VHA policy, but also in response to Congressional intent and VA's responsibilities under the President's National HIV/AIDS Strategy, for which VA is a lead agency. Requiring patients to sign the Release of Information form is a remaining obstacle to expanding HIV testing among Veterans, and is contrary to Congressional intent in passing Pub. L. 110-387. It also exceptionalizes HIV testing, further hampering efforts to

diagnose Veterans with HIV infection as early as possible and link these Veterans to care. This likely has negative effects on testing for other blood borne pathogens such as hepatitis B and hepatitis C viruses. Finally, it decreases revenue collections connected with HIV care, a significant issue considering that VA is the largest HIV provider of care in the U.S., with over 24,000 HIV-infected Veterans in care, and spends over $1B annually on HIV-related care.

VA may not condition treatment on the Veteran signing an authorization to allow VA to disclose 7332-protected information to health plans or health insurance carriers for payment activities. In order for VA to bill health plans or health insurance carriers for all admissions and episodes of care for nonservice-connected disabilities, a provision authorizing this disclosure activity needs to be included in 38 U.S.C. 7332(b). This provision would ensure the use of this information for billing purposes is consistent with the use for treatment purposes in the VA – that no consent is needed for either purpose.

VA currently has existing procedures in place for Veterans to retain control of their information, for other than the 7332-protected illnesses, which currently requires the release of information. VHA Handbook 1605.1 provides Veterans the right to request their data not be shared with a variety of sources, including health plans and health insurers. If the proposed amendment to 38 U.S.C. 7332(b) is passed, VHA Handbook 1605.1 would be updated to reflect the inclusion of the 7332-protected diagnoses as a category of information that Veterans can request withheld from disclosure, and VHA would ensure that this process is clearly communicated to Veterans. The currently protected diagnoses would then be governed by the same regulations governing treatment of all other conditions.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations.................... |  |  |  |  |  | $0 |
| Collections..................... | $34,000 | $35,000 | $36,567 | $37,920 | $39,361 | $182,848 |
| Appropriation.............. | $34,000 | $35,000 | $36,567 | $37,920 | $39,361 | $182,848 |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations.................... |  |  |  |  |  | $0 |
| Collections..................... | $40,857 | $42,409 | $44,021 | $45,693 | $47,430 | $403,258 |
| Appropriation.............. | $40,857 | $42,409 | $44,021 | $45,693 | $47,430 | $403,258 |

**Consider VA a Participating Provider for "Purposes of Reimbursement"**

| Dollars in Thousands ($000) | | | |
|---|---|---|---|
| Obligations | Collections | Appropriation | FTE |
| $0 | $91,000 | $0 | |

**Proposed Program Change in Law**:

For purposes of reimbursement, VA would be treated as a participating provider, whether or not an agreement is in place with a third-party payer or health insurer, thus preventing the effect of excluding coverage or limiting payment of charges for VA care.

**Current Law or Practice:**

In 1986, Congress authorized legislation giving VA authority to bill private insurers and third-party payers for care provided to insured nonservice-connected veterans. In 1990, this authority was expanded to allow VA to collect for the treatment of nonservice-connected conditions of insured service-connected veterans. In 1997, Public Law 105-33 established the current Medical Care Collections Fund (MCCF). With the enactment of the Balanced Budget Act of 1997, Congress changed the health insurer and third-party program into one designed to supplement VA's medical care appropriations by allowing VA to retain all collections and some other copayments. VA can use these funds to provide medical care to Veterans and to pay for its medical care collection expenses. This law also granted VA authority to begin billing reasonable charges versus reasonable costs for care. Reasonable charges are based on the amounts that health insurers and third-party payers pay for the same care provided by non-government health care providers in a given geographic area.

VA has authority under 38 U.S.C. §1729 to recover from health insurers and third-party payers the reasonable charges for treatment of a Veteran's nonservice-connected disabilities.

**Justification:**

This proposal would prevent a health insurer or third-party payer from denying or reducing payment, absent an existing agreement between VA and any health maintenance organization, competitive medical plan, health care prepayment plan, preferred or participating provider organizations, individual practice associations, or other similar plan, based on the grounds that VA is not a participating provider.

Providing this authority would increase collections from third-party payers without adding staff.  Currently, VHA provides nonservice-connected care for Veterans who have health insurance; however, VA is seen as an out of network provider and therefore benefits are either limited or non-existent.  Passing this legislation and recognizing VA as a participating provider would increase the ability of VA to bill and collect for all covered services.

NOTE:  DoD, by statute as codified under 10 U.S.C. §1095, contains this explicit authority for these business practices.

**10-Year Cost Table:**

| $ in thousands | 2013 | 2014 | 2015 | 2016 | 2017 | 5 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | | | | | | |
| Collections.................... | $91,000 | $94,000 | $97,848 | $101,468 | $105,324 | $489,640 |
| Appropriation.............. | $91,000 | $94,000 | $97,848 | $101,468 | $105,324 | $489,640 |

| $ in thousands | 2018 | 2019 | 2020 | 2021 | 2022 | 10 Year |
|---|---|---|---|---|---|---|
| Obligations.................. | | | | | | |
| Collections.................... | $109,326 | $113,480 | $117,793 | $122,269 | $123,000 | $1,075,508 |
| Appropriation.............. | $109,326 | $113,480 | $117,793 | $122,269 | $123,000 | $1,075,508 |



DEPARTMENT OF VETERANS AFFAIRS

# OFFICE OF INSPECTOR GENERAL

*Office of Audits and Evaluations*

VETERANS HEALTH ADMINISTRATION

# The Beneficiary Travel Program, Special Mode of Transportation Eligibility and Payment Controls

| **AUDIT** | **REPORT #15-00022-139** | **MAY 7, 2018** |



# OIG MISSION

**To serve veterans and the public by conducting effective oversight of the programs and operations of the Department of Veterans Affairs (VA) through independent audits, inspections, and investigations.**

*In addition to general privacy laws that govern release of medical information, disclosure of certain veteran health or other private information may be prohibited by various federal statutes including, but not limited to, 38 U.S.C. §§ 5701, 5705, and 7332, absent an exemption or other specified circumstances. As mandated by law, the OIG adheres to privacy and confidentiality laws and regulations protecting veteran health or other private information in this report.*

**Report suspected wrongdoing in VA programs and operations to the VA OIG Hotline:**

**www.va.gov/oig/hotline**

**1-800-488-8244**

VA OIG 15-00022-139 | Page i | May 7, 2018



# Executive Summary

## Why the OIG Did This Audit

The purpose of the Beneficiary Travel Program is to help alleviate the costs of travel to medical appointments for eligible veterans. Under Title 38, United States Code, Section 111, VA has the authority to pay travel expenses including mileage traveled by an eligible veteran to and from a VA-approved facility for the purpose of examination, treatment, or care.[1] Under the Beneficiary Travel Program, the Veterans Health Administration (VHA) uses vendors to transport eligible beneficiaries with disabilities using vehicles approved for special mode of transportation (SMT) travel. SMT-approved vehicles include ambulances, air ambulances, wheelchair vans, or other modes of transportation that are specifically designed to transport certain types of disabled individuals.

The VHA Chief Business Office (CBO) oversees the Beneficiary Travel Program and establishes guidance for payments and allowances to eligible beneficiaries for travel costs. SMT costs grew substantially from approximately $105 million in FY 2006 to $395 million in FY 2016. Previous OIG reviews have indicated the susceptibility of the Beneficiary Travel Program to fraud and waste as the result of ineffective controls. In addition, in April 2015, the OIG received a Hotline complaint alleging VHA overpaid SMT vendors for ambulance services. Specifically, the Hotline complaint alleged VHA overpaid SMT vendors for ambulance services by paying vendors at billed rates rather than using Centers for Medicare and Medicaid Services (CMS) rates, when lower.

The OIG team conducted this audit to determine whether the VHA Beneficiary Travel Program authorized SMT services only for eligible beneficiaries, and processed SMT vendor payments in accordance with law and policy. The OIG team also determined whether VHA paid providers of ambulance services at CMS rates when cost savings could be achieved. In addition, the team determined whether beneficiaries provided SMT services also improperly claimed and received mileage reimbursements for travel associated with attending medical appointments.

---

[1] 38 United States Code, Section 111, states the Secretary may pay the actual necessary expense of travel, or an allowance based upon mileage, of any person to or from a Department facility or other place for examination, treatment, or care. 38 U.S.C. § 111(a), May 2010, provides a beneficiary travel reimbursement rate of 41.5 cents per mile.

## What the OIG Found

VA Medical Centers (VAMCs) authorized SMT services for some ineligible beneficiaries, and VAMCs did not adequately validate some SMT vendor invoices prior to authorizing payment.

VHA also missed an opportunity to reduce program expenditures on ambulance services by paying more than rates authorized by law for SMT services. VAMCs also allowed some beneficiaries that used SMT services to improperly receive mileage reimbursements for the same appointments.

### 1. VAMCs Approved Some Ineligible Beneficiaries for SMT Services

The OIG team estimated VAMCs improperly authorized SMT services for approximately 11,900 ineligible beneficiaries during the period of October 1, 2014, through December 31, 2015. Specifically, the OIG team's sample review disclosed at four of seven sites visited, VAMCs improperly authorized SMT vendors to transport approximately 13 percent (26 of 194) of beneficiaries sampled. These beneficiaries were either administratively or medically ineligible for SMT services. The majority of improperly authorized SMT services for ineligible beneficiaries identified in our sample occurred at the Detroit VAMC. The Detroit VAMC accounted for approximately 81 percent (21 of 26) of ineligible beneficiaries transported using SMT services in our sample.

To be eligible for SMT services, at least one of the following criteria must be met:

- The beneficiary must have a service-connected disability rating of 30 percent or more.
- The beneficiary is traveling for treatment of a service-connected disability.
- The beneficiary is receiving a VA pension.
- The beneficiary's income does not exceed the maximum annual pension rate. In addition, the following criteria must also be met:
- A VA clinician must determine and document that SMT is medically required, such as the beneficiary is wheelchair-bound or confined to a bed, to transport the beneficiary to a VA facility or VA-authorized health care.
- With the exception of an emergency, SMT services must be pre-authorized by VHA.

Approval of SMT services for ineligible beneficiaries occurred because Beneficiary Travel Office managers and staff disregarded SMT eligibility requirements for the convenience of the VAMC or the beneficiary. As a result, the OIG team estimated approximately 11,900 ineligible beneficiaries used SMT during the period from October 1, 2014, through December 31, 2015. If VAMCs do not strengthen controls, the OIG team estimated VHA could allow an additional 59,500 ineligible beneficiaries to use SMT services during the period from January 1, 2016, through December 31, 2020.

### 2. SMT Vendor Invoices Not Properly Validated Prior to Payment

VAMCs did not adequately validate some SMT vendor invoices before authorizing payments for approximately 21 percent (32 of 151) of invoices in our sample. Specifically, we found:

- For 18 of 32 invoices, Beneficiary Travel Office staff did not verify beneficiaries listed on vendor invoices had been authorized for SMT services, and

- For 14 of 32 invoices, Beneficiary Travel Office staff did not verify beneficiaries attended medical appointments as required.

VA policy requires staff to determine whether claimed services were actually performed prior to payment.[2] Also, VHA Handbook 1601B.05, Beneficiary Travel, Sections 19.a and 19.b, requires determining whether satisfactory evidence supports travel occurred prior to payment.[3]

Vendor invoices were not properly validated by VAMCs prior to authorizing payments because VHA did not consistently require or enforce validation of SMT invoices as required by VHA policy prior to authorizing payments. This also occurred because of inadequate oversight of SMT activities by VHA managers. Specifically, VHA policy does not require periodic reviews to ensure Beneficiary Travel Office staff complied with VHA's eligibility requirements for using SMT services. VHA Handbook 1730.02, VHA Finance Quality Assurance Review, requires each facility Director to conduct a biannual evaluation of SMT invoice activity. However, the review only includes verifying the signature of approving officials, ensuring dollar amounts are correct, and determining if there is a tracking mechanism that matches the invoice with the beneficiary's trips.[4]

Approximately 247,000 invoices for SMT services, totaling approximately $450 million, were approved and paid by VHA. For approximately 21 percent of invoices in our sample, SMT vendor invoices were not properly validated prior to payment. As a result, the OIG team estimated VHA made approximately 59,900 improper payments nationwide valued at approximately $23 million to SMT vendors from October 1, 2014, through December 31, 2015. The team also estimated that VHA potentially could make an additional $115 million in improper payments over the next five years if oversight controls are not strengthened.

### 3. VHA Did Not Implement Policy to Save on Ambulance Costs

Our fieldwork substantiated a Hotline complaint received in April 2015 and concluded VHA missed an opportunity to reduce costs for SMT ambulance services by not paying vendors at CMS rates authorized by law when savings could have been achieved.

38 USC Section 111(b)(3)(C) states

---

[2] VA Financial Policies and Procedures, Volume VIII, Chapter 1A, states VA will conduct invoice reviews to determine whether services were performed.

[3] VHA Handbook 1601B.05, Sections 19.a and 19.b states payment will be made to an organization upon satisfactory evidence that the organization actually provided the travel.

[4] VHA Handbook 1730.02, states voucher (invoices) reviews must be performed in the first and third quarters.

> In the case of transportation of a person to or from a Department facility by ambulance, the Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)) unless the Secretary has entered into a contract for that transportation with the provider.

Specifically, at five of seven sites visited, VHA payments for ambulance services were on average 60 percent above CMS rates for eligible invoices. However, despite having the statutory authority to pay the lesser of either the billed rate or the CMS rate, VHA still had not implemented this significant cost-saving measure as of January 2018. The VHA Deputy Director of CBO's Veterans Transportation Program indicated implementation of CMS rates has taken longer than initially projected due to numerous concurrent changes to the Beneficiary Travel Program.

Specific to the approximate 247,000 SMT invoices in our sample population, 33 of 151 invoices in our sample were eligible for payment at CMS rates in accordance with 38 USC Section 111(b)(3)(C). As a result, the OIG team estimated VHA could have avoided overpaying for ambulance services by approximately $11 million from October 1, 2012, to December 31, 2015.[5] If VHA continues to pay above CMS rates, it could overpay an additional $23.5 million over the next five years.

## 4. Some SMT Beneficiaries Improperly Claimed and Received Mileage Reimbursements

VHA allowed some beneficiaries using SMT to improperly claim and receive Beneficiary Travel mileage reimbursements due to a lack of management controls.[6] At two of seven sites, VHA improperly paid approximately 1 percent (eight of 1,116) of beneficiaries in our sample mileage reimbursements for travel to medical appointments while also paying SMT vendors to transport these beneficiaries to the same appointments. These beneficiaries improperly submitted certified claims for mileage reimbursements on the same day an SMT vendor transported the beneficiaries to medical appointments. The beneficiaries should have known they were not entitled to receive these mileage reimbursements because an SMT vendor provided their transportation to the VA-approved appointment. Requesting reimbursement for mileage is only authorized when

---

[5] The OIG team identified savings of approximately $11 million from October 1, 2012 through December 31, 2015. Our calculations began the next fiscal year after law authorized VHA to use CMS rates. We further estimated VHA could save an additional $23.5 million ($4.7 million multiplied by five) over the next five years.

[6] 38 U.S.C. Section 111, *Payments or Allowances for Beneficiary Travel*. VA has the authority to pay the actual necessary expense of travel, including miles traveled to and/or from a department facility or other place, in connection with vocational rehabilitation or counseling or for the purpose of examination, treatment, or care for eligible veterans; 38 U.S.C. Section 111(a), May 2010, provides a beneficiary travel reimbursement rate of 41.5 cents per mile.

beneficiaries provide their own transportation to and from VA health care or VA-authorized, non-VA health care.

At one site, seven beneficiaries were improperly reimbursed approximately $330 for mileage. The VAMC Beneficiary Travel Office staff also authorized payments to SMT vendors for approximately $3,400 to transport these beneficiaries to the same appointments. At the OIG team's request, the two sites initiated bills of collection to recover the improper payments made to the eight beneficiaries.

According to both the June 2014 and August 2015 VHA Procedure Guide 1601B.05, Chapter 1 and Code of Federal Regulations, Title 38, Chapter 1, SMT is provided at VA expense and must be approved in advance of the beneficiary transport. If a beneficiary uses SMT, travel mileage reimbursement should not be claimed or paid. None of the seven sites the OIG team visited had implemented controls to detect and prevent beneficiaries who use SMT from also receiving mileage reimbursements. While the incidences of these eight improper payments were minimal, VHA should establish controls to mitigate the risk of fraudulent or improper payments.

As a result of the lack of controls to prevent inappropriate mileage reimbursements, the OIG team estimated VHA made approximately $229,000 in improper payments to beneficiaries for mileage reimbursements from October 1, 2014, through December 31, 2015. If adequate controls are not implemented, VHA could make an additional $1.1 million in improper payments for mileage reimbursements over the next five years.

## Conclusion

VHA management needs to strengthen oversight controls for the Beneficiary Travel Program to ensure Beneficiary Travel Office staff comply with SMT eligibility policies, prevent improper payments for SMT services, reduce SMT expenditures on ambulance services, and prevent payment of mileage reimbursement to SMT users for the same appointments. If VHA had stronger oversight controls in place, Beneficiary Travel Office staff would have verified beneficiaries were eligible for SMT services and had attended medical appointments prior to paying SMT vendor invoices. In addition, VHA would have reduced SMT costs for ambulance services and not allowed some beneficiaries using SMT to improperly claim and receive Beneficiary Travel mileage reimbursements. If oversight controls are not strengthened, improper payments for SMT services may cost taxpayers approximately $173.8 million through December 31, 2020.

## What the OIG Recommended

The OIG recommended the Under Secretary for Health implement additional and more effective controls to ensure VAMCs comply with VHA policy concerning SMT eligibility determinations and improper payments. The OIG also recommended the Under Secretary implement policy to use CMS rates, when applicable, in order to reduce unnecessary SMT expenditures.

## Management Comments

The Executive in Charge, Office of the Under Secretary for Health, concurred with the recommendations. The Executive in Charge provided acceptable action plans with target completion dates no later than December 2018. The OIG will monitor VHA's progress and follow up on the implementation of the recommendations until all proposed actions are completed.

LARRY M. REINKEMEYER
Assistant Inspector General for
Audits and Evaluations

# Contents

Executive Summary ........................................................................................................
i

Abbreviations................................................................................................. viii

Introduction................................................................................................1

Results and Recommendations
..................................................................................3

    Finding 1: Ineffective Controls and Oversight of SMT Services and Vendor Payments ..........3
    Recommendations 1–6............................................................................12

Appendix A: Background
..................................................................14  Appendix B: Scope and

Methodology...........................................................................17

Appendix C: Statistical Sampling Methodology
....................................................19

Appendix D: Potential Monetary Benefits in Accordance with Inspector General Act
Amendments....................................................................................22

Appendix E: Management Comments
....................................................................23

OIG Contact and Staff Acknowledgments
................................................................27

Report Distribution
..................................................................28

# Abbreviations

| | |
|---|---|
| CBO | Chief Business Office |
| CMS | Centers for Medicare and Medicaid Services |
| FMS | Financial Management System |
| FY | fiscal year |
| IPERA | Improper Payments Elimination and Recovery Act |
| OIG | Office of Inspector General |
| SMT | special mode of transportation |
| VA | Department of Veterans Affairs |
| VAMC | Department of Veterans Affairs Medical Center |
| VISN | Veterans Integrated Service Network |
| VHA | Veterans Health Administration |

VA OIG 15-00022-139 | Page  | May 7, 2018



# Introduction

## Objective

The audit objective was to determine whether the Veterans Health Administration (VHA) Beneficiary Travel Program authorized special mode of Transportation (SMT) services only for eligible beneficiaries and processed SMT vendor payments in accordance with law and policy. To address an OIG Hotline complaint received in April 2015, the OIG team also determined whether VHA paid providers of ambulance services at Centers for Medicare and Medicaid Services (CMS) rates when cost savings could be achieved. Specifically, the Hotline complaint alleged VHA overpaid SMT vendors for ambulance services by paying vendors at billed rates rather than using CMS rates, when lower. In addition, the OIG team determined whether beneficiaries provided SMT services also improperly claimed and received mileage reimbursements for travel associated with attending medical appointments.

## VHA Beneficiary Travel Program

The purpose of the Beneficiary Travel Program is to help alleviate the costs of travel to medical appointments for eligible veterans. Under Title 38, United States Code, Section 111, VA has the authority to pay travel expenses including mileage traveled to and from a VA-approved facility for the purpose of examination, treatment, or care of eligible veterans.[7] The VHA Chief Business Office (CBO) oversees the Beneficiary Travel Program and establishes guidance for payments and allowances to eligible beneficiaries for travel costs.

## Special Mode of Transportation

Under the Beneficiary Travel Program, VHA uses vendors to transport eligible beneficiaries with disabilities using vehicles approved for SMT travel. SMT-approved vehicles include ambulances, air ambulances, wheelchair vans, or other modes of transportation that are specifically designed to transport certain types of disabled individuals. SMT costs grew substantially from approximately $105 million in FY 2006 to $395 million in FY 2016.

---

[7] 38 United States Code, Section 111, states the Secretary may pay the actual necessary expense of travel, or an allowance based upon mileage, of any person to or from a Department facility or other place for examination, treatment, or care. 38 U.S.C. § 111(a), May 2010, provides a beneficiary travel reimbursement rate of 41.5 cents per mile.

## Requesting SMT

To request SMT services for a beneficiary, a VA clinician documents the necessity for SMT in the beneficiary's electronic medical records, which includes the beneficiary's progress notes and Beneficiary Travel Consult Template.[8] The clinician then submits the request for a beneficiary to be transported via an SMT vendor based upon medical need. VHA policy requires the local Beneficiary Travel Office to review the request and approve or deny the request based on administrative and medical eligibility.[9] If approved, the Beneficiary Travel Office schedules transport of the beneficiary to VA-approved medical appointments.

---

[8] VHA Procedure Guide 1601B.05, Chapter 6, states whenever possible the request for SMT will be made via consult. The Veteran Transportation Program recommends the use of the Special Mode Beneficiary Travel consult template to communicate and document SMT requests.

[9] Dated August 10, 2015, VHA Procedure Guide 1601B.05, Chapter 6, states VA will approve payments for SMT if the beneficiary is eligible for beneficiary travel benefits or the travel was medically required and met the terms of medical necessity.

# Results and Recommendations

## Finding 1: Ineffective Controls and Oversight of SMT Services and Vendor Payments

VA Medical Centers (VAMCs) authorized SMT services for some ineligible beneficiaries and did not adequately validate some SMT vendor invoices prior to authorizing payment.[10] Additionally, VHA missed an opportunity to reduce program expenditures on ambulance services when it paid more than rates authorized by law for SMT services. VAMCs also allowed some beneficiaries who used SMT services to also improperly receive mileage reimbursements for the same appointments. Based on our sample results, the OIG team estimated VAMCs improperly authorized SMT services for an estimated 11,900 ineligible beneficiaries during the period from October 1, 2014, through December 31, 2015. Ineligible beneficiaries were authorized for SMT services because Beneficiary Travel Office managers and staff disregarded VHA policy regarding medical necessity and administrative eligibility. If VAMCs do not strengthen controls, the OIG team estimated VHA could allow an additional 59,500 ineligible beneficiaries to use SMT services during the period from January 1, 2016, through December 31, 2020.

The OIG team estimated that VHA made 59,900 improper payments nationwide, valued at approximately $23 million, to SMT vendors from October 1, 2014, through December 31, 2015. Payment of unsupported SMT invoices went undetected because Beneficiary Travel Office managers and Veterans Integrated Service Networks (VISN) management did not adequately oversee SMT activities. If VAMC controls are not strengthened, the OIG team estimated VHA could make an additional $115 million in potential improper payments to SMT vendors from January 1, 2016, through December 31, 2020.[11]

VHA missed an opportunity to reduce costs for SMT ambulance services by not paying vendors at CMS rates authorized by law, when savings could have been achieved. Specifically, at five of seven sites visited, VHA payments for ambulance services were on average 60 percent above CMS rates for eligible invoices. At the remaining two sites, the OIG team could not perform an analysis to determine potential savings using CMS rates because invoices did not meet regulatory requirements to permit payment at CMS rates or did not contain the information necessary for a cost analysis.

The OIG team estimated VHA could have saved $11 million from October 1, 2012, through December 31, 2015, by paying CMS rates for ambulance services. We also estimated VHA

---

[10] Under Title 38, United States Code, Section 111(b)(3)(C), as amended by Public Law 112-56 and P.L. 112-154, the Secretary may pay the provider the lesser of the actual charge for transportation or the amount determined by the fee schedule established unless the Secretary has entered into a contract for that transportation with the provider.

[11] The Office of Management and Budget Memorandum M-15-02, October 2014, Appendix C to Circular A-123, defines an improper payment as any payment that should not have been made, or there is insufficient documentation to support the payment.

could save an additional $23.5 million on SMT services over the next five years by paying CMS rates for ambulance services. Despite having been provided the authority to use CMS rates as of January 2018, VHA had yet to implement a policy directing VAMCs to use these rates. In addition, our finding confirmed allegations made in an OIG Hotline complaint that VHA overpaid for SMT ambulance services by paying at billed rates rather than CMS rates, when lower.

VHA also allowed some beneficiaries using SMT to improperly claim and receive Beneficiary Travel mileage reimbursements.[12] None of the seven sites the OIG team visited had implemented controls to prevent beneficiaries who use SMT from also receiving mileage reimbursements. While the incidences of these improper payments (approximately 1 percent of our sample) were minimal, VHA should establish controls to mitigate the risk of fraudulent or improper payments. As a result of the lack of controls to prevent these improper mileage reimbursements, the OIG team estimated VHA made approximately $229,000 in improper payments to beneficiaries for mileage reimbursements when SMT services were also used from October 1, 2014, through December 31, 2015. If adequate controls are not implemented, VHA could make an additional $1.1 million in improper payments for mileage reimbursements over the next five years.

## VAMCs Approved Some Ineligible Beneficiaries for SMT Services

The OIG team estimated VAMCs improperly authorized SMT services for an estimated 11,900 ineligible beneficiaries during the period from October 1, 2014, through December 31, 2015. Specifically, our sample review disclosed at four of seven sites visited, VAMCs improperly authorized SMT vendors to transport approximately 13 percent (26 of 194) of beneficiaries sampled. These beneficiaries were either administratively or medically ineligible for SMT services. This occurred because Beneficiary Travel Office managers and staff disregarded VHA policy regarding medical necessity and administrative eligibility SMT requirements for the convenience of the VAMC or the beneficiary.

## SMT Eligibility Requirements

To be eligible for SMT services, at least one of the following criteria must be met:

---

[12] Under Title 38, United States Code, Section 111(a), VA has the authority to "pay the actual necessary expense of travel," including mileage traveled "to or from a Department facility or other place in connection with vocational rehabilitation and counseling" or "for the purpose of examination, treatment, or care" for certain eligible veterans. Title 38, United States Code, Section 111(a), May 2010, provides a beneficiary travel reimbursement rate of 41.5 cents per mile.

The beneficiary must have a service-connected disability rating of 30 percent or more.

• The beneficiary is traveling for treatment of a service-connected disability.

• The beneficiary is receiving a VA pension.

• The beneficiary's income does not exceed the maximum annual pension rate.

In addition, the following criteria must also be met:

• A VA clinician must determine and document that SMT is medically required, such as the beneficiary is wheelchair-bound or confined to a bed, to transport the beneficiary to a VA or VA-authorized health care.

• With the exception of an emergency, SMT services must be pre-authorized by VHA.

## Ineligible Beneficiaries Identified Primarily at One VAMC

The majority of improperly authorized SMT services for ineligible beneficiaries identified in our sample occurred at the Detroit VAMC. The Detroit VAMC accounted for approximately 81 percent (21 of 26) of ineligible beneficiaries transported using SMT services in our sample.

The VAMC Chief Business Officer and Beneficiary Travel Office Manager authorized these ineligible beneficiaries to use SMT services. For 19 of the 21 ineligible beneficiaries, there was no documented medical condition in their VA medical records requiring SMT services. According to VHA Procedure Guide 1601B.05, medical necessity involves beneficiaries' medical records indicating a disabling condition such as being wheelchair bound or confined to a bed. Such conditions require the use of a wheelchair van or ambulance to travel. The remaining two beneficiaries did not meet any one of the four criteria for administrative eligibility in the Beneficiary Travel Program.

Based on the results of our sample, the OIG team determined the Detroit VAMC authorized SMT services totaling approximately $1.6 million to transport ineligible beneficiaries during the scope period.

The Chief Business Officer at Detroit VAMC provided the following reasons for disregarding VHA policy on the use of SMT services:

• To accommodate beneficiaries because they did not live near public transportation

• To lessen the chance beneficiaries would complain to congressional representatives

> To increase the likelihood beneficiaries would attend their medical
> appointments

Staff authorized SMT services for the other five ineligible beneficiaries identified by the OIG team at VAMCs in Boston, Massachusetts; Pittsburgh, Pennsylvania; and Kansas City, Missouri. The paragraph below provides examples of SMT services authorized for ineligible beneficiaries at the Boston VAMC.

The Boston VAMC Beneficiary Travel Office authorized SMT services for two administratively ineligible beneficiaries. In one of the two cases, an SMT vendor transported an ineligible individual to a local non-VA hospital. The individual was neither a veteran nor a veteran's dependent, and therefore ineligible for admittance or treatment at the VAMC and for SMT services. According to Beneficiary Travel Office staff, the individual arrived at the VAMC by taxi and was provided medical care. After determining the individual to be stable, the individual was transferred to an emergency medical service provider for transport to a non-VA hospital. Although the Beneficiary Travel Office staff determined the individual was not eligible for treatment at the VAMC, they authorized an improper payment to an SMT vendor for approximately $2,400 to transport the individual to the non-VA hospital. In accordance with VHA Handbook 1601B.05, Beneficiary Travel, Sections 7 and 12, the individual should have paid for transportation to the non-VA hospital.

In the second case, the Beneficiary Travel Office staff stated SMT was used because the administratively ineligible beneficiary "simply" needed a ride to his residence. The improper payment for the transport was approximately $2,100. The VAMC's Chief of Transportation concurred neither transport should have been authorized, nor the services paid for by VHA.

The OIG team estimated approximately 11,900 ineligible beneficiaries used SMT during the period from October 1, 2014, through December 31, 2015. If VAMCs do not strengthen controls, we estimate VHA could allow an additional 59,500 ineligible beneficiaries to use SMT services during the period from January 1, 2016, through December 31, 2020.

## SMT Vendor Invoices Not Properly Validated Prior to Payment

VAMCs did not adequately validate some SMT vendor invoices before authorizing payments by not consistently verifying proper authorization for travel or not verifying the beneficiary actually attended the scheduled medical appointment. Specifically, Beneficiary Travel Office staff did not verify beneficiaries listed on vendor invoices had been properly authorized for SMT services or attended medical appointments for approximately 21 percent (32 of 151) of invoices in our sample prior to validating vendor payments:

- For 18 of the 32 invoices, VAMC staff did not verify patients were authorized for SMT services prior to vendor payment.

For 14 of the 32 invoices, VHA paid for SMT services without evidence beneficiaries actually attended medical appointments on the vendor claimed dates.

VA policy requires determining whether claimed services were actually performed prior to payment.[13] Also, VHA Handbook 1601B.05, Beneficiary Travel, Section 19.a and 19.b, requires determining whether satisfactory evidence supports travel occurred prior to payment.[14]

Vendor invoices were not properly validated prior to authorizing payments because VHA did not always require or enforce validation of SMT invoices prior to authorizing payments as required by VHA. This also occurred because VHA exercised inadequate oversight of SMT activities. Specifically, VHA policy did not require periodic reviews to ensure Beneficiary Travel Office staff complied with VHA's eligibility requirements for using SMT services. VHA Handbook 1730.02, VHA Finance Quality Assurance Review, requires each facility Director to conduct a biannual evaluation of SMT invoice activity. The review includes verifying the signature of approving officials, ensuring dollar amounts are correct, and determining if there is a tracking mechanism that matches the invoice with the beneficiary's trips.[15]

Approximately 247,000 invoices for SMT services, totaling approximately $450 million, were approved and paid by VHA. For approximately 21 percent of invoices in our sample, SMT vendor invoices were not properly validated prior to payment. As a result, the OIG estimated VHA made approximately 59,900 improper payments nationwide valued at approximately $23 million to SMT vendors from October 1, 2014, through December 31, 2015. The OIG also estimated that VHA potentially could make an additional $115 million in improper payments over the next five years if oversight controls are not strengthened.

## Authorizations for SMT Services Not Verified Prior to Payment

At four of seven sites, Beneficiary Travel Office staff did not ensure beneficiaries were authorized for SMT services as listed on the vendor invoices before authorizing SMT vendor payments. Specifically, the OIG found VAMC staff did not verify patient authorization for SMT

---

[13] VA Financial Policies and Procedures, Volume VIII, Chapter 1A, states VA will conduct invoice reviews to determine whether services were performed.

[14] Payment will be made to an organization upon satisfactory evidence that the organization actually provided the travel.

[15] VHA Handbook 1730.02 states voucher (invoice) reviews must be performed in the first and third quarters.

services prior to vendor payment for 12 percent (18 of 151) of invoices sampled. This occurred because prior to the August 2015 update to the VHA Procedure Guide 1601B.05, the VHA Chief Business Office did not require Beneficiary Travel Office staff to verify beneficiaries' authorization before approving SMT vendor invoices for payments. After the August 2015 guide update, this condition continued to occur because Beneficiary Travel Office staff were not aware

they were required to verify beneficiaries' authorization for SMT services before approving SMT vendor invoices for payment.

In addition to the August 2015 VHA Procedure Guide 1601B.05 requiring verification of eligibility prior to scheduling SMT, the guide also requires verification of beneficiary eligibility prior to vendor invoice payment. While the June 2014 VHA Procedure Guide 1601B.05 did not require verification of beneficiary authorization for SMT services before approving an SMT vendor invoice, the issues the OIG team identified indicate this was a weakness in the design of management controls for SMT vendor payments. The lack of adequate management controls allowed Beneficiary Travel Office staff to approve the payment of approximately 10 percent (15 of 151) of invoices for beneficiaries not authorized for SMT services prior to the August 2015 guide update. Although VHA strengthened management controls in the August 2015 guide update, Beneficiary Travel Office staff approved SMT vendor payments for approximately 2 percent (three of 151) of invoices without verifying beneficiaries listed on vendor invoices were properly authorized for SMT services.

## Medical Appointments Not Verified Prior to Payment

At five of seven sites, Beneficiary Travel Office staff did not verify beneficiaries attended medical appointments prior to authorizing SMT vendor payments. The OIG found VHA paid for SMT services without evidence beneficiaries attended medical appointments on the vendor claimed dates for approximately 9 percent (14 of 151) of invoices sampled. While VHA Handbook 1601B.05, Beneficiary Travel, Section 19, requires ensuring satisfactory evidence supports travel occurred prior to payment, neither the June 2014 nor August 2015 versions specifically required verification of a beneficiary attending a medical appointment before approving an SMT vendor invoice. The lack of clear guidance contributed to Beneficiary Travel Office staff approving the payment of the 14 invoices without verifying beneficiaries attended medical appointments on the SMT vendors' claimed date of service. For 10 of the 14 invoices, the Beneficiary Travel Office staff eventually provided the OIG evidence that the beneficiaries attended medical appointments on the vendor-claimed dates. For the remaining four invoices, however, the Beneficiary Travel Office staff was unable to provide evidence beneficiaries attended the medical appointments on the vendor-claimed dates of service.

Authorizing payments without verifying beneficiaries attended medical appointments on the claimed date of service also occurred because the VHA Chief Business Office did not implement procedures requiring Beneficiary Travel Office staff to verify beneficiaries attended medical appointments prior to authorizing SMT vendor payments. At all seven sample sites, the SMT invoice review process consisted only of verifying the beneficiary's name, social security number, and determining whether the beneficiary was scheduled for SMT services on the date(s) listed in the vendor's invoice. However, the process did not include verifying whether the beneficiary actually attended the scheduled appointment.

## Lack of Adequate Oversight of the Vendor Payment Process

Payment of unsupported SMT invoices also went undetected because VISNs did not adequately oversee SMT activities. Instead of implementing oversight procedures, the seven VISN Directors responsible for the sites visited stated they relied on VAMC managers to self-evaluate SMT activities. However, VAMC self-evaluations did not include testing to verify beneficiaries met all SMT eligibility requirements or attended medical appointments. VHA policy only requires the evaluation of SMT invoices by verifying approving official signatures, correct amounts, and invoices matched the request for the beneficiary's trip.[16] More importantly, the handbook does not include steps to verify the beneficiary met all eligibility requirements or attended their medical appointment as part of the review procedures.

Some VISN Directors stated they relied on information provided through the Improper Payments Elimination and Recovery Act (IPERA) evaluations.[17] However, the VISN-level IPERA reports did not provide SMT-specific information. Instead, the reports provided summary-level information for the entire Beneficiary Travel program. Detailed information about SMT invoices paid when beneficiaries did not meet all eligibility requirements or did not attend medical appointments was available to VHA's IPERA Review Team. However, VHA's Office of Finance IPERA Review Team did not include the information in the VISN-level IPERA reports. It also did not make the information available to the VISN Directors through other means such as VHA's IPERA Share Point website.

## VHA Did Not Implement Policy to Save on Ambulance Costs

Our fieldwork substantiated a Hotline complaint and concluded VHA missed an opportunity to reduce costs for SMT ambulance services by paying at billed rates rather than at CMS rates authorized by law when savings could have been achieved.[18] Specifically, at five of seven sites visited, VHA payments for ambulance services were on average 60 percent above CMS rates for eligible invoices. On average, VHA improperly paid approximately $1,215 for ambulance transports which were eligible for payment at CMS rates. The average cost for the same ambulance transports using CMS rates would have been approximately $487 per trip, or about $728 lower per SMT transport than what was actually paid. In addition, the finding also confirmed allegations made in the OIG Hotline complaint that VHA overpaid for SMT ambulance services by paying at billed rates rather than CMS rates, when lower.

---

[16] VHA Handbook 1730.02, sections 2 and 11.

[17] The Improper Payments Elimination and Recovery Act require each agency to periodically review and identify its programs and activities that may be susceptible to significant improper payments.

[18] The OIG received a Hotline complaint alleging VHA overpaid vendors for ambulance services by paying SMT vendors at billed rates rather than using CMS rates, when lower.

Specific to the approximate 247,000 SMT invoices in our sample population, 33 of 151 invoices were eligible for payment at CMS rates in accordance with 38 USC Section 111(b)(3)(C).[19] The remaining 118 invoices did not meet regulatory requirements to permit payment at CMS rates or did not contain the information necessary for a cost analysis. Specifically, these 118 invoices were for non-ambulance services (five of seven sites); contracted ambulance services (five of seven sites); ambulance services to or from a non-VA facility (five of seven sites), or; the invoices did not contain CMS rate codes (one of seven sites).

According to 38 USC Section 111(b)(3)(C); as amended in November 2011 and August 2012, in the case of transportation of a person to or from a VA facility by ambulance, the Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or the amount determined by the CMS rates established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)) unless the Secretary has entered into a contract for that transportation with the provider.

Despite having the statutory authority to pay the lesser of either the billed rate or the CMS rate, VHA still had not implemented this significant cost-saving measure as of January 2018. The VHA Deputy Director of CBO's Veterans Transportation Program indicated implementation of CMS rates has taken longer than initially projected due to numerous concurrent changes to the Beneficiary Travel Program. The Deputy Director estimated that once implemented, VHA should experience a minimum cost savings of $11 million in the first year of using CMS rates.

The Deputy Director anticipated revised regulations would be implemented in FY 2017. However, VHA had not implemented revised regulations as of January 2018. In addition, VHA has not provided justification as to why the implementation of CMS rates was not given priority among the broader changes to the Beneficiary Travel Program, given VHA's substantial cost savings estimate.

Based on our review, we estimated VHA could have saved approximately $11 million from October 1, 2012, through December 31, 2015. Furthermore, VHA could save an additional $23.5 million over the next five years by paying CMS rates for ambulance services.

## VAMCs Lack Controls to Identify Improperly Reimbursed Mileage

VHA allowed some beneficiaries using SMT to improperly claim and receive Beneficiary Travel mileage reimbursements. Specifically, the OIG identified a small number of mileage reimbursements that were improperly paid to beneficiaries transported via SMT for the same medical appointments in our sample. At two of seven sites, VHA improperly paid approximately one percent (eight of 1,116) of beneficiaries in our sample mileage reimbursements for travel to medical appointments while also paying SMT vendors to transport these beneficiaries to the

---

[19] The VA Secretary may pay the provider of the transportation the lesser of the actual charge for the transportation or the amount determined by established CMS rates unless the Secretary has entered into a contract for that transportation with the provider.

same appointments. These beneficiaries improperly submitted certified mileage reimbursement claims for the same day an SMT vendor transported the beneficiaries to medical appointments. The beneficiaries should have known they were not entitled to receive these mileage reimbursements because an SMT vendor provided their transportation to the VA-approved appointment. If a beneficiary uses SMT, travel mileage reimbursement should not be claimed or paid. Under Title 38, United States Code, Section 111, VA may authorize SMT services, such as an ambulance or wheelchair van, for eligible, disabled beneficiaries or VA may pay the actual necessary expense of travel, including mileage traveled to and/or from a VA-approved facility. Beneficiaries are not permitted to use SMT services and also receive payment for mileage traveled for the same appointment since the beneficiary did not travel in a personal vehicle.[20] Mileage reimbursement requests are authorized when beneficiaries provide their own transportation to and from VA health care or VA-authorized, non-VA health care.

At one site, seven beneficiaries were improperly reimbursed a total of approximately $330 for mileage expenses when SMT services were provided. The VAMC Beneficiary Travel Office staff also authorized payments to SMT vendors for approximately $3,400 to transport these beneficiaries to the same appointments. At the OIG team's request, the two sites initiated bills of collection to recover the improper payments made to the eight beneficiaries.

According to both the June 2014 and August 2015 VHA Procedure Guide 1601B.05, Chapter 1 and Code of Federal Regulations, Title 38, Chapter 1, SMT is provided at VA expense and must be approved in advance of the beneficiary transport. If a beneficiary uses SMT, travel mileage reimbursement should not be claimed or paid. None of the seven sites the OIG team visited had implemented controls to detect and prevent beneficiaries who use SMT from also receiving mileage reimbursements. Previous VA OIG reviews indicated the susceptibility of the Beneficiary Travel Program to fraud and waste resulting from ineffective controls. While the incidences of these eight improper payments were minimal, VHA should establish controls to mitigate the risk of fraudulent or improper payments.

As a result of the lack of controls to prevent inappropriate mileage reimbursements, VHA made approximately $229,000 in improper payments to beneficiaries for mileage reimbursements when SMT services were also used from October 1, 2014, through December 31, 2015. If adequate controls are not implemented, VHA could make an additional $1.1 million in improper payments for mileage reimbursements over the next five years.

## Conclusion

VHA management needs to strengthen oversight controls over the Beneficiary Travel Program to ensure Beneficiary Travel Office staff comply with SMT eligibility policies, prevent improper

---

[20] According to Title 38 U.S.C. Section 111, the Secretary may pay the actual necessary expense of travel or in lieu thereof an allowance based upon mileage (at a rate of 41.5 cents per mile) of any person to or from a Department facility or other place in connection with required vocational rehabilitation, counseling or for the purpose of examination, treatment, or care.

payments for SMT services, reduce unnecessary SMT expenditures on ambulance services, and prevent payment of mileage reimbursement to SMT users for the same appointments. If VHA had stronger oversight controls in place, Beneficiary Travel Office staff would have verified beneficiaries were eligible for SMT services and attended medical appointments prior to paying SMT vendor invoices. In addition, VHA would have reduced SMT costs for ambulance services and not allowed some beneficiaries using SMT to improperly claim and receive Beneficiary Travel mileage reimbursements. If oversight controls are not strengthened, improper payments for SMT services may cost taxpayers approximately $173.8 million through December 31, 2020.

## Recommendations 1–6

1. The OIG recommended the Under Secretary for Health require Veterans Integrated Service Networks to implement periodic reviews to ensure clinicians and Beneficiary Travel Office staff comply with Veterans Health Procedure Guide 1601B.05 eligibility requirements for authorizing Special Mode of Transportation services.

2. The OIG recommended the Under Secretary for Health modify Veterans Health Administration Procedure Guide 1601B.05 to require the Beneficiary Travel Office staff to verify beneficiaries attended medical appointments prior to approving payment of Special Mode of Transportation vendor invoices.

3. The OIG recommended the Under Secretary for Health require Veterans Integrated Service Networks to implement periodic reviews to ensure VA Medical Centers comply with Veterans Health Administration policies for verifying beneficiaries listed on vendor invoices had been properly authorized for Special Mode of Transportation services or attended medical appointments prior to approving payment of Special Mode of Transportation vendor invoices.

4. The OIG recommended the Under Secretary for Health ensure the Improper Payments Elimination and Recovery Act reports provided to Veterans Integrated Service Networks are modified to include Special Mode of Transportation information specific to vendor payments by VA Medical Centers.

5. The OIG recommended the Under Secretary for Health implement use of Centers for Medicare and Medicaid Services Rates when savings can be achieved for Special Mode of Transportation ambulance services in accordance with 38 U.S.C. Section 111(b)(3)(C).

6. The OIG recommended the Under Secretary for Health implement controls to prevent beneficiaries using Special Mode of Transportation services from also obtaining mileage reimbursement for the same appointment(s).

## Management Comments and OIG Response

The Executive in Charge, Office of the Under Secretary for Health, concurred with the recommendations. The Executive in Charge provided acceptable action plans with target

completion dates no later than December 2018. The OIG will monitor VHA's progress and follow up on the implementation of the recommendations until all proposed actions are completed.

# Appendix A: Background

## The Beneficiary Travel Program

The Beneficiary Travel Program is intended to help alleviate the costs of travel to medical appointments for eligible veterans. Under Title 38, United States Code, Section 111, VA has the authority to pay the actual necessary expense of travel, including mileage traveled to and/or from a department facility or other place in connection with vocational rehabilitation or counseling or for the purpose of examination, treatment, or care for eligible veterans.[21] Under the Beneficiary Travel program, VA may also authorize SMT services, such as an ambulance or wheelchair van, for eligible, disabled beneficiaries.

VHA's Chief Business Office was established in April 2002 as the single accountable authority for the development of administrative processes, policy, regulations, and directives associated with the delivery of VA health benefit programs.[22] The Beneficiary Travel Program is organizationally aligned under CBO and is responsible for assisting eligible beneficiaries with travel to and from VA or VA-authorized health care, through either mileage reimbursement or special mode of transportation.

## Beneficiary Travel Program Eligibility

Travel benefit eligibility for beneficiaries is based on certain criteria, generally related to service connection and income levels, the type of medical appointment, or a combination of the two. Certain beneficiaries who are not veterans, including family members or others accompanying veterans to appointments, are also eligible for the benefit. Travel costs reimbursable to beneficiaries include a per-mile rate for travel in private vehicles; SMT in certain circumstances; and airfare, meals, and lodging in some cases.

## Special Mode of Transportation

SMT refers to travel in an ambulance, wheelchair van, or other vehicle specially designed for transporting beneficiaries with disabilities. Other types of transportation, such as subways, trains, airplanes, and privately owned vehicles, are not considered special mode even if they have been adapted or are capable of transporting beneficiaries with disabilities.

To receive benefits for SMT, the veteran must be eligible for the benefit and the SMT must be medically required. Reimbursement for SMT must be requested prior to the trip, except in the case of medical emergencies. Round-trip SMT travel from a VA facility to a non-VA facility is authorized for reimbursement if the transportation is required. In addition, SMT travel to an

---

[21] 38 United States Code, Section 111, states the Secretary may pay the actual necessary expense of travel to or from a Department facility or other place for an examination, treatment, or care. 38 U.S.C. § 111(a), May 2010, provides a beneficiary travel reimbursement rate of 41.5 cents per mile.

[22] VHA's Chief Business Office is aligned under VHA's Office of Community Care.

emergency facility for treatment can be retroactively authorized if the emergency episode of care is approved for VA payment.

## Program Expenditures

The cost of the Beneficiary Travel Program grew substantially in recent years, from approximately $198.8 million in FY 2006 to $907.2 million in FY 2016. The cost for SMT services during the same period grew from approximately $105 million in FY 2006 to $395 million in FY 2016, or approximately 376 percent. During the period from FY 2006 through FY 2016, SMT expenditures averaged approximately 37 percent of the total cost of the Beneficiary Travel Program. Table 1 presents the relative expenditures for SMT and other Beneficiary Travel cost for FY 2006 through FY 2016.



**Table 1. Expenditures for SMT and Other Beneficiary Travel**

*Source: OIG Compilation using VA's Financial Management System and VA FY 2008 through FY 2018 Congressional Submissions.*

## Previous VA OIG Work

Previous VA OIG reviews have indicated the susceptibility of the Beneficiary Travel Program to fraud and waste resulting from ineffective controls. In 2015, the OIG issued the *Review of Alleged Beneficiary Travel Irregularities at Hudson Valley Health Care System, Hampton and Lexington VA Medical Centers* (VA-15-02400-524, December 7, 2015). The OIG concluded Beneficiary Travel Program staff at the three VAMCs did not consistently approve mileage reimbursement vouchers appropriately, and made one or more processing errors for 21 percent

(31 of 149) of vouchers reviewed during calendar year 2014. Therefore, the OIG estimated these VAMCs improperly approved reimbursements totaling approximately $37,400 for beneficiaries who claimed travel during 2014.

In 2013, the OIG issued the *VHA Audit of the Beneficiary Travel Program* (VA-11-00336-292, February 6, 2013). The OIG concluded VHA did not perform regular reconciliations of approved travel reimbursements with paid reimbursements, accurately code financial transactions, and reduce the risk of fraudulent payments. According to VHA data, VA medical facilities paid approximately $89 million more in beneficiary travel than the facilities approved during the same period. Approximately $46.5 million of the discrepancy was due to miscoded expenses; however, approximately $42.5 million remained unexplained. In addition, the OIG determined VHA needed program controls to verify the accuracy of beneficiary self-reported information prior to claim approval.

In 2011, VA OIG issued *Review of Cincinnati VA Medical Center Beneficiary Travel Office Allegations* (VA-10-03292-217, July 6, 2011). The OIG concluded the Beneficiary Travel Office approved mileage reimbursements to beneficiaries traveling to the Cincinnati VAMC when a closer VA facility could have provided the necessary care or services. In addition, the OIG determined beneficiaries received mileage reimbursements without completing appointments at VA medical facilities.

In 2010, VA OIG issued *VHA Audit of Oversight of Patient Transportation Contracts* (VA-09-01958-155, May 17, 2010). The OIG concluded VISN contract managers did not effectively provide the oversight needed to develop, administer, award, and monitor patient transportation contracts. The OIG also concluded VHA missed opportunities to provide full and open competition when soliciting offers and awarding patient transportation contracts.

# Appendix B: Scope and Methodology

## Scope

The OIG team performed audit work from March 2016 through February 2018 at VA Central Office in Washington, DC, and the VA Medical Centers in El Paso, Texas; Jamaica Plain (Boston), Massachusetts; San Juan, Puerto Rico; Detroit, Michigan; Denver, Colorado; Kansas City, Missouri; and Pittsburgh, Pennsylvania. The OIG team selected a statistical sample of 151 vouchers paid during FY 2015 and the first quarter of FY 2016 from VA's Financial Management System for attribute testing and traced the sample to supporting documentation. The OIG team tested management controls to ensure that

- Beneficiaries were eligible for transportation provided by SMT vendors,

- Beneficiaries received medical care prior to paying SMT vendor invoices, and

- Beneficiaries were not reimbursed for mileage when also using SMT for same travel day.

To address concerns made in an OIG Hotline complaint received in April 2015, the OIG also tested whether VHA paid SMT vendors the lesser of the actual ambulance charges or applicable rates established by CMS under the Social Security Act.

## Methodology

Our methodology included reviewing applicable laws, regulations, and VA guidance. The OIG team interviewed CBO management at VA Central Office in Washington, DC. We also interviewed management and personnel at seven VA Medical Centers in El Paso, Texas; Jamaica Plain (Boston), Massachusetts; San Juan, Puerto Rico; Detroit, Michigan; Denver, Colorado; Kansas City, Missouri; and Pittsburgh, Pennsylvania. In addition, the OIG interviewed VISN management and personnel at VISN 17, Arlington, Texas; VISN 1, Bedford, Massachusetts; VISN 8, St. Petersburg, Florida; VISN 10, Ann Arbor, Michigan; VISN 19, Glendale, Colorado; VISN 15, Kansas City, Missouri; and VISN 4, Pittsburgh, Pennsylvania.

The OIG team statistically selected a sample of 22 invoices paid during FY 2015 and the first quarter of FY 2016 for each of the seven VAMCs visited. During fieldwork in Kansas City, Missouri, the OIG determined that three of the invoices selected for testing were for SMT services at other VISN 15 VAMCs. However, OIG staff was not able to replace those three invoices, which resulted in testing 19 statistically selected invoices at the Kansas City VAMC.

The OIG team traced the 151 statistically selected invoices to supporting documentation to verify whether payments to SMT vendors were validated prior to payment. In addition, using the 151 invoices the OIG team tested 194 beneficiaries to determine their eligibility for SMT services. We also tested 1,116 beneficiaries on the 151 invoices to identify beneficiaries transported via SMT that also requested and were paid Personally Owned Vehicle mileage for travel on the same day. The OIG team also tested the 151 invoices to determine whether providers of SMT ambulance transports were paid the lessor of either actual charges or established CMS rates.

## Fraud Assessment

The audit team assessed the risk that fraud, violations of legal and regulatory requirements, and abuse could occur. The audit team also exercised due diligence in staying alert to any fraud indicators by:

- Examining vendor ownership records to identify potential conflicts of interest, and

- Reviewing payment records to ensure beneficiaries were not improperly reimbursed for travel mileage when using SMT for the same travel day.

While the OIG did identify potentially improper payments for mileage reimbursement, the OIG did not identify instances of potential fraud during this audit requiring referral to the OIG Office of Investigations.

## Data Reliability

The OIG team relied on computer-processed data from the VA Financial Management System. To assess the reliability of this data, the OIG team interviewed responsible officials and staff at VA Central Office in Washington, DC, and VAMCs to validate the source documentation. We also compared the data extracted from the VA Financial Management System to documentation in the Beneficiary Travel Application System. The OIG team concluded that the computer-processed data the OIG obtained from the VA Financial Management System and relied on was sufficiently reliable to support our project objectives, conclusions, and recommendations.

## Government Standards

Our assessment of internal controls focused on those controls relating to our audit objectives. We conducted this performance audit in accordance with generally accepted government auditing standards. These standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. The evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

# Appendix C: Statistical Sampling Methodology

To determine whether the Beneficiary Travel Program authorized SMT services only for eligible beneficiaries, and processed SMT vendor payments in accordance with law and policy, the OIG sampled invoice payment records within the SMT Program.

## Population

The OIG team used information extracted from VHA's Financial Management System to identify the population of invoices paid by VHA to SMT service providers during FY 2015 and the first quarter of FY 2016 (October 1, 2014, through December 31, 2015). In FY 2015, the population consisted of 204,111 invoice payments totaling approximately $366.2 million. In the first quarter of FY 2016, the population consisted of 43,002 invoice payments totaling approximately $83.8 million.

## Sampling Design

The OIG used a multistage stratified sampling approach to select the SMT sample. In the first stage, the population of sites was segregated first into three groups based on dollar amount per site. In the second stage, a sample of invoices was randomly selected for those sites selected in the first stage. In the third stage, a sample of riders was selected from each invoice. For the scope period of this audit, the OIG statistically selected and tested 151 SMT invoice payment records at the selected VAMCs:

- FY 2015

- o Twenty invoice payment records associated with six sites

- o Eighteen invoice payment records associated with one

site[23]

- FY 2016
  - o Two invoice payment records associated with six sites o

One invoice payment records associated with one site[24]

## Weights

The OIG calculated estimates in this report using weighted sample data. Sampling weights are computed by taking the product of the inverse of the probabilities of selection at each stage of sampling.

## Projections and Margins of Error

The OIG used WesVar software to calculate the weighted population estimates and associated sampling errors. WesVar employs replication methodology to calculate margins of error and confidence intervals that correctly account for the complexity of the sample design. The margins of error and confidence intervals are indicators of the precision of the estimates. If the OIG repeated this audit with multiple samples, the confidence intervals would differ for each sample but would include the true population value 90 percent of the time. Based on the sample results, the OIG team estimated VHA allowed approximately 11,900 ineligible beneficiaries to use SMT services nationwide during the audit scope period. The OIG also estimated VHA improperly paid approximately $23 million to SMT vendors when there was no evidence beneficiaries attended medical appointments or had been properly authorized for SMT services during the scope period. These payments could total an estimated $115 million ($23 million multiplied by five years) in improper payments within the next five years.

The OIG team also estimated VHA improperly reimbursed approximately $229,000 to beneficiaries who used SMT and also claimed mileage reimbursements during the audit scope period. These payments could total an estimated $1.1 million ($229,000 multiplied by five years) in improper payments over the next five years. The OIG team also estimated VHA could have saved approximately $6.3 million on SMT ambulance expenditures for the period from October 1, 2012 through September 30, 2014, and an additional $4.7 million during the scope period. These savings could total an additional $23.5 million ($4.7 million multiplied by five) over the

[23] The FY 2015 sample population for this site did not have 20 invoice payment records available for testing purposes.

[24] The first quarter FY 2016 sample population for this site did not have two invoice payment records available for testing purposes.

next five years on SMT services by paying CMS rates for ambulance services. **Table 2. Statistical Estimations Summary for SMT Activities**[25]

| Attribute | Point Estimate | Margin of Error | Lower Limit | Upper Limit |
|---|---|---|---|---|
| Ineligible Beneficiaries | 11,900 | 6,400 | 1,300 | 22,500 |
| Improper Payments (in millions) | $23 | $4 | $18.9 | $41.9 |
| Reimbursed Mileage | $229,000 | $183,000 | $6,000 | $412,000 |
| **Attribute** | **Point Estimate** | **Margin of Error** | **Lower Limit** | **Upper Limit** |
| Ambulance Expenditures (in millions) | $4.7 | $2.2 | $2.5 | $6.8 |

*Source: VA OIG statistical analysis of SMT invoice payment records*

[25] All monetary benefits identified during the 15-month scope period were annualized to allow for estimates to be projected on an annual basis.

# Appendix D: Potential Monetary Benefits in Accordance with Inspector General Act Amendments

| Recommendation | Explanation of Benefits | Better Use of Funds | Questioned Costs |
|---|---|---|---|
| 1–4 | Estimated unnecessary costs associated with VAMCs approving improper payments to SMT vendors.[26] | $115,000,000 | $23,000,000 |
| 5 | Estimated savings associated with SMT ambulance services rates.[27] | $34,500,000 | |
| 6 | Estimated unnecessary costs associated with VAMCs approving improper Beneficiary Travel mileage reimbursements.[28] | $1,100,000 | $229,000 |
| | **Total** | **$150,600,000** | **$23,229,000** |

[26] The OIG team identified approximately $23 million in improper payments during the audit scope period. We estimated VHA could make an additional $115 million ($23 million multiplied by five years) in potential improper payments to SMT vendors over the next five years.

[27] The OIG team identified savings of approximately $11 million from October 1, 2012, through December 31, 2015. (Note: Calculations began the next fiscal year after law authorized VHA to use CMS rates.) The OIG team further estimated VHA could save an additional $23.5 million ($4.7 million multiplied by five) over the next five years.

[28] The OIG team identified approximately $229,000 in improper payments during the audit scope period. We estimated VHA could make an additional $1.1 million ($229,000 multiplied by five years) in improper payments to beneficiaries over the next five years.

# Appendix E: Management Comments

**Department of Veterans Affairs Memorandum**

Date:     March 26, 2018

From:  Executive In Charge, Office of the Under Secretary for Health (10)

Subj:    OIG Draft Report, Veterans Health Administration: Audit of the Beneficiary Travel Program,
           Special Mode of Transportation Eligibility and Payment Controls

To:       Assistant Inspector General for Audits and Evaluations (52)

Thank you for the opportunity to review and comment on the Office Inspector General (OIG) draft report
Veterans Health Administration: Audit of the Beneficiary Travel Program, Special Mode of Transportation
Eligibility and Payment Controls. I concur with OIG's report as written and provide a reply to
recommendations 1 through 6.

If you have any questions, please email Karen Rasmussen, M.D., Director, Management Review Service
at VHA10E1DMRSAction@va.gov.


*(Original signed by)*

Carolyn M. Clancy, M.D.

Attachment


*For accessibility, the original format of this appendix has been modified to
comply with Section 508 of the Rehabilitation Act of 1973, as amended.*

Attachment

**VETERANS HEALTH ADMINISTRATION (VHA)**
**Action Plan**

**OIG Draft Report, Veterans Health Administration: Audit of the Beneficiary Travel Program, Special Mode of Transportation Eligibility and Payment Controls**

**Date of Draft Report: February 28, 2018**

| Recommendations/ Actions | Status | Target Completion Date |
|---|---|---|

**Recommendation 1. We recommended the Under Secretary for Health require Veterans Integrated Service Networks to implement periodic reviews to ensure clinicians and Beneficiary Travel Office staff comply with Veterans Health Procedure Guide 1601B.05 eligibility requirements for authorizing Special Mode of Transportation services.**

**VHA Comment**: Concur. This recommendation is related to the Department of Veterans Affairs (VA) Office of Inspector General's (OIG) finding that there are ineffective controls and oversight of Special Mode of Transportation (SMT) services and vendor payments at Veterans Integrated Service Networks (VISN) and VA medical centers (VAMC). VAMCs approved some ineligible beneficiaries for SMT services.

VHA Member Services senior leadership will pursue a delegation of authority with appropriate VA and VHA officials in order to outline ownership and accountability for maintaining and overseeing standardized control procedures to be implemented by VISNs and VAMCs. Veterans Transportation Program (VTP), in conjunction with Member Services Business Policy, has initiated enhancements to Procedure Guide 1601B.05 to include requirements to conduct periodic reviews of the Special Mode (SM) authorization and documentation review process. Member Service's pursuit of authority to establish and maintain standard procedures will also enable VTP to direct the medical centers' use of the SMT Reminder Dialogue consult, developed by VTP in May 2016. With consistent utilization of the SMT Reminder Dialogue consult, VHA can identify and address problems and improve the accuracy of SMT eligibility determinations.

**Status:   Target Completion Date:**

In progress  December 2018

**Recommendation 2. We recommended the Under Secretary for Health modify Veterans Health Administration Procedure Guide 1601B.05 to require the Beneficiary Travel Office staff to verify beneficiaries attended medical appointments prior to approving payment of Special Mode of Transportation vendor invoices.**

**VHA Comment**: Concur. This recommendation is related to VA OIG's finding that there are ineffective controls and oversight of SMT services and vendor payments — specifically, medical appointments are not verified prior to payment at VISNs and VAMCs.

VTP has initiated enhancements to Procedure Guide 1601B.05 to include clarification that attendance at medical appointments must be verified as part of confirming services were provided prior to issuance for payment. While developing the revised procedures, VTP will issue interim training guidance during its national site calls to clarify the medical appointment attendance requirement.

**Status:   Target Completion Date:**

In progress  December 2018

**Recommendation 3**. **We recommended the Under Secretary for Health require Veterans Integrated Service Networks to implement periodic reviews to ensure VA Medical Centers comply with Veterans Health Administration policies for verifying beneficiaries listed on vendor invoices had been properly authorized for SMT services or attended medical appointments prior to approving payment of Special Mode of Transportation vendor invoices.**

**VHA Comment**: Concur. This recommendation is related to VA OIG's finding that there are ineffective controls and oversight of SMT services and vendor payments at VISNs and VAMCs.

VTP will utilize the authorities pursued in Recommendation 1 to establish requirements in Procedure Guide 1601B.05 for VAMCs to verify beneficiaries included in vendor invoices prior to issuance of SMT payments. Additionally, enhancements to Procedure Guide 1601B.05 include requirements to conduct periodic reviews of the invoice review and approval process.

**Status:   Target Completion Date:**

In progress  September 2018

**Recommendation 4**. **We recommended the Under Secretary for Health ensure the Improper Payments Elimination and Recovery Act reports provided to Veterans Integrated Service Networks are modified to include Special Mode of Transportation information specific to vendor payments by VA Medical Centers.**

**VHA Comment**: Concur. This recommendation is related to VA OIG's finding that there are ineffective controls and oversight of SMT services and vendor payments at VISN and medical centers.

While VISN-level Improper Payments Elimination and Recovery Act (IPERA) reports did not provide SMT specific information prior to and during 2017, VHA's IPERA SharePoint Web site included real-time Dashboard reporting functionalities that allowed VISNs and VAMCs to filter results of IPERA evaluations by transportation (special mode) and benefit (mileage) sample types, as well as by VISN and VAMC number. Moving forward, annual VISN-level IPERA reports will also include evaluation results specific to sample types.

**Status:   Target Completion Date:**

In progress  December 2018

**Recommendation 5**. **We recommended the Under Secretary for Health implement use of Centers for Medicare and Medicaid Services Rates when savings can be achieved for Special Mode of Transportation ambulance services in accordance with 38 U.S.C. Section 111(b)(3)(C).**

**VHA Comment**: Concur. This recommendation is related to VA OIG's finding that VHA did not implement policy to save on ambulance costs.

Upon release of 38 U.S.C. Section 111(b)(3)(C) VTP sought the Office of General Counsel's (OGC) opinion on the ability to immediately implement the lesser Centers for Medicare and Medicaid Services (CMS) rates to ensure there was no conflict with Beneficiary Travel (BT) regulatory authority within 38 CFR Part 70. It was OGC's opinion that BT regulation changes were needed to adopt payment of CMS rates. VTP added CMS rates to its proposed regulatory changes; however, due to other additions, modifications required longer than anticipated to complete and approve. VTP has since separated the change to CMS rates from the base regulation updates in order to expedite approval. The CMS change is

currently in OGC for concurrence. Once the regulation is published as a final rule, use of CMS Rates will be implemented.

**Status:   Target Completion Date:**

In progress  December 2018

**Recommendation 6.** **We recommended the Under Secretary for Health implement controls to prevent beneficiaries using SMT services from also obtaining mileage reimbursement for the same appointment(s).**

**VHA Comment**: Concur. This recommendation is related to VA OIG's finding that some SMT beneficiaries improperly claimed and received mileage reimbursements at VISNs and VAMCs.

VTP will utilize the authorities pursued in Recommendation 1 to establish requirements in Procedure Guide 1601B.05 implementing procedures to alert BT staff of SM services provided at VA expense prior to authorizing mileage payments.

**Status:   Target Completion Date:**

In progress  December 2018

# OIG Contact and Staff Acknowledgments

| | |
|---|---|
| **Contact** | For more information about this report, please contact the Office of Inspector General at (202) 461-4720. |

| | |
|---|---|
| **Inspection/Audit/Review Team** | Timothy J. Crowe, Director |
| | Dennis Capps |
| | Debra Cato |
| | Charles F. Chiarenza |
| | Kristopher Kasey |
| | Johnny McCray |
| | Thomas McPherson Brandon |
| | Parrinello |
| | Nelvy Viguera Butler |

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Veterans Benefits Administration
National Cemetery Administration
Assistant Secretaries
Office of General Counsel
Office of Acquisition, Logistics, and Construction
Board of Veterans' Appeals
Veterans Health Administration Chief Business Office
Veterans Transportation Program Office
Compliance and Internal Control Program Office

## Non-VA Distribution

House Committee on Veterans' Affairs
House Appropriations Subcommittee on Military Construction, Veterans Affairs, and
    Related Agencies
House Committee on Oversight and Government Reform
Senate Committee on Veterans' Affairs
Senate Appropriations Subcommittee on Military Construction, Veterans Affairs, and
    Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget

**OIG reports are available at www.va.gov/oig.**

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Ch. 1

### Unified Agenda of Federal Regulatory and Deregulatory Actions

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Semiannual regulatory agenda.

**SUMMARY:** This Agenda announces the regulations that the Department of Veterans Affairs (VA) will have under development or review during the 12-month period beginning fall 2019. The purpose in publishing the Department's regulatory agenda is to allow all interested persons the opportunity to participate in VA's regulatory planning.

**ADDRESSES:** Interested persons are invited to comment on the entries listed in the agenda by contacting the individual agency contact listed for each entry or by writing to: Director, Regulations Management (00REG), Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420.

**FOR FURTHER INFORMATION CONTACT:** Michael Shores at (202) 461–4921 or Consuela Benjamin at (202) 461–5952.

**SUPPLEMENTARY INFORMATION:** This document is issued pursuant to Executive Order 12866 "Regulatory Planning and Review" (and implementing guidance) and the Regulatory Flexibility Act, which require that executive agencies semiannually publish in the **Federal Register** an agenda of regulations that they have under development or review. This edition of the Unified Agenda of Federal Regulatory and Deregulatory Actions includes The Regulatory Plan, which appears in both the online Unified Agenda and in part II of the **Federal Register** that includes the Unified Agenda. VA's Statement of Regulatory Priorities is included in the Plan.

**Michael P. Shores,**
*Director, Office of Regulation Policy and Management.*

### DEPARTMENT OF VETERANS AFFAIRS—PROPOSED RULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 327 .................... | Change in Rates VA Pays for Special Modes of Transportation ..................................................................... | 2900–AP89 |

## DEPARTMENT OF VETERANS AFFAIRS (VA)

*Veterans Health Administration*

Proposed Rule Stage

### 327. Change in Rates VA Pays for Special Modes of Transportation

*E.O. 13771 Designation:* Fully or Partially Exempt.

*Legal Authority:* 38 U.S.C. 101; 38 U.S.C. 111; 38 U.S.C. 111A; E.O. 11302; E.O. 13520

*Abstract:* VA proposes to amend the implementing regulations at 38 CFR part 70 to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C), as amended by Public Law 112–56, 112–154, and 114–58, which permits VA to pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)), unless VA has entered into a contract for that transportation. Stated more plainly, VA would be able to pay the lesser of the actual charge for ambulance transportation or the amount determined by Centers for Medicaid and Medicare Services (CMS) fee schedules, unless VA has entered into a contract for ambulance transportation. Additionally, VA proposes to codify how it will pay vendors for two forms of non-emergent special mode of transportation services offered to veterans: wheelchair and stretcher van services.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM .................. | 01/00/20 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Mike Davis, Director Member Services (10NF), Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420, *Phone:* 404 828–5691, *Email:* mike.davis2@va.gov.

*RIN:* 2900–AP89

[FR Doc. 2019–26587 Filed 12–23–19; 8:45 am]

**BILLING CODE 8320–01–P**



October 28, 2020

Subject: Economic Regulatory Impact Analysis for RIN 2900-AP89(P), Change in Rates that VA Pays for Special Modes of Transportation

I have reviewed this rulemaking package and determined the following:

1. This rulemaking will not have an annual effect on the economy of $100 million or more, as set forth in Executive Order 12866.

2. This rulemaking will have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act, 5 U.S.C. 601-612.

3. This rulemaking is not likely to result in the expenditure of $100 million or more by State, local, and tribal governments, in the aggregate, or by the private sector, in any one year, under the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532.

4. Attached please find the relevant Regulatory Impact Analysis document, dated October 28, 2020.

**Approved by:**
Nicole Korkos
Chief Economist
Office of Regulation Policy & Management (00REG)
Office of the Secretary

(Attachment)

**Regulatory Impact Analysis for RIN 2900-AP89(P)**

**Title of Regulation:** Change in rates that VA pays for special modes of transportation

**Purpose:** To determine the economic impact of this rulemaking.

**Statement of Need for Regulatory Action:** In accordance with VA's statutory authority at 38 U.S.C. § 111, VA provides Beneficiary Travel (BT) benefits to eligible veterans and other eligible persons who need to travel in connection with vocational, rehabilitation, counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care.

VA would revise the regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) at 38 CFR Part 70 to permit VA to exercise its authority to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Centers for Medicaid and Medicare (CMS) fee schedules unless VA has entered into a contract for the ambulance transportation. Additionally, VA proposes to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services. Revising the regulations at 38 CFR Part 70 would result in significant cost avoidance (i.e., cost savings) for the agency from its current mechanism of providing necessary transport for veterans and other eligible persons who need to travel.

**Summary:** The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) regulations to establish a new payment methodology for special modes of transportation to include travel by ambulance (i.e., advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 CFR 414.605) and travel by modes other than ambulance (i.e., wheelchair van, stretcher van).

The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. However, VA does not believe the impact on such vendors will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Most of VA's payments for such services (estimated at over 99%) are made pursuant to a contract between VA and the wheelchair or stretcher van service vendor. Wheelchair and stretcher van services must be approved by VA prior to the service being provided because such services are generally not needed in connection with a medical emergency (see 38 C.F.R. 70.4(d)(3)), increasing the likelihood that such services are obtained through a contract vendor. Generally, the only time VA uses a non-contract vendor for this type of transport is when services are needed outside the scope of a contract or the contract vendor cannot perform the needed services, which occurs on a very infrequent basis.

2

For travel by modes other than ambulance, VA proposes to establish a payment methodology based on states' posted rates or the actual charge. VA refers to the published Medicaid rates in each respective state as "posted rates." If a state has a posted rate, then VA would be able to access it. Relying on posted rates alone, however, would present two challenges: (1) VA cannot direct vendors to one source to obtain the posted rate for these services, and (2) not every state has posted rates for these services or makes them available. Because of this, VA proposes to establish a payment methodology for these other types of special mode of transportation services, while VA collects data for the purpose of developing a new payment methodology, which would be the subject of a separate and later rulemaking.

VA would replace this payment methodology for travel by modes other than ambulance at some time in the future, once VA has collected enough data to develop a new methodology.

**Benefits:** We believe the proposed revisions would reduce improper payments and help eliminate payment error, waste, and abuse. Use of CMS rates (or the lesser actual charge) for non-contracted ambulance providers would help maintain uniformity with CMS, eliminate confusion for vendors, and help VA control costs.

**Estimated Impact:** VA has determined that there are transfer savings to VA as a result of this rulemaking. The transfer savings are estimated to be $36.8 million in FY 2021 and $199.6million over a five-year period. VA has detailed its assumptions regarding the transfer savings in the "Assumptions and Methodology of the Analysis" section below.

**Alternative Policy Approaches:** VA's Veterans Transportation Program (VTP) considered several alternatives to regulatory action. One alternative VA considered was seeking a national contract for special mode transportation. It became apparent that taking this action would reduce current, market-based pricing schemes in certain local areas and the pricing schemes for those areas would likely remain above CMS rates. VA's ability to realize savings would prove wholly dependent on the number of qualified vendors present. For specialized markets of this type, where qualified vendors may be limited, available vendors may prove reticent to execute a fixed-price contract for economic reasons.

VA also considered a phase-in of the CMS fee schedule for ambulance transportation for entities making under $100K in annual revenue but determined that an immediate adoption of CMS rates (as would be set forth in VA's final rule) is reasonable because ambulance transportation providers are accustomed to CMS rates. Furthermore, we believe the cost savings VA would realize as a result of adopting CMS rates would be beneficial to the veteran population. However, we are sensitive to the needs of the health care community and we welcome any comments regarding plausible alternatives for implementation, including a phased-in approach. For reasons discussed above, we believe our proposed payment methodology is preferable to the alternatives discussed herein.

**Assumptions and Methodology of the Analysis:** This change in proposed § 70.30(a)(4) would implement the discretionary authority in 38 U.S.C. § 111(b)(3)(C).

3

Current § 70.30(a)(4) requires VA to pay the "actual cost of a special mode of transportation." This has been applied to mean that VA pays billed charges or, when VA has entered into a contract with a provider of special mode transportation, the contracted rate.

Proposed revisions to § 70.30(a)(4)(i) would permit VA to pay the lesser of the actual charge for special mode transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act unless VA has entered into a contract for transportation with the provider of special mode transportation. See 42 U.S.C. § 1395m(l). Proposed revisions to § 70.30(a)(4)(ii) would permit VA to pay the lesser of the vendor's actual charge or the lowest posted rate in an involved state for travel by modes other than ambulance.

CMS posts its annual schedule nationally, which is the basis for VA's payment calculations. Fee schedules are created by CMS, and it is unclear whether CMS seeks input from vendors, but it appears that CMS provides a notice and comment period when publishing rates (https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/). VA would seek to protect itself against savvy vendors increasing their prices to the maximum of the CMS fee schedule during schedule revisions. VA would undertake this activity because adopting the schedule protects VA from paying "actual charges" that are typically higher than the CMS fee schedule. Additionally, VA would maintain its option to contract based on volume or other reasons which may entice rates even more favorable in some cases.

It is highly unlikely that CMS would increase rates beyond an annual economic price increase and typically the rates are always much lower than provider billed charges or insurance company allowed reimbursements. However, if CMS rates increased significantly to accommodate vendors, then VA would pay the increased charges or pursue contracts at a lesser rate.

The methodology VA used to estimate cost savings is as follows: Using the Financial Management System (FMS) 830 870 cube, VA estimated the total FY 2021 charges for beneficiary travel ambulance payments as $550,307,884 and removed the estimated charges for contracted transport which is estimated at $280,955,416 (because the proposed changes would have no impact on contracted services). This resulted in estimated non-contract billed charges being $269,352,468.

Currently, the billed charges VA pays are greater than the amount VA would pay using the CMS fee schedule. VA estimates that for FY 2021, the CMS rates for non-contracted ambulance services would be about 86.23% of billed charges for such services. This estimate is based on VA's methodology for ambulance cost savings. VA estimated 49% of the total special mode transportation budget (i.e., budget object code 2120) are billed as non-contract costs based on information gathered from our facilities.

VA established an average cost per transport for non-contracted ambulance services based on the information gathered as referenced above, and we established an average CMS reimbursement rate combining all HCPCS codes. VA does not have the ability to determine payments made by facilities by HCPCS code, but we determined that CMS reimbursement rates are on average 13.68% lower than costs being reimbursed under current regulatory guidelines (i.e., billed charges). VA multiplied the

4

estimated number of transports by the estimated cost per transport for each (i.e., non-contract/CMS). We subtracted the estimated CMS reimbursement costs from the estimated current non-contract costs to establish our cost avoidance. Finally, VA used the same methodology used annually for the Presidential Budget assuming a four (4%) percent utilization increase per year for each year in FY 2021-FY 2025.

| FY | Billed Charges – All SMT transport (ground/air) | Billed Charges - Contracted SMT transport (ground/air) | Billed Charges - non-contract SMT transport (ground/air) | Payments using CMS methodology | Cost Avoidance (Savings) |
|---|---|---|---|---|---|
| 2021 | $550,307,884 | $280,955,416 | $269,352,468 | $232,505,050 | ($36,847,418) |
| 2022 | $572,320,199 | $292,193,633 | $280,126,566 | $241,805,252 | ($38,321,314) |
| 2023 | $595,213,007 | $303,881,378 | $291,331,629 | $251,477,462 | ($39,854,167) |
| 2024 | $619,021,528 | $316,036,633 | $302,984,894 | $261,536,561 | ($41,448,334) |
| 2025 | $643,782,389 | $328,678,098 | $315,104,290 | $271,998,023 | ($43,106,267) |
| 5 - Year Total | $2,980,645,007 | $1,521,745,158 | $1,458,899,847 | $1,259,322,348 | ($199,577,500) |
| Numbers may not add due to rounding | | | | | |
| FMS 830 870 cube used for estimate as of 1/10/19 | | | | | |

**Regulatory Flexibility Act:**

The Secretary hereby certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601-612. VA estimates that this proposed rule would potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally. The per entity burden is estimated to be less than 1% of preliminary receipts for all entities in NAICS Code 621910. VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99% of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1% of small entities within these NAICS Codes are estimated to be impacted by this proposed rule. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

**Submitted by:**
Paul Perry
Deputy Director, Veterans Transportation Program
Veterans Health Administration
810 Vermont Avenue, NW
Washington, DC 20420

**Date:** October 28, 2020


applicable provisions of this section and part 385 of this title, sufficient to allow each applicable copyright owner to assess the manner in which the digital music provider determined the adjustment and the accuracy of the adjustment. As appropriate, an adjustment may be calculated using estimates permitted under paragraph (d)(2) of this section.

(iii) Where applicable, the particular sound recordings and uses to which the adjustment applies.

(iv) A description of the reason(s) for the adjustment.

(4) In the case of an underpayment of royalties, the digital music provider shall pay the difference to the mechanical licensing collective contemporaneously with delivery of the statement of adjustment or promptly after being notified by the mechanical licensing collective of the amount due. A statement of adjustment and its related royalty payment may be delivered together or separately, but if delivered separately, the payment must include information reasonably sufficient to allow the mechanical licensing collective to match the statement of adjustment to the payment.

(5) In the case of an overpayment of royalties, the mechanical licensing collective shall appropriately credit or offset the excess payment amount and apply it to the digital music provider's account, or upon request, issue a refund within a reasonable period of time.

(6)(i) A statement of adjustment must be delivered to the mechanical licensing collective no later than 6 months after the occurrence of any of the scenarios specified by paragraph (k)(6)(ii) of this section, where such an event necessitates an adjustment. Where more than one scenario applies to the same cumulative statement of account at different points in time, a separate 6-month period runs for each such triggering event.

(ii) A statement of adjustment may only be made:

(A) Except as otherwise provided for by paragraph (c)(5) of this section, where the digital music provider discovers, or is notified of by the mechanical licensing collective or a copyright owner, licensor, or author (or their respective representatives, including by an administrator or a collective management organization) of a relevant sound recording or musical work that is embodied in such a sound recording, an inaccuracy in the cumulative statement of account, or in the amounts of royalties owed, based on information that was not previously known to the digital music provider despite its good-faith efforts;

(B) When making an adjustment to a previously estimated input under paragraph (d)(2) of this section;

(C) Following an audit of a digital music provider that concludes after the cumulative statement of account is delivered and that has the result of affecting the computation of the royalties payable by the digital music provider (*e.g.,* as applicable, an audit by a sound recording copyright owner concerning the amount of applicable consideration paid for sound recording copyright rights); or

(D) In response to a change in applicable rates or terms under part 385 of this title.

(7) A statement of adjustment must be certified in the same manner as a cumulative statement of account under paragraph (j) of this section.

(l)(1) Subject to the provisions of 17 U.S.C. 115, a digital music provider and the mechanical licensing collective may agree in writing to vary or supplement the procedures described in this section, including but not limited to pursuant to an agreement to administer a voluntary license, provided that any such change does not materially prejudice copyright owners owed royalties required to be transferred to the mechanical licensing collective for the digital music provider to be eligible for the limitation on liability described in 17 U.S.C. 115(d)(10). The procedures surrounding the certification requirements of paragraph (j) of this section may not be altered by agreement. This paragraph (l)(1) does not empower the mechanical licensing collective to agree to alter any substantive requirements described in this section, including but not limited to the required royalty payment and accounting information and sound recording and musical work information.

(2) The mechanical licensing collective shall maintain a current, free, and publicly accessible online list of all agreements made pursuant to paragraph (l)(1) of this section that includes the name of the digital music provider (and, if different, the trade or consumer-facing brand name(s) of the services(s), including any specific offering(s), through which the digital music provider engages, or has engaged at any time during the period identified in paragraph (c)(1) of this section, in covered activities) and the start and end dates of the agreement. Any such agreement shall be considered a record that a copyright owner may access in accordance with 17 U.S.C. 115(d)(3)(M)(ii). Where an agreement made pursuant to paragraph (l)(1) of this section is made pursuant to an agreement to administer a voluntary license or any other agreement, only those portions that vary or supplement the procedures described in this section and that pertain to the administration of a requesting copyright owner's musical works must be made available to that copyright owner.

(m) Each digital music provider shall, for a period of at least seven years from the date of delivery of a cumulative statement of account or statement of adjustment to the mechanical licensing collective, keep and retain in its possession all records and documents necessary and appropriate to support fully the information set forth in such statement (except that such records and documents that relate to an estimated input permitted under paragraph (d)(2) of this section must be kept and retained for a period of at least seven years from the date of delivery of the statement containing the final adjustment of such input).

Dated: October 30, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–24528 Filed 11–4–20; 8:45 am]

**BILLING CODE 1410–30–P**

---

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 70

**RIN 2900–AP89**

## Change in Rates VA Pays for Special Modes of Transportation

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's (VHA) beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule (AFS) established by the Centers for Medicare & Medicaid Services (CMS). For travel by modes other than ambulance, VA proposes to establish a payment methodology based on states' posted rates or the actual charge. VA would replace this payment methodology for travel by modes other than ambulance at

some time in the future, once VA has collected enough data to develop a new methodology.

**DATES:** Comments must be received on or before January 4, 2021.

**ADDRESSES:** Comments may be submitted through *www.Regulations.gov.* Comments received will be available at *regulations.gov* for public viewing, inspection or copies.

**FOR FURTHER INFORMATION CONTACT:** Paul Perry, Deputy Director, Veterans Transportation Program (10NB2G), Veterans Health Administration, Department of Veterans Affairs, 810 Vermont Avenue NW, Washington, DC 20420, (404) 828–5691 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** Pursuant to 38 U.S.C. 111, VA provides beneficiary travel benefits to eligible veterans who need to travel in connection with vocational rehabilitation, counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care. Regulations governing beneficiary travel benefits provided by the Veterans Health Administration (VHA) are in part 70 of title 38, CFR. See also Executive Order 11302. Under part 70, VA pays for a ''special mode of transportation'' when that travel is medically required, the beneficiary is unable to defray the cost of that transportation, and VHA approved the travel in advance or the travel was undertaken in connection with a medical emergency. See 38 CFR 70.2 (defining the term ''[s]pecial mode of transportation''), and 38 CFR 70.4(d) (establishing criteria for approval of special mode travel). We propose to amend these regulations to implement the discretionary authority in 38 U.S.C. 111(b)(3)(C), which permits VA to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Medicare Part B AFS established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)), unless VA has entered into a contract for that transportation. Additionally, VA proposes to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services. VA would use this payment methodology while VA collects data for the purpose of developing a new payment methodology. In doing so, VA would establish two (2) categories of special modes of transportation for purposes of determining the payment rate: Travel by ambulance, which would be defined in 38 CFR 70.2, and travel by modes other than ambulance. We

believe that these changes would reduce improper payments and help eliminate payment error, waste, and abuse in line with the goals of Executive Order 13520.

## §70.2 Definitions

We propose to add a definition of ''ambulance'' that would be necessary in administering payments for special mode transportation. VA would define ambulance by cross-referencing the CMS regulations related to coverage and payment for ambulance services. See 42 CFR 410.40, 410.41, and Part 414, Subpart H. VA proposes to define ambulance to mean advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those services are defined in 42 CFR 414.605. Consistent with 42 CFR 414.605, the definitions of these terms would apply to ground (both land and water) ambulance services and to air ambulance services unless otherwise specified. Currently Medicare Part B covers these levels of ambulance services under 42 CFR 410.40(c), as well as paramedic ALS intercept, when applicable criteria are met. VA would exclude paramedic ALS intercept (PI) because this service involves arriving on scene, providing initial care, and intermittent accompaniment of a person on an ambulance. Paramedic ALS intercept does not involve actual transport of the person, and the vendor may charge for mere arrival on scene rather than providing care during transport. VA would not pay for this charge because PI does not involve active care during transportation from the point of emergency to the final location. CMS regulations are an appropriate reference source in our proposed definition of ''ambulance'' because VA is proposing to rely on the Medicare Part B AFS payment rates in its new ambulance payment methodology as authorized by 38 U.S.C. 111(b)(3)(C). VA would make this change in an effort to maintain uniformity with CMS and eliminate confusion for vendors.

## §70.30 Payment Principles

Under current 38 CFR 70.30(a)(4), VA pays the ''actual cost of a special mode of transportation.'' Current 38 CFR 70.30(a)(4) has not been revised to reflect VA's payment authority for travel by ambulance in 38 U.S.C. 111(b)(3)(C), and this proposed rule would implement that authority in 38 CFR 70.30(a)(4). Moreover, VA would revise 38 CFR 70.30(a)(4) to prescribe a payment methodology for travel by

modes other than ambulance while VA collects data for the purpose of developing a new payment methodology. The new payment methodology would be the subject of a separate and later rulemaking.

We would restructure the current language in 38 CFR 70.30(a)(4) to distinguish between travel by ambulance and travel by modes other than ambulance in new 38 CFR 70.30(a)(4)(i) and 70.30(a)(4)(ii), respectively. Additionally, VA would state that the proposed payment methodologies for special modes of transportation would apply notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120, which relates to payment or reimbursement of the expenses of emergency treatment under 38 U.S.C. 1728. Proposed 70.30(a)(4) would also specify that the payment methodologies for travel by ambulance and travel by modes other than ambulance would not apply when VA has entered into a contract with the vendor. When VA has entered into a contract with the vendor, the terms of the contract would govern VA's payments. Finally, proposed 70.30(a)(4) would define the term ''posted rate'' for purposes of the payment methodology for travel by modes other than ambulance, discussed further below.

Proposed 38 CFR 70.30(a)(4)(i) would establish in regulation a new payment methodology for travel by ambulance. VA would adopt the Medicare Part B AFS for transport by ambulance, and we would pay for ambulance services based on the lesser of either the AFS payment amount or the actual charge, unless (as would be stated in 38 CFR 70.30(a)(4)) VA has executed a contract for ambulance services from the vendor in which case the terms of the contract would govern VA payments. For ALS1 and BLS, the AFS includes rates for emergency and nonemergency transportation. For purposes of proposed section 70.30(a)(4)(i), VA would apply the applicable CMS rate based on the vendor's coded invoice. New 38 CFR 70.30(a)(4)(i) would read as follows: ''Travel by ambulance: VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).''

Proposed 38 CFR 70.30(a)(4)(ii) would establish in regulation a payment methodology for travel by modes other than ambulance. Unlike travel by ambulance, there are no existing Medicare Part B payment rates for transport by modes other than

ambulance to include wheelchair and stretcher van services. While Medicare Part B does not currently cover these services, there are Healthcare Common Procedure Coding System (HCPCS) codes for them, and CMS makes reference to the published Medicaid rates in each respective state. In this proposed rule, we refer to the published Medicaid rates in each respective state as "posted rates." If a state has a posted rate, then VA would be able to access it. Relying on posted rates alone, however, would present two challenges: (1) VA cannot direct vendors to one source to obtain the posted rate for these services, and (2) not every state has posted rates for these services or makes them available. Because of this, VA proposes to establish a payment methodology for these other types of special mode of transportation services, while VA collects data for the purpose of developing a new payment methodology, which would be the subject of a separate and later rulemaking.

Proposed 38 CFR 70.30(a)(4) would define the term "posted rate" for purposes of section 70.30(a)(4)(ii) to mean "the applicable Medicaid rate for the special mode transport in the state or states where the vendor is domiciled or where transport occurred ("involved states")." Proposed 38 CFR 70.30(a)(4)(ii)(A)–(C) would create a payment methodology to pay the lesser of either: (1) A state's posted rate for these services, or (2) the vendor's actual charge. VA would undertake this action as stated above to comport with Executive Order 13520. By paying the lowest rate between a state's posted rate or the vendor's actual charge, VA would actively reduce the possibility of waste and abuse in a major VA program.

VA recognizes that some vendors provide services only in states where they are domiciled or are domiciled in states other than the ones in which they provide services. VA would attempt to account for both singular and multi-jurisdictional vendors. VA also recognizes that transport can occur across state lines, and we would account for this in the payment methodology. For situations where the vendor provides services in a state or states other than where the vendor is domiciled, or where special mode transport occurs across state lines, VA would pay the lowest posted rate among the states involved or the actual charge, whichever is lowest. If the states involved have no posted rate, then VA would pay the vendor's actual charge. We would make this change in an effort to control costs where we work with regional or national vendors who provide services in multiple jurisdictions, and the posted rates in the areas where they deliver services are lower or higher than the vendor's state or states of domicile. In the absence of a posted rate for an involved state, VA would pay the lowest among the posted rates of the other state or states or the vendor's actual charge. Proposed 70.30(a)(4)(ii) would read as follows: "Travel by modes other than ambulance: VA will pay the lesser of: (A) The vendor's actual charge. (B) The posted rate in the state where the vendor is domiciled. If the vendor is domiciled in more than one state, the lowest posted rate among all involved states. (C) The posted rate in the state where transport occurred. If transport occurred in more than one state, the lowest posted rate among all involved states. NOTE TO PARAGRAPH (a)(4)(ii): In the absence of a posted rate for an involved state, VA will pay the lowest among the available posted rates or the vendor's actual charge."

After utilizing this methodology for an initial 90 calendar day period after this rule becomes final in the **Federal Register**, VA would analyze the payments made to vendors for travel by modes other than ambulance and determine whether we have enough payment data (*e.g.*, arithmetic average of actual charges, locality rates, or posted rates) to develop a new methodology. If VA determines that it has enough payment data, then VA would develop a payment methodology using the lowest possible rate. If VA does not have enough payment data to create a methodology after the initial 90 calendar day period, then VA would continue to collect data for as many 90 calendar day intervals as VA would deem necessary to gather sufficient payment data, which we do not anticipate exceeding 18 months from the effective date of the final rule. Subsequently, VA would propose a new methodology for travel by modes other than ambulance in a separate rulemaking in the **Federal Register**.

## Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This proposed rule would have no such effect on State, local, and tribal governments, or on the private sector.

## Paperwork Reduction Act

This proposed rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

## Executive Orders 12866, 13563, and 13771

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Information and Regulatory Affairs has determined that this rule is not a significant regulatory action under Executive Order 12866.

VA's impact analysis can be found as a supporting document at *http:// www.regulations.gov,* usually within 48 hours after the rulemaking document is published. Additionally, a copy of the rulemaking and its impact analysis are available on VA's website at *http:// www.va.gov/orpm/,* by following the link for "VA Regulations Published From FY 2004 Through Fiscal Year to Date."

This proposed rule is expected to be an E.O. 13771 deregulatory action. Details on the estimated cost savings of this proposed rule can be found in the rule's economic analysis.

## Regulatory Flexibility Act

The Secretary hereby certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601–612. VA estimates that this proposed rule would potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally. The per entity burden is estimated to be less than 1% of preliminary receipts for all entities in NAICS Code 621910. VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care

Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because we do not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99% of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1% of small entities within these NAICS Codes are estimated to be impacted by this proposed rule. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

**Catalog of Federal Domestic Assistance**

The Catalog of Federal Domestic Assistance numbers and titles for the programs affected by this document are 64.008—Veterans Domiciliary Care; 64.012—Veterans Prescription Service; 64.013—Veterans Prosthetic Appliances; 64.014—Veterans State Domiciliary Care; 64.015—Veterans State Nursing Home Care; 64.026—Veterans State Adult Day Health Care; 64.029—Purchase Care Program; 64.035—Veterans Transportation Program; 64.040—VHA Inpatient Medicine; 64.041—VHA Outpatient Specialty Care; 64.042—VHA Inpatient Surgery; 64.043—VHA Mental Health Residential; 64.044—VHA Home Care; 64.045—VHA Outpatient Ancillary Services; 64.046—VHA Inpatient Psychiatry; 64.047—VHA Primary Care; 64.048—VHA Mental Health clinics; 64.049—VHA Community Living Center; 64.050—VHA Diagnostic Care.

**List of Subjects in 38 CFR Part 70**

Administrative practice and procedure, Alcohol abuse, Alcoholism, Claims, Day care, Dental health, Drug abuse, Foreign relations, Government contracts, Grant programs—health, Grant programs—veterans, Health care, Health facilities, Health professions, Health records, Homeless, Medical and dental schools, Medical devices, Medical research, Mental health programs, Nursing homes, Philippines, Reporting and recordkeeping requirements, Scholarships and fellowships, Travel and transportation expenses, Veterans.

**Signing Authority**

The Secretary of Veterans Affairs, or designee, approved this document and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs. Brooks D. Tucker, Assistant Secretary for Congressional and Legislative

Affairs, Performing the Delegable Duties of the Chief of Staff, Department of Veterans Affairs, approved this document on October 28, 2020, for publication.

**Consuela Benjamin,**

*Regulations Development Coordinator, Office of Regulation Policy & Management, Office of the Secretary, Department of Veterans Affairs.*

For the reasons set forth in the preamble, the Department of Veterans Affairs proposes to amend 38 CFR part 70 as follows:

## PART 70—VETERANS TRANSPORTATION PROGRAMS

■ 1. The authority citation for part 70 is revised to read as follows:

**Authority:** 38 U.S.C. 101, 111, 111A, 501, 1701, 1714, 1720, 1728, 1782, 1783, E.O. 11302, and E.O. 13520.

■ 2. Amend § 70.2, by adding in alphabetical order the definition "Ambulance" to read as follows:

*Ambulance* for this subpart, means advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those terms are defined in 42 CFR 414.605.

*       *       *       *       *

■ 3. In § 70.30 amend paragraph (a)(4) to read as follows:

**§ 70.30    Payment principles.**

(a) * * *

(4) VA payments for special modes of transportation will be made in accordance with this section, unless VA has entered into a contract with the vendor in which case the terms of the contract will govern VA payments. This section applies notwithstanding 38 CFR 17.55 and 17.56 for purposes of 38 CFR 17.120. For purposes of paragraph (ii), the term "posted rate" refers to the applicable Medicaid rate for the special mode transport in the state or states where the vendor is domiciled or where transport occurred ("involved states").

(i) Travel by ambulance: VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).

(ii) Travel by modes other than ambulance: VA will pay the lesser of:

(A) The vendor's actual charge.

(B) The posted rate in the state where the vendor is domiciled. If the vendor is domiciled in more than one state, the lowest posted rate among all involved states.

(C) The posted rate in the state where transport occurred. If transport occurred in more than one state, the lowest posted rate among all involved states.

**Note to paragraph (a)(4)(ii) of this section:** In the absence of a posted rate for an involved state, VA will pay the lowest among the available posted rates or the vendor's actual charge.

*       *       *       *       *

[FR Doc. 2020–24261 Filed 11–4–20; 8:45 am]

**BILLING CODE 8320–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

**[EPA–R05–OAR–2020–0388; FRL–10016–08–Region 5]**

## Air Plan Approval; Ohio; Base Year Emission Inventories and Emissions Statement Rule Certification for the 2015 Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve, under the Clean Air Act (CAA), a revision to the State Implementation Plan (SIP) submitted by the Ohio Environmental Protection Agency on July 24, 2020. The CAA establishes emission inventory requirements for all ozone nonattainment areas. The revision will address the emission inventory requirements for the Cleveland, Ohio (OH) nonattainment area and the Ohio portion of the Cincinnati, Ohio-Kentucky (Cincinnati) ozone nonattainment area, as designated under the 2015 ozone National Ambient Air Quality Standard (NAAQS or standard). Also, EPA is proposing to approve Ohio's certification that its stationary annual emissions statement regulation, which has been previously approved by EPA under a prior ozone standard, satisfies the CAA emissions statement rule requirement for the Cleveland and Cincinnati nonattainment areas under the 2015 ozone NAAQS.

**DATES:** Comments must be received on or before December 7, 2020.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2020–0388 at *http://www.regulations.gov* or via email to *blakley.pamela@epa.gov*. For comments submitted at *Regulations.gov*, follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. For either manner of

# United States Senate
WASHINGTON, DC 20510

September 19, 2022

The Honorable Denis R. McDonough
Secretary of Veterans Affairs
810 Vermont Ave NW
Washington, DC  20420

Dear Secretary McDonough,

We write today to express concerns with the Department of Veterans Affairs' (VA) proposed rule change for rates paid for air ambulance services (AP89). We find this proposed rule change to be premature, as VA currently lacks a substantive analysis on the costs of providing air ambulance services to Veterans Health Administration (VHA) beneficiaries.

We recognize VA is working towards improving operations and simplifying finances, yet this rule change proposal would likely contribute to less accessibility to quality emergency care for our nation's veterans, especially in rural areas. The proposal would have VA pay the lesser of either the Medicare Part B Ambulance Fee Schedule (AFS) or the actual charge of the transportation service(s). As it stands, the AFS payment rate is minimal in comparison to the operational costs of the air ambulance bases, and implementing this rule will only exacerbate the financial strain that is placed on these transportation providers, causing many of the smaller service sites to close. Further, the AFS rates are based on cost data from 1998, and have only been adjusted to accommodate the annual ambulance inflation factor, not including more critical cost components like provider services and operational costs.

The demand for air ambulances in rural areas is especially high given the limited specialized services available across great distances and sometimes hazardous roads. The number of Medicare, Medicaid, and uninsured patients in rural areas is also substantial. Covering the cost difference – between the reimbursement rate and actual cost –for these patients is significant. A large percentage of veterans eligible for VA health care also live in rural areas. The effect of having an additional payer, VA, whose reimbursement rate is woefully below cost will result in closure of these sites, because the providers will no longer be able to cover operational costs. Other types of providers in cases where reimbursement rates have dipped below operational costs have the option of which patients to admit, but that is not an option for air ambulance providers given the nature of the essential, urgent services they offer. And it is not in anyone's interest for these providers to change that and insist eligibility requirements be met in order to transport a patient. In 2019, fifty-seven air ambulance bases were forced to close, primarily in rural areas and largely due to payment gaps. Not only do these base closures impact Medicare and Medicaid beneficiaries, but they also significantly impact VHA beneficiaries.

The No Surprises Act of 2020, passed as part of Public Law 116-260, the Consolidated Appropriations Act of 2021, requires the Secretary of Health and Human Services, in consultation with the Secretary of Transportation, to determine appropriate cost data relating to air ambulance services. VA should wait until this determination has been completed in order to ensure the correct rate is established, rather than risk closure of rural bases that may have the inability to re-open even if the cost is properly adjusted at a later date. As such, and in line with this legislation, we are requesting VA delay implementation of AP89 in order to allow for appropriate data collection, analysis of findings, and final recommendations from the Secretary of Health and Human Services and the Secretary of Transportation.

We look forward to hearing from you about your plans to appropriately and efficiently address these concerns. We must ensure this critical care service remains intact and our veterans receive the care they need and have earned.

Sincerely,

Jon Tester
Chairman
Senate Committee on Veterans' Affairs

John Hickenlooper
United States Senator

Mazie K. Hirono
United States Senator

Brian Schatz
United States Senator

# United States Senate

WASHINGTON, DC 20510

October 27, 2022

The Honorable Denis R. McDonough
Secretary of Veterans Affairs
810 Vermont Ave NW
Washington, DC 20420

Dear Secretary McDonough,

We write today to share concerns about the Department of Veterans Affairs' (VA) Notice of Proposed Rule Making ("proposed rule") to reduce reimbursement rates for air ambulances at the VA.[1] We are particularly concerned about the impact that this may have on our constituents living in rural parts of the country. We urge you to further review this proposed rule to consider the potential impacts it may have on access to health care for veterans. We must work to ensure that rural veterans throughout the United States are not adversely impacted before issuing a final rule.

Air ambulances guarantee that patients have immediate access to emergency health care, regardless of where they reside. A recent study from the Association of Air Medical Services (AAMS) indicates that patients who are transported by air or ground ambulance to a VA hospital have a 20% better survival rate on average than patients transported by ambulances to a non-VA hospital.[2] In order to fulfill our duty to our nation's veterans, it is integral that we continue to support access to air ambulance providers that transport veterans to VA medical centers.

Air ambulance providers are experiencing unprecedented financial challenges in providing lifesaving medical transportation services. The proposed rule would amend the Veterans Health Administration (VHA) regulations by proposing a new payment methodology based on the rates from the Centers for Medicare & Medicaid Services (CMS) Medicare Part B Ambulance Fee Schedule. Although this proposed rule aims to improve operations and simplifying finances, it would reduce the reimbursement rate for air ambulance transportation to $5,998 per transport, yet the median cost for air ambulance transports is $10,199.[3] This proposed rule fails to account for the actual cost of transporting veterans via air ambulance, further risking the viability of the air ambulance industry.

Like other emergency services, air ambulance providers have had to navigate the ongoing effects of the COVID-19 pandemic, increased supply costs, volatile fuel costs, and worker shortages. Between 2020 and 2022, the air ambulance industry experienced a 20% increase in fuel costs, a 6% increase in labor costs, and a 15% increase in aviation and aircraft related expenses.[4] According to internal analysis, AAMS estimates that this rule change will result in an over 90% reduction in the current reimbursement rate for air ambulance VHA transports. This analysis

---

[1] https://www.govinfo.gov/content/pkg/FR-2020-11-05/pdf/2020-24261.pdf
[2] https://cdn.ymaws.com/aams.org/resource/resmgr/air-medical-services-cost-st.pdf
[3] https://cdn.ymaws.com/aams.org/resource/resmgr/air-medical-services-cost-st.pdf
[4] AAMS Proposal for Medicare Fix

indicates that the Medicare Part B Ambulance Fee Schedule covers less than half the cost of providing a single patient air ambulance transport. This change will tremendously impact air ambulance resources near VA hospitals, and access to air ambulance services for veterans.

If enacted, this proposed rule could lead to the closure of up to 40 air ambulance bases throughout the United States.  Recently, a major air ambulance provider closed 17 air ambulance bases in order to cut costs and stay afloat.[5]  This not only puts more pressure on existing providers in those 17 regions, but results in some regions only having one air ambulance provider.

Preserving access to a robust system for air ambulances in rural areas is critical for the health and wellbeing of our veterans. The proposed rule threatens the viability of air ambulance providers, thus limiting veterans' access to these critical services. We respectfully request further evaluation of the proposed rule and look forward to hearing from you about your plans to remedy the aforementioned concerns before issuing a final rule.

Sincerely,

Martin Heinrich
United States Senator

John Boozman
United States Senator

---

[5] https://www.ems1.com/air-medical-transport/articles/air-ambulance-service-parent-company-to-close-multiple-bases-dYexctCcfsyPVVcG/

STEVE DAINES
MONTANA

320 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–2651

**United States Senate**

COMMITTEES
BANKING
ENERGY AND NATURAL
RESOURCES
FINANCE
INDIAN AFFAIRS

November 17, 2022

The Honorable Denis R. McDonough
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, D.C. 20420

Dear Secretary McDonough:

I am writing to voice significant concern regarding the proposed rule which would alter the rates at which the Department of Veterans Affairs (VA) pays for beneficiary travel special modes of transportation.

Air ambulances add necessary diversity to emergency services options and significantly increase access to emergency medical care in the rural and remote areas of Montana and the western United States. Their services aid our nation's veterans and their fellow citizens every day to ensure safe and swift transport to care. Many members of air ambulance teams are veterans themselves, having learned emergency medicine and aviation skills in the uniformed services.

My understanding is that the VA has neglected to study the actual cost of providing air ambulance services in proposing to modify reimbursement rates and has not distinguished air ambulance services from traditional ground ambulance transportation. Instead, VA used aggregated data for ground and air ambulance transportation due to the refusal of the VA to track specific air transports. VA determined that Centers for Medicare & Medicaid Services reimbursement rates are on average 13.68% lower than costs being reimbursed under the current regulations. However, this is based on methodology that insinuates that the operating and maintenance costs of each of these life-saving emergency services are the same. This insinuation is incorrect. In fact, the Association of Air Medical Services (AAMS) has stated that the reduction in air ambulance reimbursement rates would be approximately 90% less than the current reimbursement rate for air ambulance transport.

With the number of instances of emergency care being provided by the VA exponentially increasing, it is critical the VA explores sustainable options for the future and ensures veterans living in rural areas have access to care. Unfortunately, I am concerned that the VA has not done due diligence in developing this rule, nor does it recognize the significant impact it will have on a full spectrum of emergency services, ultimately leading to air ambulances or other innovative services not being available to veterans.

I ask that the VA review the data used in support of this change in reimbursement for ambulance services, provide a timeline to develop the ability to track and differentiate between ground and air ambulance services, and implement an impact study to fully explore the consequences of such a change in reimbursement rates. I also ask that you share your conclusions with me before

taking further steps to promulgate a final rule. These reimbursements are critical in ensuring veterans receive lifesaving care when they are most vulnerable and should not be changed without accurate data and careful study.

Thank you for your assistance.

Sincerely,

Steve Daines
United States Senator

MICHAEL F. BENNET
COLORADO

COMMITTEES:
AGRICULTURE, NUTRITION, AND FORESTRY

FINANCE

INTELLIGENCE

**United States Senate**

WASHINGTON, DC 20510–0609

WASHINGTON, DC:
261 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5852

COLORADO:
CESAR E. CHAVEZ BUILDING
1244 SPEER BOULEVARD
DENVER, CO 80204
(303) 455-7600

http://www.bennet.senate.gov

December 9, 2022

The Honorable Denis McDonough
Secretary
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

Dear Secretary McDonough:

The Department of Veterans Affairs (VA) is tasked with supporting veterans and reducing barriers to provide them with access to high-quality health care services. Given that mission, I write to you with strong concerns regarding the VA's proposed rule (AP89) to amend the Veterans Health Administration's (VHA) beneficiary travel regulations to create a new reimbursement methodology for air ambulance services. This rule, if finalized and implemented, would result in a drastic cut to reimbursement rates, threatening access to life-saving air ambulance services and health care access for veterans across the United States.

The federal government pays for more than three out of four of all emergency air transports. While the changes aim to reduce improper payments and help eliminate error, waste, and abuse, the VA's proposed rule to essentially align payment rates with Medicare should be of great concern. The Centers for Medicare and Medicaid Services (CMS) Medicare Part B Ambulance Fee Schedule rates pay air ambulance providers less than 50 percent of the cost of providing air service. The inadequate rates and a lack of cash flow, partly due to the implementation of the *No Surprises Act (NSA)*, have led to base closures across the country. Should this proposal go forward, it will further reduce access to emergency services for millions of people, including many who are veterans.

The *NSA*, which protects patients from surprise medical bills, also includes a provision requiring CMS to collect transport cost data from air ambulance service providers and produce a report. This would inform the VA with the best available data to more appropriately update VHA reimbursement methodology and protect beneficiaries from any adverse consequences.

Veterans already face unacceptable disparities in accessing health care services. Emergency air ambulance services are essential to the more than 5 million veterans who reside in rural communities and are not able to use conventional transport to obtain trauma care. We must do everything we can to ensure veterans and those living in rural and underserved areas maintain access to lifesaving care.

Therefore, I strongly urge the VA to delay changing the air ambulance reimbursement rate until the *NSA*'s data is made available to further prevent air ambulance base closures.

1

This issue is of great importance not only to veterans' groups, rural communities and their advocates, and health care providers fighting on the frontlines. I share your commitment to veterans and believe they deserve to always have timely access to critical care. I look forward to hearing back from you on how the VA plans to address these concerns.

Sincerely,

Michael F. Bennet
United States Senator

2

### Congress of the United States
#### Washington, DC 20515

December 15, 2022

The Honorable Denis R. McDonough
Secretary of Veterans Affairs
810 Vermont Ave NW
Washington, DC 20420

Dear Secretary McDonough:

We write today regarding VA's proposed rule to change reimbursement rates for special modes of transportation, particularly air ambulance services, and to urge you to delay the implementation of the final rule until stakeholder concerns have been fully and fairly addressed.

While we commend the Department's desire to make certain that VA's reimbursement rates for air ambulance services are in line with other government payors, we are gravely concerned that this proposed rule could impede access to life-saving medical care for veterans across the country, especially those who reside in rural, remote, or underserved areas. Unfortunately, repeated efforts by lawmakers and air ambulance industry stakeholders to engage in an open dialogue with VA officials about this proposed rule and the impact it could have on timely access to care for veterans in the midst of medical emergencies have largely gone unanswered. That does not meet our expectations for transparency and communication, especially where the life and health of millions of veteran patients is concerned.

As such, we request that you put an immediate pause on any and all efforts to implement a final rule until VA officials are able meet with congressional, industry, and veteran service organization stakeholders and can assure us that access to care for veterans in need of air ambulance services will not be in any way constrained by this rulemaking.

Thank you for your prompt attention to this urgent matter and for your ongoing commitment to veterans and their families, caregivers, and survivors.

Sincerely,

Jerry Moran
Ranking Member
Committee on Veterans' Affairs
U.S. Senate

Mike Bost
Ranking Member
Committee on Veterans' Affairs
U.S. House of Representatives



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Jon Tester
Chairman
Committee on Veterans' Affairs
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Thank you for your September 19, 2022, co-signed letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including, myself, met with Congress members and their staff, including your Committee staff, on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending

Page 2.

The Honorable Jon Tester

rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

I acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, I am constrained from responding to the substance of your letter because of the pending rulemaking. I understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – I will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Moran.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Brian Schatz
United States Senate
Washington, DC 20510

Dear Senator Schatz:

Thank you for your September 19, 2022, co-signed letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including, myself, met with Congress members and their staff, including your Committee staff, on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending

Page 2.

The Honorable Brian Schatz

rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

I acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, I am constrained from responding to the substance of your letter because of the pending rulemaking. I understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – I will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Moran.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Mazie K. Hirono
United States Senate
Washington, DC 20510

Dear Senator Hirono:

Thank you for your September 19, 2022, co-signed letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including, myself, met with Congress members and their staff, including your Committee staff, on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending

Page 2.

The Honorable Mazie K. Hirono

rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

I acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, I am constrained from responding to the substance of your letter because of the pending rulemaking. I understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – I will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Moran.

Sincerely,

Denis McDonough



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable John Hickenlooper
United States Senate
Washington, DC 20510

Dear Senator Hickenlooper:

Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including myself, met with Congress members and their staff, including your Committee staff, on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending

Page 2.

The Honorable John Hickenlooper

rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

I acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, I am constrained from responding to the substance of your letter because of the pending rulemaking. I understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – I will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Moran.

Sincerely,

Denis McDonough



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Martin Heinrich
United States Senate
Washington, DC 20510

Dear Senator Heinrich:

Thank you for your October 27, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General that found VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

The Honorable Martin Heinrich


We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – we will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator John Boozman.

Sincerely,

Patricia L. Ross
Assistant Secretary for Congressional
  and Legislative Affairs



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable John Boozman
United States Senate
Washington, DC 20510

Dear Senator Boozman:

Thank you for your October 27, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General that found VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

The Honorable Jon Boozman


We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – we will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Martin Heinrich.

Sincerely,

Patricia L. Ross
Assistant Secretary for Congressional
  and Legislative Affairs



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Steve Daines
United States Senate
Washington, DC 20510

Dear Senator Daines:

Thank you for your November 17, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions, in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA medical centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the Final Rule.

Page 2.

The Honorable Steve Daines

We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – we will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission.

Sincerely,

Patricia L. Ross
Assistant Secretary for Congressional
    and Legislative Affairs



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Michael F. Bennet
United States Senate
Washington, DC 20510

Dear Senator Bennet:

Thank you for your December 9, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA medical centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

The Honorable Michael F. Bennet

We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – we will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission.

Sincerely,

Patricia L. Ross
Assistant Secretary for Congressional
  and Legislative Affairs



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

January 17, 2023

The Honorable Jerry Moran
Ranking Member
Committee on Veterans' Affairs
United States Senate
Washington, DC 20510

Dear Senator Moran:

Thank you for your December 15, 2022, co-signed letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including myself, met with Congress members and their staff, including your Committee staff, on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending

Page 2.

The Honorable Jerry Moran

rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

I acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, I am constrained from responding to the substance of your letter because of the pending rulemaking. I understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule. Once the final rule is officially cleared and published – early this year – I will ensure we brief you on it.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and for your continued support of our mission. A similar letter has been sent to Senator Moran.

Sincerely,

Denis McDonough



January 4, 2021


The Honorable Robert Wilkie
Secretary
Department of Veterans Affairs
Attention: VA-2020-VHA-0022-0001
810 Vermont Avenue, NW
Washington, DC 20420

**Re: AP89-Proposed Rule-Changes in VA Payments for Special Modes of Transportation (VA-2020-VHA-0022-0001, FR 2020-24261)**

Dear Secretary Wilkie:

On behalf of Air Methods Corporation, I am pleased to submit the following comments in response to the above referenced proposed rule published in the Federal Register on November 5, 2020. Air Methods provides emergency air medical services (AMS) in 49 states. We currently operate nearly 300 bases and over 400 air medical aircraft, staffed by over 5,000 employees around the country to keep our bases in-service 24 hours a day, 365 days a year to serve patients with medical emergencies. We are also affiliated with over 75 hospitals and provide transport to thousands of different hospitals across the United States, bringing patients to the appropriate level of definitive interventional care they need in medical emergencies.

Because of the nature of the emergency care we provide, often to the most severely ill or injured patients necessitating transport for care, we are concerned with the proposed changes to VA ambulance transportation rates. Emergency AMS is a rare critical care service utilized by attending physicians and first responders when the patient is experiencing a medical emergency. AMS are essential in rural areas, and over 65% of the 983 VA beneficiaries we transported in 2019 initiated in rural or super rural areas. While AMS are a very small portion of the total transports covered by the VA for its beneficiaries, these services are critical to the episodes of care for the patients we do serve, and the current payment rates for AMS by the VA enable us to continue to provide the highest level of transport care to these beneficiaries.

This proposed rule change would hinder our ability to continue to serve rural areas, because the Medicare fee schedule reimburses us less than 50% of our operational costs as providers. As a result, this proposed rule would affect a loss of several millions of dollars for our company alone, not to mention the impact on the rest of the emergency AMS throughout the United States. This will make it even less sustainable for emergency AMS to continue to serve rural and super rural areas where most of our VA patients require our care.

Air Methods has submitted comments to CMS on multiple occasions requesting that the agency fulfill its non-discretionary duty to review and adjust air ambulance payment rates under the ambulance fee schedule (AFS) given that these rates have failed to keep pace with the costs of

Appx1357

providing air medical services, which have increased significantly over time. Most recently, comments were filed with CMS in October of 2020 (CMS-1734-P) to reiterate those earlier policy and legal arguments and encourage CMS to update AFS rates in the final rule, and/or to begin collecting data from air ambulance providers, as it has already done with ground ambulance providers. In 2016, The Association of Air Medical Services (AAMS), an international trade association representing many AMS suppliers and providers commissioned a study that showed Medicare payment rates only covered 59 percent of the actual cost of providing AMS and that nearly one-third of all AMS providers are operating in the red.[1] This study definitively revealed that: (1) AFS rates have simply failed to keep pace with the rising costs associated with providing air ambulance services; and (2) providers and suppliers have access to detailed cost information and are both willing and able to share that information with CMS.

Underlying our request is a vital need to ensure a robust emergency medical service ecosystem. Air medical services play a vital role in this ecosystem by providing timely critical care response to high-acuity patients facing a threat to life or limb. By providing access to Level I or II trauma centers within the "golden hour"[2] for nearly 85 million Americans, as well as another 32 million rural Americans who live outside 60 minute access even by air, air medical service providers and suppliers are the critical link to tertiary care in severe medical emergencies.

**The Cost of Providing Air Medical Services Has Increased**

The cost of providing air medical services has increased significantly over time. At this very moment, thousands of Air Methods personnel – including flight nurses and paramedics, medical directors, pilots and mechanics, administrative support staff, clinical and aviation safety staff, and dispatch and communications teams – are making sure that our 296 bases are staffed and prepared to dispatch safely at any time. Providing 24/7/365 staffing and readiness is the largest costs of operating our company. Those costs are not optional, and the salaries of the personnel required to ensure we are able to provide care when it is needed have increased dramatically over the last two decades. The rising cost of fuel and the cost of updating, retrofitting, certificating and maintaining our aircraft and equipment and aircraft to ever-evolving FAA standards and regulation has also exerted pressure on our bottom line and dramatically increased our operational costs.

At the same time, Medicare and Medicaid patients have consistently grown as a percentage of our patients over the last decade – currently representing a majority of our total transported patients – but continue to reimburse on an increasingly outdated fee schedule. This has forced us to look to payment from commercial plans to help offset tremendous losses from Medicare and Medicaid.

A distressing number of air medical bases have closed due to this mounting financial pressure and increasingly unsustainable environment. Many of these closed bases were in rural areas where there tends to be a disproportionate share of Medicare and Medicaid patients. Other bases have

---

[1] "Air Medical Services Cost Study Report," March 24, 2017; Xcenda, *available at* https://xcenda.com/insights/xcenda-conducts-unique-research-on-air-medical-services-costs.

[2] The **golden hour** is the period of time following a traumatic injury during which there is the highest likelihood that prompt medical and surgical treatment will prevent death. While initially defined as an hour the exact time period depends on the nature of the injury and refer to the core principle of rapid intervention in trauma cases

been forced to consolidate and redeploy resources away from rural areas. At the same time rural hospitals are closing or eliminating key critical services.

The combination of fewer air bases and fewer rural hospitals should be of great concern to the VA as it is critical to ensure the availability of emergency transportation for rural and underserved Americans. Increasing the time required to transport a critically ill or injured patient from an incident scene or rural hospital to the appropriate specialty facility for definitive interventional care also increases the risks of life-altering complications and diminished outcomes, including death. Unfortunately, with the closure of AMS bases and the closure of rural hospitals, it seems inevitable that transportation times and the unavailability of air medical transport will only increase, and with it, morbidity and mortality for patients in these underserved areas.

The positive impact of our services in the health care system can be seen in the over 4,000 COVID-19 transports Air Methods has provided throughout the pandemic, transporting COVID-19 patients on ventilators or with compromised respiratory function to other ICU facilities that can provide the care they require. Many of these are VA beneficiaries, and the care we have provided during the pandemic has further increased the costs of our operations, at the same time that the economic effects of the pandemic further worsened our payer mix. Going into 2021, our payer mix has deteriorated so that over 66% of our patients are covered by Medicare, Medicaid, DIHS, TRICARE and VA, for an average reimbursement covering less than 30% of our operational costs. This is not sustainable, and this proposed rule will further exacerbate the problem.

On behalf of Air Methods, I thank you for the opportunity to submit comments.

Sincerely,

Ms. Carolyn Mayle
Vice President of Government Affairs
Air Methods Corporation


*- Submitted electronically to Regulations.Gov -*

# PUBLIC SUBMISSION

**As of:** 11/6/20 8:47 AM
**Received:** November 05, 2020
**Status:** Posted
**Posted:** November 06, 2020
**Tracking No.** kh5-8sx0-ob85
**Comments Due:** January 04, 2021
**Submission Type:** Web

**Docket:** VA-2020-VHA-0022
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Comment On:** VA-2020-VHA-0022-0001
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Document:** VA-2020-VHA-0022-0003
Comment on AP89-Proposed Rule-PHA, Inc.

## Submitter Information

**Email:** debbie@cavalryems.com
**Organization:** PHA, Inc.

## General Comment

I would like to explain why Medicare rates for all VA patient ambulance transports is a bad idea. If a patient is not Medicare covered or under the age of 65, the rates should be higher. Medicare or Medicaid rates (for other transports) are below what it actually costs to transport a paitent. The VA will get horrible service and the veterans are who will suffer. Each hospital should contract with who they want to contract with and have agreed upon rates in place.

**Board of Directors**

**Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE**
**Chair and Region IV Director**
Teddy Bear Transport

**Rene Borghese, MSN, RN, CMTE**
**Vice Chair and Director-At-Large**
Duke Life Flight

**Susan Rivers, RN, BSN, MBA, CMTE**
**Secretary and Region VI Director**
Carilion Clinic Life-Guard

**Frankie Toon, RN, CFRN, CMTE, MBA, MSN**
**Treasurer and Director-At-Large**
AirMed

**Douglas Garretson**
**Immediate Past Chair**
STAT MedEvac Center for Emergency Medicine of Western PA, Inc.

**Mike Griffiths, RN, CFRN, CEN**
**Region I Director**
Life Flight Network, LLC

**Dustin Windle, RN, CMTE**
**Region II Director**
Guardian Air Transport

**James Houser MSN, APRN, FNP-C, NRP, CFRN**
**Director-At-Large**
STAT MedEvac

**Anthony Pellicone**
**Region V Director**
Northwell Health/ Southside Hospital

**Russell MacDonald, MD, MPH, FRCPC**
**Region VII Director**
Ornge

**Graeme Field**
**Region VIII Director**
NSW Air Ambulance Service

**Kolby L. Kolbet RN, MSN, CFRN**
**Region III* Director**
Life Link III

**Martin Arkus, CMTE**
**Director-At-Large**
Global Medical Response

**Guy Barber**
**Director-At-Large**
Air Methods Corporation

**Edward Eroe, LFACHE, CAE, CMTE**
**Public Member**

**Denise Treadwell, CRNP, MSN, CFRN, CEN, CMTE**
**CAMTS Representative**
AirMed International, LLC

**Cameron Curtis, CMM, CAE**
**President and CEO**
AAMS

ASSOCIATION OF AIR MEDICAL SERVICES



January 4, 2021

Mr. Paul Perry,
Deputy Director, Veterans Transportation Program
Veterans' Health Administration
Department of Veterans Affairs
810 Vermont Avenue NW, Washington, DC 20420

Re : VA-2020-VHA-0022

Dear Deputy Director Perry,

The Association of Air Medical Services (AAMS) writes today in reference to "AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation". This proposal amends Veterans Health Administration (VHA) regulations regarding ambulance travel by VHA beneficiaries and proposes a new payment methodology for those services based on rates paid by Medicare Part B.

Specifically, the proposal states:

> Proposed 38 CFR 70.30(a)(4)(i) would establish in regulation a new payment methodology for travel by ambulance. VA would adopt the Medicare Part B AFS for transport by ambulance, and we would pay for ambulance services based on the lesser of either the AFS payment amount or the actual charge, unless (as would be stated in 38 CFR 70.30(a)(4)) VA has executed a contract for ambulance services from the vendor in which case the terms of the contract would govern VA payments.

This proposal replaces previous Veteran's Administration (VA) policy which, according to current 38 CFR 70.30(a)(4), pays the "actual cost of a special mode of transportation." AAMS believes this is a significant change in policy, especially to air ambulance transports whose costs, according to an independent study of helicopter air ambulance costs, outpace Medicare payments by more than $4,000 per transport.[i] The Centers for Medicare and Medicaid Services have never conducted a study of air ambulance costs nor does any federal database for those costs currently exist; further, Medicare payments for air ambulance transports were never based on costs, but rather a mandated reapportionment of the total Medicare ambulance payments in 1996.

Recent legislation passed by Congress will create a federal database of air ambulance costs, which we hope will allow for CMS to modernize the current Ambulance Fee Schedule (AFS) and reimburse emergency air medical services to more appropriately reflect the cost of providing these services, especially in low volume rural areas. We ask the VA to consider the following comments and to delay the implementation of this proposal until the appropriate data can be gathered and considered. Without an informed consideration, we believe the VA cannot ensure that this policy change will result in the loss of critical transportation services for its beneficiaries.

**Background on Emergency Air Medical Services**

AAMS represents both helicopter and fixed-wing air medical providers and operators who deliver life-saving emergency transports every day. AAMS members transport approximately 360,000 critically ill and injured patients per year via emergency helicopter transport and an additional 100,000 per year via fixed-wing airplanes- some of which are also emergencies. Emergency air medical services (EAMS) are not ambulances- they are essentially flying emergency rooms, capable of a level or care far beyond most ground ambulances. This is an expensive service that should only be used according to pre-existing protocols developed by local medical and emergency response authorities.

Emergency air medical services only respond to requests from trained first-responders or physicians and never self-dispatch. They are required to respond to patient requests regardless of the patient's ability to pay; the only factors involved in determining whether a patient transport request can be met are limited to those assuring aviation safety, such as weather, fatigue, and the status of the aircraft. Emergency air medical crews respond to these requests within minutes—day or night, operating 24 hours per day 7 days per week. Air medical crews, many of whom are veterans themselves, are dedicated critical care providers with higher levels of training and experience than most ground ambulances. Air medical pilots are some of the most experienced in aviation. Through voluntary industry commitments and industry-supported regulations, helicopters operate at a level of aviation safety higher than the rest of the on-demand aviation segments, with several regulations designed solely to address the risks associated with the emergency air medical environment.

Approximately 90% of the patients transported by emergency air medical helicopters are for stroke, cardiac, and trauma conditions; the remaining 10% encompass specialty pediatric care, burns, neonatal, high-risk obstetrics, neurological, and other conditions.

EAMS are a critical part of the health care delivery system for patients with the most serious, time-sensitive illnesses and injuries that require immediate assistance from critical care specialists. Today, because of EAMS, 90% of Americans can reach a trauma center within the time-sensitive window for optimizing patient outcomes.

**Establishment of the Ambulance Fee Schedule**

The Medicare AFS was created in 2002 through the efforts of a Negotiated Rulemaking committee comprised of CMS staff and industry representatives. CMS set the initial AFS rates using cost data from 1998 – data that has long been recognized as incomplete and requiring administrative adjustments.

Payment for AMS under the AFS consists of the following four components:
- A nationally uniform base rate for fixed wing and a nationally uniform base rate for rotary wing;
- A geographic adjustment factor equal to the non-facility practice expense portion of the GPCI for each Ambulance FS locality area;
- A nationally uniform loaded mileage rate for each type of air ambulance transport; and
- A rural adjustment to the base rate and mileage for transports furnished for a rural point-pickup.

CMS has not incorporated adjustments to the AFS beyond the "ambulance inflation factor" – a modest adjustment reflecting the Consumer Price Index adjusted by the 10-year moving average of changes in economy-wide private nonfarm business multi-factor productivity.[ii] For CY 2019, the AIF was 2.3 percent. Aside from the annual AIF adjustment, CMS has made no additional adjustments to the AFS since it was established.

**The Economics of Air Medical Transport**

Over 70% of air medical flights are under-reimbursed by Medicare, Medicaid or the uninsured. This results in an ongoing imbalance between actual costs and government reimbursement. The single biggest factor increasing cost is the Medicare reimbursement gap. A study conducted by Xcenda found the following:

- $10,199.00: Median cost of providing one helicopter transport
  - $5,998.00: Median Medicare reimbursement (base rate plus mileage) per transport
  - $3,463.00: Median Medicaid reimbursement per transport
  - $354.00 Median Self-Pay Reimbursement

Seven out of ten patients transported by EAMS are either Medicare or Medicaid, meaning that the remaining three out of ten patients must subsidize the remaining cost. This is unsustainable, and drives a significant cost-shift to private insurance-compensated transports.



Of the approximately 360,000 patients transported by EAMS per year:
- ~133,200 are Medicare patients (37%);
- ~86,400 are Medicaid patients (24%);
- ~36,000 are Uninsured patients (10%);
- ~93,600 are Commercially insured (26%) (approximately 40% of those patients would be in-network).

The study further found that cost deficits incurred by serving Medicare, Medicaid, and uninsured patients requires private payers to cover more than $26,000 per transport to allow providers to only break even. These numbers—both the cost of providing the service and the mix of patients transported—become significantly worse in rural areas, where demand is highest (mostly due to hospital closures) but the ratio of Medicare, Medicaid, and uninsured patients is significantly higher. Fifty-seven air ambulance bases closed in 2019, mostly in rural areas and all due to the gap in payments by increased rural Medicare and Medicaid populations. For this reason, EAMS are less likely to have the ability to serve the very areas where emergency air ambulance transports are needed most.

Should the VA move to parity with the Ambulance Fee Schedule, the cost of uncompensated care will only increase, furthering the increased costs shifted to commercial payors or, should those costs not be covered, leading to the increased closure of bases. These closures have increasingly impacted low-volume rural areas and other areas with a higher portion of Medicare and Medicaid beneficiaries, as well as VA beneficiaries.

**Effects of COVID-19 Pandemic**

AAMS estimates its members have transported over 20,000 COVID patients since the start of the pandemic. Many of these transports involve the sickest patients that must travel at a critical care level of care for significant distances in order to receive the appropriate care. In addition to specific COVID infected patients, AAMS members are also moving patients through our nation's healthcare system due to hospital staffing and capacity issues caused by the pandemic. For instance, in New York city, hundreds of non-infected critically ill patients had to be transported out of New York area hospitals as those hospitals were overwhelmed by COVID- infected patients. A significant number of these patients were transported via helicopter to hospitals as far away as Albany and Pittsburgh. [iii]

All of these transports come at significantly higher cost. In addition to the increased burn-rate of personal protective equipment and sanitization protocols, exposure to COVID infected patients and co-workers has a dramatic impact on workforce expenses as air medical providers have had to add or rebase staff as other workers are forced to quarantine.

While some areas have experienced an increase in the volume of patients transported, others have experienced a significant downturn. Pediatric hospitals, for example, who rely on fee-for-service reimbursements have seen a significant loss of volume due to the cancelation of scheduled procedures and from the prevention of injury as a result of stay-at-home orders related to the pandemic. While these stay-at-home orders currently lead to a decrease in traumatic injury, they will not last forever. Once those orders are lifted and trauma levels return to normal levels, the EAMS resources that communities relied upon for critical emergency care before the pandemic must remain available.

We therefore believe that any effort by the government to limit payments during this global health crisis may be disastrous and have far-reaching consequences for the healthcare and emergency medical systems far beyond their intended result.

**Conclusion**

AAMS believes that without the proper data, and the analysis of that data, the VA cannot effectively measure the multi-faceted impacts of this policy change. The need to ensure the continued survivability of EAMS services, and emergency medical services as a whole, must outweigh the need for any payor to limit reimbursement for those services to an amount below the cost of providing that care.

We again ask that the VA delay the implementation of this proposal and revisit this policy only after the appropriate data has been collected and analyzed by CMS to determine a fair reimbursement rate. We also believe that any decision to limit payments to healthcare providers should be delayed until the end of COVID-19 pandemic and after we have a firm understanding of its effect on the healthcare system in this country. AAMS stands ready to assist in these efforts and act as a resource to the VA.

Sincerely,

Cameron Curtis, CMM, CAE
President & CEO
Association of Air Medical Services

Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE
Chairman and Region IV Director, AAMS
Teddy Bear Transport, Cooks Children Medical Center

---

i *"Air Medical Services Cost Study Report"*; March 24, 2017; Xcenda
ii 1834(l)(3)(B) – (C)
iii https://world.wng.org/2020/04/new_york_s_dunkirk_moment

VA-2020-VHA-0022:

AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

PHI Health, LLC (PHI) welcomes the opportunity to share <u>our significant concerns with and comments on the proposed rule AP-89-Proposed Rule-Change in Rates the Veteran Administration (VA) Pays for Special Modes of Transportation</u>.

**PHI Health Commitment**

PHI Health is a leading provider of air ambulance services in the US, serving veterans and their fellow citizens in 17 states from more than 75 bases of operation with over 1100 highly skilled employees. PHI Health, an independent provider as well as partner to hospitals and healthcare systems, is honored to be serving on the front lines during the ongoing pandemic, alongside other first responders, to ensure the health and wellbeing of our fellow citizens, many of whom reside in medically under-served areas. PHI provides access to emergency air medical care and critical care helicopter and fixed wing air ambulance services in rural and urban areas, ensuring that patients with time-sensitive illnesses or injuries are transported safely and swiftly to definitive care. As a condition of Emergency Medical Service state licensure, PHI has a legal duty to respond and transport emergency patients, regardless of their ability to pay.  We also commit ourselves to the moral duty to do what is right to ensure patients get the care they need, when they need it most.

**VA Proposed Rule Changes**

In this Notice of Proposed Rule Making (NPRM), VA proposes to define ambulance to "mean advanced life support, level 1 (ALS1); advanced life support, level 2 (ALS2); basic life support (BLS); fixed wing air ambulance (FW); rotary wing air ambulance (RW); and specialty care transport (SCT), as those services are defined in 42 CFR 414.605." Consistent with 42 CFR 414.605, the definitions of these terms would apply to ground (both land and water) ambulance services and to air ambulance services unless otherwise specified.

VA further proposes to revise 38 CFR 70.30(a)(4) to "establish in regulation a new payment methodology for travel by ambulance. VA would adopt the Medicare Part B AFS [Ambulance Fee Schedule] for transport by ambulance, and we would pay for ambulance services based on the lesser of either the AFS payment amount or the actual charge, unless (as would be stated in 38 CFR 70.30(a)(4)) VA has executed a contract for ambulance services from the vendor in which case the terms of the contract would govern VA payments. For ALS1 and BLS, the AFS includes rates for emergency and nonemergency transportation. For purposes of proposed section 70.30(a)(4)(i), VA would apply the applicable CMS rate based on the vendor's coded invoice. New 38 CFR 70.30(a)(4)(i) would read as follows: 'Travel by ambulance: VA will pay the lesser of the actual charge for ambulance transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act (42 U.S.C. 1395m(l)).'"

In this NPRM, the Veterans Administration takes an approach to cost-control that is based on a severely flawed fee schedule, which is poorly timed and could harm the very veterans that VA is charged to serve.

## 1.  The Misuse of the Medicare AFS as a Baseline for Reimbursement

Providing air ambulance services, especially in underserved and rural areas, is a cost-intensive enterprise. In 2017, the Association of Air Medical Services (AAMS) commissioned Xcenda[1] to perform the first and only air ambulance cost study, to date.  Based on responses from more than half of AAMS members, Xcenda found a median cost of approximately $3M annually to run an air ambulance base, with the majority (nearly 80%) of this cost due to high fixed costs such as labor, aircraft, and equipment.

In honoring our duty to respond without regard for ability of the patient to pay for services, PHI Health has no ability to predict when we will receive reimbursement or how much we will receive.

- Of the over 35,000 patients PHI transports each year, we estimate that 10-30% are covered by commercial health insurance.
- The vast majority of patients we treat and transport (approx. 60-65%) are covered by a government payer like Medicare, Medicaid, or another government provider, such as the VA.
- Approximately 10% of our patients have no health insurance coverage at all.

Our findings are consistent with the 2017 Xcenda study, which found the median cost of the service to be approximately $10,200 and the median reimbursement from Medicare to be approximately $6,000, with Medicaid paying substantially less. Taken together, 70-80% of patients transported are paid at 60% or less of the actual cost of providing the service.

The accumulation of these unreimbursed and under-reimbursed transports results in significant uncompensated care that must be accounted for and, unfortunately, creates financial pressures that contribute to increased air ambulance charges.  Reducing the amount of reimbursement of air ambulance services by the VA only compounds the problem by adding one more government payer to the list of those who already under-reimburse for air ambulance transport and threatens the broad availability of these life-saving services.

The indexing of government reimbursement to the Medicare Ambulance Fee Schedule is a gross miscalculation that only generates a greater cost from undercompensated care. In 1997, Congress passed the Balanced Budget Act of 1997, which required the Secretary of HHS to develop a national fee schedule for Medicare air and ground ambulance reimbursement. This fee schedule was not based on actual costs per service because "these data [did] not exist."[2] Through a negotiated rulemaking process involving air and ground ambulance stakeholders, the

---

[1] Xcenda, *Air Medical Services Cost Study Report,* March 24, 2017, https://aams.org/wp-content/uploads/2017/04/Air-Medical-Services-Cost-Study-Report.pdf, accessed March 30, 2020.
[2] 67 Fed. Reg. 9104, 9117

fee schedule was negotiated based upon a fixed amount of funding limited to historical amounts paid by Medicare for all ambulance services, minus 1%.  Since, the fee schedule has seen nominal increases, but the benefit of any increases has been blunted since 2010 with the implementation of sequestration of federal funding at an annual rate of 2%, resulting in years where the adjustment was a *net negative*. The ongoing tactic by government payers to index to Medicare has only exacerbated the baseline financial mismatch. Reliance on the Medicare fee schedule *creates a greater amount of uncompensated care that only adds more pressure to rely on commercial insurers to cover the offset.* In response, commercial insurers not only act to reduce their level of coverage, but also threaten higher premiums and larger deductibles, further exacerbating the problem of balance bills. If government reimbursement is going to rely upon Medicare as the index, then government must take action to gather cost data and make a meaningful increase in Medicare reimbursement that covers the actual cost.  Absent this far overdue increase, this action by the VA will only further compound the problem of uncompensated care, increased air ambulance charges, and higher healthcare costs.

2.  **Air ambulances are facing increasing costs and financial losses due to the COVID-19 pandemic.**

Since the declaration of the Public Health Emergency in April of 2020, PHI has not faltered in ensuring our 24/7 readiness to respond.  Our teams have been on the frontline in taking care of known and suspected COVID-19 patients, transporting over 2,000 severely ill COVID-19 patients, in addition to responding to care for patients experiencing heart attacks, strokes, and severe trauma. As we have maintained our commitment to the communities we serve, PHI has experienced significant financial losses from a decrease in transports due to early 2020 statewide lockdown orders. As the number of COVID-19 patient transports have surged, we have incurred significant financial costs in securing the necessary Personal Protective Equipment and the specialized medical equipment needed to both protect our teams and to take care of COVID-19 patients. As we look to 2021, PHI recognizes the unpredictability of this pandemic and the likelihood of ongoing financial, logistical, and operational challenges we will face in ensuring the readiness required to take care of our patients on their worst day.

**It is unconscionable that the VA would choose to cut reimbursements during a global pandemic – and thereby potentially limit the availability of critical lifesaving service to veterans across the country.** Air ambulance services already face the catastrophic combination of the challenges of an unprecedented infectious disease on top of the ongoing, unresolved underlying baseline Medicare under-reimbursement.  As VA seeks to reduce costs, this proposal to cut reimbursement for emergency air ambulances only creates greater financial jeopardy for air ambulance services and further risks reduced access to emergency air medical care for veterans, as well as the general population.

3. **This proposed rule change harms Veterans – reducing Veteran emergency care and jobs for Veterans.**

PHI Health is honored to be an employer of our nation's veterans, employing over 360 highly skilled former service men and women and is actively seeking to hire veteran pilots, mechanics, nurses, paramedics, and others to join our team and serve our communities.  <u>Together with our fellow emergency medical responders, we share an unending gratitude to our veterans for serving our country</u>. Indeed, it is these same veteran employees who respond to provide air medical transportation and emergency healthcare to our patients, which includes their fellow veterans. This proposed reimbursement reduction represents a two-pronged attack against the very veterans that the VA is charged to serve. ***Through one singular act, the VA's cost-cutting strategy will not only reduce revenue necessary to employ veterans, the VA will also reduce revenue needed to provide veterans with lifesaving emergency medical care***. This move to index to Medicare will cut reimbursement needed to both staff air ambulances and to ensure access to care for those veterans most in need of emergency healthcare.

We strongly urge the VA to find other alternatives to effect cost control, without putting additional burden on the air ambulance community, the communities we serve, or the veterans we have pledged to both employ and care for. <u>We humbly ask the VA to cease any efforts to index VA reimbursement to the Medicare AFS.</u>

We further ask the VA to work with ambulance service stakeholders on solutions that recognize the value of this lifesaving service and ensure ongoing sustainability of the service to our nation's veterans.  To that end, <u>rather than cutting reimbursements for air ambulance care for veterans, we urge the VA to work with the Department of Health and Human Services to reform the Medicare Ambulance Fee Schedule to bring rates closer to actual costs of providing the service.</u>  By doing so, the VA can meet its duty to protect and serve veterans, instead of jeopardizing access to care that comes with additional air ambulance base closures.

Thank you for your important consideration of our comments and concerns. We are prepared to further assist or provide any additional information or clarification, as needed.

Sincerely,

Christopher Hall
Director, Government Affairs & Industry Relations
PHI Health, LLC.
2800 N. 44th St., Ste. 800
Phoenix, AZ 85008
O: 602-224-3500
E: cdhall@phiairmedical.com

# PUBLIC SUBMISSION

**As of:** 11/9/20 8:01 AM
**Received:** November 07, 2020
**Status:** Posted
**Posted:** November 09, 2020
**Tracking No.** 1k4-9jyk-m7ao
**Comments Due:** January 04, 2021
**Submission Type:** Web

**Docket:** VA-2020-VHA-0022
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Comment On:** VA-2020-VHA-0022-0001
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Document:** VA-2020-VHA-0022-0004
Comment on AP89-Proposed Rule-Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Good

**As of:** 12/7/20 8:14 AM
**Received:** December 06, 2020
**Status:** Posted
**Posted:** December 07, 2020
**Tracking No.** 1k4-9khs-h89k
**Comments Due:** January 04, 2021
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** VA-2020-VHA-0022
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Comment On:** VA-2020-VHA-0022-0001
AP89-Proposed Rule-Change in Rates VA Pays for Special Modes of Transportation

**Document:** VA-2020-VHA-0022-0005
Comment on AP89-Proposed Rule-Cox, Kimberly

## Submitter Information

**Name:** Kimberly Cox

## General Comment

Agency:
Department of Veterans Affairs.

Action:
Proposed rule

Document citation:
85 FR 70551

CFR:
38 CFR 70

RIN:
2900-AP89

Document Number:
2020-24261

Summary:

The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's (VHA) beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule (AFS) established by the Centers for Medicare & Medicaid Services (CMS). For travel by modes other than ambulance, VA proposes to establish a payment methodology based on states' posted rates

or the actual charge. VA would replace this payment methodology for travel by modes other than ambulance at some time in the future, once VA has collected enough data to develop a new methodology.

I am writing in regards to Federal Register Number 2020-24261 titled Change in Rates VA Pays for Special Modes of Transportation. I am writing in opposition of this proposed rule. I am not in opposition of the VA paying for ambulance and special modes of transportation for VA patients. However, I am opposed to the changes that are being proposed.

As a healthcare support coordinator who works directly with patients who require transportation assistance to and from medical appointments, I can tell you from my professional experience that transportation is a barrier to care for so many patients, including many VA patients. This is also supported by research conducted by Syed, Gerber, and Sharp (2013) which showed that transportation is an immense barrier to patient care.

Many of these patients do not have access to transportation, especially for those who may require wheelchair transport, ambulance transport, or stretcher transport. In the rare case that transportation assistance is made available through community resources or their insurance benefit (whether it is VA, Medicaid, or in very rare circumstances, Medicare) it is extremely difficult to navigate through the system to actually set up physical transportation. When patients need care, transportation should be easily accessible, especially to VA patients. Some of the information presented in this proposed rule make it more difficult for patients to access this transportation assistance, which is why I am in opposition to this proposed rule, specifically for travel by other modes than ambulance.

The proposed rule states "Proposed 38 CFR 70.30(a)(4)(ii) would establish in regulation a payment methodology for travel by modes other than ambulance. Unlike travel by ambulance, there are no existing Medicare Part B payment rates for transport by modes other than ambulance to include wheelchair and stretcher van services. While Medicare Part B does not currently cover these services, there are Healthcare Common Procedure Coding System (HCPCS) codes for them, and CMS makes reference to the published Medicaid rates in each respective state. In this proposed rule, we refer to the published Medicaid rates in each respective state as posted rates." The problem with this is that these rates (given that they are even available for each state) are often quoted as quite lower than what the actual transportation cost may be. What happens with the remaining balance? Is the patient then responsible for the remaining cost of transportation? My suggestion is that there needs to be further clarification regarding this within the proposed rule.

I would suggest that while the "VA collects data for the purpose of developing a new payment methodology" the VA should continue to pay for the total cost of non-ambulance transportation. Once the data is collected, then the revision should occur and a new proposed rule be submitted. Relying on the Medicaid rates is sub-par in regards to actual transportation costs that patients may incur.

Syed, S. T., Gerber, B. S., & Sharp, L. K. (2013). Traveling towards disease: transportation barriers to health care access. Journal of community health, 38(5), 976-993. https://doi.org/10.1007/s10900-013-9681-1



Fact Sheet

# VHA Office of Community Care
## Ambulance Transportation

The Department of Veterans Affairs (VA) has the authority to provide or reimburse land or air ambulance transport of certain eligible Veterans in relation to VA care or VA community care.

### Authorized Ambulance Transport

Pre-authorized ambulance transport for eligible Veterans to or from a VA facility or VA-authorized community care facility is approved and arranged in advance of care. Veterans must meet the following administrative requirements to qualify for authorized transport:

- Have a service-connected (SC) disability or combined rating of 30% or more (travel for care relating to any condition), *or*

- Be in receipt of a VA pension, *or*

- Previous calendar year income does not exceed maximum VA pension rate, *or*

- Projected income in travel year does not exceed maximum VA pension rate, *or*

- Travel is in connection with care for a SC disability, *or*

- Travel is for a Compensation and Pension exam, *or*

- Travel is to obtain a service dog, *or*

- Travel relates to VA transplant care, *and*

- A VA clinician determines and documents that special mode transportation is medically required.

Note: Income related eligibility must be verified and on file with VA on or before the date of transport.

To arrange non-emergent transportation, contact the local VA Beneficiary Travel Office.

### Emergency Transportation

During a medical emergency, Veterans should immediately seek care at the nearest medical facility without delay. A medical emergency is an injury, illness or symptom so severe that without immediate treatment, an individual believes his or her life or health is in danger. If a Veteran believes his or her life or health is in danger, call 911 or report to the nearest emergency department right away. Veterans do not need to check with VA before calling an ambulance or going to an emergency department.

Notifying VA of the emergent transport within 30 days is required, and the best way to notify is through claim submission. If a claim for transport is unable to be submitted to VA within 30 days, notification can be reported to the Centralized Notification Center by calling 833-724-7842.

VA has three legal authorities under which emergency treatment in a community facility may be paid for, but specific requirements must be met. The legal authority under which the emergency treatment falls dictates eligibility requirements for associated emergent transportation.

| Emergency Treatment | Associated Ambulance Transport | Eligiblity Reference |
|---|---|---|
| Authorized Emergency Treatment - 38 CFR 17.4020(c) | Authorized Transport | Authorized Ambulance Transport |
| Unauthorized Emergency Treatment (Service-Connected) - 38 USC §1728 | Unauthorized Transport (must meet authorized ambulance transport eligibility) | Authorized Ambulance Transport |
| Unauthorized Emergency Treatment (Nonservice-connected) - 38 USC §1725 | Unauthorized Emergency Treatment (Nonservice-connected) - 38 USC §1725 | Unauthorized Emergency Treatment (Nonservice-connected) |

Appx1403



U.S. Department of Veterans Affairs

Veterans Health Administration
Office of Community Care

### Unauthorized Emergency Treatment (Service-Connected) - 38 USC §1728

Ambulance transports associated with emergent treatment approved under 38 USC §1728 will be assessed in accordance with Authorized Ambulance Transport eligibility.

### Unauthorized Emergency Treatment (Nonservice-connected) - 38 USC §1725

Ambulance transports associated with emergent treatment approved under 38 USC §1725 will be assessed in accordance with Code of Federal Regulations (CFR) 17.1003 eligibility.

In accordance with 38 CFR 17.1003 VA must receive and adjudicate a claim for the emergency treatment received as part of the emergency transportation. If no claim is received for the associated treatment, VA cannot pay for the emergency transportation unless one of the following two exceptions are met:

1. Other health insurance or a third party paid for the emergency treatment (leaving no liability for the treatment) excluding the emergency transportation itself; **or**

2. Death occurred during transportation to receive emergency care.

If VA cannot pay for emergency care outside of the above two exceptions, then it generally cannot pay for the associated emergency transportation.

To learn more about how emergency treatment eligibility determinations are made, visit https://www.va.gov/COMMUNITYCARE/providers/info_EmergencyCare.asp

## Reimbursement Payment Rates

| Ambulance Transport | Eligibility Reference | Payment Rate |
|---|---|---|
| Authorized Transport & Unauthorized Emergency Transport tied to 38 USC §1728 (Service-Connected) | Authorized Ambulance Transport | Generally billed charges |
| Unauthorized Emergency Transport tied to 38 USC §1725 episode of care (Nonservice-connected) | Unauthorized Emergent Transport 38 USC §1725 (Nonservice-connected) | Generally, 70% Medicare |

To be considered for payment, all ambulance claims should be sent to VA using one of the following options:

**Electronic Data Interchange (EDI):** Payer ID is **12115**

**Mail paper claims to:**
VHA Office of Community Care
P.O. Box 30780
Tampa, FL 33630-3780

*Ambulance claims should **always** be submitted to VA and **never** to TriWest or Optum.*

Appx1404

# Congress of the United States
## Washington, DC 20510

August 8, 2022

The Honorable Denis McDonough
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

Dear Secretary McDonough:

We write to express our concerns over the Department of Veterans Affairs' (VA) Notice of Proposed Rulemaking (NPRM) to change rates the VA pays for special modes of transportation.[1] We are concerned that this NPRM will negatively impact our veterans' access to Emergency Air Medical Services (EAMS), especially in rural areas. We understand that these proposals are still subject to a public review process and have yet to be finalized. As such, we ask that you review the impacts this rulemaking will have on veterans' healthcare and work to ensure our veterans in rural communities have adequate and appropriate access to EAMS before issuing a final rule.

EAMS, often air ambulances, ensure patients with urgent health needs can access emergency medical care in rural and urban areas. Their services aid our nation's veterans every day. Studies have shown that patients who are transported by air or ground ambulance to a VA hospital have a 20% better survival rate than patients transported by ambulance to non-VA hospitals.[2] The survival data is even better for Hispanic and Black patients, with 23% and 25% better survival rates, respectively. To best serve our veterans, it is crucial that we continue our support for EAMS transporting emergency VA patients to VA hospitals.

The NPRM amends Veterans Health Administration (VHA) regulations by proposing a new payment methodology based on rates paid by the Centers for Medicare & Medicaid Services (CMS) Medicare Part B Ambulance Fee Schedule. This Medicare Ambulance Fee Schedule was created in 2002 using aggregated ground and air ambulance transportation data and has never been adjusted, aside from an annual inflation factor. The median cost of an air ambulance transport is $10,199,[3] which is significantly higher than the median cost of a ground ambulance transport, $429.[4] The NPRM would set the reimbursement rate for ambulance transportation at $5,998 per transport, about half of the median cost for an air ambulance transport.

---

[1] Department of Veterans Affairs, "Change in Rates VA Pays for Special Modes of Transportation," *Federal Register* 85, no. 215, proposed November 5, 2020: 70551, https://www.govinfo.gov/content/pkg/FR-2020-11-05/pdf/2020-24261.pdf.

[2] David C. Chan et al., "Mortality among US Veterans after Emergency Visits to Veterans Affairs and Other Hospitals: Retrospective Cohort Study," *BMJ* 2022; 376:e068099 https://www.bmj.com/content/376/bmj-2021-068099.

[3] Xcenda, LLC et al., "Air Medical Services Cost Study Report," March 24, 2017, https://cdn.ymaws.com/aams.org/resource/resmgr/air-medical-services-cost-st.pdf.

[4] U. S. Government Accountability Office, "Ambulance Providers: Costs and Medicare Margins Varied Widely; Transports of Beneficiaries Have Increased," October 1, 2012, https://www.gao.gov/products/gao-13-6.

1

The impact of the proposed rule will be particularly detrimental in rural communities, which represent a fifth of the U.S. population.[5] Since 2010, 138 rural hospitals have closed, with 19 hospitals closing in 2020 alone. Additionally, the Association of Air Medical Services members determined that 57 air ambulance bases closed in 2019 alone, mostly in rural areas. Rural hospital closures make air ambulance services even more critical and in-demand, and yet air ambulance bases have struggled to maintain their operations in rural communities. A significant decrease in reimbursement rates for air ambulance services, as this rule proposes, may decrease availability of necessary emergency health care for our veterans, especially in rural areas.

Ensuring robust support for EAMS in rural areas is critical for the health and wellbeing of our veterans. These proposed changes threaten the viability of local air ambulance providers, thus limiting veterans' access to these critical services. We strongly believe that without the proper data separating the cost of air and ground ambulance transports, and the analysis of that data, the VA cannot effectively measure the impacts of the NPRM. Knowing all of this, how are you ensuring our veterans in rural areas will continue to have access to air ambulance services?

We look forward to working with you to care for and defend our nation's veterans.

Sincerely,

Ann Kirkpatrick
Member of Congress

Don Bacon
Member of Congress

Cliff Bentz
Member of Congress

Ruben Gallego
Member of Congress

---

[5] Centers for Medicare & Medicaid Services, "Press Release Biden-Harris Administration Takes Action to Expand Access to Emergency Care Services in Rural Communities," June 30, 2022, https://www.cms.gov/newsroom/press-releases/biden-harris-administration-takes-action-expand-access-emergency-care-services-rural-communities.

Jared Golden
Member of Congress

Josh Gottheimer
Member of Congress

Jay Obernolte
Member of Congress

Tom O'Halleran
Member of Congress

David G. Valadao
Member of Congress

3



**CLARENDON COUNTY FIRE RESCUE**

Michael A. Johnson, Chief
Jason L. Dennis, Deputy Chief
Robert Pegram, Division Chief

517 SUNSET DR
MANNING, S.C. 29102
(803) 435-4075 / FAX: (803) 435-4683

Robert L. Ridgeway, Asst. Chief
Brad C. Gerfin, Deputy Chief
Joshua Jordan, Division Chief

E-mail: info@clarendonfirerescue.com

*EST. 2020*

11/8/2022

The Honorable Denis McDonough
Secretary of Veterans Affairs
Department of Veterans Affairs
Veterans Affairs Building
810 Vermont Avenue, NW, Room 1000
Washington, DC 20420

Dear Secretary of Veterans Affairs Denis McDonough,

As providers of ground-based EMS services, we desperately need your help. It appears that the Department of Veterans Affairs is considering cutting its reimbursement for air medical services to a level that is less than 50% of the actual cost of the services.

This change is expected early next year and could leave Veterans as well as non-veterans without access to air medical services. We live in a very rural area (as does over 70% of the population) and should the air medical service not be able to maintain the cost of doing business, then the nearby air ambulance bases will close. This will leave not only veterans, but also the population in general with decreased access to prompt and proper medical care. In the rural areas, we rely heavily on the air ambulances to transport patients to the appropriate level medical centers quickly for life-saving treatment that is not available locally. This can range from acute heart attacks to trauma, burns, etc.

An opportunity for a solution may be to allow the Centers for Medicare and Medicaid Services to complete the process of collecting air transport cost data. With this report, the VA can properly determine the adequate reimbursement rate for air ambulance transport service.

Please assist the VA in delaying any change in reimbursement until CMS publishes this cost data report.

Thank You for your consideration in preserving adequate medical care for our citizens,

Brad Gerfin, NRP
Deputy Chief Medical Operations

Robert L Ridgeway III, MD
Medical Control Physician

Filed: 05/20/2024    Page: 144    Document: 53    Case: 24-1104



# WATER WHEEL FIRE & MEDICAL DISTRICT

10603 N. Houston Mesa Road
Payson, Arizona 85541
*928-474-3088 (office)*
*928-472-3392 (FAX)*

Received By

NOV 17 2022

Ex Exec Correspondence

The Honorable Denis McDonough
Secretary of Veterans Affairs
Office of the Secretary
Department of Veterans Affairs
Room 1000
Veteran's Affairs Building
810 Vermont Avenue, NW
Washington, DC 20420

November 11, 2022

Subject: VA Proposal to Cut Rate for Air Ambulances

Dear Secretary of Veterans Affairs Denis McDonough,

I am writing to raise concerns about the U.S. Department of Veterans Affairs' plan to cut its reimbursement rate for emergency air medical services to be in line with Medicare, which currently reimburses providers at less than 50 percent of operating costs. Given that government payors account for roughly 75 percent of all emergency transports, the change would greatly impact patients' ability to access these lifesaving services.

If this proposal moves forward, it will further jeopardize the ability of air medical providers to operate in rural and underserved communities. With 25% of all Veterans living in rural America, this stands to significantly impact their access to the lifesaving care they deserve.

The No Surprises Act, in addition to protecting patients from surprise medical bills, requires air medical companies to submit their transport cost data to the U.S. Department of Health and Human Services (HHS). HHS is mandated by law to publish a report on the data - something that has never been done before on this scale.

Please delay changing the reimbursement rate until the HHS report is published.

Sincerely,

Ron Sattelmaier

Ron Sattelmaier

Fire Chief - Paramedic

COLIN ALLRED
32ND DISTRICT, TEXAS

WASHINGTON OFFICE
114 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-2231



# Congress of the United States
## House of Representatives
### Washington, DC 20515

December 20, 2022

Dr. Shereef Elnahal, Under Secretary for Health
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

Dear Dr. Elnahal:

Thank you for your work on behalf of our nation's veterans. I write today to share my concerns with the Department of Veterans Affairs' (VA) proposed rule AP89, for rates paid for air ambulance services. It is my understanding that this change, expected to go into effect in early 2023, would bring the VA's reimbursement rate for providers to less than 80 percent of operational costs, which could lead to the closure of emergency air medical bases around the country.

Veterans across the country, but especially in rural and highly rural areas, rely on air medical services to transport them to a hospital or trauma center in the case of a serious emergency. As you know, about 4.8 million veterans live in rural areas, which is 25 percent of our nation's veterans, including 2.7 million veterans enrolled in the Veterans Health Administration (VHA). Many of those veterans could lose access to life-saving emergency transportation should VA proceed with its stated intention to put the new reimbursement rates in place as early as January 1, 2023.

In January 2022, the No Surprises Act went into effect. This bill required air medical companies to submit two years of cost data to the U.S. Department of Health and Human Services (HHS). Once this data is collected, which is expected to be completed by the end of 2024, HHS will be required to produce a report sharing this data. Provisions of the No Surprises Act have caused a significant reduction in rates paid by insurance companies, leading to dozens of emergency air bases already being closed. These companies project that many more may close should the VA rate reductions go into effect. It is imperative that the CMS report on cost be factored into VA's decision to reduce reimbursement rates. Moving forward without the CMS data means VA is not considering the complete structure of the reimbursement system. This could result in many rural veterans losing access to life-saving emergency ambulance services.

I understand the VA reimbursement structure for the emergency air ambulance service industry is fundamentally flawed. However, if the VA's proposed rule goes into effect as planned, our nation's rural veterans will lose quick access to care in cases of strokes, heart attacks and serious

accidents. Emergency care during the time immediately following these emergencies often means the difference between life and death.

I respectfully urge you to consider waiting until CMS develops its Congressionally mandated cost numbers before implementing the proposed rule. At the very least, I would urge VA leaders to meet with the air ambulance industry to work out a solution that best serves our nation's veterans in the short term. Thank you for your service and commitment to working on behalf of our nation's veterans.

Sincerely,

Colin Allred
Member of Congress



Office of General Counsel
Washington DC 20420

In Reply Refer To: **00REG**

January 5, 2023

Subject: Regulatory Impact Analysis for RIN 2900-AP89(F), Change in Rates that VA Pays for Special Modes of Transportation

I have reviewed this rulemaking package and determined the following:

1.  This rulemaking will not have an annual effect on the economy of $100 million or more, as set forth in Executive Order 12866.

2.  This rulemaking will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act, 5 U.S.C. 601-612.

3.  This rulemaking is not likely to result in the expenditure of $100 million or more by State, local, and tribal governments, in the aggregate, or by the private sector, in any one year, under the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532.

4.  Attached please find the relevant Regulatory Impact Analysis document, dated January 5, 2023.


**Approved by:**
Roy Johnson
Chief Economist
Office of Regulation Policy & Management (00REG)
Office of General Counsel

**(Attachment)**

**Regulatory Impact Analysis for RIN 2900-AP89(F)**

**Title of Regulation:**  Change in rates that VA pays for special modes of transportation

**Purpose:**  To determine the economic impact of this rulemaking.

**Statement of Need:**  In accordance with the Department of Veterans Affairs (VA) statutory authority at 38 U.S.C. § 111, VA provides Beneficiary Travel (BT) benefits to eligible veterans and other eligible persons who need to travel in connection with vocational, rehabilitation, or counseling required by the Secretary pursuant to chapter 34 or 35 of Title 38, U.S.C., or for the purpose of examination, treatment, or care. VA will revise the BT regulations at 38 CFR Part 70 to permit VA to exercise its authority under 38 U.S.C. 111(b)(3)(C) to pay the lesser of the actual charge for ambulance transportation or the amount determined by the Centers for Medicaid and Medicare (CMS) fee schedules unless VA has entered into a contract for the ambulance transportation. Additionally, VA proposes to establish a payment methodology for other types of special modes of transportation, including wheelchair and stretcher van services. These revisions will result in significant cost avoidance (i.e., transfer savings) for VA while still providing necessary transport for veterans and other eligible persons who need to travel.

**Summary:**  VA amends its beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology will apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA will pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule (AFS) established by the Centers for Medicare & Medicaid Services (CMS). For travel by modes other than ambulance, VA will establish a payment methodology based on states' posted rates or the actual charge.

**Benefits:**  VA believes the revisions will reduce improper payments and help eliminate payment error, waste, and abuse. Use of CMS rates (or the lesser actual charge) for non-contracted ambulance providers will help maintain uniformity with CMS, eliminate confusion for vendors, and help VA control costs.

**Estimated Impact:**  VA has determined that there are transfer savings to VA as a result of this rulemaking. This rulemaking will delay implementation until one year after publication, to ensure that ambulance providers have adequate time to adjust to VA's new methodology for calculating ambulance rates. Therefore, VA does not anticipate any transfer savings in FY2023. The transfer savings are estimated to be $41.4 million in FY 2024 and $223.2 million over a six-year period. VA has detailed its assumptions regarding the transfer savings in the "Assumptions and Methodology" section below. Further detail regarding VA estimates is provided in the table listed below.

| FY | Billed Charges – All SMT transport (ground/air) | Billed Charges - Contracted SMT transport (ground/air) | Billed Charges - non-contract SMT transport (ground/air) | Payments using CMS methodology | Transfer Savings |
|---|---|---|---|---|---|
| 2023 | $0 | $0 | $0 | $0 | $0 |
| 2024 | $619,021,528 | $316,036,633 | $302,984,894 | $261,536,561 | ($41,448,334) |
| 2025 | $643,782,389 | $328,678,098 | $315,104,290 | $271,998,023 | ($43,106,267) |
| 2026 | $666,224,103 | $340,135,541 | $326,088,561 | $281,479,646 | ($44,608,915) |
| 2027 | $690,225,402 | $352,389,217 | $337,836,183 | $291,620,194 | ($46,215,990) |
| 2028 | $714,061,496 | $364,558,549 | $349,502,944 | $301,690,942 | ($47,812,003) |
| 6 - Year Total | $3,333,314,918 | $1,701,798,038 | $1,631,516,872 | $1,408,325,365 | ($223,191,510) |

*Numbers may not add due to rounding*
*6 total years of data provided to reflect a full 5-year time horizon of estimated impacts.*

*FMS 830 870 cube used for estimating as of 1/10/19*

**Assumptions and Methodology:**  This change in § 70.30(a)(4) will implement the discretionary authority in 38 U.S.C. § 111(b)(3)(C). Current § 70.30(a)(4) requires VA to pay the "actual cost of a special mode of transportation." This has been applied to mean that VA pays billed charges or, when VA has entered into a contract with a provider of special mode transportation, the contracted rate.

Revisions to § 70.30(a)(4)(i) will permit VA to pay the lesser of the actual charge for special mode transportation or the amount determined by the fee schedule established under section 1834(l) of the Social Security Act unless VA has entered into a contract for transportation with the provider of special mode transportation. See 42 U.S.C. § 1395m(l). Revisions to § 70.30(a)(4)(ii) will permit VA to pay the lesser of the vendor's actual charge or the lowest posted rate in an involved state for travel by modes other than ambulance.

CMS posts its annual schedule nationally, which is the basis for VA's payment calculations. Fee schedules are created by CMS, and it is unclear whether CMS seeks input from vendors, but it appears that CMS provides a notice and comment period when publishing rates (https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AmbulanceFeeSchedule/). VA would seek to protect itself against savvy vendors increasing their prices to the maximum of the CMS fee schedule during schedule revisions. VA would undertake this activity because adopting the schedule protects VA from paying "actual charges" that are typically higher than the CMS fee schedule. Additionally, VA will maintain its option to contract based on volume or other reasons which may entice rates even more favorable in some cases.

It is highly unlikely that CMS would increase rates beyond an annual economic price increase and typically the rates are always much lower than provider billed charges or insurance company allowed reimbursements. However, if CMS rates increased

significantly to accommodate vendors, then VA would pay the increased charges or pursue contracts at a lesser rate.

The methodology VA used to estimate cost savings is as follows: Using the Financial Management System (FMS) 830 870 cube, VA estimates the total FY 2024 charges for beneficiary travel ambulance payments as $619,021,528 and removed the estimated charges for contracted transport which is estimated at $316,036,633 (because the changes will have no impact on contracted services). This resulted in estimated non-contract billed charges being $302,984,894.

Currently, the billed charges VA pays are greater than the amount VA would pay using the CMS fee schedule. VA estimates that for FY 2024, the CMS rates for non-contracted ambulance services would be about 86.32% of billed charges for such services. This estimate is based on VA's methodology for ambulance cost savings. VA estimated 49% of the total special mode transportation budget (i.e., budget object code 2120) are billed as non-contract costs based on information gathered from our facilities.

VA established an average cost per transport for non-contracted ambulance services based on the information gathered as referenced above, and VA established an average CMS reimbursement rate combining all HCPCS codes. VA does not have the ability to determine payments made by facilities by HCPCS code, but VA determined that CMS reimbursement rates are on average 13.68% lower than costs being reimbursed under current regulatory guidelines (i.e., billed charges). VA multiplied the estimated number of transports by the estimated cost per transport for each (i.e., non-contract/CMS). VA subtracted the estimated CMS reimbursement costs from the estimated current non-contract costs to establish our cost avoidance (transfer savings). Finally, VA used the same methodology used annually for the Presidential Budget assuming a four (4%) percent utilization increase per year for each year in FY 2024-FY 2028, noting that in FY2023, the provisions in this rulemaking will not yet be implemented.

**Paperwork Reduction Act:**  The final rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3521).

**Alternative Policy Approaches:**  VA's Veterans Transportation Program (VTP) considered several alternatives to regulatory action. One alternative VA considered was seeking a national contract for special mode transportation. It became apparent that taking this action would reduce current, market-based pricing schemes in certain local areas and the pricing schemes for those areas would likely remain above CMS rates. VA's ability to realize savings would prove wholly dependent on the number of qualified vendors present. For specialized markets of this type, where qualified vendors may be limited, available vendors may prove reticent to execute a fixed-price contract for economic reasons.

VA also considered a phase-in of the CMS fee schedule for ambulance transportation for entities making under $100K in annual revenue but determined that an immediate adoption of CMS rates (as would be set forth in VA's final rule) is reasonable because ambulance transportation providers are accustomed to CMS rates. Furthermore, VA believes the cost savings VA would realize as a result of adopting CMS rates would be

beneficial to the veteran population. For reasons discussed above, VA believes its payment methodology is preferable to the alternatives discussed herein.

**Regulatory Flexibility Act:**  The Secretary hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act, 5 U.S.C. 601-612. According to Small Business Administration's Size Standard of $16.5 Million[1], VA estimates that this final rule will potentially impact 2,979 small entities within NAICS Code 621910 (Ambulance Services), which represents 97 percent[2] of the total entities covered by NAICS Code 621910. However, VA assumes that all entities within NAICS Code 621910 would bear VA's cost avoidance equally, which totals to 3,071 entities potentially impacted by this rulemaking. The per entity burden is estimated to be less than 1% of preliminary receipts, for a total cost of $13,496.69 per entity in FY2024 for all entities within NAICS Code 621910.

VA does not believe the impact on vendors within NAICS Code 621999 (All Other Miscellaneous Ambulatory Health Care Services) or NAICS Code 485991 (Special Needs Transportation) will be significant because VA does not typically pay for non-contract wheelchair or stretcher van services. Because VA estimates that over 99% of its payments to vendors potentially covered within NAICS Codes 621999 and 485991 are made pursuant to a contract, less than 1% of small entities within these NAICS Codes are estimated to be impacted by this final rule.  Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

**Submitted by:**
Veterans Transportation Program
Veterans Health Administration
810 Vermont Avenue, NW
Washington, DC 20420

**Date:** January 5, 2023

---

[1] 2019 SBA table of size standards utilized for the analysis of NAICS 621910; https://www.sba.gov/document/support--table-size-standards

[2]  Percentage generated by comparing SBA size standard threshold to 2017 Census SUSB Data for NAICS 621910; https://www2.census.gov/programs-surveys/susb/datasets/2017/us_state_6digitnaics_2017.txt



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC  20420**

January 19, 2023

The Honorable Colin Allred
U.S. House of Representatives
Washington, DC 20515

Dear Representative Allred:

Thank you for your December 20, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

The Honorable Colin Allred

We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue. And thank you for your continued support of our mission.

Sincerely,

Shereef Elnahal, M.D., MBA



**DEPARTMENT OF VETERANS AFFAIRS**
**WASHINGTON**

January 19, 2023

Mr. Jack Du Teil
President
The Military Coalition
201 N Washington Street
Alexandria, VA 22314

Dear Mr. Du Teil:

Thank you for your January 9, 2023, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

After the close of the comment period, VA received your letter as well as several other letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the Proposed Rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

Mr. Jack Du Teil

    We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed air ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule.

    Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and thank you for your continued support of our mission.

                    Sincerely,

                    Kimberly M. Mitchell
                    Director, Veterans Service
                    Organization Liaison



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC 20420**

January 20, 2023

Mr. Shawn Baird
President
American Ambulance Association
P.O. Box 96503, #72319
Washington, DC 20090

Dear Mr. Baird:

Thank you for your December 12, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Centers for Medicare and Medicaid Services' (CMS) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I am responding on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Members of Congress and their staffs on several occasions in December 2022, during which VA outlined the terms of the Proposed Rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of Inspector General that found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the Final Rule.

Page 2.

Mr. Shawn Baird

We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the Final Rule.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and thank you for your continued support of our mission.

Sincerely,

Shereef Elnahal, M.D., MBA



**DEPARTMENT OF VETERANS AFFAIRS**
**Under Secretary for Health**
**Washington DC  20420**

January 20, 2023

Mr. Ron Sattelmeir
Fire Chief - Paramedic
Water Wheel Fire and Paramedic District
10603 N. Houston Mesa Road
Payson, AZ 85541

Dear Mr. Sattelmeir:

Thank you for your November 11, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

After the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.

Page 2.

Mr. Ron Sattelmeir

     We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule.

     Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue and thank you for your continued support of our mission.

                                     Sincerely,

                                     Shereef Elnahal, M.D., MBA



**VHA Member Services**

2957 Clairmont RD., NE, STE. 200

Atlanta, GA 30329-1647

January 20, 2023

Mesquite Chamber of Commerce
11 W. Pioneer Blvd., Suite C
Mesquite, NV 89027

Dear Carol Kolson:

Thank you for your December 1, 2022, letter to the Department of Veterans Affairs (VA) regarding your concerns with VA's proposed adoption of the Center for Medicare and Medicaid Services' (CMS's) Medicare Ambulance Fee Schedule, for air ambulance service to certain VA beneficiaries, particularly those in rural areas. VA remains committed to delivering world-class care and services to all Veterans and VA beneficiaries, including those who depend on transportation assistance. I appreciate the opportunity to respond on behalf of the Department.

On November 5, 2020, VA issued its Proposed Rule in the Federal Register, titled "Changes in Rates VA Pays for Special Modes of Transportation," RIN 2900-AP89. See 85 FR 70551. In this Proposed Rule, "The Department of Veterans Affairs (VA) proposes to amend its regulations concerning beneficiary travel. The revisions would amend the Veterans Health Administration's beneficiary travel regulations to establish a new payment methodology for special modes of transportation. The new payment methodology would apply in the absence of a contract between VA and a vendor of the special mode of transportation. For transport by ambulance, VA proposes to pay the lesser of the actual charge or the amount determined by the Medicare Part B Ambulance Fee Schedule established by the Centers for Medicare & Medicaid Services." *Id.*

As you know, after the close of the comment period, VA received your letter as well as several other Congressional letters relating to the Proposed Rule. These letters expressed concerns also raised in some of the public comments. VA officials, including Secretary McDonough, met with Congress members and their staff on several occasions in December 2022, during which VA outlined the terms of the proposed rule. VA officials noted that the Proposed Rule would result in a change to rates only where there was no separate contract between an air ambulance vendor and a local VA facility, and that a majority of VA Medical Centers had existing contracts with local air ambulance providers. VA officials also noted that the Proposed Rule was consistent with the recommendations of a 2018 report by the VA Office of the Inspector General which found that VA was paying substantially more than CMS for air ambulance services. During these Congressional meetings, because of the pending rulemaking, VA did not discuss any policy considerations or decisions related to the final rule.



**VHA Member Services**

2957 Clairmont RD., NE, STE. 200

Atlanta, GA 30329-1647

We acknowledge and thank you for sharing your concerns that the Proposed Rule may reduce Veteran access to needed Air Ambulance services, including in rural areas. As frustrating as this is, we are constrained from responding to the substance of your letter because of the pending rulemaking. We understand your concern. It reflects many of the comments we received, and we will take those into consideration when issuing the final rule.

Again, thank you for your carefully considered thoughts and concern for all involved interests in connection with this issue. And thank you for your continued support of our mission.

Sincerely,

BENJAMIN
WILLIAMS

Digitally signed by BENJAMIN
WILLIAMS
Date: 2023.01.24 09:40:40 -05'00'

Ben Williams
Director, Veterans Transportation Program
VHA Member Services

**SANFORD D. BISHOP, JR.**
SECOND DISTRICT, GEORGIA

**COMMITTEE ON APPROPRIATIONS**
SUBCOMMITTEES:
**CHAIRMAN**
AGRICULTURE, RURAL DEVELOPMENT, FOOD
AND DRUG ADMINISTRATION AND RELATED AGENCIES
**VICE CHAIR**
MILITARY CONSTRUCTION, VETERANS AFFAIRS
AND RELATED AGENCIES
FINANCIAL SERVICES AND GENERAL GOVERNMENT

**COMMITTEE ON AGRICULTURE**
LIVESTOCK AND FOREIGN AGRICULTURE
GENERAL FARM COMMODITIES AND
RISK MANAGEMENT

OFFICES:
**WASHINGTON, DC**
2407 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1002
PHONE: (202) 225-3631
FAX: (202) 225-2203

**ALBANY**
323 PINE AVENUE, SUITE 400
ALBANY, GA 31701
PHONE: (229) 439-8067
FAX: (229) 436-2099

**COLUMBUS**
18 NINTH STREET, SUITE 201
COLUMBUS, GA 31901
PHONE: (706) 320-9477
FAX: (706) 320-9479

**MACON**
300 MULBERRY STREET, SUITE 502
MACON, GA 31201
PHONE: (478) 803-2631
FAX: (478) 803-2637



**Congress of the United States**
House of Representatives
Washington, DC 20515-1002

February 9, 2023

The Honorable Denis R. McDonough
Secretary
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

Dear Secretary McDonough:

I am writing to express my concerns with the Department of Veterans Affairs (VA) proposed rule change for air ambulance services rates. I understand that this rule is expected to go into effect later this year, which could lead emergency air medical bases to close around the country.

Veterans across the country, especially in rural areas, rely on air medical services to transport them to a hospital or trauma center in an emergency. Georgia is home to over 630,000 veterans, many of whom live in rural communities. In the U.S., about 4.8 million veterans live in rural areas, which is 25 percent of our nation's veterans, including 2.7 million veterans enrolled in the Veterans Health Administration. Unfortunately, many veterans may lose access to life-saving emergency transportation should VA proceed with its stated intention to put the new reimbursement rates in place.

The No Surprises Act, enacted in January 2022, requires air medical firms to furnish the U.S. Department of Health and Human Services (HHS) with two years of cost information and mandates the HHS to publish a report. The act's provisions have led to decreased insurance payment rates, causing the closure of emergency air bases with more closures expected. The VA should consider the Center for Medicare and Medicaid Services (CMS) cost report when making decisions on reimbursement rate cuts, as failure to do so could affect access to emergency ambulance services for rural veterans, which is crucial during life-threatening situations.

I ask that the VA delay implementing the proposed rule until CMS provides its congressionally mandated cost numbers.

PRINTED ON RECYCLED PAPER

The Honorable Denis R. McDonough
February 9, 2023

     Thank you for your service and commitment to working on behalf of our nation's veterans. With warmest regards, I remain

          Sincerely,

          Sanford D. Bishop, Jr.
          Member of Congress

JON TESTER, MONTANA
    CHAIRMAN
PATTY MURRAY, WASHINGTON
BERNARD SANDERS, VERMONT
SHERROD BROWN, OHIO
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
JOE MANCHIN III, WEST VIRGINIA
KYRSTEN SINEMA, ARIZONA
MAGGIE HASSAN, NEW HAMPSHIRE
ANGUS S. KING, JR., MAINE

TONY McCLAIN, STAFF DIRECTOR

JERRY MORAN, KANSAS
    RANKING MEMBER
JOHN BOOZMAN, ARKANSAS
BILL CASSIDY, LOUISIANA
MIKE ROUNDS, SOUTH DAKOTA
THOM TILLIS, NORTH CAROLINA
DAN SULLIVAN, ALASKA
MARSHA BLACKBURN, TENNESSEE
KEVIN CRAMER, NORTH DAKOTA
TOMMY TUBERVILLE, ALABAMA

JON TOWERS, STAFF DIRECTOR

# United States Senate

COMMITTEE ON VETERANS' AFFAIRS
WASHINGTON, DC 20510

February 15, 2023

The Honorable Denis R. McDonough
Secretary of Veterans Affairs
810 Vermont Ave NW
Washington, DC  20420

Dear Secretary McDonough,

We write today to reiterate our deep concern with the upcoming finalization of the Department of Veterans Affairs (VA) proposed rule change for air ambulance and other special mode transportation services rates (AP89). We understand, and support, VA's interest in ensuring rates are fair and appropriate and in following the recommendations made by the 2018 Office of Inspector General Report: The Beneficiary Travel Program, Special Mode of Transportation Eligibility and Payment Controls. However, we are disappointed VA has not been transparent with, or adequately responded to, widespread outreach from Congress, stakeholders, veterans, and the public surrounding this proposed rule change.

This proposed rule change was issued in the midst of negotiations surrounding Public Law 116-260, the Consolidated Appropriations Act of 2021, which included the No Surprises Act. Not only does the proposed rule not account for the major impact the No Surprises Act has had on Center for Medicare & Medicaid Services (CMS) rates for air ambulance services, but it also does not account for the unique nature of these emergency life-saving services or the permanent changes to health care resulting from the pandemic that began after it was proposed. VA has admitted to not having done its own market assessment of air ambulance rates before publishing this proposed rule, which is highly concerning given the impact VA's payment rates could have on this critical transportation service for veterans and the general public, particularly those in rural, remote, or underserved areas. We are discouraged by the lack of due diligence carried out by VA before publishing this rule, with the lack of action taken by VA to rectify these missteps, and with the general dismissiveness that has characterized VA's response to the many concerns raised by lawmakers and stakeholders about this rulemaking.

Additionally, we are concerned with VA's insistence that reductions in care due to the implementation of AP89 are unlikely when more than 80% of claims and related payments will be impacted according to VA's own data. VA asserts air ambulance providers' ability to enter into contracts with VA medical centers (VAMCs) at higher rates than reimbursed by CMS will prevent any base closures or reductions in care. However, it is our understanding VA has not conducted outreach to external stakeholders or VAMCs to encourage this contracting process. VA claims there are contracts in place nationwide, when the majority of providers are only aware of a handful of such contracts in existence, if any.

We urge VA to delay finalizing this rule and to coordinate with the Department of Health and Human Services to ensure VA is basing any changes to air ambulance payment rates on accurate data, as requested in the joint explanatory statement accompanying Public Law 117-328, the Consolidated Appropriations Act, 2023. We also encourage VA to issue another comment period and hold a public forum on the rule given the changes that have occurred in the air ambulance and health care industries since the proposed rule was issued. We further ask VA to conduct extensive internal and external outreach to appropriately inform stakeholders of the implications of the proposed rule change and the tools prospective air ambulance partners may require to begin the contracting process and ensure continuity of care and services for veterans. Finally, we also ask that you take steps to make certain that the Veterans Health Administration demonstrates improved responsiveness and transparency on this and all other matters moving forward.

We look forward to hearing from you regarding our concerns with this proposed rule change, and to working together to ensure veterans who rely on this critical care service are not negatively affected by any payment rate changes.

Sincerely,

Jon Tester
Chairman
Senate Committee on Veterans' Affairs

Jerry Moran
Ranking Member
Senate Committee on Veterans' Affairs

forward to umm the information that comes out of there analysis of that rate but but do have have to defer all questions regarding the rate at 2 CMS so as Mr.

0:16:9.440 --> 0:16:12.350
Williams, Benjamin G
Miller mentioned, you know, it was with great intention that the Secretary.

0:16:14.90 --> 0:16:31.560
Williams, Benjamin G
Provided and and and and ultimately set an implementation period of one year to allow us to go through the specific process, the very specific process that the federal government has for for contracting and acquisition and meeting acquisition requirements.

0:16:32.190 --> 0:16:45.140
Williams, Benjamin G
So I'll go over a little bit more of that in the next couple of slides on on the activity that that we've been undertaking for the last few months since the since the rule was was published.

0:16:45.470 --> 0:17:0.690
Williams, Benjamin G
Uh, and and really leading up to within now what we, I I can confidently say is in the next few weeks to begin the solicitations, we'll be able to and provide some greater transparency on on that timeline.

0:17:0.740 --> 0:17:1.830
Williams, Benjamin G
And then what's next?

0:17:4.190 --> 0:17:4.810
Williams, Benjamin G
Next slide please.

0:17:8.590 --> 0:17:18.900
Williams, Benjamin G
So so now that we covered a little a little bit more on on what's in the rule, I wanna cover some details on on how we'll how we'll execute the impact of process.

0:17:22.520 --> 0:17:34.980
Williams, Benjamin G
Again, for those of you industry providers who are on the first call, we where are going over some some items that that are redundant but want to make sure any new new participants have have the same information.

0:17:36.30 --> 0:17:48.830
Williams, Benjamin G
Uh, so each contract and solicitation will happen for ground and air ambulance service for the for the entire catchment area and that will be solicited at the the VA Medical Center level.

0:17:50.850 --> 0:17:54.140
Williams, Benjamin G
What's so that's not different from our previous.

0:17:54.790 --> 0:18:1.970
Williams, Benjamin G
I'll say the difference in that in our previous acquisition strategy, umm, is that it?

0:18:1.980 --> 0:18:9.200
Williams, Benjamin G
It was a local, local VMC solicitation previously that will remain the same this time.

0:18:9.620 --> 0:18:17.990
Williams, Benjamin G
Some of the specifics is is, is is our goal and our and our solicitation will be for full coverage of the entire catchment area.

0:18:18.560 --> 0:18:34.240
Williams, Benjamin G
So that will will create some changes, some additional opportunity for uh for for competition with within the the catchment area and and ambulance services within the catchment area.

0:18:34.990 --> 0:18:39.480
Williams, Benjamin G
Each solicitation will also include a standardized set of performance requirements.

0:18:39.590 --> 0:18:48.250
Williams, Benjamin G
That's a big change from from the previous environment prior to a P89, when the local facilities were.

0:18:49.890 --> 0:19:7.680
Williams, Benjamin G
Uh, had a, I'll say, a whole lot more flexibility in the specific requirements that were set in the in the contract we we spent a lot of time over the last.

0:19:7.690 --> 0:19:10.80
Williams, Benjamin G
Really though, at this time last year is when is.

0:19:10.130 --> 0:19:35.290
Williams, Benjamin G
When the work began to examine the this the the acquisition strategy and begin developing the standardized components of the project work schedule to ensure that the agency has an appropriate, I'll say, a consistent and efficient way to execute the solicitation award and execution of of these contracts and and again that was well well prior to the.

0:19:36.130 --> 0:19:50.40
Williams, Benjamin G

To the rule being finalized, and if solicitation also, which is different from another key differentiation from the previous environment to to the current one, uh.

0:19:50.940 --> 0:19:57.420
Williams, Benjamin G
The new solicitations will require electronic trip requests and and and acceptance and or rejection.

0:19:59.280 --> 0:20:3.720
Williams, Benjamin G
That's uh, you know, and that's going to be done through the VA approved software which is, which is that right.

0:20:3.730 --> 0:20:8.760
Williams, Benjamin G
So we're we're excited to share that in session two, that's going to be the Lions.

0:20:9.140 --> 0:20:32.250
Williams, Benjamin G
Of what was covered during Session 2 today, we're hope you everyone can can have time to participate in that and UM and be able to, you know, and we'll we'll continue the discussion of regarding that ride and how how to use it and how the VA as well as the the contractor providers will will use that right in the future.

0:20:33.400 --> 0:20:44.140
Williams, Benjamin G
And finally, the contractor rates will be based on market pricing and be applicable to to all VA initiated ambulance trips.

0:20:44.480 --> 0:20:56.280
Williams, Benjamin G
So you know that's that's the the main, you know, main pieces of information that wanted to to cover that was covered in the first session.

0:20:56.610 --> 0:21:7.860
Williams, Benjamin G
But wanna make sure that that everyone has baseline transparency on before we get into to the next question which is which is when we'll start the solicitation.

0:21:9.270 --> 0:21:9.860
Williams, Benjamin G
Next slide, please.

0:21:11.540 --> 0:21:17.70
Williams, Benjamin G
Alright, so the $1,000,000 question you know when when when will when will we get started?

0:21:17.80 --> 0:21:31.740
Williams, Benjamin G

So as we discussed last time, we we've been working very diligently since since last summer as as an age, a disciplinary UM project team.

0:21:31.860 --> 0:21:32.970
Williams, Benjamin G
Uh with uh?

0:21:34.170 --> 0:22:5.160
Williams, Benjamin G
Members from the VA office of Acquisition, Logistics and and construction, as well as via a Procurement Logistics office to get to the point where we we are are confident that we've done what we've needed to do from a pre award planning and strategy acquisition strategy perspective and and prepare do do free solicitation preparation with the local VA MC stakeholders.

0:22:6.250 --> 0:22:9.140
Williams, Benjamin G
Uh, that will will carry out these actions.

0:22:9.470 --> 0:22:11.580
Williams, Benjamin G
Uh, with our acquisition professionals.

0:22:11.630 --> 0:22:12.110
Williams, Benjamin G
Uh.

0:22:12.120 --> 0:22:15.670
Williams, Benjamin G
Within the different national contracting offices, so.

0:22:17.110 --> 0:22:39.310
Williams, Benjamin G
We we do expect umm to have a finalized standardized procurement package that will that will be disseminated for initiation of proposals within within the next month.

0:22:39.320 --> 0:22:47.880
Williams, Benjamin G
So so by August, August 15th is is the big the big date we we have been working in making aware.

0:22:49.770 --> 0:22:51.840
Williams, Benjamin G
Providing awareness and socializing.

0:22:52.220 --> 0:23:6.60
Williams, Benjamin G
What the process will be the timeline will be and and the expectation that each Medical Center we'll we'll solicit ground and air ambulance service contracts. Uh.

0:23:8.440 --> 0:23:10.490
Williams, Benjamin G
Once that guidance is finalized.

0:23:11.160 --> 0:23:11.960
Williams, Benjamin G
So.

0:23:12.80 --> 0:23:12.590
Williams, Benjamin G
So what?

0:23:12.600 --> 0:23:14.70
Williams, Benjamin G
That what that really means for you.

0:23:14.80 --> 0:23:21.610
Williams, Benjamin G
All ads as industry providers and and and preparing for a response to the request for proposals.

0:23:22.240 --> 0:23:27.710
Williams, Benjamin G
It is is that that's the timeline that you should be anticipating soon thereafter.

0:23:28.570 --> 0:23:46.900
Williams, Benjamin G
You know August 15th and or on or about the beginning of September is when the AMC's will begin solicitations via the via the thesand.gov and and and our our National Contracting Office representatives.

0:23:48.390 --> 0:23:56.20
Williams, Benjamin G
So as as I mentioned or or I'm sorry as as many of you know and and I'm and I'm sure have have responded.

0:23:56.310 --> 0:23:57.140
Williams, Benjamin G
But we did.

0:23:57.190 --> 0:24:8.340
Williams, Benjamin G
Since the last industry day, we did put out requests for information which will which will provide us a lot of information that we'll use as the basis for our market research.

0:24:9.490 --> 0:24:15.390
Williams, Benjamin G
Umm, within the the local areas as we as we go through the.

0:24:16.940 --> 0:24:23.150
Williams, Benjamin G
Various specific acquisition process and acquisition guidelines that we have for federal agencies.

0:24:24.500 --> 0:24:27.950
Williams, Benjamin G
Prior to the actual solicitation process.

0:24:29.240 --> 0:25:27.230
Williams, Benjamin G
So, UM, finally again, you know our goal and and operationally on from from the VA side as well as you know from the Transportation Office Program, Office team perspective as well as you know our stakeholders in the field that we work with on a daily basis as well as the acquisition by we, we remain very confident that we have time in the timeline that we have prior to to February of next year that we can can ensure that we we do have ground and air ambulance service contracts at every Medical Center that covers the entire catchment area again pending you know ensuring that you know there are services provided to cover the entire service providers to cover the entire entire catchment area.

0:25:27.620 --> 0:25:50.90
Williams, Benjamin G
So you know, we're gonna be working very hard with you all to continue that effort and and ensure we meet that timeline and do not put any particular Medical Center or veterans who are servers by that Medical Center at a disadvantage for not having a provider under contract for those services prior to February of 2024.

0:25:51.130 --> 0:25:55.870
Williams, Benjamin G
UH-1 key point that I do want to make uh before we move on on this, this timeline.

0:25:57.540 --> 0:26:9.420
Williams, Benjamin G
All, all, all questions and or inquiries should be directed to the national points of contact that are listed in the sam.gov postings that associated with any ambulance contract questions.

0:26:10.450 --> 0:26:27.200
Williams, Benjamin G
Am I would I would love and my team would love to be able to, to, to meet with with all the industry providers, be able to answer questions specific to to, to to them of whether you know big, big, big or small.

0:26:27.850 --> 0:26:40.600
Williams, Benjamin G
But we are very involved in this process, so I know many of you have reached out to our office already and we have not been able to be, you know, as as responsive as we would you know.

0:26:41.360 --> 0:27:7.910
Williams, Benjamin G
We would like to be just just because we want to ensure that we retain the independent central required

based on our role in the acquisition process, our guidance to the facilities and and specifically our our engagement, uh with the local teams that are going to be soliciting the contract and reviewing the the proposals on the contracts.

0:27:8.200 --> 0:27:8.910
Williams, Benjamin G
We do it.

0:27:8.920 --> 0:27:11.240
Williams, Benjamin G
It does require we maintain that independence.

0:27:11.250 --> 0:27:11.590
Williams, Benjamin G
So.

0:27:11.600 --> 0:27:13.960
Williams, Benjamin G
So want to to reiterate that.

0:27:14.640 --> 0:27:24.670
Williams, Benjamin G
Any questions or inquiries that that you have or or your leadership team have about the upcoming solicitations and or?

0:27:26.350 --> 0:27:36.730
Williams, Benjamin G
And or process acquisition process should be directed to those national contact, non national contracting office points of contact in the sam.gov postings.

0:27:37.830 --> 0:27:38.380
Miller, Garth (VHA)
They'll Ben.

0:27:38.390 --> 0:27:48.660
Miller, Garth (VHA)
Do you intend to rehash the secretaries decision or the process by which VA went about leading to the secretary's decision?

0:27:48.670 --> 0:27:54.830
Miller, Garth (VHA)
Are you looking to move forward on on how we're actually going to implement the secretary's decision at this time?

0:27:56.510 --> 0:27:58.750
Williams, Benjamin G
So our our focus, Mr.

You know, we are obligated by the law and the Federal acquisition Regulation to promote competition within the market.

0:41:21.190 --> 0:41:21.670
Walker, Evelyn E.
Umm.

0:41:22.550 --> 0:41:26.330
Walker, Evelyn E.
And that is the reason for for that.

0:41:30.910 --> 0:41:33.430
Ben Clayton
Can I ask a clarifying question? No.

0:41:34.580 --> 0:41:34.860
Dougherty, Kenneth M.
Yes, Sir.

0:41:37.830 --> 0:41:40.900
Ben Clayton
So just I think my background might be important here.

0:41:40.970 --> 0:41:42.860
Ben Clayton
I enlisted in the Marine Corps in 1999.

0:41:43.170 --> 0:41:45.340
Ben Clayton
I spent a long time on active duty as a pilot.

0:41:46.70 --> 0:41:51.680
Ben Clayton
I'm currently the CEO of the we got about 50 aircraft and employ about 30% of veterans.

0:41:51.990 --> 0:41:52.970
Ben Clayton
Were it not for profit?

0:41:54.480 --> 0:41:54.870
Ben Clayton
Umm, what?

0:41:54.880 --> 0:41:55.750
Ben Clayton
I heard a couple.

0:41:55.840 --> 0:41:58.710
Ben Clayton
So when we get a call, it's a 911 call.

0:41:59.510 --> 0:42:1.200
Ben Clayton
Uh, it's the closest facility.

0:42:1.270 --> 0:42:12.940
Ben Clayton
It's the closest person that's available so that we can get there and we can save the life of whoever it is or we can get there in time for a stroke or a STEMI so that we can increase their quality of life so that we can reduce their time in the hospital.

0:42:13.980 --> 0:42:16.810
Ben Clayton
We don't know if they're about trend when we get the call.

0:42:16.820 --> 0:42:19.480
Ben Clayton
It's a 911 call or it's an emergency in a hospital.

0:42:20.360 --> 0:42:27.240
Ben Clayton
So my question I guess is changed cause you made the comment the comment about well, this is to encourage competition.

0:42:27.300 --> 0:42:30.150
Ben Clayton
Many of us in this room compete, and many of us were on the hill this week.

0:42:30.240 --> 0:42:35.330
Ben Clayton
All as competitors, but all talking about the same thing, that this will close basis.

0:42:35.340 --> 0:42:45.860
Ben Clayton
This will cause veterans harm, so I guess the question is like, are we really talking about contracting for 911 where it's the closest, most available?

0:42:45.870 --> 0:42:48.960
Ben Clayton
And by the way, there are more than 10,000 ground agencies in this country.

0:42:51.50 --> 0:42:54.630
Ben Clayton
Or are we talking about non emergent VA initiated transport?

0:42:56.760 --> 0:42:57.930
Williams, Benjamin G
So thanks.

0:42:58.420 --> 0:42:59.270
Williams, Benjamin G
Thanks, Mr Clayton.

0:42:59.280 --> 0:42:59.610
Williams, Benjamin G
Good.

0:42:59.620 --> 0:43:1.520
Williams, Benjamin G
Good to see you again from from last time.

0:43:2.850 --> 0:43:13.990
Williams, Benjamin G
So the answer answer your question it it so the scope of of what is included in payable at the contractor
rate are VA initiated contracts not the 911.

0:43:14.620 --> 0:43:17.970
Williams, Benjamin G
Sorry, VA initiated trips, not the 911 initiated trips.

0:43:17.980 --> 0:43:22.430
Williams, Benjamin G
I will say that some of those trips, umm, can be emergent.

0:43:24.820 --> 0:43:30.950
Williams, Benjamin G
But, but predominantly they are the the, the non non emergent trips.

0:43:31.20 --> 0:43:35.430
Williams, Benjamin G
So the 911 trips are not able to be paid under the contract and rates.

0:43:39.30 --> 0:43:41.540
Ben Clayton
So what they're what rate will they be paid out then?

0:43:43.60 --> 0:43:43.940
Ben Clayton
The 911 trips.

0:43:45.130 --> 0:43:50.170
Williams, Benjamin G
So 911 trips would be paid at the Medicare rate, 100% of the Medicare rate.

0:43:52.980 --> 0:43:53.590
Ben Clayton
We have a problem.

0:43:52.440 --> 0:44:2.810
Williams, Benjamin G
Or as the as the regulations, the as the regulation states 100% of the Medicare rate or the lesser of the build rate or the hundred 100% of the Medicare rate?

0:44:4.580 --> 0:44:16.810
Ben Clayton
To the thousands of veteran transports that are industry does nationally, you're gonna cut away about 3/4 of a billion or two a quarter of a billion dollars from from them in in reimbursement and you're gonna.

0:44:15.560 --> 0:44:18.410
Miller, Garth (VHA)
Yeah, Ben, I realize you're not cutting off anything.

0:44:18.420 --> 0:44:19.810
Miller, Garth (VHA)
You're not making that decision.

0:44:19.820 --> 0:44:23.220
Miller, Garth (VHA)
I realize you are implementing the secretaries in time.

0:44:23.230 --> 0:44:23.730
Miller, Garth (VHA)
Thank you, Ben.

0:44:32.630 --> 0:44:33.210
Dougherty, Kenneth M.
OK.

0:44:33.540 --> 0:44:35.110
Dougherty, Kenneth M.
So we'll move to our next question.

0:44:35.660 --> 0:44:43.110
Dougherty, Kenneth M.
Where can we find the fee schedule so we can make sure our rates we are receiving on the market research isn't Sky High.

0:44:43.120 --> 0:44:45.90
Dougherty, Kenneth M.
So do we have available the fee schedules?

0:44:45.100 --> 0:44:46.210
Dougherty, Kenneth M.
Weren't weren't could locate them.

 **Williams, Benjamin G** 24:29

You know, I I I I can't speak on behalf of the secretary.

I know there's ongoing conversations again like, like Mr Montoya mentioned this week with Doctor on the hall as well as the Hill in terms of the agency strategy and and how we're, how we're prepared to to to manage the the regulation, the implementation of the regulation.

👤 **Nash, Deborah (VHA)** joined the meeting

👤 **Pranav Srinivasan** left the meeting

👤 **Byrd, Robert** joined the meeting

 **Williams, Benjamin G** 24:56

And the implementation date.

So appreciate that as as well as as well as your service and many of those who in your industry who, who, who are veterans and are are committed to continuing to sustain.

The the existing service and provide that time we care for veterans.

Thank you.

Then we're going to.

 **Dougherty, Kenneth M.** 25:25

Take a question from the chat.

This is from coming from Matt.

Is that a dusky?

How will contracting work with thousands of Local 911 EMS agencies, including local fire departments and other private and public agencies in every community in the United States?

**RH** **Rachel Harracksingh** 25:58

OK, so I'll read the question again in case uh.

👤 **Groves, Steven G.** left the meeting

 **Dougherty, Kenneth M.**  26:00
It wasn't her.
How will contracting work with thousands of Local 911 EMS agencies to include local fire departments and other private and public agencies and the communities in the United States?

 **Rachel Harracksingh**  26:16
It's Joe Miletto from VHA, uh.

 **Maletta, Joseph**  26:19
Umm, yeah, I'll.
I'll start Ben, and you can fill in any of the blanks on that.

&#128101; **Cardoso, Maximiliano** joined the meeting

 **Maletta, Joseph**  26:23
Now obviously our first priorities are to get the contracted rates in in place for VA initiated initiated.
Transportation.
From there, we will have to work within the the the constraints that that, that we have in the Federal acquisition regulations.
We do anticipate there to be some sort of solution out there, but I the idea of taking it to every provider is is gonna be a challenge for sure.
I don't.
I don't know if it will be able to get to that, but we we're we're gonna start with focusing on getting the VA initiated transportation resolved.
And and I will say just.

 **Williams, Benjamin G**  27:11
You know, part of the strategy Matt is, is solicitation at that local level where they have visibility of of the different vendors, the service level or and the service service areas.
And as they work through the solicitation process, they get the responses from the local providers to be able to best compare and sit and make sure they have coverage

with the available providers to to ensure that the entire catchment area has covered service and maximized the ability to contract at a fair rate with those in the local area.

**RH** **Rachel Harracksingh**  27:56
Ben, thank you, Mr Nick.

**DM** **Dougherty, Kenneth M.**  27:58
Looper.
Carol Looper porcaro.
Sorry, that was great.
Thank you, Mr Adore.

**LN** **Loporcaro, Nick**  28:03
And unless I'd be remiss if I didn't thank you for coordinating these uh, these industry days, I know we don't always seem aligned, but we do appreciate having the opportunity to discuss and Mr Montoya really appreciated the collaborative nature of our our call on Monday, Mr.
Williams, on our our last call and only because I haven't heard this overtly said on this call, I think we're all assuming all of what we've discussed so far this morning is for non emergent interfacility.
You know, contracting and the last call it was said that there would be no contracting opportunity for 911 emergent calls.
And I guess that is where our, you know, main concerns remain I think to match question as well, probably a segue to that is this you know this impacts 1000 different thousands, we estimate probably 10,000 different agencies that we need to interact with and the other sort of acute issue for us is we're all in our planning for 2024 already as we start thinking about our you know where we have individuals where we put our assets, where we plan on servicing those communities and my sense is to the last response as well.

👤 **Macias, David** left the meeting

👤 **Emma Knaus** left the meeting

**LN** **Loporcaro, Nick**  29:20

And in fairness, and I agree, this gets very complicated.

There's a data point I can tell you as we work with commercial payers to get a network.

Those contracting discussions go on for three to five years before we close them.

We're talking about a rule that's gonna go into place within six months.

Umm so.

So understand or please appreciate that's that's where our growing concern is.

On one hand, we've heard no contracting opportunity for 911 and we'd go straight to Medicare rates.

I think we've surfaced and assessed the financial impact there.

I think there's been some data shared recently that shows the order of magnitude of that.

So just for clarification, if possible, is the current position that was still not be a contracting opportunity for 9111 emergent calls.

Also, so Nick, if I may, I'll jump in before.

 **Montoya, Alfred (he/him/his)**  30:12

For Ben and then I'll let Ben play clean up, right.

So certainly I really appreciated your time as well earlier in the week.

And I think what wasn't lost on me at all was the strategic planning nature of our discussion, right.

And really going back and forth on how we work together collaboratively as a partnership in making sure that we take care of our nation's heroes.

And so I thank you again for bringing up those finer points and the follow on email, right.

**Joshua Davidson** joined the meeting

 **Montoya, Alfred (he/him/his)**  30:38

I I think you know, certainly your team has done a good job at this but we are very close to a solution.

**Longley, Charles E. (he/him/his)** left the meeting

 **Montoya, Alfred (he/him/his)**  30:44

As I mentioned to you on that call, very close to a solution to other contracting portion for emergency 911 calls, I will put it that way because I think it does play into part of the conversation and certainly there, as I mentioned to you on our call, there has been a lot of work back and forth with our Office of General Counsel as well as Member services and the team to get us to this point.

**Melaragno, Brenda J. (Orlando)** joined the meeting

**Vv** left the meeting

**Montoya, Alfred (he/him/his)**  31:10
And so certainly when we have more to share about that when we will.
But I will tell you that we're very close to a solution that I think will certainly address the finer points that you just brought up and the concerns that you raised as well.
Thank you.
Then anything that you wanna add to that?

**Krenik** joined the meeting

**Montoya, Alfred (he/him/his)**  31:37
They're not, I think.

**Williams, Benjamin G**  31:38
You, you you hit the nail on the head there.
OK, great. OK.

**Whitaker, Thelma** joined the meeting

**Dougherty, Kenneth M.**  31:46
Uh.
You tools, you have your hand up.

**492e5838-bfce-4d96-8857-3c27631b5cb6** left the meeting

**Dougherty, Kenneth M.**  31:54

Yes.

Hi, I'm.

**RH** **Rachel Harracksingh**  31:55

Rachel, her axing in El Paso, TX with life ambulance and we do a lot of work with veterans.

👤 **Blair, Anna** joined the meeting

**RH** **Rachel Harracksingh**  32:02

I'm a veteran.

My brother's a veteran.

Veteran my father was a veteran, right?

And it just seems like this process, you know, everyone's concerned right now about their emergency.

👤 **Curtis, Tiffany** joined the meeting

**RH** **Rachel Harracksingh**  32:13

I'm concerned about the non emergency and the emergency because we provide both.

Why is it not possible for delay in the implementation?

I just would like to ask that question.

Why is it not possible?

Can someone answer that?

That's the only question I wanna ask, but I'm so grateful for all the work that you all are doing and I'm extremely grateful for the time and the calls that you all have.

And you know to be part of the process has been awesome, but can someone answer please answer that question for me.

Sorry, yeah, I feel.

I feel like I'm kind of stepping on Ben.

👤 **Montoya, Alfred (he/him/his)**  32:46

Quite a bit here today, but Ben.

&#x2A2F; **Hohn, Dina A.** left the meeting

 **Montoya, Alfred (he/him/his)**   32:48
Uh, stop me at any point.

&#x2A2F; **Hohn, Dina A.** joined the meeting

 **Montoya, Alfred (he/him/his)**   32:49
This is your show, right?
And the teams the show here.
So first of all, Rachel, thank you so much for your service from 1 veteran to another.
Really appreciate all of our veterans who are on the call today.
I can tell you that this is an Ave just for the number one thing that we talked about, I think on industry day one was making sure that the that the services were poised to be successful in February.

&#x2A2F; **Starla Brown** joined the meeting

 **Montoya, Alfred (he/him/his)**   33:17
And so, as Ben did go through one of the slides here with the dashboard, actually I think it was Darcy that went through the dashboard slide that was created to really show us where some of those gaps were, you know, so we are making sure that we're combining all of that to include if there needs to be a potential delay to making sure that we bring this forward to our senior leaders to make the most appropriate decision.
So right now we are poised and ready to be able to launch the contracting process next month.
And I do have a standardized performance work statement that will help out the field in making them successful as well.
So this is one that I am watching very carefully to make sure that if we need to make that recommendation, we can right.

&#x2A2F; **05588ad2-6c38-446b-92e7-fbd17ebbdd92** joined the meeting

 **Montoya, Alfred (he/him/his)**  34:02
And so hopefully I answered that question as direct as I could, Rachel.
But then, is there anything that you would like to add?
No, Sir, I think.

 **Williams, Benjamin G**  34:12
I think the you know the importance of having the information from the RFI that they sent back and being able to align that to the coverage maps and and include that in our plan solicitations to begin next month and and and the importance of continuing to monitor that and see you know comprehensively where that recommendation if that recommendation does does happen or does does need to happen that we have visibility on all those factors.

A× **John Ungaretti** left the meeting

 **Williams, Benjamin G**  34:44
So and then and and like you said, the the work to to to find a pathway within the Financial acquisition regulations and the VIB Acquisition regulations to be able to include umm the the Nabi initiated or 911 calls and and pay those to contracted vendors at the contracted rate and the progress towards that you know those are those are all things that that we're we're watching and including and and and as of now you know or continuing to to to work towards towards February and and we'll adjust course you know as soon as we identify the need to do so.
OK.
Thank you very much.
I'm gonna pull the.

A+ **Adegbolagun, Nora L.** joined the meeting

 **Dougherty, Kenneth M.**  35:33
I'm sorry.
Somebody have something to say?

A+ **Shoemo, Ebony N.** joined the meeting

 **Dougherty, Kenneth M.**  35:38
OK, I'm gonna pull the next question from chat.
It's from Brian Warfel, attorney for turning for the American Ambulance Association.
He said on the last industry day we understood that the VA had indicated that it believed it had the authority under the Federal Acquisition Act to to contract for both beneficiary of travel services under section one. 11111.
Excuse me and emergency ambulance transportation associated with a veteran's receipt of emergency treatment under section 1728.
Can you confirm that our understanding is correct?
If so, can you point us to the specific provisions within the Federal Acquisition Act and the fact that needs to be right?
Again, I would understand.
I'd be happy to read it again.
Yeah.
It's funny you guys could take.

 **Williams, Benjamin G**  36:32
That got that question.
Darcy, are you available?

 **Dougherty, Kenneth M.**  36:44
Yes, Sir.
Yes.
Yeah, that was that was good.
The last call call.
I'm sorry, I'm getting a lot of feedback for some reason.

 **Horvat, Darcy S. (VHACLE) (she/her/hers)**  36:54
Umm, but I that is something, as Mr Montoya said, our OGC and myself and other policy individuals are looking at what's available and what we can use and we believe we have something worked out.
But I don't have all of the the details to present to you at this time.
OK.
Thank you, garson.

**DM** **Dougherty, Kenneth M.**  37:18

Mr Christopher Easley, you have your hand raised.

Thank you, Ken.

As I struggle with my mute button, I hope you.

**CE** **Christopher Eastlee**  37:28

You hear me OK?

Yes, my name is Chris Eastley on behalf of the association of your medical Services.

I'd like to ask for some details and some confirmations on the proposed air ambulance contract.

I believe you said and thank you very much for the presentation.

**Samantha (Guest)** joined the meeting

**CE** **Christopher Eastlee**  37:45

I think it was a very clear, but I just wanna have a couple of follow-ups.

And like I said, some a, you know, perhaps some restatements from your presentation the, the the VA is proposing one national air ambulance contract that would be contracted through a broker, is that correct?

Uh, it's either gonna be one or the.

**Horvat, Darcy S. (VHACLE) (she/her/hers)**  38:12

Three, we're still going through the market research to determine which will be the the best Ave for that.

So it might I I'm.

I'm sorry.

Go ahead.

Alright, that but yes, it will either be one or three.

**George, John** left the meeting

**Horvat, Darcy S. (VHACLE) (she/her/hers)**  38:24

Yeah.

So the the, the the process.

**CE**  **Christopher Eastlee**  38:27

Access for then a VA, uh.

The the, the, the, the the process for requesting an air ambulance would go from a VA official to the broker and then from the broker to an air ambulance provider.

👤  **Allyson Pharr (Guest)** joined the meeting

**CE**  **Christopher Eastlee**  38:41

Is that correct?

Correct.

That's how the broker.

Yeah, contracts work.

So so that contract would then only be applied to those non emergent VA requested services and would not apply to non VA requests and services or any immersion service given the the, the the timeline of the request.

Yeah, as discussed earlier, we are.

👤  **Horvat, Darcy S. (VHACLE) (she/her/hers)**  39:04

Working on the solutions to include uh, the 911 uh we believe are very close to allow to being able to put that in the contract again.

It would have to be a subcontractor that is on that broker contract.

👤  **Dennis Rowe** joined the meeting

👤  **Horvat, Darcy S. (VHACLE) (she/her/hers)**  39:19

So if that condition.

**CE**  **Christopher Eastlee**  39:21

That would that, would there be a separate contracting opportunity for those non VA requested emergency services or would there somehow be a an addendum to that contract to allow for those non requested services to enter into that brokered contract but non VA requested emergency services so.

👤  **Blair, Anna** left the meeting

**Allyson Pharr (Guest)**  39:43

What?

What we are working on is.

**Horvat, Darcy S. (VHACLE) (she/her/hers)**  39:45

Trying to make it a part of that broker contract as a separate line item for a reimbursement of the 911 at the contracted rate.

But only for that individual.

**Christopher Eastlee**  39:57

That is, some contracted through the broker that provider correct.

But again, these were our it's either, I mean, Nash.

**Horvat, Darcy S. (VHACLE) (she/her/hers)**  40:05

Channel or regional contracts, so that's should be way more than one vendor 1 subcontractor, right, right.

And and and that.

**Christopher Eastlee**  40:13

Part I understand, but just you know, the the nature of these emergency services, the the average air ambulance on an emergency request takes off in under 10 minutes, usually about 8 minutes.

So just a comment that the emergency services provided by air ambulances are immediate from the requesting service, so that the contract that is built for those non emergent brokered services may not be the appropriate vehicle for those non VA or even via requested emergency transports.

Something to keep in mind as I know you guys work very diligently on this and thank you very much for answering my question.

**Allyson Pharr (Guest)**  41:01

Yes, Sir.

Thanks Mr Easley.

And and and I think.

**Williams, Benjamin G**   41:04
Uh, you know the final point I want to make sure was interpreted correctly.

**Lu, Dan Feng** left the meeting

**Williams, Benjamin G**   41:13
Is what the the the additional I'll say clause or parameters of that of that contract wouldn't wouldn't be a requirement for those those 911 calls to go through the broker, they would happen, but that what they would allow us to do for those vendors who are subcontracted on for the for the VA initiated.

**98b030a0-7c10-4c69-bc0c-46b2af494f6f** left the meeting

**Lu, Dan Feng** joined the meeting

**Williams, Benjamin G**   41:41
Ambulance.
Air ambulance, or air ambulance through through the through the broker contract that would allow us the authority to reimburse them at the contracted rate when they provide a 911 ambulance trip if that makes.
If that makes more sense there, so it wouldn't actually go through the, you know, the process from an ordering perspective from the broker, but it would just allow us the ability to reimburse at the contracted rate for those, those those vendors who are under contract with the air broker.
It happened.

**Allyson Pharr (Guest)**   42:17
I think I I I I think that makes sense but again.

**Christopher Eastlee**   42:22
Umm, you know that is something that, that, that is something that that I in in my opinion also calls for a delay in the implementation of the rule given the the extreme consequences of getting that even even a little bit wrong.
Uh, in, in, in terms of making sure that those services are requested, you know, with

the immediacy of the emergency situation, but I sincerely appreciate your answer to this.

👤 **615136b4-6865-4bd8-bea5-cd4df3359e3b** joined the meeting

**Christopher Eastlee** 42:52
And again hope for more communication and frankly more runway, more time to continue these very, very helpful conversations.
Thank you.
Thank you, Sir. Next.

**Dougherty, Kenneth M.** 43:06
Next question, Joe.
Don Rigel.

👤 **Miller, Shella M. (she/her/hers)** joined the meeting

**Dougherty, Kenneth M.** 43:10
Yeah.
Appreciate it.
Again, I I wanna thank.

**Ridgell, Joe Don** 43:12
Goal for the time.
Uh, it's been very helpful.
The three industry days on the past two industry days, y'all directed the kind of the stakeholders to to not ask questions about the Medicare reimbursement rate and directed us to CMS on that.
I don't wanna ask about the specific rate, but I do want to ask if the VA has conducted any independent assessment of the reasonable reasonableness or sufficiency of the Medicare rate as applied to ambulance services.
No, Sir, we have not.

**Williams, Benjamin G** 43:54
OK.

Thank you.
OK.
Next question from Jamie.

**DM** **Dougherty, Kenneth M.**  43:59
I've heard.
Good morning.

**JP** **Jamie Pafford (Guest)**  44:06
Guys, thank you for taking the time.
I'm from hope AR I'm a private provider and a lot of rural communities, my brothers and I service Arkansas, Louisiana and Oklahoma and numerous rural areas.
I'm hundreds of miles away from a VA hospital.

⤬  **Martinez, Rafael** left the meeting

**JP** **Jamie Pafford (Guest)**  44:23
We do numerous transports in between non VA facilities on a daily basis and I have a lot of concern just as my friend from El Paso, TX, I heard the concern in her voice and the worry.

⤲  **Spikes, Darren L.** joined the meeting

**JP** **Jamie Pafford (Guest)**  44:39
I hope you hear it in mine as well.
It's not only about our veterans, but it's about our communities in which we service and the ability to properly do that and maintain our health care safety net for all of our rural communities.
And we're not properly reimbursed and about the VA, it is about the Medicare, just like, uh, this pointed out.
But the pain?
I quit there any of these communities and and it's a concern for us and what I've heard y'all say today is that you've worked with Capitol Hill, you've worked with legal counsel and I know you guys have a job to do.

⌊ **Butler, Donald** joined the meeting

**JP** **Jamie Pafford (Guest)**   45:17

But I'm curious since the Umm inception of this policy that was almost pre COVID or during COVID when it came out, our industry has taken so many hits during COVID and we're still trying to recover from our losses that we had during that period of time that going forward it's just like almost the straw that break breaks the camels back when this is put on top of our providers across the United States and not properly thought out.

I'm hopeful that your staff, I understand you guys have a job to do and you've been given an order to proceed, but at the same time, I'm hopeful in your circle of people you're talking to that you have a concern in your voice that, hey, guys, I know you gave us this to do, but we do have some concerns that this could have some collapse in the systems across the United States if we're not careful.

I hope you are also sharing that with the voices on Capitol Hill and your leadership as well.

⌊ **Laemmerhirt, Cynthia A.** left the meeting

**JP** **Jamie Pafford (Guest)**   46:26

I need to delay until this gets right.

I'm very scared, my friends all around the state are very scared.

You saw the state of Arkansas when you pulled up the map while ago.

It had a lot of pink on it.

You've got a lot of work to do.

There are a lot of rural communities.

I feel like that will be left out and that will be put at the Medicare allowable rate or below and that could be detrimental to our healthcare system across the state.

Thank you for your time.

Yeah.

So Jamie, thank you so much for that.

**Montoya, Alfred (he/him/his)**   46:58

Feedback and uh really telling the rural story.

You know, being someone who grew up in rural Wyoming, which I think I mentioned on Industry Day, number one, you know, I certainly understand the impact, right.

And I certainly understand the services that we need to be able to provide to our veterans.

And so we will make sure that we take this conversation back right to make sure that it is fully baked into our decision making process.

And so I really, I do appreciate the collaboration back and forth.

Thank you. Next.

👤 **Curtis, Tiffany** left the meeting

**Dougherty, Kenneth M.**  47:36
Ask questions.
Gonna be coming from Lisa Latona.
Hi, good morning.
Thank you.

**Lisa Latona**  47:42
For taking my call, I'd like to umm add on to what Miss Pafford said.
I've been in the air ambulance industry for close to 45 years and I have been working with veterans, with veterans in my family as well.
For that time over the course of these years, like many of the companies that are also involved, they develop a relationship with many vias around the country, and because of that relationship, they become relying relied on you for the services we not only own aircraft, but we also broke our, so we're able to cover nationally some of the very larger or the very large companies that are on this call handle what they handle because they have a a vast number of helicopters or aircraft that can do the job that they need to do.

👤 **Macias, David** joined the meeting

👤 **Gibbons, Marcus D.** left the meeting

**Lisa Latona**  48:37

But if they're not available, they just pass on the call.

And I've seen that happen thousands of times as an owner operator and a broker.

⊗ **45438502-2dfd-49a0-9f5b-142de3c330bc** left the meeting

**LL** **Lisa Latona**  48:47

I'm able to do both, so I deal with some of these companies on a daily basis to help me so that I can take care of the veterans 24/7.

So it is very personal to me as well because of that Medicare, Medicare has never really been involved in the air ambulance industry, even on the private sector, they have no idea honestly how to reimburse for this particular problem.

Not only has COVID decimated some of our sister companies out there because they can no longer proceed and work, and they've lost pilots during the national pilot shortage because the airlines are taking them right out of schools they can't even cover the airplanes they currently own or operate.

That being said, there's fewer and fewer of us out there.

This is going to put a tremendous burden on not only the people in the core who are actually working this, but you're gonna put it on contracting people who have no core relationship with any of these companies out there.

It's all dollar and cents.

I was put in charge and this is what I wanna do.

That being said, many veterans and VA's are gonna be left behind in this whirlwind of mess.

Medicare not reimbursing us, especially since COVID, as Miss Pafford said, is not going to be sufficient because fuel you see it in your cars in the, in the gas tank of kerosene at the higher level of refinement has gone up to $15 a gallon during these past couple of years.

Manicure doesn't understand that some of these places you pull up to buy gas you have to pay at $800.00 ramp fee just to pay for their gas and an after hour fee because most of the transplantation that these veterans get on a daily basis around the country happen in the hours when you all are asleep and I'm working and when I'm dishing out thousands of dollars on a flight besides the actual mileage charge or whatever Medicare would deem necessary would never get reimbursed.

⊕ **Ma, Elina** joined the meeting

**LL**  **Lisa Latona**  50:54

I can no longer fly for the veterans transplant people around the country aren't even aware of this.

I've talked to hundreds of them.

The people in our industry are but the actual transplantation people who work in it have no idea this is coming along.

So now when they call me in March and say ohh my God Lisa, can you help me with this veteran?

I'm gonna have to say no because I can't fly for $0.20 a dollar now.

My my suggestion would be besides a delay which I cannot even imagine, you guys don't see that.

But besides that, there's another opportunity and would also take more time, but I have been involved in.gov for 45 years and part of that was through contracts with the Federal Bureau of Prisons, which I had for 20 years, known as the BPA Blank purchase agreement.

And that went out to solicitations all over.

Everybody could bid on it.

They picked 5.

All those five companies, they are reimbursed at 100%, but it was already predetermined that those five companies were the best fit for the government dollars based on their contract.

And then these VA, for example, could call any one of those five or three of those five forbids, but they don't go out of that.

👤ₓ  **Smith, Donyale E. (she/her/hers)** left the meeting

👤₊  **Smith, Donyale E. (she/her/hers)** joined the meeting

**LL**  **Lisa Latona**  52:18

So versus a contract with one group, it would be BPA with multiple companies and it might solve some of the problems that are happening now.

Thank you.

Yeah.

You and me?

Yes, nicely done.

🧑‍⚖️ **Cephas, Roy E.** left the meeting

**Lisa Latona**  52:44

Thank you.

Does anybody from contracting 1?

**Dougherty, Kenneth M.**  52:46

Don't respond.

Provide a feedback.

As Joe Mono, will I? Yeah.

**Maletta, Joseph**  52:54

Appreciate the the input there and and obviously we are looking for that type of feedback on every solution we're trying to put in place.

So I I definitely appreciate that.

I absolutely understand the concerns that are out there.

You know, Please note the the Medicare rate issue is is on the forefront of our minds as well, but it's not a V8 rate.

We don't establish those, so we have that it is something we need to discuss with the right parties, but thank you.

If I might add, if you if you don't mind me adding.

**Lisa Latona**  53:30

To that comment, that being said, you don't set Medicare rates, Medicare will never cover our industry ever.

It just won't happen, and all the good intentions and all the hard work that you are putting into this will flop on the veterans and the air ambulance.

🧑‍⚖️ **Joseph Cornett** left the meeting

**Lisa Latona**  53:48

Part of it is the least of this.

The greatest part of this is the transplantation aspect, which happens every day, and most of that happens from 10:00 PM to 6:00 AM and Medicare is not going to cover the ramp.

Charges the excess fees and all these things that occur in the middle of the night, and you don't even establish those rates.

So air ambulance should be pulled from this ruling.

It doesn't even make sense, and I've talked to so many people who agree, including core people in the VA who worked this, not contracting people who are not on the ground, they know their job, they know what they're doing, the financial aspect, but they're not on the ground, they're not frontline.

And the people who are frontline are all outraged.

And if you reach out to your own people within the VA who work in the benefit Travel Office and the mobility management offices, you will find that this doesn't make sense and air ambulance is going to collapse.

You're going to collapse a lot of companies and veterans are going to suffer, so this needs to either be delayed air ambulance removed or a new project needs to be. I'm started such as the EPA.

Thank you again for your time.

I just wanted to make that final comment on the Medicare notation.

Good.

  👤 **Boominathan, Purnima** joined the meeting

**LL** **Lisa Latona**  55:12
Thank you very much for that.

**DM** **Dougherty, Kenneth M.**  55:14
This is another question that's coming from chat from a Thorson page, and this is also a contracting question.
Is it possible?
Is is the possible contracting solution for 911 calls, also including emergent or urgent grant ground ambulance transports from one non VA hospital to another non VA hospital for higher level of care.

  👤 **Curtis, Tiffany** joined the meeting

**Dougherty, Kenneth M.**  55:39
These are ordered by a physician or clinician at the originating facility, not the VA.

**84d2229c-122c-455c-8e95-e92fd2987ba4** left the meeting

**Cephas, Roy E.** joined the meeting

**Dougherty, Kenneth M.**  55:53
Yeah, that's a great question.
This is Darcy and I think.

**Horvat, Darcy S. (VHACLE) (she/her/hers)**  55:56
We just need to take it back and discuss among all the experts to see if that's
something that can be included or not, or if that's something that's kind of falls
outside of the scope.
OK.
Thank you. Next.

**Dougherty, Kenneth M.**  56:10
Question.
This is coming from Mr Ben Clayton and this is to Mr Montoya and Mr.

**Kathy Lester** joined the meeting

**Dougherty, Kenneth M.**  56:18
Williams, who is this?

**Whitaker, Thelma** left the meeting

**Dennis Cataldo** left the meeting

**Dougherty, Kenneth M.**  56:22
Can you please meet your microphones?
OK, so the question is are the comment is.

Thank you so much for the discussion surrounding the delay.

Do you have a timeline on when you would make a recommendation for a delay?

As Nick pointed out, we all have planning.

We must do and waiting until February to find out is untenable for most of us as an industry, we wanna work collaboratively with you and understanding your timeline is key for us.

👤ₓ **Spikes, Darren L.** left the meeting

**DM** **Dougherty, Kenneth M.**  56:52
So yeah, so yeah, thank you.

Yeah.

Thank you for uh.

**Montoya, Alfred (he/him/his)**  56:55
For that one, I think you know the response to that question is in the chat box.

You know, so certainly this is not a decision that we take lightly.

And my goal would be to you know, if that recommendation is to come forward, not spring, that on everyone at the very last minute, as I think that, that would be irresponsible. Right.

👤ₓ **Blair, Anna** joined the meeting

**Montoya, Alfred (he/him/his)**  57:14
And so certainly we are looking at all of the facts across the board to be able to present that recommendation forward on which path we should go.

👤ₓ **398ff22f-600a-48ed-a376-425c9603b8d7** left the meeting

**Montoya, Alfred (he/him/his)**  57:22
Again, I think I have really, really appreciated the collaborative nature of this call and the back and forth.

👤ₓ **16559a22-5b6b-4eb6-ad39-92e06d2955a2** left the meeting

 **Montoya, Alfred (he/him/his)**   57:32

And so certainly I am pulling all of the sentiments out of the conversation today to make sure that we fold those into the decision making process.

And so I thank you all for the the feedback on that one.

OK.

Thank you.

Uh, this is a common.

**DM  Dougherty, Kenneth M.**   57:50

From Caroline just reminder that emergency transports are not just not 911 calls, but also in Interfacility transports where patients transported from a smaller hospital to a higher level tertiary hospital.

And these are emergency situation where time is critical.

Thank you for that comment, Caroline.

**Amanda Riordan (Guest)** left the meeting

**DM  Dougherty, Kenneth M.**   58:14

I see Miss Lisa.

Look Etana, if your hand up.

**Michal Marczak** left the meeting

**DM  Dougherty, Kenneth M.**   58:25

And maybe that was from earlier, OK.

**Joseph Mowen** joined the meeting

**DM  Dougherty, Kenneth M.**   58:29

And next comments from unknown user.

Thank you for the opportunity to continue to collaborate on this very uncomplicated and important matter for our veterans.

We've heard commentary on multiple occasions regarding quote via initiated unquote transports.

So what so that we can all understand the magnitude of VA initiated transports, can we get the percentage of all transport planes that the VA receives that our VA initiated and parentheses it says broken out by air and ground?

**Martinez, Alex B.,  CBO** left the meeting

**Dougherty, Kenneth M.**  59:02
I can speak for your uh, our organization and saying that the percentage is in the low single digits, which makes the topic fairly immaterial.

**01f46642-54ef-420b-8e65-cab4aab372c0** joined the meeting

**Dougherty, Kenneth M.**  59:17
OK, so the the question that was in that comment or the file that comment so that we can all understand the magnitude of VA initiated transports, can we get the percentage of all transport claims that the VA receives that are VA initiative initiated?

**263c27e6-8da5-4b8f-b1a1-55635e791fa6** left the meeting

**Montoya, Alfred (he/him/his)** left the meeting

**Williams, Benjamin G**  59:35
So can I can I can take I can take this one so you know as we work towards finalizing the rule, we met with the hill several times and and the numbers that we had from the agency perspective in terms of dollar volume.

**Breci, Trent A.** joined the meeting

**Jaramillo, Todd** joined the meeting

**Williams, Benjamin G**  59:51
A lot of times in in the current process of the contracted trips or claims on an invoice are are batched and so it makes it more challenging to to to get a true count of of trips for the contracted claims.

&#x2697; **Anthony Maneri** left the meeting

 **Williams, Benjamin G**  1:00:09

But from a dollar volume perspective, the split was about and was that 78% to 22% of the of the claims, 78% of the claims would be those those community initiated.

&#x2697; **LICZNERSKI Yumiko** left the meeting

&#x2697; **Andrew Blake** left the meeting

&#x2697; **Tommy Anderson** joined the meeting

&#x2697; **d1048c2a-ccdb-4163-9ef7-28d499fca4a8** left the meeting

 **Williams, Benjamin G**  1:00:28

Ambulance claims compared to 22% that would be VA initiated.
So that's the end of FY22 statistics that we have on that.
When we began the process of implementing this rule following the Oig's recommendation to use the discretionary authority that Congress gave us to use the CMS rate, the the split was about 5050.

&#x2697; **James Goldszer** left the meeting

 **Williams, Benjamin G**  1:00:55

So in recent years since Mission Act implementation, the trend is going more towards, you know, Community initiated calls and and it's something as we as we discussed earlier as part of the factors that you know we're looking at and the broader picture umm you know as we were as we work forward and ultimately make the agency makes a decision uh to to Mr Clayton and Mr Montoya's most recent comments on on whether or not you know a delay is warranted.

&#x2697; **Courtney Davis** joined the meeting

&#x2697; **Ma, Elina** left the meeting

&#8999; **Curtis, Tiffany** left the meeting

&#8999; **2d77acba-7948-4626-8e75-4b3d80c39387** joined the meeting

 **Williams, Benjamin G** 1:01:32
And thank you very much man.

**DM** **Dougherty, Kenneth M.** 1:01:34
OK, next comments come in from a Matt Zavadoski, he said without a contract that the VA pays the Medicare rate for a 911 call initiated by or 4 veteran, it's probable that the veteran will now receive a balanced bill for the difference between the A's underpayment and the build amount placing a financial burden on the better.
Is this accurate statement?
So.

 **Williams, Benjamin G** 1:02:07
So as as I think is is pretty pretty widely known, but in terms of.
Of.
Or authority that that we use to pay.
Today for beneficiary travel and and and these and these claims, especially those that are even community care, claims that are approved under 1703, they they are paid out of beneficiary travel based off the way the agency implemented the Mission Act and and and it does in VA as sole payer and balance billing is is is not umm it is not allowable under under the beneficiary travel payment principles.

&#8999; **Kelvin** joined the meeting

 **Williams, Benjamin G** 1:02:53
So so I understand, and that is something that, you know, was it an explicit in the regulation?
But is, you know is part of the payment principles for the authority under beneficial trade that may be part of the principle, but that's not in the.

**MZ** **Matt Zavadsky** 1:03:11



# Department of Veterans Affairs
# Industry Day for Ambulance Service Providers

**TOPIC: Change in Rates VA Pays for Special Modes of Transportation (AP89)**

**May 25, 2023**





# Agenda

- Welcome
  - Housekeeping
  - Introduction of Government Panelists
- Opening Remarks
- Overview of Regulation
- Factors Influencing VA Action
- Key Implementation Components
- VA-Approved Software
- Next Steps
- Q&A Session
- Closing Remarks



# Housekeeping

- Today's event is being recorded
- Keep microphones on mute when not speaking
- The audience is encouraged to actively participate during the question-and-answer period
- Please hold comments and questions until the question-and-answer period towards the end of today's presentation
- Please use the *raise your hand feature* and wait until your name is called before speaking
- Questions and comments can be entered into Chat box
- Responses to unanswered questions in the Chat box will be posted to SAM.gov under notice ID 36C24523Q0586 after today's event



# Government Panelists

VHA Member Services Veterans Transportation Program (VTP)

- Ben Williams, Director VTP
- Marc Chevalier, Manager VTP Field Operations Team (National VTS Program Coordinator)
- Johnathon Coble Harrison, Senior VTP Regional Coordinator
- Brenda Hamilton, VTP Regional Coordinator

VHA Procurement and Logistics Office

- Donyale Smith, Director of Contracting, Network Contracting Office 5
- Donald Butler, Deputy Director of Contracting, Network Contracting Office 5
- Kristina Weir, Division Chief, Network Contracting Office 5
- Evelyn Walker, Branch Chief, Network Contracting Office 5



# Opening Remarks

Mr. Alfred Montoya

Deputy Assistant Under Secretary for Health for Operations at U.S. Department of Veterans Affairs



# Overview of Regulation:
# What does AP89 do?

- VA's <u>Change in Rates VA Pays for Special Modes of Transportation</u> Final Rule amends VA Beneficiary Travel (BT) regulations under title [38 Code of Federal Regulations, Part 70, Subpart A](#) to establish a new payment methodology for Special Mode Transportation (SMT), which includes ambulance and air ambulance

  - Applies in the <u>absence of a contract</u> between VA and a vendor of the special mode of transportation

  - Otherwise, VA will pay the <u>lesser of the actual charge</u> or the amount determined by the Medicare Part B Ambulance Fee Schedule (AFS) established by the Centers for Medicare & Medicaid Services (CMS)

- Effective Date: February 16, 2024



Appx1769

## Key Implementation Components:
## How will VHA implement?

- Solicitation/award will remain at the VAMC Level

- Each VAMC will solicit contracts for ground and air ambulance service for the entire catchment area

- Each solicitation will:
  - Include standardized performance requirements
  - Require electronic trip request and acceptance/rejection via VHA – specified and provided software application (VetRide)
  - Restrict orders to only specific, identified VA Ordering Officials
  - Require submission of claims via the HCFA 1500 through the VHA specified and provided software application

- Contracted rates will be based on market pricing

- Non contracted vendors will receive the lesser of billed charges or one hundred percent of CMS reimbursement rates



U.S. Department of Veterans Affairs
Veterans Health Administration
Regional Procurement Office East

Appx1770

## VA-Provided Software:
## What does VetRide do?

- What VetRide **does**:
  - Enables providers to timely receive, accept, and reject trips
  - Permits contractor and VA to monitor progress of transport while in-route (requires driver to scan VendorPass code with smartphone or tablet)
  - Provides integrated, HCFA-compliant claims submission following trip completion
  - Enables single system claims submission by providers—documenting end to end chain of custody/authorization by ordering official
  - Provides providers ability to reconcile all trip/transport requests and completed trips electronically

- What VetRide **does not** do:
  - Allow batch claims submission
  - Issue payments to providers



## Next Steps:
## Where do we go from here?

- Enterprise contract solicitation prioritization with VISNs/VAMCs

- VHA Stakeholder Training

- Upcoming Request for Information (RFI)

- VetRide Application Training (Vendors)

- Industry Day 2 week (est. June/July 2023)



**U.S. Department of Veterans Affairs**
Veterans Health Administration
*Regional Procurement Office East*

Appx1772

# Questions and Answers

Please use the *raise your hand feature* and wait until your name is called before speaking



Or

Enter your question or comment into the chat box

*Note: Questions that are not able to be addressed by the panel during today's event will be captured by the moderators and responses will be provided via an amendment to SAM Notice ID 36C24523Q0586.*





# Closing Remarks

Dr. Shereef Elnahal

Under Secretary for Health, U.S. Department of Veterans Affairs



# Closing Remarks

Thank you all for your attendance and participation in today's event!





VHA Member Services
2957 Clairmont Road – Suite 200
Atlanta, GA   30329-1641

## RE:  FOIA REQUEST #23-09227-F

August 18, 2023

Mr. Tristan North
American Ambulance Association
Tnorth@ambulance.org

Mr. Chris Eastlee
Association of Air Medical Service
 CEastlee@aams.org

Dear Mr. North & Mr. Eastlee:

        This letter is the initial agency decision to your May 24, 2023, request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, submitted to the VHA Member Services FOIA Office for the following records:

*The AAMS and the AAA are requesting the following payment data:*

*1. The total volume of ambulance claims and total payments for ambulance services under the VA Beneficiary Travel Program (38 U.S.C §111) during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed below.*

*2. The total volume of ambulance claims and total payments for ambulance services under the Veterans Community Care Program (38 U.S.C §1703) during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed below.*

*3. The total volume of ambulance claims and total payments for ambulance services under the Millennium Bill (38 U.S.C §1725) during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed below.*

*Applicable HCPCS Codes:*

Appx1776

MEDSTAR_000056

1. A0425 – Ground Ambulance Mileage
2. A0426 – Advanced Life Support Level 1, Non-Emergency
3. A0427 – Advanced Life Support Level 1, Emergency
4. A0428 – Basic Life Support, Non-Emergency
5. A0429 – Basic Life Support, Emergency
6. A0430 – Air Ambulance, Fixed Wing
7. A0431 – Air Ambulance, Helicopter
8. A0433 – Advanced Life Support, Level 2
9. A0434 – Specialty Care Transport
10. A0435 – Air Ambulance Mileage, Fixed Wing
11. A0436 – Air Ambulance Mileage, Rotary Wing

As indicated in our June 12, 2023 letter acknowledging receipt, the VHA Member Services FOIA Office received your request on June 9, 2023, assigned it the FOIA tracking number 23-09227-F, placed it in the complex processing category and stated that we would search for records responsive to your FOIA request that were gathered or created by the VHA Member Services on and before the date your request is sent out for record search.

On June 9, 2023, an inquiry was sent to VHA Member Services Veteran Transportation Program (VTP), VHA Integrated Veteran Care (IVC), and VHA Office of Finance requesting they conduct a search for documents responsive to your request. The search was conducted by utilizing the search criteria of:

- Item #1 -The total volume of ambulance claims and total payments for ambulance services under the VA Beneficiary Travel Program
- Item #2 - the total volume of ambulance claims and total payments for ambulance services under the Veterans Community Care Program
- Item #3 - the total volume of ambulance claims and total payments for ambulance services under the Millennium Bill,

during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed above, the Veteran Transportation Program (VTP), VHA Office of Finance's Electronic Claims Adjudication Management System (e-CAMS) database and the VHA Integrated Veteran Care (IVC) Consolidated Data Set (CDS) claims table were searched. At the conclusion of their search, VHA Member Services Veteran Transportation Program (VTP), VHA Integrated Veteran Care (IVC), and VHA Office of Finance located (3) documents, totaling (3) pages, as responsive to your request. For reference purposes, the three (3) documents were Bates numbered.

Upon completion of my review, I have determined a total of (3) pages may be provided in their entirety. No portions of the requested records were withheld either in whole or in part.

This concludes my response to FOIA request #23-09227-F. If you disagree with my determinations set forth in this response, please be advised you may appeal to the VA Office of General Counsel. Appeals may be submitted electronically, faxed, or mailed to the following address:

MEDSTAR_000057

Office of the General Counsel (024)
Department of Veterans Affairs
810 Vermont Avenue, N.W.
Washington, DC 20420
Fax: 202-273-6388
ogcfoiaappeals@va.gov

If you should choose to file an appeal, your appeal must be postmarked or electronically transmitted no later than ninety (90) calendar days from the date of this letter. Please include a copy of this letter with your written appeal and clearly state why you disagree with the determinations set forth in this response.

You may also seek assistance and/or dispute resolution services for any other aspect of your FOIA request from VHA's FOIA Public Liaison and/or Office of Government Information Services (OGIS) as provided below:

VHA FOIA Public Liaison:
vhafoiahelp@va.gov
Phone: 833-880-8500

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001
Fax: 202-741-5769
ogis@nara.gov

If you should have any questions, please feel free to contact me at VHA MS Services FOIA (VHAMSServcesFOIA@va.gov).

Sincerely,

Shirley P. Hobson
VHA Member Services FOIA Officer

Enclosure:   3 pages

Appx1778

MEDSTAR_000058

# FOIA Request 23-09227-F   RESPONSIVE INFORMATION

**Q1:  The total number of ambulance claims and the total payments for ambulance services under the VA Beneficiary Travel Program (38 U.S.C. 1111) during the most recent VA Fiscal Year for the HCPCS codes listed at the bottom of this document.**

**Q1 Response:  Veteran Transportation Program (VTP)**

VA Veterans Transportation Program (VTP) Beneficiary Travel (BT) is unable to determine the total number of ambulance claims and the total payments for ambulance services.  VA is currently using two main systems for payment of these claims.

- Contract claims are paid through Invoice Payment Processing System (IPPS).  This system captures the most basic invoice data (total amount due, dates, etc.) and not the claim specific data.  To gather this granular data, the facility must physically open each invoice, view the image of the claim form, and manually extract the claim data.  If VA extracted funds expended against the budget operating code (BOC) associated with these payments, it would skew the data as this BOC includes ambulance, wheelchair vain, air ambulance, or other modes of transportation specially designed to transport disabled persons.

- Non-Contract Veterans Transportation Program Beneficiary Travel claims are paid through Electronic Claims Adjudication Management System (e-CAMS).  Payments based on the HCPCs noted below for FY22 include:

| HCPCS | DEFINITION | FY 22 CLAIMS | FY 22 PAYMENTS |
|---|---|---|---|
| A0425 | Ground Mileage Ambulance | | Unable to derive from data electronically captured on invoices |
| A0426 | Advanced Life Support Level 1, Non-Emergency | 19,117 | $70,279,904 |
| A0427 | Advanced Life Support Level 1, Emergency | 199,856 | $310,793,266 |
| A0428 | Basic Life Support, Non-Emergency | 64,778 | $88,091,281 |
| A0429 | Basic Life Support, Emergency | 103,365 | $129,118,688 |
| A0430 | Air Ambulance, Fixed Wing | 1,789 | $213,248,118 |
| A0431 | Air Ambulance, Rotary Wing | 7,309 | $809,228,023 |
| A0433 | Advanced Life Support, Level 2 | 5,918 | $12,283,550 |
| A0434 | Specialty Care Transport | 4,560 | $20,682,577 |
| A0435 | Air Ambulance Mileage, Fixed Wing | | Unable to derive from data electronically captured on invoices |
| A0436 | Air Ambulance Mileage, Rotary Wing | | Unable to derive from data electronically captured on invoices |

Appx1779

**Q2: The total volume of ambulance claims and total payments for ambulance services under the Veterans Community Care Program (38 U.S.C §1703) during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed at the bottom of this document.**

**Q2 Response: Integrated Veteran Care (IVC)**

FY23 Community Care Ambulance Claims Processed under 38 U.S.C. 1703 and 38 U.S.C. 1725

| Program | Claims |
|---|---|
| 38 U.S.C. 1703 | 28,848 |
| 38 U.S.C. 1725 | 5,026 |
| Total | 33,874 |

(1) : This total represents the claim amount paid where at least one of the Current Procedural Terminology (CPT) codes provided were present on the claim.  This total may include payment for ambulance related services that may not have been on the of the aforementioned CPT codes.  For example: oxygen supplies.

(2) : This total represents only the amounts paid for the CPT codes provided.

Data excludes claims processed under the Beneficiary Travel Authority - 38 U.S.C. 111
Data is for dates of service occurring on or after October 1, 2023.
Data Source(s):  IVC Consolidated Data Set (CDS) claims tables, VTP Beneficiary Travel data (used for exclusions) CPT Codes Requested:
A0425
A0426
A0427
A0428
A0429
A0430
A0431
A0433
A0434
A0435
A0436

MEDSTAR_000060

**Q3: The total volume of ambulance claims and total payments for ambulance services under the Millennium Bill (38 U.S.C §1725) during the most recent VA fiscal year for the Healthcare Common Procedure Coding System (HCPCS) Codes listed below.**

**Q3 Response: VHA Office of Finance**

During FY23 so far, we have paid 14,305 claims under 1725, totaling payments of $6,457,759.02.

Breakdown of the CPTs we paid under:

| Row Labels | Count of Proc/Svc Code |
|---|---|
| A0425 | 13597 |
| A0426 | 203 |
| A0427 | 7911 |
| A0428 | 464 |
| A0429 | 4610 |
| A0430 | 66 |
| A0431 | 567 |
| A0433 | 296 |
| A0434 | 74 |
| A0435 | 66 |
| A0436 | 563 |
| **Grand Total** | **28417** |

*As a note, A0425 being mileage, it is typically not a standalone claim but inclusive of another claim, hence the CPT count being double the volume paid.

Applicable HCPCS Codes:

1. A0425 – Ground Ambulance Mileage
2. A0426 – Advanced Life Support Level 1, Non-Emergency
3. A0427 – Advanced Life Support Level 1, Emergency
4. A0428 – Basic Life Support, Non-Emergency
5. A0429 – Basic Life Support, Emergency
6. A0430 – Air Ambulance, Fixed Wing
7. A0431 – Air Ambulance, Helicopter
8. A0433 – Advanced Life Support, Level 2
9. A0434 – Specialty Care Transport
10. A0435 – Air Ambulance Mileage, Fixed Wing
11. A0436 – Air Ambulance Mileage, Rotary Wing

MEDSTAR_000061

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

|  |  |  |
|---|---|---|
| METROPOLITAN AREA EMS AUTHORITY aka MedStar Mobile Healthcare, VALLEY AMBULANCE AUTHORITY, QUAKER VALLEY AMBULANCE AUTHORITY, ALTOONA LOGAN TOWNSHIP MOBILE MEDICAL EMERGENCY DEPARTMENT AUTHORITY dba AMED, | ) ) ) ) ) ) ) ) ) ) | 2024-1104 |
| Petitioners, | ) ) |  |
| v. | ) ) |  |
| SECRETARY OF VETERANS AFFAIRS, | ) ) ) |  |
| Respondent. | ) ) |  |

**NOTICE OF FILING OF INDEX OF RULEMAKING RECORD**

Pursuant to Federal Circuit Rule 17(b)(3), respondent, the Secretary of

Veterans Affairs, files the attached index of rulemaking record in connection with

the Department of Veterans Affairs (VA) final rule entitled *Change in Rates VA*

*Pays for Special Modes of Transportation*, 88 Fed. Reg. 10,032 (Feb. 16, 2023).

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Borislav Kushnir
BORISLAV KUSHNIR
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-5928
Facsimile: (202) 353-0461
Email: Steven.Kushnir@usdoj.gov

January 8, 2024                    Attorneys for Respondent

2

# <u>INDEX OF RULEMAKING RECORD</u>

1.    VA Notice of Proposed Rulemaking – Beneficiary Travel under 38 U.S.C. 111 Within the United States, RIN 2900-AM02, 72 Fed. Reg. 40,096 (July 23, 2007)

2.    VA Notice of Final Rulemaking – Beneficiary Travel under 38 U.S.C. 111 Within the United States, RIN 2900-AM02, 73 Fed. Reg. 36,796 (June 30, 2008)

3.    Beneficiary Travel Benefits, Fact Sheet, June 2010

4.    VHA Handbook 1601B.05, Beneficiary Travel, July 23, 2010

5.    VOW to Hire Heroes Act of 2011, Pub. L. No. 112-56, § 263, 125 Stat. 711, 732 (November 21, 2011)

6.    VA FY2012 Budget Submission, Summary, Volume 1 of 4, February 2011

7.    Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 704, 126 Stat. 1165, 1206 (August 6, 2012)

8.    U.S. Government Accountability Office, "Ambulance Providers: Costs and Medicare Margins Varied Widely; Transports of Beneficiaries Have Increased," October 1, 2012

9.    FY 2012 Funding and FY 2013 Advance Appropriations Request, Medical Programs and Information Technology Programs, Volume II

10.    Veteran Beneficiary Travel Benefits Fact Sheet, February 2013

11.    FY 2013 Funding and FY 2014 Advance Appropriations Request, Medical Programs and Information Technology Programs, Volume II

12.    VHA Procedure Guide 1601B.05, August 10, 2015

13.    Fact Sheet 20-6, Ambulance Transport at VA Expense – A Guide for Community Ambulance Providers, September 2015

14.    U.S. Department of Health and Human Services, Report to Congress, Evaluations of Hospitals' Ambulance Data on Medicare Cost Reports and Feasibility of Obtaining Cost Data from All Ambulance Providers and Suppliers, September 28, 2015

i

15.    Xcenda, LLC, et al., "Air Medical Services Cost Study Report," March 24, 2017

16.    Department of Veterans Affairs, Office of Inspector General, Veterans Health Administration, The Beneficiary Travel Program, Special Mode of Transportation, Eligibility and Payment Controls, Report No. 15-0022-139, May 7, 2018

17.    VHA Directive 1695, Veterans Transportation Services, September 18, 2019

18.    VA Unified Agenda of Federal Regulatory and Deregulatory Actions – Semiannual Regulatory Agenda, 84 Fed. Reg. 71,185 (December 26, 2019)

19.    Regulatory Impact Analysis, Change in Rates that VA Pays for Special Modes of Transportation, RIN 2900-AP89(P), October 28, 2020

20.    VA Notice of Proposed Rulemaking – Change in Rates VA Pays for Special Modes of Transportation, RIN 2900-AP89, 85 Fed. Reg. 70,551 (November 4, 2020)

21.    Congressional Response Letters regarding November 4, 2020 Proposed Rule:

    (1)    From Senators Tester, Hickenlooper, Hirono, and Schatz, September 19, 2022

    (2)    From Senators Heinrich and Boozman, October 27, 2022

    (3)    From Senator Daines, November 17, 2022

    (4)    From Senator Bennet, December 9, 2022

    (5)    From Senator Moran, December 15, 2022

22.    VA Response to Congressional Letters regarding November 4, 2020 Proposed Rule:

    (1)    To Senator Tester, January 17, 2023

    (2)    To Senator Schatz, January 17, 2023

    (3)    To Senator Hirono, January 17, 2023

    (4)    To Senator Hickenlooper, January 17, 2023

(5)     To Senator Heinrich, January 17, 2023

(6)     To Senator Boozman, January 17, 2023

(7)     To Senator Daines, January 17, 2023

(8)     To Senator Bennet, January 17, 2023

(9)     To Senator Moran, January 17, 2023

23.    Public Comments on November 4, 2020 Proposed Rule:

(1)     From Carolyn Mayle, Air Methods Corporation, Document ID: VA-2020-VHA-0022-0008

(2)     From Debbie Cavalry, PHA, Inc., Document ID: VA-2020-VHA-0022-0003

(3)     From Cameron Curtis and Deborah Boudreaux, The Association of Air Medical Services (AAMS), Document ID: VA-2020-VHA-0022-0007

(4)     From Christopher Hall, PHI Health, LLC, Document ID: VA-2020-VHA-0022-0006

(5)     From Anonymous, Document ID: VA-2020-VHA-0022-0004

(6)     From Kimberly Cox, Document ID: VA-2020-VHA-0022-0005

24.    VHA Directive 1601B.05, Beneficiary Travel, January 20, 2022

25.    David C. Chan, et al., "Mortality among US veterans after emergency visits to Veterans Affairs and other hospitals: retrospective cohort study," February 16, 2022

26.    VHA, Office of Integrated Veteran Care, Ambulance Transportation, May 2, 2022

27.    Letter from Congressmembers Kirkpatrick, Bacon, Bentz, and Gallego, August 8, 2022

28.    VA response letter to Congressmembers Kirkpatrick, Bacon, Bentz, and Gallego, October 13, 2022

iii

29.    Letter from Brad Gerfin, Deputy Chief of Medical Operations, and Robert
       Ridgeway III, Medical Control Physician, Clarendon County Fire Rescue,
       November 8, 2022

30.    Letter from Ron Sattelmaier, Fire Chief-Paramedic, Water Wheel Fire &
       Medical District, November 11, 2022

31.    VHA Directive 1695(1), Veterans Transportation Services, November 22,
       2022

32.    Letter from Thedrick Andres, Chief of Police, Henderson Police
       Department, November 28, 2022

33.    VA response to Brad Gerfin, Deputy Chief of Medical Operations, and
       Robert Ridgeway III, Medical Control Physician, Clarendon County Fire
       Rescue, November 29, 2022

34.    Letter from Carol Kolson, President/CEO, Mesquite Chamber of Commerce,
       December 1, 2022

35.    Department of Veterans Affairs, Veterans Health Administration,
       Beneficiary Travel Proposed Rule, "Changes in Rates VA Pays for Special
       Modes of Transportation," Talking Points, December 6, 2022

36.    Letter from Shawn Baird, President, American Ambulance Association,
       December 12, 2022

37.    Letter from Congressmember Allred, December 20, 2022

38.    Regulatory Impact Analysis, Change in Rates that VA Pays for Special
       Modes of Transportation, RIN 2900-AP89(P), January 5, 2023

39.    Letter from Jack Du Teil, President, The Military Coalition, January 9, 2023

40.    Department of Veterans Affairs, Veterans Health Administration, Message
       from the Assistant Under Secretary for Health for Operations, January 18,
       2023

41.    VA Response Letter to Congressmember Allred, January 19, 2023

42.    VA Response Letter to Jack Du Teil, President, The Military Coalition,
       January 19, 2023

iv

43.   VA Response Letter to American Ambulance Association, January 20, 2023

44.   VA Response Letter to Ron Sattelmeir, Fire Chief – Paramedic, Water Wheel Fire and Paramedic District, January 20, 2023

45.   VA Response Letter to Carol Kolson, President/CEO, Mesquite Chamber of Commerce, January 20, 2023

46.   Letter from Congressman Bishop, Jr., February 9, 2023

47.   Letter from Senators Tester and Moran, February 15, 2023

48.   VA Notice of Final Rulemaking – Change in Rates VA Pays for Special Modes of Transportation, RIN 2900-AP89, 88 FR 10032 (February 16, 2023)

v